# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| WESLEY IRA PURKEY, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | No. 06-8001-CV-W-FJG |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

———————————

## MOTION TO COMPEL THE BUREAU OF PRISONS
## TO PROVIDE MR. PURKEY WITH NECESSARY AND ESSENTIAL
## PSYCHIATRIC TREATMENT

———————————

Wesley Ira Purkey, an indigent death-sentenced inmate, through his undersigned counsel, requests, pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, an order compelling the Bureau of Prisons to provide Mr. Purkey with necessary and essential medical treatment. The grounds for the motion are as follows.

> Mr. Purkey is receiving inadequate attention to relevant psychiatric needs. There are no entries [in his SCU records] about his psychiatric functioning because those questions are not being asked.

*Treatment Recommendations of Dr. Peterson[1]* at 8.

———————————

[1] Stephen E. Peterson, M.D.

1

## I. <u>Background</u>

Mr. Purkey is incarcerated on federal death row – i.e., the Special Confinement Unit at United States Penitentiary – Terre Haute, Terre Haute, Indiana (hereinafter "SCU"). He suffers from "severe chronic mental disease." *Treatment Recommendations of Dr. Peterson* at 2. "[T]here remains an organic basis for his loss of emotional control, rage or rage-like anxiety responses, and self-defeating behaviors." *Id.* His Active Problem List includes depression, anxiety, bipolar/mood disorder. *Treatment Recommendations of Dr. Peterson* at 3. Mr. Purkey needs active psychiatric medication treatment for these illnesses. *Id.* at 8. Nevertheless, since at least December 18, 2006, Mr. Purkey has received no mental health treatment or medications at the SCU.[2] Mr. Purkey's "severe anxiety" and "self-defeating behaviors" – related largely to the lack of psychiatric treatment at the SCU – makes it extremely difficult at times for Mr. Purkey to work with counsel.

On February 14, 2007, Mr. Purkey filed a *pro se* "Motion to Withdraw Habeas Counsel(s) to Waive Habeas Proceedings and For Execution Date to Be Set." Mr. Purkey subsequently requested, on March 1, 2007, that that motion be withdrawn. The

---

[2] Incredibly, just a week and a half earlier, "[o]n December 7, 2006, Mr. Purkey was seen for chest pains, pounding head, dry mouth, and nausea without vomiting. This followed a verbal confrontation with the unit team member related to noise from another inmate's door-kicking. He was assessed as having altered comfort due to 'ineffective coping

2

substance of that *pro se* motion, however, remains relevant and provides substantial support for this request. Specifically, the bulk of the motion related to Mr. Purkey's request that this Court "mercifully" set an execution date for him. In essence, Mr. Purkey sought relief from the "torturous" conditions of the SCU. He specifically cited the lack of adequate mental health treatment and the constant noise within the unit as causing mental and physical anguish, such that he suffers "acute anxiety and distress" at all times.

It bears noting, here, that Mr. Purkey is not alone in his suffering; nor, is his suffering de minimus. David C. Fathi, Senior Staff Counsel for the ACLU, has investigated other complaints of noise and lack of adequate medical care in the SCU. He writes:

> Without exception, the prisoners I spoke with complained of extreme noise at all hours of the day and night. This noise, prisoners report, makes reading, writing, and indeed any other mental activity all but impossible, and sometimes interferes with sleep for days at a time. There appear to be two main sources of this noise. First, prisoners in the SHU,[3] which is located beneath the SCU, scream, bang on metal fixtures, and otherwise make noise around the clock. Second, prisoners report that the fire alarm regularly goes off (sometimes several times a week), making an extremely loud noise that lasts for hours. Apparently staff have ear protectors that they use when this occurs, but prisoners have no such protection. While individual prisoners are sometimes moved in

---

mechanisms.'" *Treatment Recommendations of Dr. Peterson* at 3.

[3] The Special Housing Unit (SHU) houses prisoners who would otherwise be in general population, but who are being disciplined or segregated for one reason or another.

3

response to their complaints about noise, this is, of course, not a solution, and only results in different prisoners being exposed to the same unacceptable conditions. . . .

I have received many complaints about the quality of medical care in the SCU. . . .

*ACLU letter to BOP* at 1-2. Mr. Fathi then listed some specific complaints for prisoners as examples of the BOP's neglect regarding medical care. *Id.*

On August 24, 2007, and on September 11, 2007, Mr. Purkey filed new *pro se* motions to relieve counsel and to let him proceed *pro se* in this § 2255 case. Subsequently, on September 18, 2007, Mr. Purkey again moved to withdraw those motions. As these latter two requests to relieve counsel reflect, it is becoming increasingly more difficult for counsel to maintain productive relations with Purkey as his anxiety level, impulsivity, hostility, and irrational demands only increase with time.

## II.     **<u>Dr. Thomas Webster</u>**

Thomas Webster, M.D. is the Clinical Director at USP – Terre Haute and oversees the psychiatric care of the men in the SCU. In reality, however, he and his staff provide no psychiatric care, only subterfuge. Dr. Webster claims that Mr. Purkey has *never* exhibited rage or rage-like anxiety; yet, in recent months, Mr. Purkey has cracked the window in his cell and broken his television.[4]  *See Treatment*

---

[4] Not unlike the level of agitation and rage that led him to slam his glasses on the defense table during trial, breaking them.

4

*Recommendations of Dr. Peterson* at 5 ("Mr. Purkey reported feeling agitated to the point he threw his TV against the wall some three months earlier.")  Of course, Dr. Webster and his staff limit their exposure to Mr. Purkey to mere "drive-bys" – they simply walk past Mr. Purkey's cell and ask him how he's doing and leave, not wanting to hear his response.  *See Treatment Recommendations of Dr. Peterson* at 5 ("Mr. Purkey did not have a reasonable therapeutic alliance with Dr. Webster who apparently just came to his door in what Mr. Purkey thought was 'for show.'").

On July 5, 2007, undersigned counsel wrote to Dr. Webster apprising him of Dr. Peterson's treatment recommendations:

> Dr. Peterson's recommendations speak for themselves, but I would like to underscore his core finding that Mr. Purkey should "restart medications to treat depression, anxiety, and mood swings.  Respectively these would be an antidepressant, an anti-anxiety, and a mood stabilizer."

*7-5-07 Letter to Dr. Webster* at 1.  A copy of this letter was forwarded to Mary Ellen Doucette-Lundstrom[5] at USP – Terre Haute.  On July 10, 2007, Ms. Doucette-Lundstrom contacted undersigned counsel to say that she had forwarded a copy of this letter to the prison's Chief Psychologist.  Nevertheless, anytime that Mr. Purkey has stopped medical staff to inquire about Dr. Peterson's recommendations he has been advised that "such report has not been received." *Purkey Medical Request.*  To be

---

[5] Ms. Doucette-Lundstrom heads the legal department at USP – Terre Haute.

5

sure, no one from the prison – aside from Ms. Doucette-Lundstrom – responded to counsel's July 5, 2007, letter or Dr. Peterson's recommendations.

Throughout September 2007, Dr. Peterson and Mr. Brotherton attempted to contact Dr. Webster to discuss Mr. Purkey's ongoing symptoms and medication needs. Neither was ever successful in having such a discussion with Dr. Webster. On September 24, 2007, Mr. Brotherton finally got to speak with Dr. Webster for roughly 30 seconds, ending with Dr. Webster promising to call back that afternoon – he didn't. Three days later, Dr. Webster left a message on Mr. Brotherton's phone saying simply that Mr. Purkey had been "evaluated" by the prison psychiatrist and psychologist and that no medication was warranted, even though he was medicated prior to and during trial by BOP medical staff and remained on medications for at least several years after his transfer to USP – Terre Haute. *Telepsychiatry Consultation Report (October 12, 2004)*. Because Mr. Purkey has not been evaluated recently, it also appears that the evaluation cited by Dr. Webster as justifying no medications now occurred three years ago. And, even that report cited Tegretol and Prozac as helpful for Mr. Purkey.

### III.  <u>History of Medication</u>

Mr. Purkey was medicated by the Kansas Department of Corrections, even before his admission to the Bureau of Prisons. He was, likewise, medicated by before and during trial – both in CCA and the Bureau of Prisons. With Dr. Peterson's

6

recommendations and this Court's intervention, Mr. Purkey "was treated at CCA with 3.0 mg Klonopin daily (1.5 mb twice per day), 100 mg Zoloft daily, and 200 mg Tegretol three times per day." *Treatment Recommendations of Dr. Peterson* at 1. When USP – Leavenworth discontinued the Klonopin, he suffered "a critical deterioration of his mental functioning, marked agitation, anxiety-induced exhaustion, diminished concentration, and angry outbursts." *Id.*

During trial, testimony was offered in sentencing concerning the importance of medications to relieve Mr. Purkey's prominent mental health symptoms – symptoms, which interfere with his ability to communicate calmly and rationally with counsel.[6] William Grant, M.D., of the federal Medical Center in Springfield, Missouri, testified at trial that he prescribed Tegretol, which stabilizes "unstable people," Zoloft, which is an anti-depressant that helps with obsessions, and Klonepin, which is an anti-anxiety medication. Transcript at 1409. These medications had also been advocated by Dr. Peterson, the psychiatrist retained by trial defense counsel, because, without the medications, Mr. Purkey was having uncontrolled rage attacks and was "close to being unable to work with [defense counsel], or anyone else," *id.* at 1780, in part because of his "severe anxiety," which makes Mr. Purkey irritable, *id.* at 1781.

---

[6] Again, severe anxiety, depression and mood swings have been major contributing factors that have thrice led Mr. Purkey to ask this Court to remove *habeas* counsel (Docs. 7,

**IV.   Dr. Peterson's Treatment Recommendations**

Dr. Peterson is very familiar with Mr. Purkey; indeed, trial counsel engaged Dr. Peterson "to provide treatment recommendations due to difficulties with his conditions of confinement at CCA and at USP Leavenworth." *Treatment Recommendations of Dr. Peterson* at 1.  Due to that familiarity, undersigned counsel turned back to Dr. Peterson for treatment recommendations when difficulties began with the SCU, and, on May 3, 2007, this Court approved Dr. Peterson's appointment.

On June 8, 2007, Dr. Peterson traveled to the SCU and conducted "4.0 hours of psychiatric assessment." *Treatment Recommendations of Dr. Peterson* at 1.  Just two hours before Dr. Peterson's arrival, Mr. Purkey "felt life was not worth living" *Id.* at 6.  This is not uncommon – "He can easily go into the deep pit of depression" and "[He] feels suicidal frequently." *Id.*  He had felt suicidal a few weeks before Dr. Peterson's assessment:  "He was exhausted by no treatment, the 'everyday' noise, and no prospect of medications." *Id.*  As the assessment began, Mr. Purkey was in a good mood, and was oriented to month and year, but not to day. *Id.*  "Mr. Purkey spoke with significant dysprosody.  He had prominent word-finding problems.  This was much different than his stuttering." *Id.* at 5.

28, 32).

8

Mr. Purkey still experiences "significant anxiety with panic, depression, and personality disorder-mediated mood swings." *Id.* at 7. Since having Tegretol discontinued – and he was only on a minimal dose as it was, Mr. Purkey "has more frequent headaches,[7] recurrent panic attacks, and greater feelings of agitation." *Id.* Dr. Peterson strongly recommends that Mr. Purkey "restart medications to treat depression, anxiety, and mood swings. Respectively these would be an antidepressant, an anti-anxiety agent, and a mood-stabilizer." *Id.* at 8. In the past, Mr. Purkey has benefited by Prozac (20 mg/day), Klonopin (3 mg/day) and Tegretol (200 mg/day). *Id.* at 8-9. Tegretol should be made the "mainstay of managing his irritability, short fuse, anger/rage outbursts, cyclical dysphoria, and mood swings." *Id.* at 9. Even if one or more of these specific medications is not on the approved USP formulary that is no excuse for offering absolutely no treatment rather than seeking a suitable alternative medicinal regimen.

## IV.   Conclusion.

Based on these reasons, Mr. Purkey requests an order compelling the Bureau of Prisons to provide Mr. Purkey with necessary and essential medical treatment so that he will remain able to rationally communicate with counsel in these 28 U.S.C. § 2255 proceedings.

---

[7] He is given ½ an aspirin a day for his excruciating headaches. *Id.* at 5.

9

In capital cases, prisoners challenging their convictions or sentences in federal court have a right to assistance of counsel. *See* 21 U.S.C. § 848(q)(4)(B). This prescription reflects Congress's belief that "federal habeas corpus has a particularly important role to play in promoting fundamental fairness in the imposition of the death penalty," *McFarland v. Scott*, 12 U.S. 849, 859, 114 S.Ct. 2568, 129 L.Ed.2d 666 (1994), and that meaningful assistance of counsel is essential to secure federal constitutional rights. Counsel's assistance, however, depends in substantial measure on the petitioner's ability to communicate with him. And if meaningful assistance of counsel is essential to the fair administration of the death penalty and capacity for rational communication is essential to meaningful assistance of counsel, it follows that Congress's mandate cannot be faithfully enforced unless courts ensure that a petitioner is competent.

*Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 813 (9th Cir. 2003).

Aside from issues of competence, which gives this Court the impetus to intervene, Mr. Purkey is entitled to adequate medical care.

"[A] prisoner is not required to show that he was literally ignored;" for example, the constitution is violated when health care staff "doggedly persis[t] in a course of treatment known to be ineffective." *Greeno v. Daley*, 414 F.3d 645, 653, 655 (7th Cir. 2005). *See also Gil v. Reed*, 381 F.3d 649, 663-664 (7th Cir. 2004) (prison doctor's disregard of outside specialist's recommendation states claim for Eighth Amendment violation).

*ACLU letter to BOP* at 3.

Therefore, Mr. Purkey requests, through the undersigned counsel, that the Bureau of Prisons be compelled to provide medical treatment, including medications, as recommended by Dr. Peterson or, alternatively, by a suitable alternative medicinal

10

regimen.

Respectfully submitted,

Teresa L. Norris, Esq.
P.O. Box 11744
Columbia, SC 29211
(803) 765-1044  (Phone)
(803) 765-1143  (Fax)
teresa@blumelaw.com
Co-counsel to Movant

Gary E. Brotherton, Esq.
2101 Chapel Plaza Court, Suite 13
Columbia, Missouri  65203
(573) 875-1571  Phone
(573) 875-1572  Fax
GEBrotherton@LegalWritesLLC.com
Co-counsel to Movant

By:    /s/  Gary E. Brotherton
       GARY E. BROTHERTON
       Co-counsel to Mr. Purkey

CERTIFICATE OF SERVICE

This will certify that, on today's date, this motion and its attachments were served upon the United States by filing via CM/ECF.

/s/ Gary E. Brotherton
Gary E. Brotherton

11

Dated:    Columbia, MO
          October 1, 2007

12

Case 4:06-cv-08001-FJG    Document 44    Filed 10/01/07    Page 12 of 12