LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



**VIA FIRST CLASS MAIL**

August 13, 2007

Director Harley G. Lappin
Federal Bureau of Prisons
320 First St. N.W.
Washington, DC 20534

Dear Director Lappin:

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

ELIZABETH ALEXANDER
DIRECTOR
ATTORNEY AT LAW

NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500

OFFICERS AND DIRECTORS
NADINE STROSSEN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

RICHARD ZACKS
TREASURER

As you may be aware, I visited USP-Terre Haute on June 4 and 5, 2007, and interviewed a number of death-sentenced prisoners housed in the Special Confinement Unit (SCU). The purpose of my visit was to investigate complaints regarding conditions of confinement in the SCU. Bureau staff were uniformly helpful and cooperative, and made sure that my visit went smoothly. Please convey my thanks to the staff at USP-Terre Haute for the courteous reception I received.

The National Prison Project was established by the American Civil Liberties Union in 1972 to protect the civil and constitutional rights of incarcerated persons. Since that time, we have represented tens of thousands of prisoners in lawsuits throughout the United States. A sampling of our current cases may be found at www.aclu.org/prison.

Based upon the interviews I conducted and documents I have reviewed, it appears that conditions in the SCU may violate federal law in several respects. I write in an attempt to learn the Bureau's position on these issues and, I hope, to resolve them without the need for litigation.

**Noise**

Without exception, the prisoners I spoke with complained of extreme noise at all hours of the day and night. This noise, prisoners report, makes reading, writing, and indeed any other mental activity all but impossible, and sometimes interferes with sleep for days at a time. There appear to be two main sources of this noise. First, prisoners in the SHU, which is located beneath the SCU, scream, bang on metal fixtures, and otherwise make noise around the clock. Second, prisoners report that the fire alarm regularly goes off (sometimes several times a week), making an extremely loud noise that sometimes lasts for hours. Apparently staff have ear protectors that they use when this occurs, but prisoners have no such protection. While individual prisoners are sometimes moved in response to their complaints about noise, this is, of course, not a solution, and only results in

different prisoners being exposed to the same unacceptable conditions.

It is well established that subjecting prisoners to excessive noise can violate the Eighth Amendment. *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996) (allegations that "at all times of the day and night inmates were 'screaming, wailing, crying, singing and yelling,' often in groups, and that there was a 'constant, loud banging,'" states Eighth Amendment claim). In addition, sleep has been recognized as a basic human need, and conditions that deprive prisoners of sleep may violate the Eighth Amendment for that reason as well. *Harper v. Showers*, 174 F.3d 716, 717, 720 (5th Cir. 1999) (sleep "undoubtedly counts as one of life's basic needs;" allegation that prisoner was housed next to mental patients who scream, beat on metal fixtures, and prevent him from sleeping states Eighth Amendment claim); *Gates v. Cook*, 376 F.3d 323, 343 (5th Cir. 2004) (similar). This is a serious problem that requires immediate and effective remedial action.

## Denial of Religious Services

It is apparently undisputed that no form of congregate religious services are permitted in the SCU. This is a serious infringement upon religious freedom that, under federal law, can be justified only if it is the least restrictive means of advancing a compelling governmental interest. 42 U.S.C. § 2000bb-1 (Religious Freedom Restoration Act).[1]

There can be no doubt that a complete ban on congregate religious activity is a substantial burden on prisoners' religious exercise. "A governmental body that imposes a 'substantial' burden on a religious practice must *demonstrate*, and not just assert, that the rule at issue is the least restrictive means of achieving a compelling governmental interest." *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003) (emphasis in original). Absent such demonstration, a ban on religious services violates RFRA. *See Murphy v. Missouri Dept. of Corrections*, 372 F.3d 979, 988-89 (8th Cir.), *cert. denied*, 543 U.S. 991 (2004) (on motion for summary judgment, prison officials failed to show that ban on congregate worship

---

[1]Although RFRA has been held unconstitutional as to the states, it continues to govern the claims of federal prisoners. *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003). Congress has since enacted the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc-1 *et seq.*, which applies RFRA's least restrictive means/compelling government interest test to the religious freedom claims of state prisoners. Because the legal standard under both statutes is identical, this letter cites cases decided under RLUIPA as well as RFRA.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

2

was the least restrictive means of advancing a compelling governmental interest); *see also Spratt v. Rhode Island Dept. of Corrections*, 482 F.3d 33, 42-43 (1st Cir. 2007) (on motion for summary judgment, prison officials failed to show that ban on prisoner's preaching to fellow prisoners was least restrictive means of advancing compelling governmental interest).

### Medical Care

I have received many complaints about the quality of medical care in the SCU. As I am sure you are aware, prison officials' deliberate indifference to prisoners' serious medical needs violates the Eighth Amendment. Prison officials do not discharge their obligation simply by employing some health care staff; rather, the number, qualifications, and treatment decisions of those staff must meet minimal standards. To prevail on an Eighth Amendment claim, "a prisoner is not required to show that he was literally ignored;" for example, the constitution is violated when health care staff "doggedly persis[t] in a course of treatment known to be ineffective." *Greeno v. Daley*, 414 F.3d 645, 653, 655 (7th Cir. 2005). *See also Gil v. Reed*, 381 F.3d 649, 663-64 (7th Cir. 2004) (prison doctor's disregard of outside specialist's recommendation states claim for Eighth Amendment violation).

Prisoner 1 was diagnosed with Hepatitis C in November 2006, but reports that he has thus far received no treatment; indeed, he has not even received a liver biopsy to determine a suitable course of treatment. Hepatitis C infection is unquestionably a serious medical need, and denial of treatment for this condition can violate the Eighth Amendment. *Johnson v. Wright*, 412 F.3d 398, 406 (2d Cir. 2005).[2]

Prisoners 2 and 3 suffer from diabetes. Although I did not review their medical records, both prisoners made allegations about their medical care which, if accurate, are extremely troubling. These allegations include unacceptable delays in checking blood pressure and blood sugar levels, as well as lengthy waits for eye examinations to check for diabetic retinopathy. In addition, both prisoners stated that USP-Terre Haute does not provide special diets for persons with diabetes. Diabetes is a serious medical need, and failure to provide necessary diets and other appropriate care can violate the Eighth Amendment. *Taylor v. Anderson*, 868 F. Supp. 1024, 1025-26 (N.D. Ill. 1994).

[2]To protect medical privacy, individual prisoners are identified by number; a key accompanies this letter.

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

Although I did not meet with him, several prisoners voiced concern about Prisoner 4, who has a serious eye condition and is losing his vision. At the time of my visit he had had surgery on one of his eyes, but was still awaiting surgery on the other.

More than one prisoner complained of delays of many months in receiving prescription eyeglasses. Eyeglasses necessary to correct vision problems are a serious medical need for which prison officials must provide. *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996).

### Dental Care

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Many prisoners complained of substantial delays in receiving care for painful dental conditions. Dental care is "a basic human need" and "one of the most important medical needs of inmates." *Board v. Farnham*, 394 F.3d 469, 484 (7th Cir. 2005). When denial of dental care results in pain or difficulty eating, the Eighth Amendment is violated. *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001). Even relatively brief delays in providing dental care can violate the Eighth Amendment if the prisoner is suffering pain in the interim. *See, e.g., Canell v. Bradshaw*, 840 F. Supp. 1382, 1387, 1393 (D. Or. 1993), *aff'd*, 97 F.3d 1458 (9th Cir. 1996) (several days); *Fields v. Gander*, 734 F.2d 1313, 1315 (8th Cir. 1984) (three weeks). Prisoner 5 reported to me that he is suffering dental pain that has gone untreated for six months; Prisoner 6 also reported current dental pain.

Prisoner 1 told me that he has been without a partial dental plate for more than three years. Such protracted delay in providing dental prostheses can violate the Eighth Amendment. *Wynn*, 251 F.3d at 593.

### Legal Telephone Calls

While SCU prisoners are allowed to make confidential legal telephone calls to attorneys, they are not permitted to make such calls to other members of the legal team, such as paralegals, investigators, and mitigation specialists. Moreover, even if the prisoner is willing to talk to these persons on a monitored line, such a call does not qualify as "legal," and therefore is deducted from his 300 minutes per month of non-legal telephone time. Accordingly, a prisoner may have to choose between speaking with his attorney's office and speaking with family members or other loved ones.

When I met with staff at USP-Terre Haute, it was explained to me that the lawyer may conference in a paralegal or mitigation specialist on a legal call. This,

4

however, is not a solution. The very reason a lawyer employs assistants is to perform tasks that do not require the lawyer's personal attention, and to be available when the lawyer herself is not. If the lawyer is required to be on the call, this purpose is entirely defeated. As for mitigation specialists, they perform a critical and very specialized function that involves establishing a rapport with the prisoner and eliciting personal and often painful information about family dynamics, early childhood abuse, and other trauma. Such information is unlikely to be disclosed on a conference call.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

"Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of [prisoners'] right of access to the courts are invalid." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974). *See also Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) (noting that "[a]ccess is essential to lawyers *and legal assistants* representing prisoner clients") (emphasis added). In *Martinez*, the Supreme Court invalidated a California regulation providing that only attorneys and licensed private investigators could interview prisoner clients. Noting that this amounted to a *de facto* ban on the use of paralegals and law students to interview prisoners, the Court held that the regulation unjustifiably restricted prisoners' right to legal representation. 416 U.S. at 419-21.

The Bureau recognizes the holding of *Martinez*, providing in 28 C.F.R. § 543.16 that "assistants" to attorneys have "the same status as attorneys with respect to visiting and correspondence." However, for reasons that to my knowledge have never been explained, assistants do *not* have the same status as attorneys with respect to telephone calls. This arbitrary distinction further undermines the ban on legal calls with non-attorney members of the prisoner's legal team. *See Martinez*, 416 U.S. at 421 (noting that while law students associated with law school programs could visit prisoners, those working for attorneys could not; "the arbitrariness of the distinction between the two categories of law students does reveal the absence of any real justification for the sweeping prohibition"). USP-Terre Haute's ban on legal calls with non-attorneys simply cannot be squared with the Supreme Court's ruling in *Martinez*.

## Visits

Prisoners in the SCU are not permitted to visit with persons whom they did not know prior to their incarceration. While I understand this to be a Bureau-wide policy, it works a particular hardship on prisoners under sentence of death. Many of these prisoners have been incarcerated for many years; many of them are estranged from their families; and all of them have increased needs for social and spiritual support as they face possible execution. In short, prisoners on Death Row

5

are in a unique situation that distinguishes them from other federal prisoners to whom this rule is applied. In many cases, the bottom-line effect of the rule is that the prisoner receives no non-legal visitors at all.

While prisoners' First Amendment rights are of course limited by the exigencies of incarceration, they are not extinguished. Moreover, restrictions on visiting burden not only the First Amendment rights of prisoners, but also those of free persons who wish to visit them. *Cf. Thornburgh*, 490 U.S. at 408 ("there is no question that publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners").

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

It is difficult to imagine any justification for this rule. If anything, persons the prisoner knew prior to incarceration are *more* likely to present a security risk than those he met later, given the control exercised by the government over prisoners' social contacts. Obviously the Bureau may bar visiting by particular persons known or believed to present a security risk, but a blanket ban on *any* visitor the prisoner did not know prior to his incarceration cannot be justified. *See Mujahid v. Sumner*, 807 F. Supp. 1505, 1510 (D. Hawaii 1992) (invalidating rule that barred prisoners from visiting or corresponding with members of the news media unless they had been acquainted prior to the prisoner's incarceration; "these regulations act to categorically prohibit a class of communications, many of which the prison has no legitimate penological interest in prohibiting").

## Food

Several prisoners stated that food is sometimes spoiled or otherwise inedible, and some provided evidence for this claim. One prisoner showed me a banana he said he had been served for breakfast that day; it was entirely black and limp. Another showed me an unopened carton of milk stamped "best if used before 4/6/07;" this occurred on June 5, 2007.

Prisons must provide "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Ramos v. Lamm*, 639 F.2d 559, 570-71 (10th Cir. 1980); *see also French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985) (affirming remedy for inadequate prison food service); *Capps v. Atiyeh*, 559 F. Supp. 894, 914 (D. Or. 1983) (serving prisoners unsafe milk violated Eighth Amendment).

6

Please let me know, at your earliest convenience, if the Bureau is willing to take corrective action on these issues. If you or other Bureau officials would find it useful to discuss these issues in person, I would be happy to attend a meeting at USP-Terre Haute or in any other location that is convenient for you.

Thank you for your kind consideration. I look forward to hearing from you.

Very truly yours,

David C. Fathi
Senior Staff Counsel[1]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Enclosure

cc:     Regional Director Michael K. Nalley
        Warden R.V. Veach
        Mary Beth Doucette-Lundstrom, Esq.

---

[1]Not admitted in DC; practice limited to the federal courts.

7