**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| WESLEY IRA PURKEY, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | No. 06-8001-CV-W-FJG |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**MOTION UNDER 28 U.S.C. § 2255, TO VACATE, SET ASIDE,**
**OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY**

Movant, Wesley Ira Purkey, by court-appointed counsel, pursuant to 28 U.S.C. § 2255, the

Fifth, Sixth and Eighth Amendments to the United States Constitution and the provisions of Rule

33 of the Federal Rules of Criminal Procedure requests this Court to grant him a new trial and to

vacate, set aside and/or correct his conviction and death sentence.[1]

### *Procedural History*

1. Purkey was indicted (01-00308) in the United States District Court, Western District of

Missouri, for kidnaping, rape, and murder, under 18 U.S.C. §§ 1201(a), (g), and 3559(d).

2. He was convicted on November 5, 2003. Following a jury trial on sentencing, which

concluded on November 19, 2003, he was formally sentenced by this Court on January 23, 2004.

3. Purkey was sentenced to death.

---

[1]In accordance with Rule 2 of the Rules Governing 2255 Proceedings, the Motion sets forth only the facts and claims entitling Purkey to relief. It does not contain legal argument or citation. Purkey simultaneously files a motion seeking permission and a schedule by which to file a Memorandum of Law in Support of the Motion.

1

4.      His convictions were based on the finding that he had kidnaped Jennifer Long, a sixteen-year-old girl, in Kansas City, Missouri, and transported her across state lines to Lansing, Kansas, where she was forcibly raped and killed.

5.      Purkey pled not guilty to the crimes.

6.      His trial and sentencing were conducted by jury trial.

7.      He testified in a pretrial hearing in support of his motion to suppress his statements and related motions.  No. 4:01-cr-00308, Doc. #140 (October 25, 2002 Hearing) at 4-90.  He also testified during his trial denying that he had kidnaped Long, but admitting that he had raped and killed her.  Trial Transcript (hereinafter "Tr.") at 907-1043.  Purkey also addressed the Court before he was formally sentenced on January 23, 2004.  Doc. #535 (January 23, 2004 Hearing).

8.      Purkey appealed his conviction and his sentence.

9.      In the appeal to the United States Court of Appeals for the Eighth Circuit, Purkey asserted the following errors:

> (a)     Failure to Suppress Statements.
> (b)     Failure to Prohibit Seeking Death Penalty as Alternative Relief to Suppression of Statements.
> (c)     Failure to Dismiss Due to Destruction of Defense Evidence.
> (d)     Indictment Clause Violation.
> (e)     Risk of Execution of the Actually Innocent.
> (f)     Exclusion of Death-Scrupled Venirepersons.
> (g)     Prohibiting First Phase Presentation of Brain Injury Evidence.
> (h)     Refusal to Permit Testimony Pertaining to Purkey's Father Introducing Purkey to Use of Prostitutes At an Early Age.
> (i)     Refusal to Permit Poisoning Evidence in First Phase of Trial.
> (j)     Improperly Limiting Cross-Examination of Witness Michael Speakman.
> (k)     Permitting Testimony Regarding Bone and Hair Fragments.
> (l)     Failure to Order Mistrial Due to Improper Prosecutorial Behavior.
> (m)     Eliciting False Testimony.
> (n)     Failure by Government to Disclose Tarpley Rough Notes.
> (o)     Erroneous Verdict Directing Instruction.
> (p)     Refusal to Permit Poisoning Evidence in Trial Penalty Phase.

(q)     Refusal to Permit Fetal Alcohol Exposure Evidence in Trial Penalty Phase.
(r)     Refusal to Permit Rebuttal Against Helen Mayberg Testimony in Penalty Phase.
(s)     Refusal to Permit Impeachment Of Park Dietz.
(t)     Permitting Aryan Brotherhood Testimony.
(u)     Permitting FBI Profiler Testimony.
(v)     Improperly Permitting Evidence Regarding Sexual Encounter With Gary Hatfield.
(w)     Refusal to Permit Testimony Regarding Accusations Against Gary Hatfield by Ronald Lones.
(x)     Improper Questioning Regarding Dr. Peterson's Opinions with Regard to the Death Penalty.
(y)     Baseless, Inflammatory Accusation of Threat Against Prosecutor.
(z)     Refusal to Grant Mr. Purkey Allocution by Refusal to Permit Purkey To Make Statement of Remorse to Jury Without Being Subject to Cross-Examination.
(aa)    Failure to Dismiss Duplicative Aggravating Factors.
(bb)    Erroneously Failing to Instruct the Jury That They Are Never Required to Return a Sentence of Death.
(cc)    Failure to Require Jury to Make Findings Regarding Mitigating Factors.

On November 7, 2005, the court affirmed the convictions and the sentence. *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005). Rehearing and rehearing *en banc* were denied on January 13, 2006.

A petition for writ of certiorari was filed in the United States Supreme Court raising the following

questions:

> Whether the Eighth Circuit erred in holding – in acknowledged conflict with the Tenth Circuit, and even the conceded position of the government – that the District Court's removal of a potential juror for viewpoints regarding the death penalty, expressed solely in answers to limited questions posed in a questionnaire, is a question reviewed for abuse of discretion rather than *de novo?*
>
> Whether the Eighth Circuit erred in holding – in acknowledged conflict with four other Courts of Appeals – that the prosecution's use of duplicative aggravating factors in the penalty phase of petitioner's trial violates the Eighth Amendment?
>
> Whether the Eighth Circuit erred in sustaining the jury instructions regarding the jury's penalty phase consideration of mitigating and aggravating factors, instructions in which the interpretation of the law is in conflict with holdings of this Court as well as instructions used in the vast majority of Federal capital cases to date?

Certiorari was denied on October 16, 2006. *Purkey v. United States*, 127 S. Ct. 433 (2006) (No. 05-11528).

10.     Other than the direct appeals listed above, Purkey has not previously filed any other motions, petitions, or applications concerning the judgment of conviction and sentence in any other court.

11.     Not applicable.

12.                                             ***Grounds for Relief***

  **I.     Purkey was denied due process of law during trial and sentencing and his sentence was based on an arbitrary factor in violation of the Eighth Amendment due to government counsel's deliberate misconduct in repeatedly referring to Purkey's desire to serve a life sentence in a United States Penitentiary as a desire to go to "Club Fed."**

  **(a)     Supporting Facts.**

          (1)     In December 1998, Purkey was confined in the Wyandotte County Detention Center in Kansas City, Kansas, pending trial for the robbery and murder of Mary Ruth Bales. He had confessed to those crimes in a sworn statement given to Detective Bill Howard of the Kansas City, Kansas, Police Department on October 30, 1998.

          (2)     On December 15, 1998, Purkey sent a note to Howard expressing his desire to talk to a Federal Bureau of Investigations (hereinafter "FBI") Agent concerning a kidnaping and murder.

          (3)     Howard went to the Detention Center that day and spoke to Purkey. According to his pretrial testimony, Howard stated that Purkey wanted to talk to an FBI Agent to confess to a federal crime because he knew he was facing a potential life sentence in the Kansas Department of Corrections and he would rather serve a life sentence in the federal prison system.

4

Howard then asked Purkey if he "wanted to go to Club Fed." Doc. #136 (October 17, 2002 Hearing) at 100.

(4)     Although it was clear that "Club Fed" was a phrase used not by Purkey but by Detective Howard, government counsel declared in opening statements during trial that Purkey confessed because he wanted to serve his sentence in a federal penitentiary, which is called "Club Fed" due to better conditions than in state prisons. Tr. 402.

(5)     During Detective Howard's testimony, government counsel continued to use the phrasing of "Club Fed" in questioning Howard concerning discussions with Purkey about the federal prison system. Tr. 424.

(6)     Even during the testimony of FBI Agent Dirk Tarpley, who was not even present during this initial discussion with Purkey, government counsel continued to assert in questioning that Purkey "wanted to go serve his time at Club Fed." Tr. 596, 601.

(7)     Finally, in closing arguments during the trial, government counsel again asserted that Purkey sought to go to "Club Fed," as if Purkey had been the one to use the language rather than it being the language used only by Detective Howard. Tr. 1102.

(8)     Government counsel deliberately presented a false impression that "Club Fed" was a term used by Purkey and that it implied better prison conditions than in state prisons. This deliberate misleading of the jury and creation of a false impression violated due process and Purkey's right to a fair and impartial trial under the Fifth and Sixth Amendments of the United States Constitution. This deliberate false impression also injected an arbitrary and capricious factor in the jury's sentencing deliberations in violation of the Eighth Amendment to the United States Constitution.

5

(b)     This ground was not asserted on direct appeal due to trial/appellate counsel's failure to object during trial and failure to assert this ground as plain error on appeal.

**II.     Purkey was denied the effective assistance of trial and appellate counsel in violation of the Fifth and Sixth Amendments due to counsel's failure to object to the government's deliberate misconduct during the trial in repeatedly referring to Purkey's desire to serve a life sentence in a United States Penitentiary as a desire to go to "Club Fed" and appellate counsel's failure to assert this ground on direct appeal.**

**(a)     Supporting Facts.**

(1)     The facts with respect to the government's misconduct are set forth in paragraphs 12(I)(a)(3)-(7) above.

(2)     Trial counsel's conduct was deficient in failing to object to the "Club Fed" references and the implication that this was Purkey's phrasing during government counsel's opening statement, examinations of Detective Howard and Agent Tarpley, and government counsel's closing argument during trial.

(3)     Counsel's conduct was not based on a reasonable strategic or tactical decision.

(4)     Purkey was prejudiced during sentencing by counsel's failures because government counsel was allowed to create an impression from the opening statements during the trial that the federal prison system had better conditions for inmates and that Purkey was relying on that "fact" when he confessed to Agent Tarpley.  Counsel's arguments to the contrary, after permitting the government to create these false impressions without objection, during trial and sentencing did not negate the reasonable probability that the jury would have reached a different conclusion in sentencing if defense counsel had properly objected during trial.

6

(5)     Alternatively, appellate counsel were ineffective in failing to assert the government's misconduct as plain error on direct appeal.  Counsel's conduct was deficient, not based on reasonable strategy, and prejudicial.

(b)     This ground has not been previously asserted.

**III.     Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's unfulfilled and prejudicial promise to the jury during opening statements in the trial that Jennifer Long's friends and family would testify that there was no kidnaping.**

**(a)     Supporting Facts.**

(1)     In his initial statements to Agent Tarpley and Detective Howard, Purkey confessed to kidnaping Jennifer Long.

(2)     Long before trial, however, Purkey recanted his statement that he had kidnaped Long.

(3)     Purkey's defense during trial was essentially based on this recantation.  In other words, while Purkey did rape and kill Long as he had confessed and testified during trial, he did not kidnap her.  He had confessed to kidnaping in his initial statements only to confer federal jurisdiction based on his understanding that he would be sentenced to life imprisonment in exchange for his cooperation.

(4)     In counsel's opening statements during trial, counsel asserted this defense theory, but then followed with the groundless assertion that Long's family and friends would even testify that there was no kidnaping.  Tr. 413.

(5)     Counsel had no indication prior to trial and no good faith basis otherwise for believing that Long's family and friends would testify that there was no kidnaping.  Exhibit 1 (Declaration of Laura O'Sullivan).  Counsel's conduct was, thus, deficient.

7

(6)     Counsel's conduct was not based on a reasonable strategic or tactical decision.

(7)     Counsel's conduct was prejudicial during trial and sentencing because counsel's promise to the jury went unfulfilled during trial and sentencing when Long's family and friends did not give this testimony and, in fact, testified that Long had never been known to get in the car with a stranger.  Tr. 892-93.  The prejudice was heightened by the government's reminder to the jury in closing arguments that counsel's promise had gone unfulfilled.  Tr. 1097.

(b)     This ground has not been previously asserted.

**IV.     Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to prepare and present evidence to rebut the uncorroborated self-serving testimony of government witness Michael Speakman.**

**(a)     Supporting Facts.**

(1)     Several months prior to trial, the government notified defense counsel that Michael Speakman, a federal inmate, would be called to testify at trial and provided copies of FBI 302s summarizing his statements.  The government also provided notice that it had filed a Rule 35 Motion for Reduction of Speakman's federal sentence in exchange for his testimony against Purkey.

(2)     The 302 transcribed on November 28, 2001, Exhibit 2, and a letter Speakman had sent to government counsel, Exhibit 3, included information that he had been Purkey's cellmate at the Correctional Corporation of America (hereinafter "CCA") facility for a while and his allegations that Purkey repeatedly boasted about "killing people" while in confinement.

(3)     Sometime prior to trial, lead defense counsel prepared a "Consolidated Witness List" designating responsibility for preparation with respect to Speakman's testimony to co-counsel, Laura O'Sullivan.  Exhibit 4.  O'Sullivan was also tasked, at least as of that time, with preparation for the testimony of Melvin Lister, Sue Purdue, and Mary Williams.

8

(4)     O'Sullivan met with Purkey and discussed these witnesses several times in the two weeks prior to trial.  Purkey informed counsel then, as he had earlier, that Speakman's allegations were false.  He provided counsel with the names of other inmates, such as Cornelius Peoples and Xavier Lightfoot, officers and other CCA staff, such as Lister, Purdue, and Williams, and CCA volunteers, such as Sam Hoffmeier, who could and would testify, contrary to Speakman, that Purkey never talked about his crimes with other inmates let alone boast about them to inmates or officers.  Exhibit 5 (O'Sullivan Notes from August 29, 2002; October 8, 14, 15, and 27, 2003).

(5)     Nonetheless counsel did not develop and present evidence from these witnesses.

(6)     During trial, Speakman testified, consistent with his pretrial allegations, that Purkey boasted that he was confined "for killing people."  Tr. 682.  Counsel presented no evidence during trial or sentencing to rebut this testimony.

(7)     Counsel's conduct was not based on a reasonable strategic or tactical decision.  Counsel could not make a reasonable decision not to present the testimony of these witnesses without ever having talked to them.

(8)     If counsel had adequately prepared and presented the evidence, both Cornelius Peoples (who had been Purkey's cellmate for a time and was otherwise housed near him when Speakman was around) and Melvin Lister (a staff member that worked in that unit while Speakman was housed there) would have rebutted Speakman's testimony.  Both would have testified that Purkey never talked about his crimes or his case and certainly never boasted or talked about "killing

9

people," especially to Speakman because he was a well-known "jailhouse snitch."[2] Sam Hoffmeier also would have testified that Purkey never talked or bragged about his crimes. Exhibit 25 (Sam Hoffmeier Declaration).

(9) Purkey was prejudiced during trial but especially during sentencing because Speakman's testimony cast doubt on Purkey's credibility and the evidence and information that Purkey was remorseful. If the available evidence rebutting Speakman's testimony had been presented there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different.

(b) This ground has not been previously asserted.

**V. Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to obtain the services of a mitigation specialist or otherwise adequately investigate, prepare, and present mitigation evidence.**

**(a) Supporting Facts.**

(1) In counsel's initial *ex parte* request for investigative services submitted on January 25, 2002, counsel sought authorization for funding for Michael Armstrong as "investigator/mitigation specialist." Counsel specifically sought the immediate services of Armstrong:

a. to ferret out information regarding mitigating circumstances which first can be presented to the Department of Justice, in an effort to try to persuade the government to not seek the death penalty, and second, if seeking the death penalty is authorized can be presented to a jury to persuade it against imposition of the death penalty, and

b. to begin proper preparation of this case for trial.

---

[2]Declarations from these witnesses will be provided in conjunction with the Memorandum of Law.

Doc. #35 (Request for Funds to Hire Investigator).

(2)     Only days later, on January 29, 2002, lead counsel submitted a proposed case budget to the court.  In the proposal, which his co-counsel never even saw, Exhibit 1, counsel estimated a total cost of $35,000 for Armstrong as investigator.  Counsel separately estimated a total cost of $45,000 for a "mitigation specialist."  In support of this request, counsel asserted:

> Use of mitigation specialists is a common practice in death penalty cases, and mitigation specialist services have been approved in all of the death penalty cases which have been tried to date in the Western District of Missouri.  Many times, the use of a mitigation specialist is a more cost-effective way of preparing the penalty phase case for the defense.

Exhibit 6 (Proposed Budget).

(3)     In the following months, with respect to possible mitigation issues, counsel and Armstrong interviewed only Purkey's wife (Jeanette Purkey), daughter (Angie Genail),[3] and ex-wife (Claire Gaida).

(4)     On April 11, 2002, counsel then filed a motion captioned as a request "for Funds To Obtain Psychiatric Expert Assistance for Development of Evidence Regarding Competence Issues."  In the opening paragraph, counsel sought funding for Stephen Peterson, M.D., "for purposes of development of evidence in support of issues of competence and mitigation."  Subsequently in the motion, counsel asserted anticipation that the government would seek to present "the non-statutory aggravating circumstance claim that Mr. Purkey would pose a future danger if he was incarcerated rather than put to death."  Counsel then asserted immediately after this:

---

[3]A declaration from Ms. Genail will also be submitted along with the Memorandum of Law. In addition to other information, Ms. Genail asserts that the first time counsel attempted to interview her, lead counsel showed up at her home unannounced on her wedding day and was attempting to interview guests.  She asked him to leave and to arrange an interview on a more appropriate occasion.

11

In order to effectively prepare and present evidence at the second or punishment phase in this case, the services of a mitigation/sentencing specialist are necessary.

Later in the motion, counsel defined a "mitigation/sentencing specialist" as follows:

A mitigation/sentencing specialist is a person who, due to training and experience, is able to explain, in detail, what means are available within the Bureau of Prisons to effect the safe and secure exaction of the punishment of life imprisonment without parole as a viable alternative to a sentence of death. Also, the mitigation/sentencing specialist is able to take the peculiar personal characteristics of the defendant, and determine whether such a defendant is likely to pose a danger while incarcerated, and what steps can be taken through the correctional systems available to address any such risk of danger. Such information is necessary for the defense to present the sentence of life imprisonment without parole as such a viable alternative to the sentence of death, and to counter the government's case regarding future dangerousness. Such information is also necessary to counter any arguments which might be made by the government that a sentence of life imprisonment without parole cannot be safely and securely carried out.

Counsel then asserted that courts have uniformly recognized the need for a "mitigation/sentencing specialist" and cited a number of cases including his own case of German Sinisterra in which he had not retained a mitigation specialist. Counsel also asserted that "mitigation specialists are maintained on staff" in a number of Missouri Public Defender Offices "and hired as a matter of course in all capital cases." Counsel concluded with a request for $25,000 for Mark Cunningham, Ph.D. as such a "mitigation/sentencing specialist." Exhibit 7 (Ex Parte Request #3 – Cunningham).

(5)     For the next six months, counsel and the investigator still interviewed no one with respect to mitigation other than the potential witnesses listed in paragraph (3) above, as well as Purkey's stepsons and other witnesses concerning Purkey's activities during the 18 months prior to his arrest including his drug usage and the potential poisoning of him.

(6)     The only other witnesses interviewed during this time period that could possibly provide evidence mitigating in its own right or as mitigating in response to potential

12

aggravation evidence by the government was one phone call from Duchardt with Purkey's brother, sister-in-law, and niece and O'Sullivan's interview of Purkey's defense counsel on a prior case the government would ultimately use as aggravation evidence.

(7)     Then, on October 15, 2002, counsel filed a "substitute" motion for the previous motion seeking funding for Dr. Cunningham.  This substitute motion changed little except to change the caption of the motion to request "Funds to Obtain Mitigation/Sentencing Expert Assistance For Development of Evidence Regarding Competence Issues" and to reflect in the first paragraph that the request was for funding for Dr. Cunningham "for purposes of development of evidence in support of issues related to penalty phase defense of this case."  Exhibit 7.

(8)     On November 11, 2002, counsel then provided records to defense experts, including Dr. Cunningham, over 3,500 pages of records.  Counsel did little to summarize these records or to make them manageable for the experts.  Instead, counsel provided them with only an 11 page index that he prepared.  Exhibit 8 (Duchardt  Summary of Records).

(9)     Around the same time period, lead counsel put together a "to do" list for the defense team.  Again, aside from records collections, the only items even listed for interviews of people who could provide social history mitigating evidence or evidence mitigating to the extent it would rebut government aggravation evidence was preparation of evidence to rebut allegations of prior misconduct in prison and a single interview of Purkey's brother Gary, who lead counsel intended to interview in late 2002.  While listing this single social history interview, counsel clearly already considered as the top two "mitigating circumstances not related to confessions": (1) "abandonment by parents in childhood"; and (2) "sexual abuse by mother."  Exhibit 9 (To Do List).

13

(10)     After Dr. Cunningham's initial review of records and evaluation of Purkey, he sent a letter to Duchardt listing "emerging mitigation themes/hypotheses and associated investigation needs." As "emerging mitigation hypotheses," the items listed included the following:

Multigenerational family distress
Genetic predisposition to substance dependence
Genetic predisposition to mental illness
Fetal alcohol exposure
Parental alcoholism
Parental neglect and abandonment
Observed family violence
Physical and emotional abuse
Inadequate structure and violence
Corruptive influence of brother
Traumatic sexual exposure

Because Purkey's parents were dead, the only other available direct witness to corroborate Purkey's statements to Dr. Cunningham and to provide additional information concerning most of these items that addressed activities in the home in which he grew up was his brother Gary. Thus, Dr. Cunningham specifically listed him as a person that needed to be interviewed concerning specific listed areas, including "observation of parental sexual activities," "observation of mother's promiscuity," possible sexual abuse by Gary's friend "Hup," and "sexual interactions" between Purkey and his mother. Dr. Cunningham also listed the need to investigate whether Purkey had told others, specifically listing his wife and ex-wife, about being sexually abused by his mother and the timing of those reports. In addition, Dr. Cunningham noted the need to interview "corrections officers and mental health providers," who had known Purkey. Exhibit 10 (Letter from Dr. Cunningham to Duchardt dated December 19, 2002).

(11)     From that time until August 2003, still the only "mitigation" or background interviews conducted were of the potential witnesses listed in paragraphs (3) and (5) above, attempts

14

to contact several previous co-defendants, and a single in-person interview of Purkey's brother Gary Hamilton.

(12)     Duchardt met with Hamilton in his home in Nebraska in March 2003. Duchardt apparently took no notes of the interview and did not prepare a file memo or otherwise document the substance of the interview for his own file or for the retained experts.  According to Hamilton, Duchardt took his teenage son to that interview.  Indeed, Duchardt's son was present during at least portions of the interview even though this was the only meeting with Hamilton. During that meeting, Duchardt apparently did not ask questions about the aberrant sexual interactions among family members, which, as stated by Dr. Cunningham, would be "a standard aspect of a comprehensive psychosocial history and are a particularly important component of interviews of family members when information has been provided by a defendant that sexual abuse had occurred."  Exhibit 11 (Mark Cunningham, Ph.D., Declaration).

(13)     Other than this one background interview, Duchardt had only brief phone calls with Hamilton's daughter, Tanya, and Purkey's cousin, Debbie Prothero.  He also had several phone call interviews with Purkey's paternal aunt, Marguerite Hotchkiss.

(14)     No other interviews of potential background witnesses who knew Purkey prior to his 1997 parole were conducted other than witnesses that related to a prior conviction and an alleged sexual assault in the Oregon Department of Corrections in 1987.

(15)     Nonetheless, Duchardt informed the court in seeking additional authorization for funding for Armstrong and for the mental health experts that "the services of a mitigation specialist" had been "dispensed with" as unnecessary.

> Counsel had originally budgeted some $45,000.00 for the hiring of a mitigation specialist, the amount based upon prior experience in dealing with the payment of

15

costs for such a mitigation specialist. Actually, Counsel later learned that, since the last time he had utilized a mitigation specialist, the costs for such a mitigation specialist had so substantially increased that the price tag for such a specialist would likely have been upwards of $80,000.00. Mitigation Specialists have classically been utilized to assist Counsel with preparing a penalty phase presentation, and undersigned Counsel has had experience using mitigation specialists in some cases. Counsel determined that the services of a mitigation specialist could be dispensed with, and budgetary savings realized, by reassigning to the investigator and to counsel the investigative work traditionally done by a mitigation specialist. This approach has allowed the same quality of work to be done more efficiently, without needless duplication of efforts, and therefore without the $80,000.00 cost for a mitigation specialist. However, this has significantly increased the workload of the investigator, and therefore the costs for the investigator, over that budgeted for initially.

Exhibit 12 (Supplemental Expert Request for Investigator). Similar statements were included in the supplemental funding motion for Dr. Peterson.

Thanks to the work that Dr. Peterson has done, and the testimony he will now be able to put forth, combined with anticipated testimony from a sentencing specialist who has also been retained, supported by done [sic] by Mr. Purkey's investigator and Counsel, Counsel for Mr. Purkey has been able to dispense with the hiring of a mitigation specialist. . . . Dispensing with the $80,000.00 cost of a mitigation specialist has resulted in a significant overall savings in the budget, but has in no way adversely impacted the defense, since the duties which would have been assumed by the mitigation specialist have merely been shifted to others, including Dr. Peterson, all to better and more efficient effect for the defense.

Exhibit 13 (Supplemental Expert Request for Psychiatrist). Virtually, the same portion quoted for Dr. Peterson was included in the supplemental funding motion for Dr. Cunningham, but crediting him also for assuming some of the duties of a mitigation specialist. Exhibit 14 (Supplemental Expert Request for Dr. Cunningham).

(16) Counsel's conduct was deficient in a number of ways. First, counsel was ineffective in failing to retain a mitigation specialist because this person is an integral part of any capital defense team. As explicitly stated in the American Bar Association, Guidelines for the

16

Appointment and Performance of Defense Counsel in Capital Cases (Feb. 2007) (hereinafter

"Guidelines"):

> The defense team should consist of no fewer than two attorneys . . . an investigator,
> and a mitigation specialist.

Guideline 4.1(A)(1). Moreover, contrary to the definition of a "mitigation/sentencing specialist"

Duchardt provided to the court in seeking funding for Dr. Cunningham:

> Mitigation specialists possess clinical and information-gathering skills and training
> that most lawyers simply do not have. They have the time and the ability to elicit
> sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse)
> that the defendant may have never disclosed. They have the clinical skills to
> recognize such things as congenital, mental or neurological conditions, to understand
> how these conditions may have affected the defendant's development and behavior,
> and to identify the most appropriate experts to examine the defendant or testify on
> his behalf. . . .
>
> The mitigation specialist compiles a comprehensive and well-documented psycho-
> social history of the client based on an exhaustive investigation; analyzes the
> significance of the information in terms of impact on development, including effect
> on personality and behavior; finds mitigating themes in the client's life history;
> identifies the need for expert assistance; assists in locating appropriate experts;
> provides social history information to experts to enable them to conduct competent
> and reliable evaluations; and works with the defense team and experts to develop a
> comprehensive and cohesive case in mitigation.

Guideline 4.1 Commentary. Mitigation specialists typically have "graduate degrees, such as a Ph.D.

or masters degree in social work." Judicial Conference of the U.S., Subcomm. On Federal Death

Penalty Cases, Comm. On Defender Services, *Federal Death Penalty Cases: Recommendations*

*Concerning the Cost and Quality of Defense Representation* at 24 (1998). Thus, including a

mitigation specialist and utilizing a team approach "combines the different skills, experience, and

perspectives of several disciplines" and allows counsel "to delegate many time-consuming tasks to

skilled assistants and focus on the legal issues in the case." Guideline 10.4 Commentary. Use of

a mitigation specialist independent of testifying experts also allows that person to serve "as part of

17

the defense team covered by the attorney-client privilege and work product doctrine." *Id.* Finally, contrary to counsel's assertions that it was cost-effective to have counsel try to perform the function of a mitigation specialist, it is more *costly* to have counsel do the work.

> Because the hourly rates approved for mitigation specialists are substantially lower than those authorized for attorneys, the appointment of a mitigation specialist or penalty phase investigator generally produces a substantial reduction in the overall costs of representation.

Judicial Conference of the U.S., Subcomm. On Federal Death Penalty Cases, Comm. On Defender Services, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* at 10 (1998).

(17)     Here, counsel did not have the services of a mitigation specialist, who had clinical and information-gathering skills and training with "the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) . . . ."  Contrary to his representations to the Court that this role was filled to some extent by Dr. Cunningham and Dr. Peterson, neither expert was qualified as a social worker or mitigation specialist or even attempted to fulfill this function.  Dr. Cunningham interviewed only a few family members previously interviewed by counsel.  Exhibit 11.  Dr. Peterson interviewed no one other than Purkey.  Exhibit 15 (Stephen Peterson, M.D., Declaration).

(18)     Duchardt was the only person in the defense team to interview Gary Hamilton, who was the only person that could corroborate much of the information Purkey provided about his background.  And, this very sensitive interview was conducted in only one meeting with counsel's teenage son coming in and out of the room while counsel purportedly attempted to learn about the pervasive incest and frequent sexual assaults of the brothers by their mother.  Counsel's actions were contrary to commonsense but also revealed a fundamental lack of understanding that

18

"[t]opics like childhood sexual abuse should . . . not be broached in an initial interview" and that "[o]btaining such information typically requires overcoming considerable barriers, such as shame, denial, and repression, as well as other mental or emotional impairments" the witness may suffer. Guideline 10.7 Commentary.

(19)     Counsel's failure to retain a mitigation specialist also meant that there was no one in the defense team to compile "a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation," which should be provided to the mental health experts in the team to assist them.  Instead, the experts were given basically only an index of thousands of pages of records in order to assist them in ferreting out relevant and significant information.  Exhibit 11; Exhibit 15.

(20)     Counsel's conduct was also deficient in the failure to investigate Purkey's social history before March 1997 and beyond his immediate family members.  The Guidelines specifically list the need to interview "virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others." *Id.  See also* Exhibit 11; Exhibit 15.

(21)     Counsel also ignored the need to develop "[a] multi-generational investigation," which frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment." *Id.*

(22)     Counsel did not have a reasonable tactical or strategic reason for the failure to retain a mitigation specialist or to otherwise adequately investigate Purkey's background.  Even co-counsel at the time of trial, Laura O'Sullivan, believed that a mitigation investigator should be

19

retained. Exhibit 1. And, while counsel should certainly be cost-conscience, it is not a reasonable strategy to ignore a vital part of a capital defendant's trial and sentencing preparation simply to be more "cost effective" overall and in the mistaken belief that counsel can adequately perform these functions on his own. Indeed, it is clear that counsel made no effort even to perform most of the functions a mitigation specialist would actually have performed for the defense team.

(23) Purkey was prejudiced due to counsel's deficient conduct in a number of ways. First, because of counsel's deficient conduct, particularly in the handling of the interview of Gary Hamilton, counsel failed to learn the excruciating details of the brutality of Purkey's father that included even slamming his wife's arm in a door repeatedly until her arm broke while his children watched. Exhibit 16 (Gary Hamilton Declaration). More importantly, counsel failed to learn that Gary had also been abused not just by his mother but also by his grandmother. Exhibit 16. As summarized by Dr. Cunningham, who obtained the details from Hamilton:

> Mr. Hamilton reported to me that he had been sexually abused in separate contexts by both his mother and his maternal grandmother over a period of many years beginning in his elementary school years. The recurrent instances with each involved displays of full body nudity, breast and mutual genital fondling, and simulated or attempted intercourse; and occurred in the respective homes of these maternal figures. Additionally, as he entered early adolescence, his mother took him to bars with her, represented him as her boyfriend, gave him alcohol, and engaged him in necking and mutual fondling. Mr. Hamilton also provided information regarding his mother's promiscuity, as well as the longstanding incestuous sexual relationship between his mother and his maternal grandmother's husband (step-grandfather to Gary and Wesley). Mr. Hamilton's descriptions represented critically important, both in providing inferential corroboration of Mr. Purkey's self-report and in providing anecdotal detail regarding the disturbed interactions that constituted the primary relationships of Mr. Purkey's childhood.

Exhibit 11.

(24) Purkey was also prejudiced by counsel's failure to interview other social history and background witnesses. For example, counsel should have easily anticipated that the

government would allege that Purkey had recently fabricated the allegation that he had been sexually abused by his mother in order to avoid the death penalty. Indeed, the government did make the allegation in cross-examining Dr. Peterson, the defense psychiatrist, that the abuse had never before been reported to anyone. Tr. 1817, 1824. Government counsel then argued that Dr. Peterson's "findings were a fairy tale" and that the evidence of Purkey's horrible childhood was simply "the old abuse excuse." Tr. 2267-68.

(25)     If counsel had adequately prepared or had the assistance of a comprehensive history prepared by a mitigation specialist, counsel could have easily countered the allegation that Purkey had never before reported being sexually abused. Indeed, this information was apparent in Purkey's Oregon Department of Corrections records. Specifically, the records reflect that on November 25, 1986, Purkey completed a life history questionnaire in applying for counseling by Rex Newton, Ph.D. On the questionnaire he reported "anxiety or guilt feelings arising out of sex or masturbation" from "years ago." In response to "[a]ny relevant details regarding your first or subsequent sexual experiences" he wrote "being abused as a child." He also listed his "most significant memories and experiences" for ages "6-10" as "being sexually abused." Thus, it was clear from just this record, which had even been specifically noted by Dr. Peterson is his own report, that Purkey had previously reported the sexual abuse. Exhibit 17 (Portion of Oregon Department of Corrections Records). And, significantly, Purkey had reported it years before trial in a correctional setting where there was no possible motivation for doing so except in attempting to get mental health counseling. In short, Purkey was prejudiced by counsel's failure to establish this on the record in response to the government's cross of Dr. Peterson and argument on this issue.

21

(26)     Purkey was also prejudiced by counsel's failure to interview Dr. Newton because he would have been a powerful mitigation witness in his own right.  Dr. Newton would have been available to testify, based on many years of experience as a prison psychologist, that Purkey very much wanted to face his demons with therapy and that he was afraid of freedom because even a decade before his parole he knew that he was institutionalized.  Dr. Newton also supported the finding that Purkey was a product of his childhood as "a throw away kid," who was abused, sexually and otherwise, by parents who never really parented him.  Dr. Newton also would have confirmed that, even more than fifteen years prior to trial, Purkey was clearly not involved in racist prison gangs and was ashamed of his tattoos.  Thus, Dr. Newton could also have helped counter the government's arguments of future dangerousness based on his alleged racial bias and involvement with prison gangs.  Exhibit 18 (Rex Newton, Ph.D., Declaration).

(27)     Purkey was also prejudiced by counsel's failure to interview Peggy Marteney Noe and her daughter, Evette Marteney Noe, who will be referred to hear by their first names for simplicity's sake.[4]  Peggy was named in some of Purkey's Wichita Police Records that were obtained by trial counsel.  Specifically, on April 4, 1974, when he had been taken into "protective custody" for public drunkenness and taken to the hospital, she was listed as his common law wife.  Purkey has remained in contact with her over the years and could easily have provided contact information for her.

(28)     Peggy has known Purkey since the second grade and went to school with him.  She knew he went to special classes everyday after school for his stuttering problem.  She also knew

---

[4]Declarations from both of these witnesses will also be provided in conjunction with the Memorandum of Law.

even at the time that he was physically abused by his parents and that they were alcoholics. When Purkey was only 16 or 17 years old, he also admitted to Peggy that his mother was sexually abusing him and had been doing so for a long time. While it was difficult for him to talk about it and stuttered badly when he did, he admitted to Peggy that his mother forced him to have sex with her and made him do other things to her sexually to stimulate her. Peggy was also aware that after Purkey's grandmother died, his mother lived with her step-father "like husband and wife" and clearly had a sexual relationship. Peggy even observed Purkey's step-grandfather threaten him with a shotgun when Purkey confronted them asserting that their actions were wrong.

(29)     In addition to this information, Peggy has many very positive things to say about Purkey and has remained in contact with him over the years. Her daughter, Evette Noe, who was born in 1973, also has very good things to say about Purkey, including that he has been like a father to her. She has known him since she was a child when he helped to raise her. After he went to prison, she started writing to him when she was nine, and she still writes to him. Purkey gave her Duchardt's phone number prior to trial, and she tried to contact him a number of times prior to Purkey's capital trial. He never returned her calls.

(30)     Purkey was also prejudiced by counsel's failure to interview other background witnesses, such as Floyd Bose and his daughter, Dion Leiker, who were made known to trial counsel well prior to trial but never even contacted despite the significant mitigation evidence they could have provided. Exhibit 19 (Purkey Letter to Duchardt dated August 7, 2003). Specifically, Bose, a law enforcement officer for 24 years and former Sheriff in Smith Center, Kansas, would have testified that he met Purkey while Purkey was in prison in the early 1980's. Bose's son had been murdered and Purkey contacted the family to provide them with information he had learned that

23

gave the family closure in helping them to understand what had happened. Bose also found Purkey to be very remorseful for his own crimes. Exhibit 20 (Floyd Bose Declaration). He remains in irregular contact with Purkey as does his daughter, Dion Leiker, who also served twelve years in law enforcement. Leiker stayed in contact with Purkey after that time and describes him as a very compassionate person, who even helped her understand her grandson's problems after her grandson was sexually molested. She also credits Purkey with saving her life in 1983 when he convinced her to escape an extremely violent marriage in which she was being abused weekly. Exhibit 21 (Dion Leiker Declaration).

(31) Prejudice is clear because Dr. Newton and Peggy Marteney not only could have provided substantial and credible mitigating information in their own right, but their testimony was also relevant corroborating information that would have supported Dr. Peterson's testimony and established that Purkey did not just "make up" the report of sexual abuse in order to escape the death penalty. He had reported it to a friend as a teenager and to a prison psychologist many years before. These witnesses also would have provided substantial support for Dr. Cunningham's testimony rebutting the government's assertion of future dangerousness. Exhibit 11.

(32) The overall prejudice is especially clear because the jury spent approximately twelve hours in deliberations before reaching a verdict of death, even though it found no mitigating circumstances at all. *See* Ground XX, *infra.* If all of the available mitigating evidence had been presented, there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different.

(b) This ground has not been previously asserted.

24

**VI.** **Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to adequately prepare and present the expert testimony of Bruce Leeson, Ph.D.**

**(a)** **Supporting Facts.**

(1) Bruce Leeson, Ph.D., testified in sentencing on the basis of neuropsychological testing of Purkey that Purkey suffers from frontal and temporal lobe dysfunction. During cross-examination, however, it became apparent that he had not been provided with sufficient information and/or had not been adequately prepared by defense counsel for the government's cross examination. Specifically, Dr. Leeson was not aware that Purkey had completed some college courses or that he was "a jailhouse lawyer." Tr. 1616. He also was not aware of neurological examinations of Purkey following head injuries in car accidents, even though Dr. Leeson had referred to these head injuries as a possible source of neurological dysfunction. He was also unaware of other prior expert reports that formed the basis for government cross-examination. Tr. 1626-1631.

(2) Counsel's conduct was deficient in failing to provide Dr. Leeson with sufficient records and/or failing to adequately prepare him for cross-examination.

(3) Counsel's conduct was not based on a reasonable tactical or strategic decision.

(4) Counsel's conduct was prejudicial because Dr. Leeson's credibility was severely challenged before the jury simply because he had not been adequately prepared to address these prior reports. If Dr. Leeson had been adequately prepared, there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different.

**(b)** This ground has not been previously asserted.

25

**VII.** **Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to adequately prepare and present the expert testimony of Stephen Peterson, M.D.**

**(a)** **Supporting Facts.**

(1)     Dr. Peterson, a forensic psychiatrist, was retained by counsel as a defense expert.  Dr. Peterson had previously been retained by Purkey's appointed counsel on the Bales murder case in Wyandotte County, Kansas.  He prepared a report in that case detailing Purkey's report to him of having been sexually abused by his mother.  Exhibit 22 (Peterson Report dated April 19, 2000).  This report specifically included information about her sexually abusing him from as early as age 9, including forcing him to have sexual intercourse with her.  She also had him to perform oral sex on her and taught him to anally and vaginally stimulate her.

(2)     Dr. Peterson examined Purkey with respect to the federal capital charge in late 2002.  Dr. Peterson's last examination of Purkey prior to his capital trial was in December 2002, approximately a year before trial.  His final report was submitted on August 13, 2003.  In that report, he clearly referenced prior records that he had reviewed, including Dr. Newton's records from the Oregon Department of Corrections reflecting Purkey's reports to him of being sexually abused between the ages of 6 and 10.  He also included a finding of longstanding sexual abuse by Purkey's mother, but did not include near as much detail on this as he had in his report in the Bales case.  Exhibit 23 (Peterson Report dated August 13, 2003).

(3)     Prior to trial, Duchardt did not ask Dr. Peterson to include additional information on this topic in his report or prepare to testify to this in sentencing.  Indeed, Duchardt did not advise him that Purkey had also provided details of the sexual abuse to Dr. Cunningham, Exhibit 11, and did not even provide Dr. Peterson with the opportunity to consult with Dr.

26

Cunningham. Thus, Dr. Peterson did not focus in detail on this as a mitigation theme or, as he explains it now, "include the raw details of what had happened to Mr. Purkey, such that the jury could really envision what had happened to Mr. Purkey as a child." Exhibit 15.

(4)     Instead, Dr. Peterson testified generally about these topics. He provided only general testimony that Mr. Purkey was "severely sexually and physically and emotionally abused in childhood" and he "developed abnormal psychosexual ideas." Tr. 1748. The only detail he included in his testimony was that Purkey had reported pervasive sexual abuse by his mother from age six to 14 and he witnessed her sexual involvement with her boyfriends after his father left. Tr. 1750. He also mentioned Purkey's father paying for prostitutes for him at a young age and how each of these things resulted in Purkey having substantial difficulties with "emotional detachment" to women. Tr. 1750. He also mentioned Purkey's prior diagnosis of "psychosexual problems of identification." Tr. 1752.

(5)     During cross-examination, Dr. Peterson "admitted" that the only prior report of sexual contact with his mother was her 1972 report that he raped her. Tr. 1817. He also testified on cross that he was the only one Purkey told about sexual abuse in detail because he was the only one to ask. Tr. 1824. At the time, he was not aware, of course, that Purkey had provided some of this information to Peggy Marteney as a teenager or that he had also provided detailed information on this topic to Dr. Cunningham.

(6)     Dr. Peterson was aware, however, but had simply forgotten that the Oregon Department of Corrections Records reflected Purkey's prior report of being sexually abused as a child. Nonetheless, counsel failed to even point out those records in redirect or to even direct him to his own report, which referenced in detail the prior Oregon reports.

27

(7)  Counsel's conduct was deficient in failing to prepare Dr. Peterson to testify concerning the details of the sexual abuse he was aware of, failing to provide him with the information concerning the details of the sexual abuse Dr. Cunningham was aware of, failing to develop the additional information that Dr. Newton and Peggy Marteney could have provided, and failing to even correct the false perception created during cross-examination.

(8)  Counsel's conduct was not based on a reasonable strategic or tactical decision. Much of this was again the product of failing to obtain a mitigation specialist, who would at least have caught the fact that the abuse was reported to Dr. Newton years before. Exhibit 15. Even without that, however, counsel needed only to have referred Dr. Peterson to his own report to establish that Purkey had not just recently fabricated information about being sexually abused as a child.

(9)  Purkey was prejudiced because the jury was deprived of substantial mitigating evidence through Dr. Peterson specifically related to the horrific details of the sexual abuse that he endured and the effect it had upon his development and still had on him at the time of trial. The jury heard only generics instead of the nightmarish realities of what happened to him when he was just a defenseless, small boy, that would impact him for the rest of his life and did at the time of this crime as well as his prior crimes. Exhibit 15.

(10)  The prejudice is especially clear because Dr. Peterson was not adequately prepared beforehand and redirected even after the very damaging cross because government counsel was free to argue without objection or contradiction by defense counsel that Dr. Peterson's "findings were a fairy tale" and that the evidence of Purkey's horrible childhood was simply "the old abuse excuse." Tr. 2267-68.

28

(11)	The overall prejudice is especially clear because the jury spent approximately twelve hours in deliberations before reaching a verdict of death.  If all of the available mitigating evidence had been presented in a credible and corroborated fashion through Dr. Peterson, there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different.

(b)	This ground has not been previously asserted.

**VIII.	Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to adequately prepare and present the expert testimony of Mark Cunningham, Ph.D.**

**(a)	Supporting Facts.**

(1)	Dr. Cunningham, a forensic psychologist, was retained by counsel as a defense expert or as a "mitigation/sentencing specialist" to rebut the government's allegations of future dangerousness and to address other matters.

(2)	In his interviews of Purkey, Dr. Cunningham was provided with details about the sexual abuse of Purkey by his mother.  Specifically, Dr. Cunningham had learned and was prepared to testify, based on information provided to him by Purkey, that Purkey had been exposed to such things as his parents having sexual intercourse with the door open, seeing his father walk around naked with a partial erection, and seeing his mother frequently in only a negligee.  After his parents separated, he had also observed his mother having sexual intercourse with another man.

(3)	Dr. Cunningham was also prepared to testify about the details of the sexual abuse by Purkey's mother because he believed it was very important in providing mitigating information to a jury to provide the actual details of events rather than simply putting a label on it such as "sexual abuse."  He could have testified that, beginning as early as age eight, Purkey's

29

mother was inappropriately touching his genitalia. After she separated from her husband, she would have him sleep with her and manually stimulate her sexually or to penetrate her with the handle of a hairbrush. She would also have him to rub lotion on her breasts and genitalia. As he grew older, she had him to perform cunnilingus on her, and she would manually stimulate him to orgasm. Ultimately, she sporadically engaged him in sexual intercourse. Exhibit 11.

(4) Dr. Cunningham had even prepared slides, which were discussed with Duchardt in preparation for his testimony, including these relevant slides. Exhibit 11. Dr. Cunningham understood, when he took the witness stand that he would be testifying about the details of "the sexual abuse of Mr. Purkey and his exposure to other sexual traumas as a child." Exhibit 11. Nonetheless, counsel did not question him about the detail, even though Dr. Cunningham believed "this was a significant omission because this was important mitigating information in its own right but was also important in understanding Mr. Purkey's mental makeup." Exhibit 11.

(5) Like Dr. Peterson, Dr. Cunningham testified only generically about Purkey's mother's promiscuous behavior. Tr. 1858. He also testified generically that she sexually abused him for years and he had also been abused by an older male several times. Tr. 1865.

(6) Counsel's conduct was deficient in failing to adequately prepare Dr. Cunningham to testify concerning the details of the sexual abuse he was aware of, failing to develop the additional information that Dr. Newton and Peggy Marteney could have provided, and failing to even ask the questions of Dr. Cunningham to elicit the information he was prepared to testify to in accordance with the slides he had prepared. Exhibit 11.

30

(7)    Counsel's conduct was not based on a reasonable strategic or tactical decision. Dr. Cunningham's intent to testify to these details is clear from his slides.  Exhibit 11.  Thus, counsel apparently just failed to ask the appropriate questions, perhaps because of his failure to prepare or refer to notes while he examines witnesses in court.  Exhibit 1.

(8)    Purkey was prejudiced because the jury was deprived of substantial mitigating evidence through Dr. Cunningham specifically related to the horrific details of the sexual abuse that he endured and the effect it had upon his development and still had on him at the time of trial.  The jury heard only generics instead of the nightmarish realities of what happened to him when he was just a defenseless, small boy, that would impact him for the rest of his life and did at the time of this crime as well as his prior crimes.

(9)    The overall prejudice is especially clear because the jury spent approximately twelve hours in deliberations before reaching a verdict of death.  If all of the available mitigating evidence had been presented in a credible and corroborated fashion through Dr. Cunningham, there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different.

(b)    This ground has not been previously asserted.

**IX.    Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to adequately prepare and present the lay testimony of Gary Hamilton and Angie Genail in mitigation.**

**(a)    Supporting Facts.**

(1)    Setting aside the witnesses that counsel failed to interview and call to testify, counsel was ineffective in failing to adequately prepare and present the testimony of Gary Hamilton and Angie Genail.

31

(2)     The details of Gary Hamilton's possible testimony are included in his declaration.  Exhibit 16.  As noted previously, the details of Genail's possible testimony will be provided in a declaration to be submitted with the Memorandum of Law.

(3)     Counsel's conduct was deficient, not explained by reasonable strategy or tactics, and prejudicial.

(b)     This ground has not been previously asserted.

**X.     Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to adequately investigate and prepare witnesses, which resulted in counsel calling alleged "mitigation" witnesses that were prejudicial.**

**(a)     Supporting Facts.**

(1)     In sentencing, the very first witness called by the defense was Dr. William Grant, a Bureau of Prisons employee.  He testified concerning the medications he had prescribed for Purkey, but also made it clear that he prescribed these medications based on the recommendation of Dr. Peterson and because Purkey was "on trial for his life" and the medications were not otherwise inappropriate.  Tr. 1410, 1415, 1417.  He then testified on cross-examination that while Dr. Peterson reported that Purkey suffered "anxiety" others, presumably himself included, would call it "attitude, belligerent, irritable."  He also testified that it "seems to be more acceptable to be anxious than to be irritable, angry and aggressive" and that Purkey has "real anger control problems."  Tr. 1416.

(2)     Counsel also called Mark Russell, a counselor at USP-Leavenworth, presumably to testify that it was no "club Fed."  On cross-examination, however, he acknowledged that Purkey was housed in a unit for inmates that had behavioral problems and were administratively segregated.  He also testified that Purkey was the only pretrial detainee there and he was sent

32

because he "was a management problem" and was "demanding." Tr. 1656. He also testified that he had heard that Purkey has a long history of assaultive behavior in prison. Tr. 1658.

(3) Counsel's conduct was deficient, not explained by reasonable strategy or tactics, and prejudicial. Clearly this testimony was more aggravating than mitigating.

(b) This ground has not been previously asserted.

**XI. Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment due to counsel's failure to advise him to testify in sentencing.**

**(a) Supporting Facts.**

(1) Purkey testified during trial but did not testify in sentencing before the jury. Instead, counsel sought to present an allocution statement from him. Doc. #475; Tr. 1838-39. This request was denied.

(2) Counsel's conduct was deficient, not explained by reasonable strategy or tactics, and prejudicial. At minimum, Purkey sought to testify to express his remorse as he did in his statement during the formal sentencing hearing before this Court. Doc. #535 at 16.

(b) This ground has not been previously asserted.

**XII. Purkey was denied due process of law and his right to fair trial in violation of the Fifth and Sixth Amendments during trial and sentencing and his sentence was based on an arbitrary factor in violation of the Eighth Amendment due to government counsel's deliberate misconduct in repeatedly telling the jury that Purkey had just walked into court and recanted the kidnaping of Ms. Long.**

**(a) Supporting Facts.**

(1) In December, 1998, Purkey told Agent Tarpley and Detective Howard that he had kidnaped Ms. Long in Missouri and forced her to accompany him to his home in Kansas, where he killed her.

33

(2)     In October, 2001, Purkey was indicted for the kidnaping, rape, and murder of Ms. Long.

(3)     On November 2, 2001, Michael Speakman spoke with the FBI, advising them that Purkey had said:

(i)      "[the] girl was with him partying"

(ii)     "[he] did not snatch [her]"

(iii)    "[it was] not forcible with girl"

Exhibit 24 (Brunell Rough Notes dated 11/02/01). "Purkey explained his case was different than the ongoing Keith Nelson and Pamela Butler incident, in that Purkey did not 'snatch' the girl from the street as Nelson did. Purkey described the initial contact with the girl as more like they were 'partying,' and that is [sic] was not forcible." Exhibit 2 (Speakman 302, Transcribed 11/28/2001).

(4)     On August 13, 2003, Stephen E. Peterson, M.D., authored a report, noting Purkey's insistence during their 2002 discussions that he had not kidnaped Ms. Long. Exhibit 15. On September 25, 2003, the government moved *in limine* to preclude Dr. Peterson from testifying about this recantation. Doc. #337. Although, its star witness – i.e., Michael Speakman – had reported this same recantation two years earlier, government counsel claimed, "the United States has learned for the first time that defendant is now claiming that the victim accompanied him voluntarily from Missouri to Kansas." Doc #337, p. 2.

(5)     In October, 2003, Purkey's confession served as the centerpiece for the government's case-in-chief. Tr. 429-35, 490-92, 534, 538, 572, 956-60. Government counsel elicited from Agent Tarpley that "[r]ight before this trial" was the first time he had ever heard that Purkey was claiming not to have kidnaped Ms. Long. Tr. 566.

34

(6)     Purkey's defense, on the other hand, centered on his testimony that Ms. Long had voluntarily entered his truck and had voluntarily accompanied him from Missouri to his home in Lansing, Kansas to "party."  Tr. 927-40, 948, 955, 962.

(7)     Government counsel then told the jury that Purkey had just "change[d] his story" in order to avoid the death penalty – "he's trying to get out of it."  Tr. 1135.  Government counsel emphasized, "All the way up, all the way through this case up until recently it's been I kidnaped her, I kidnaped her, I kidnaped her."  Tr. 1135.

(8)     Government counsel deliberately presented a false impression that Purkey had just walked into court and decided to recant the kidnaping as a means of saving his life.  Deliberately misleading the jury to create this false impression violated due process and deprived Purkey of his right to a fair and impartial trial under the Fifth and Sixth Amendments of the United States Constitution. This deliberate misconduct also injected an arbitrary and capricious factor in the jury's sentencing deliberations in violation of the Eighth Amendment to the United States Constitution.

(b)     This ground was not asserted on direct appeal due to counsel's failure to object during trial and failure to assert this ground as plain error on appeal.

### XIII.     Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel failed to impeach Agent Tarpley's testimony that he had only heard of Purkey's recantation "[r]ight before this trial."

**(a)     Supporting Facts.**

(1)     On November 2, 2001, Michael Speakman told Agent Brunell that Purkey had recanted the kidnaping to him.

(2)     On November 28, 2001, the FBI's first 302 on Speakman was transcribed. It was generated by Brunell and Tarpley and included the following:

35

Purkey explained his case was different than the ongoing Keith Nelson and Pamela Butler incident, in that Purkey did not "snatch" the girl from the street as Nelson did. Purkey described the initial contact with the girl as more like they were "partying," and that is [sic] was not forcible.

(3)     Two years later, in October, 2003, Government counsel elicited from Agent Tarpley that "[r]ight before this trial" was the first time he had ever heard that Purkey was claiming not to have kidnapped Ms. Long.  Tr. 566.

(4)     As defense counsel readily admitted, Purkey's credibility was central to the case:  "It is ironic that both we and the government are *absolutely dependent on one man's credibility* and believability in this case, and that one man is Wes Purkey."  Tr. 1104 (emphasis added).

(5)     A reasonably competent attorney would have impeached Agent Tarpley with the November 2001 302 bearing his name that clearly reports that Purkey was denying that he kidnapped Ms. Long *two years before this trial*.

(6)     Counsel's inaction was not the result of any reasonable strategic or tactical decision.

(7)     Government counsel deliberately gave the jury the false impression that Purkey had just walked into court and decided to recant the kidnapping as a means of saving his life. Trial counsel had the information to attack Tarpley's credibility, and he sat silent.  Letting the jury form a belief that Purkey was lying, when it was really Tarpley who was lying sounded the death knell for Purkey.  Had counsel impeached Tarpley, there is a reasonable probability that the jury would have decided the case differently.

(b)     This ground has not been presented previously.

36

**XIV. Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel failed to correct the government's deliberate misconduct in asserting that Purkey had just walked into court and recanted the kidnapping for the first time because counsel both knew that Purkey had disclaimed the kidnapping since their very first meetings with him two years before trial.**

**(a)      Supporting Facts.**

(1)      The facts with respect to the government's misconduct are set forth in paragraphs 12(XII)(a)(1)-(7) and 12(XIII)(a)(1)-(5) above.

(2)      In October 2001, Purkey had his first meeting with Duchardt, and Purkey insisted that he had not kidnaped Ms. Long and that she had accompanied him voluntarily.  Duchardt was a necessary witness to rebut the false impression concocted by the government.

(3)      In January 2002, Purkey had his first meeting with O'Sullivan, and Purkey again insisted that he had not kidnapped Ms. Long and that she had accompanied him voluntarily.  O'Sullivan was a necessary witness to rebut the false impression concocted by the government.

(4)      Trial counsel's conduct was deficient in failing to correct the government's implication that Purkey had not recanted the kidnapping until he came into court for his trial. Counsel had exculpatory material in the way of Purkey's immediate and persistent denial that he had kidnapped Ms. Long.  Reasonably competent attorneys would have used that information to set the record straight for the jury.

(5)      Counsel's conduct was not based on a reasonable strategic or tactical decision.

(6)      Purkey was prejudiced by counsel's failures because government counsel was allowed to create the false impression that the centerpiece of Purkey's defense was fabricated "[r]ight before this trial."  Counsel's *arguments* to the contrary did not negate the reasonable

37

probability that the jury would have reached a different decision had counsel properly corrected the government's gross misconduct.

(b) This ground has not been previously asserted.

**XV. Purkey was denied the effective assistance of trial and appellate counsel in violation of the Fifth and Sixth Amendments when counsel failed to object to the government's deliberate misconduct in asserting that Purkey had just walked into court and recanted the kidnapping for the first time and when appellate counsel failed to assert this ground on direct appeal.**

**(a) Supporting Facts**.

(1) The facts with respect to the government's misconduct are set forth in paragraphs 12(XII)(a)(1)-(7) and 12(XIII)(a)(1)-(5) above.

(2) Trial counsel's conduct was deficient in failing to object during government counsel's examination of Agent Tarpley and during his closing argument. During both, government counsel made the unfounded allegation that Purkey had just walked into court and recanted the kidnapping for the first time.

(3) Counsel knew from day-1 that Purkey was denying any kidnapping:

(i) In October 2001, Purkey had his first meeting with Duchardt, and Purkey insisted that he had not kidnaped Ms. Long and that she had accompanied him voluntarily.

(ii) In January 2002, Purkey had his first meeting with O'Sullivan, and Purkey again insisted that he had not kidnaped Ms. Long and that she had accompanied him voluntarily.

(iii) In November 2001, Speakman claimed that Purkey had similarly recanted the kidnaping to him.

38

> The government would want you to believe that the first time they ever heard anything about Mr. Purkey saying this wasn't a kidnapping was just a few weeks ago. Baloney. You know why that's baloney? Well, I can understand them wanting to forget about Michael Speakman… . But you know what, Michael Speakman told them in 2001 that Wes Purkey told him there was no kidnapping. They knew about it.

Tr. 1106.

(4)    Nevertheless, counsel sat idle when the government was painting Purkey as a convenient liar because, as counsel will undoubtedly assert, the bottom line was that Purkey was changing his story from the confession and objecting would have led to an unnecessary squabble with the government. But counsel was already engaged in a squabble over the kidnapping – he had told the jury "from day one" that the kidnapping did not happen. *See, e.g.,* Tr. 408, 1104. As counsel readily admitted at trial, Purkey's credibility was central to the case: "It is ironic that both we and the government are *absolutely dependent on one man's credibility* and believability in this case, and that one man is Wes Purkey." Tr. 1104 (emphasis added). Counsel's inaction was not the result of any reasonable strategic or tactical decision.

(5)    Purkey was prejudiced by counsel's failures in that government counsel was given unbridled latitude to create the false impression with the jurors that Purkey's recantation had been recently fabricated for trial. Counsel's argument to the contrary, after letting the government create its false impression without objection, did not negate the reasonable probability that the jury would have reached a different conclusion if counsel had properly objected and resolved the matter during trial.

(6)    Alternatively, appellate counsel were ineffective in failing to assert the government's misconduct as plain error on direct appeal because the trial court was obliged to

39

intervene *sua sponte* to correct the government's misconduct.  Counsel's conduct was deficient, not based on reasonable strategy, and prejudicial.

(b)      This ground has not been previously asserted.

**XVI.    Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel tied Purkey's hands while testifying, telling him that he could not mention having told Dr. Peterson that he did not kidnap Ms. Long and that if he did, his entire testimony would be struck by the court.**

**(a)      Supporting Facts.**

(1)      In October, 2003, Purkey's confession served as the centerpiece for the government's case-in-chief.  Tr. 429-35, 490-92, 534, 538, 572, 956-60.

(2)      Purkey's defense, on the other hand, centered on the fact that Ms. Long had voluntarily entered his truck and had voluntarily accompanied him from Missouri to his home in Lansing, Kansas to "party."  Tr. 927-40, 948, 955, 962, 1104.

(3)      In October 2001, Purkey had his first meeting with Duchardt, and Purkey insisted that he had not kidnapped Ms. Long and that she had accompanied him voluntarily.

(4)      In January 2002, Purkey had his first meeting with O'Sullivan, and Purkey again insisted that he had not kidnapped Ms. Long and that she had accompanied him voluntarily.

(5)      Two months before trial, Stephen E. Peterson, M.D., authored a report, noting Purkey's insistence that he had not kidnapped Ms. Long.

(6)      On September 25, 2003, the government moved *in limine* to preclude *Dr. Peterson* from testifying about this recantation. Doc. #337. The government argued, "[D]efendant's recent fabrication is a shallow attempt to put on his defense through his psychiatrist while at the

40

same time denying the government the opportunity to cross-examine defendant concerning his changed story." *Id.* at 3. A month later, this Court sustained the government's motion. Doc. #440.

(7)     On November 4, 2003, approximately an hour before calling him to the witness stand, trial counsel informed Purkey that he would be testifying. During this last minute conversation, counsel warned Purkey not to mention having told Dr. Peterson that he did not kidnap Ms. Long because the court would strike his entire testimony if he did.

(8)     On cross-examination, the government attacked: "here recently you have come up with this new story that you didn't kidnap her?" Tr. 1008. With his hands tied, Purkey simply replied, "That's true." Tr. 1008. Of course, it wasn't true. Two years earlier, Speakman had reported that "Purkey explained his case was different than the ongoing Keith Nelson and Pamela Butler incident, in that Purkey did not 'snatch' the girl from the street as Nelson did. Purkey described the initial contact with the girl as more like they were 'partying,' and that is [sic] was not forcible." Exhibit 2. Nevertheless, Purkey understood that his *entire* testimony would be struck if he answered any other way.

(9)     Counsel imposed a gag-order on Purkey. Counsel's inaction was not the result of any reasonable strategic or tactical decision.

(10)     Purkey was prejudiced by counsel's deficient advice. But for counsel's gag-order, Purkey would have testified that

(i)     he had denied the kidnapping from the time of the indictment;

(ii)     two years before trial, he had told both his attorneys (Duchardt and O'Sullivan) and his investigator (Michael Armstrong) that Ms. Long accompanied him to his home voluntarily;

41

(iii)    nearly a year before trial, he had told Dr. Peterson that Ms. Long accompanied him to his home voluntarily.

(b)    This ground has not been previously asserted.

**XVII.    Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel failed to call Dr. Stephen E. Peterson to testify that Purkey had denied kidnapping Ms. Long when he had interviewed Purkey in 2002.**

**(a)    Supporting Facts.**

(1)    Two months before trial, Stephen E. Peterson, M.D., authored a report, noting Purkey's insistence that he had not kidnapped Ms. Long.

(2)    On September 25, 2003, the government moved *in limine* to preclude *Dr. Peterson* from testifying about this recantation. Doc. #337. The government argued, "[D]efendant's recent fabrication is a shallow attempt to put on his defense through his psychiatrist while at the same time denying the government the opportunity to cross-examine defendant concerning his changed story." *Id.* at 3.

(3)    A month later, this Court sustained the government's motion.  Doc. #440.

(4)    Once Purkey testified, however, Dr. Peterson was ready, willing and able to testify to rebut the government's allegation that Purkey had recently fabricated his testimony that he did not kidnap Ms. Long.

(5)    Dr. Peterson would have testified that through the course of four interviews between September, 2002 and December 2002, Purkey shared with him that Purkey had not kidnapped Ms. Long that she had joined him voluntarily.

(6)    Purkey was prejudiced by counsel's deficient performance in that government counsel was given unbridled latitude to create the false impression with the jurors that Purkey's

42

recantation had been recently fabricated for trial. As counsel readily admitted, Purkey's credibility was central to the case: "It is ironic that both we and the government are *absolutely dependent on one man's credibility* and believability in this case, and that one man is Wes Purkey." Tr. 1104 (emphasis added). Had the jury heard from Dr. Peterson that Purkey had denied the kidnaping a year before trial there is a reasonable probability that the jury would have reached a different conclusion about Purkey's culpability.

    (b)    This ground has not been previously asserted.

    **XVIII Purkey was denied his right to due process of law when the court accepted the jury's verdict finding Purkey guilty of kidnapping resulting in death because no reasonable juror could have found beyond a reasonable doubt that Purkey kidnapped Ms. Long from Missouri and forced her to go to his home in Kansas.**

**(a)    Supporting Facts.**

    (1)    In December, 1998, Purkey told Agent Tarpley and Detective Howard that he had kidnapped Ms. Long in Missouri and forced her to accompany him to his home in Kansas, where he killed her. He lied. He lied so that it would be a federal crime and he could get out of the cesspool of the Kansas Department of Corrections.

    (2)    Nearly three years later, in October, 2001, Purkey was indicted for the kidnapping, rape, and murder of Ms. Long.

    (3)    The government, however, had absolutely no evidence of a kidnapping *except* Purkey's confession. Its entire case rested on that.

    (4)    In October, 2001, Purkey had his first meeting with Duchardt, and Purkey insisted that he had not kidnapped Ms. Long and that she had accompanied him voluntarily.

43

(5)     In January 2002, Purkey had his first meeting with O'Sullivan, and Purkey again insisted that he had not kidnapped Ms. Long and that she had accompanied him voluntarily.

(6)     On November 2, 2001, Michael Speakman spoke with the FBI, advising them that Purkey had said:

(i)      "[the] girl was with him partying"

(ii)     "[he] did not snatch [her]"

(iii)    "[it was] not forcible with girl"

Exhibit 24.  "Purkey explained [that] his case was different than the ongoing Keith Nelson and Pamela Butler incident, in that Purkey did not 'snatch' the girl from the street as Nelson did.  Purkey described the initial contact with the girl as more like they were 'partying,' and that is [sic] was not forcible."  Exhibit 2.

(7)     Two months before trial, Stephen E. Peterson, M.D., authored a report, noting Purkey's insistence that he had not kidnaped Ms. Long.

(8)     The "corroborating" evidence led inextricably to the inference that Ms. Long voluntarily accompanied Purkey to his Kansas home:

(i)      Purkey knew that Ms. Long drank gin and orange juice;

(ii)     Purkey knew that Ms. Long was having trouble in school;

(iii)    Ms. Long did not leave when she had the chance, e.g., when she used the rest room at the convenience store on Highway 7 and when Purkey had to stop at various stop lights along Highway 7.

44

(9) Clinging to Purkey's confession, however, the government undertook simply to convince the jury that his recantation of the kidnapping had come, not two years before trial, but "[r]ight before this trial."  Tr. 566.

(10) On October 10, 2003, Duchardt wrote to the government reminding it of Purkey's willingness to take a polygraph regarding the kidnaping.

(11) But for the government's misleading tale of deceit, no reasonable juror could have found beyond a reasonable doubt that Purkey kidnaped Ms. Long.

(b) This ground was not asserted on direct appeal due to counsel's ineffectiveness.

**XIX. Purkey was denied his right to effective assistance of counsel when appellate counsel failed to argue that no reasonable juror could have found beyond a reasonable doubt that Purkey kidnapped Ms. Long from Missouri and forced her to go to his home in Kansas.**

**(a) Supporting Facts.**

(1) The facts with respect to the insufficient evidence of kidnapping are set forth in paragraphs 12(XIX)(a)(1)-(6) above.

(2) Counsel's conduct was deficient in failing to challenge the insufficient evidence of kidnapping in Purkey's direct appeal.

(3) Counsel's conduct was not based on a reasonable strategic or tactical decision; indeed, there can be no reasonable strategy to omit a claim that would result in the discharge of one's client.

(4) There is a reasonable probability that the court of appeals would have reversed Purkey's conviction and discharged him from his sentence had counsel challenged that there was not sufficient evidence to support the verdict.

(b) This ground has not been previously asserted.

45

**XX. Purkey was denied due process in violation of the Fifth Amendment and was sentenced based on arbitrary factors in violation of the Eighth Amendment when his jury did not vote on obvious mitigating evidence.**

**(a) Supporting Facts.**

(1) The verdict form required the jury – in accord with 18 U.S.C. 3593(d) and (e) – to account that it had indeed lawfully considered the evidence in mitigation presented by Purkey. Doc. #487.

(2) The jury, however, left blank the entire section of the verdict form related to findings upon mitigation evidence. Doc. #487.

(3) The jury failed to *acknowledge,* let alone *consider* the following obvious evidence in mitigation:

\* \* \*

11. Mr. Purkey's past criminal behavior is attributable, at least in part, to his alcohol and drug dependence.

12. As a child, Mr. Purkey suffered from slow speech development, and for his entire life, Wesley Purkey has suffered from the disability of stuttering.

13. While incarcerated, Mr. Purkey was the victim of serious physical abuse, that is stabbings.

14. While incarcerated, when given the opportunity to do so, Mr. Purkey completed a significant number of hours of college coursework.

15. While incarcerated, when given the opportunity to do so, Mr. Purkey received training and became qualified as a plumber.

16. Mr. Purkey has offered to donate a portion of his liver to his sister-in-law who is dying of liver failure.

\* \* \*

46

18.     The disappearance of Jennifer Long was solved only because Mr. Purkey came forward and admitted that he had killed Jennifer Long, and directed authorities to evidence about the killing.

* * *

21.     Mr. Purkey is the father of Angie Purkey Genail, and the two have carried on a loving, father-daughter relationship, with Mr. Purkey providing Angie Purkey Genail advice, nurturance and emotional support, even while he has been incarcerated.

22.     Angie Purkey Genail loves her father Mr. Purkey very much.

* * *

24.     Mr. Purkey is the grandfather of Angie Purkey Genail's children Mikey, age 4, and Haley, age 1, and has carried on a loving, grandfatherly relationship, particularly with Mikey, speaking with Mikey on the telephone on numerous occasions.

* * *

27.     In the past three years, Mr. Purkey has volunteered to offer good advice to many young men in trouble about how to avoid a life of crime, and would continue to do so if sentenced to life imprisonment without possibility of release.

Doc. #484, pp. 33-36; Doc. #487, pp. 9-16.

(4)     The jury's failure to vote even on obvious mitigating evidence violated the Due Process Clause of the Fifth Amendment and subjected Purkey to a death sentence based upon arbitrary factors in derogation of the Eighth Amendment.

(b)     This ground was asserted on direct appeal and denied due to Circuit precedent.

47

**XXI. Purkey was denied due process of law and his right to a fair and impartial trial during trial and sentencing and his sentence was based on an arbitrary factor in violation of the Eighth Amendment due to the cumulative effect of government counsel's deliberate misconduct.**

**(a)     Supporting Facts.**

(1)     Each of the individual instances of government misconduct cited throughout this motion were material and require reversal without reference to any other claim.  In addition, however, the cumulative nature of the material prejudice requires reversal.

(2)     In considering the cumulative prejudice, this Court must also consider the prejudice due to the government's misconduct in withholding more than 80 pages of raw notes in discovery including the notes of the critical interview of Michael Speakman on November 2, 2001 addressed above.

(3)     The government also engaged in deliberate misconduct in displaying a picture of Purkey during direct examination of its very first witness during trial that called attention to Purkey's tattoos that included, among other things, a Nazi swastika and other arguably racist symbols. Tr. 419-20. While defense counsel's objection was sustained, the pictures were displayed before the jury for at least a couple of minutes. Exhibit 1. This was intentional misconduct because these pictures were not relevant to any issue in the trial. This conduct was also material during the trial because it unfairly purported to reflect on Purkey's character and, thus, his credibility.

(4)     Government counsel also engaged in prejudicial misconduct in cross-examination of Purkey in asking if Long saw the "Nazi Swastika on your arms?"  Again, trial counsel's objection was sustained, but the damage had been done, such that this misconduct was prejudicial. Tr. 1010-11.

48

(5)     Government counsel engaged in misconduct in sentencing in cross-examining Dr. Peterson about whether he was "aware [that Purkey] threatened to run my head through yesterday in court." While trial counsel objected and the court sustained the objection, the damage was again already done.

(6)     Finally, government counsel engaged in misconduct during cross-examination of Dr. Peterson in asserting that there was no "prior report" of Purkey having been the victim of sexual abuse. Tr. 1817. Government counsel was in possession of the Oregon Department of Corrections Records reflecting Purkey's prior report of being sexually abused as a child. Government counsel was also in possession of Dr. Peterson's report specifically citing these records. Thus, government counsel knew that a false perception was being created by the implication that Purkey had just "made up" this report in order to escape the death penalty.

(7)     The government's deliberate misconduct violated due process and Purkey's right to a fair and impartial trial under the Fifth and Sixth Amendments of the United States Constitution. This misconduct also injected an arbitrary and capricious factor in the jury's sentencing deliberations in violation of the Eighth Amendment to the United States Constitution.

(b)     The grounds asserted in paragraph 12(XXI)(a)(2) & (6) was not asserted on direct appeal due to trial/appellate counsel's failure to request full discovery and failure to assert this ground as plain error on appeal. The grounds asserted in paragraphs 12(XXI)(a)(3)-(5) were asserted on direct appeal but found to be harmless. The prejudicial, harmful nature of these grounds is clear, however, when considered cumulatively with the government's other misconduct.

49

**XXII. Purkey was denied the effective assistance of counsel guaranteed by the Sixth Amendment due to the cumulative effect of counsel's deficient conduct and the resulting prejudice.**

**(a)    Supporting Facts.**

(1)    Each of the individual instances of trial counsel's deficient conduct cited throughout this motion were prejudicial and require reversal without reference to any other claim. In addition, however, the cumulative nature of the prejudice requires reversal.

(2)    In considering the cumulative prejudice, this Court must also consider the prejudice due to trial counsel's failure to request in discovery the raw notes and draft 302's in discovery including the notes of the critical interview of Michael Speakman on November 2, 2001 addressed above.

(3)    With respect to prejudice in sentencing, this Court should also consider the prejudice due to this Court's error in excluding the testimony of Dr. Mark Cunningham regarding Purkey's fetal alcohol exposure and this Court's error in limiting the impeachment of Dr. Park Dietz concerning an error that the doctor made when testifying in the case of *Yates v. State,* 171 S.W.3d 215 (2005) in testifying that the facts of an episode of a television show on which he consulted, "Law & Order," were very similar to those in *Yates* when no such episode existed.

(4)    The prejudice from counsel's errors during trial require that Purkey's conviction be set aside.  Even assuming, however, that the resulting prejudice from counsel's errors during the trial does not require reversal, the prejudice from these errors and the court's errors in sentencing, requires that Purkey's death sentence be set aside.

(b)    The ground asserted in paragraph 12(XXII)(a)(2) was not asserted on direct appeal due to trial/appellate counsel's failure to request full discovery and failure to assert this ground as

plain error on appeal. The grounds asserted in paragraph 12(XXII)(a)(3) were asserted on direct appeal but found to be harmless. The prejudicial, harmful nature of these grounds is clear, however, when considered cumulatively with the errors of counsel, specifically those relating to the failure to adequately prepare and present the sentencing evidence.

### *Additional Procedural Information*

13. As addressed previously, a number of the issues relating to government misconduct and the ineffective assistance of counsel have not previously been presented in this Court or the Court of Appeals due to trial counsel's ineffectiveness and because trial counsel also represented Purkey on direct appeal.

14. Purkey does not have any other motion, petition, or appeal now pending in any court for the conviction and sentence in the Jennifer Long case.

15. During all stages of the trial and appellate proceedings, Purkey was represented by Frederick A. Duchardt, Jr., P O Box 349, Kearney, MO 64060. During all stages of the trial and the filing of Purkey's opening brief in direct appeal, Purkey was represented by Laura E. O'Sullivan, District Defender, 100 S. Central, 2nd Floor, Clayton, MO 63105. Ms. O'Sullivan was replaced as Purkey's counsel on direct appeal by William C. Odle, Spencer Fane Britt & Browne LLP, 1000 Walnut Street, Suite 1400, Kansas City, MO 64106.

16. Purkey was not sentenced on any other indictment in federal court.

17. Purkey does currently have a sentence to serve for the robbery and murder of Mary Ruth Bales in Wyandotte County, Kansas.

18. Purkey's motion is timely under the one-year statute of limitations as contained in 28 U.S.C. § 2255.

51

## *Conclusion*

Based upon all of the above allegations and the entire record of this prosecution, Movant respectfully requests that the Court provide the following relief:

1.      That Movant be permitted to file a Memorandum of Law in Support of this Petition no later than December 15, 2007;[5]

2.      Require Respondent to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States District Court, identifying all proceedings conducted in Movant's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

3.      Permit Movant to file a traverse to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

4.      Permit Movant to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his petition, and any defenses thereto raised by the Respondent's Answer;

5.      Permit Movant to Amend this Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion, and, to allow the amendment to relate back to the date of the filing of this motion;

6.      Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Petition, or by Movant's Response to any Affirmative Defenses raised by the

---

[5]A separate motion requesting this relief is also being filed simultaneously with this Motion.

52

Respondent. Because Petitioner has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges.

7. Permit oral argument as appropriate and required;

8. Vacate Movant's conviction and sentence and order that appropriate retrial and/or new sentencing hearings be conducted; and

9. Grant any other relief to which Movant may be entitled.

Respectfully submitted,

Teresa L. Norris, Esq.
P.O. Box 11744
Columbia, SC 29211
(803) 765-1044  (Phone)
(803) 765-1143  (Fax)
teresa@blumelaw.com

Gary E. Brotherton, Esq.
2101 Chapel Plaza Court, Suite 13
Columbia, Missouri  65203
(573) 875-1571  Phone
(573) 875-1572  Fax
GEBrotherton@LegalWritesLLC.com

By:   /s/ Teresa L. Norris
Court-Appointed Counsel for Purkey

Dated: Columbia, SC
October 16, 2007

53

## Verification

I, Teresa L. Norris, swear and affirm as follows:

I am an attorney admitted to practice before the courts of the State of South Carolina, the United States District Court, District of South Carolina, the United States Court of Appeals for the Fourth Circuit, and the United States Supreme Court.

Mr. Purkey is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana. Because of the distance and difficulty involved in getting this motion to him for personal verification, he has authorized me to file the foregoing Motion for a New Trial and to Vacate, Set Aside and Correct Conviction and Death Sentence Made Pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure on his behalf.

I declare that the contents of the foregoing Motion for a New Trial and to Vacate, Set Aside and Correct Conviction and Death Sentence Made Pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure are true and correct to the best of my information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

 /s/ Teresa L. Norris
Teresa L. Norris, Esq.
P.O. Box 11744
Columbia, SC 29211
(803) 765-1044  (Phone)
(803) 765-1143  (Fax)
teresa@blumelaw.com

October 16, 2007.

54

**Certificate of Service**

This will certify that, on today's date, this motion was served upon the United States by filing via CM/ECF.

/s/ Teresa L. Norris
Teresa L. Norris

Dated: Columbia, SC
October 16, 2007

55

Case 4:06-cv-08001-FJG    Document 47    Filed 10/16/07    Page 55 of 56

**Attached Exhibits**

1) Laura O'Sullivan Declaration
2) Michael Speakman 302 (Nov. 28, 2001)
3) Michael Speakman Letter to USA (Nov. 25, 2002)
4) Consolidated Witness List
5) O'Sullivan Notes from August 29, 2002; October 8, 14, 15, and 27, 2003
6) Proposed Budget
7) Ex Parte Request #3 – Cunningham
8) Duchardt Summary of Records
9) Duchardt To Do List
10) Letter from Dr. Cunningham to Duchardt dated December 19, 2002
11) Mark Cunningham, Ph.D., Declaration
12) Supplemental Expert Request for Investigator
13) Supplemental Expert Request for Psychiatrist
14) Supplemental Expert Request for Dr. Cunningham
15) Stephen Peterson, M.D., Declaration
16) Gary Hamilton Declaration
17) Portion of Oregon Department of Corrections Records
18) Rex Newton, M.D. Declaration
19) Purkey Letter to Duchardt dated August 7, 2003
20) Floyd Bose Declaration
21) Dion Leiker Declaration
22) Peterson Report dated April 19, 2000
23) Peterson Report dated August 13, 2003
24) Brunell Rough Notes dated 11/02/01
25) Sam Hoffmeier Declaration