# DECLARATION OF LAURA O'SULLIVAN

I, Laura O'Sullivan, being duly sworn and of lawful age, state as follows:

1. I am a licensed attorney in the State of Missouri since 1991. Since January, 1994, with the exception of a three and a half year period, I have been employed with the Missouri State Public Defender (MSPD) system in various offices. I am currently the District Defender in the St. Louis County trial office.

2. I left the MSPD in October 2001 and went into private practice. I was appointed to represent Wesley Ira Purkey shortly after that time. I was not on the federal court appointments list, but Fred Duchardt, Purkey's lead counsel, asked that I be appointed. I met Mr. Duchardt years earlier in the MSPD system. An attorney at the Federal Public Defender Office suggested that he contact me to work with him in this case. I agreed to the appointment and completed the paperwork then to be placed on the federal appointments list.

3. Mr. Duchardt was the lead counsel on the case. From the beginning, I was not given any clear area of the case designated to me, except that I had an understanding that Mr. Duchardt expected me to gather a lot of Mr. Purkey's background records. Other than that, I was given specific tasks to do as they arose and would complete them.

4. We did not meet in person on a weekly or monthly basis throughout the case; most of our discussions were by phone. I had no involvement in many of the issues and decisions made in the case. While Mr. Duchardt discussed some issues with me, there were other issues that we did not discuss. For example, I was not consulted or involved in the preparation and submission of the Proposed Budget to the Court. I did not even see the Proposed Budget before it was submitted. I do not recall seeing this Proposed Budget until just recently when 2255 counsel provided it to me. I

1

also had virtually no involvement with the mental health experts retained, except that I did discuss at least general issues with Dr. Peterson when we were having difficulties communicating with Mr. Purkey.

5.      There were several times in the case that I discussed with Mr. Duchardt the possibility of me moving to withdraw from the case. The first time, I believe, was around August 2002 when Mr. Purkey had filed a pro se motion to relieve me. The second time was around May 2003. Both times, I considered the possibility of withdrawing because I was concerned with the lack of communication from Mr. Duchardt. There were things he was doing in the case that I was not aware of, records that he had received that I did not have copies of, and things of that nature. I was also concerned in my discussions with Mr. Purkey that Mr. Duchardt was making statements to him that had the effect of undermining my abilities to effectively communicate with Mr. Purkey and provide effective assistance to him.

6.      With respect to the May 2003 discussions, I was also concerned because we were fast-approaching the trial date and there were no clearly defined expectations of what Mr. Duchardt expected me to do. Up until that time, it would often happen that he would ask me to do something and expect it to be done in a matter of days. I believed that in order for me to be effective my role should be more clearly defined. After that, Mr. Duchardt did at least designate specific witnesses and areas for me to address during trial and sentencing, such as the allegation that Mr. Purkey had sexually assaulted another inmate while in the Oregon Department of Corrections.

7.      With respect to specific areas of concern in the 2255 proceedings, my recollections are as follows.

2

### Mitigation Specialist and Investigation

8. At no time prior to or during the trial did we employ a mitigation specialist to work on Mr. Purkey's behalf. I recall discussing the possibility of retaining a mitigation specialist with Mr. Duchardt early in the case. I had not previously worked on a capital case, but I was aware from my years of work in the MSPD that it was routine in capital cases to hire a mitigation specialist as part of the capital defense team.

9. It was my understanding then and now that the mitigation specialist's role is to investigate the client's entire background gathering records and interviewing people that have known the client from birth. I was also aware that sometimes a mitigation specialist will also focus on records and information prior to the client's birth since there may be genetic, hereditary issues or, as in Mr. Purkey's case, allegations of fetal alcohol exposure due to his mother's drinking while pregnant with him.

10. I was concerned about our ability to adequately do this work without the assistance of a mitigation specialist because I certainly have no training in social work or this type of investigation. As far as I know, neither did Mr. Duchardt or Michael Armstrong, the investigator we retained. Nonetheless, it was clear from the beginning that Mr. Duchardt did not intend to retain a mitigation specialist.

11. I again expressed my opinion that a mitigation specialist should be hired after a United States Supreme Court decision on the topic was decided. I believe the case that prompted me to raise the issue again was *Wiggins v. Smith*, 539 U.S. 510 (2003), which was decided in June 2003 while Mr. Purkey's case was still pretrial.

12. With respect to the actual investigation we conducted, I collected many of the records related

3

to Mr. Purkey. I do not recall collecting records on anyone else, except that we did obtain some medical records related to his parents.

13. Specifically, as it relates to other family members or background witnesses, I was present for interviews of Jeanette Purkey, Claire Gaida, Angie Genail, and other witnesses in the Wichita area who could address Mr. Purkey's behavior during the eighteen months or so when he was out of confinement. I was not involved in interviewing Mr. Purkey's brother Gary or any other family member. I also do not recall discussing with Mr. Duchardt whether these types of background people should be interviewed or records obtained for them as well as Mr. Purkey.

14. On the few occasions when Mr. Duchardt and I were both present for interviews, I do not recall Mr. Duchardt taking any notes. When we had meetings together or during trial, he would always use his computer. I do not recall him having any written notes or printed outlines before him when he examined witnesses during trial.

15. The only background witnesses that I recall discussing with Mr. Duchardt or interviewing myself that were from the time period prior to March 1997 when Mr. Purkey had been paroled were witnesses related to allegations of misconduct in confinement that we knew the government would offer in aggravation. I also recall some investigations relating to Mr. Purkey's prior conviction that involved a shooting and at least attempting to get information concerning Mr. Purkey's prior treatment for his stuttering problem as a child and an adult.

16. With respect to the mitigation, we were looking to present everything we could for Mr. Purkey and there was no decision, at least on my part, to avoid good character evidence if it was available from credible witnesses. I do not recall being aware of possible witnesses here, other than I do recall Betty Morago generally as a "pen pal" type person that wrote to Mr. Purkey while he was in

4

confinement. I recall speaking to her on several occasions and recall her being at some of the court proceedings.

17.     I do not recall ever hearing the names of Dion Bose, Floyd Bose, or Dr. Rex Newton as possible mitigation witnesses or in any other aspect of Mr. Purkey's trial proceedings.

**Other Issues.**

18.     **"Club Fed"** - I recall the phrase "club fed" being used during Mr. Purkey's trial but it was never my impression that it was being used in a way that implied that was a phrase Mr. Purkey had used. In addition, Mr. Duchardt was the attorney examining the agents that had taken Mr. Purkey's statements so if this issue needed to be addressed it would have been done by him.

19.     **Jennifer Long's Friends and Family** - Prior to trial, I recall that Mr. Duchardt and I had interviewed Jennifer Long's mother and I believe Mic Armstrong had interviewed some of her friends. We knew that they would testify about Ms. Long drinking alcohol and skipping school and those types of things, but had no indication that they would say anything else favorable to the defense.

20.     **Michael Speakman Rebuttal** - I recall Michael Speakman's testimony. I do not recall hearing about possible inmate or officer rebuttal witnesses on this issue and do not believe I was involved in interviewing these folks or making any determination of whether rebuttal evidence would be offered to Mr. Speakman's allegations that Mr. Purkey boasted of "killing people" while in confinement at CCA.

21.     **Mr. Purkey Testimony in Sentencing** - I recall discussing with Mr. Purkey the possibility of him testifying during sentencing. He had testified during trial and we felt it would be better for him to make an allocution statement rather than be subject to cross-examination because we believed

5

cross would go badly since he had denied the kidnapping in his earlier testimony and the jury had clearly rejected that testimony in convicting him. Mr. Purkey also liked the idea of preserving the allocution issue for appeal so he chose not to testify.

22. **Sexual Abuse** - I do not recall specifics but recall that Mr. Purkey had, prior to being charged in this case, reported to someone that he had been sexually abused. I do not recall the name of Dr. Rex Newton from the Oregon Department of Corrections. I can state only that I went to Oregon with Mic Armstrong shortly before trial to interview witnesses and gather records concerning the prior alleged sexual assault of Gary Hatfield. We did not interview or attempt to interview any prison mental health people during the trip and were focused only on rebutting the alleged sexual assault evidence.

23. I knew at the time of Dr. Peterson's testimony that there were prior records reflecting that Mr. Purkey had reported being sexually abused as a child long before the charges in this case arose. I do not recall whether I told Mr. Duchardt this during Dr. Peterson's testimony. I also do not recall whether Mr. Duchardt asked me if I had any input in possible direct or redirect examination questions for Dr. Peterson while he was on the witness stand. Mr. Duchardt would sometimes ask me, or in more cases, ask Mr. Purkey for follow-up but this was more often during the testimony of lay witnesses. With respect to the mental health experts, I had very little involvement with them or that aspect of the case other than I recall generally discussing with Mr. Duchardt whether Dr. Peterson would be called to testify during the trial phase.

24. **Preparation of Sentencing Witnesses** - I was not involved in the interviewing or preparation of any of the witnesses presented during sentencing other than those that I examined. I do recall some discussions with Mr. Purkey's daughter, but I do not believe that was in preparation for her

6

Case 4:06-cv-08001-FJG    Document 47-1    Filed 10/16/07    Page 6 of 8

testimony.

25. **Kidnapping/Recantation Issue** - I recall that Mr. Purkey had confessed to kidnapping in his original statements to the FBI. Mr. Duchardt was responsible for examination of the government witnesses on this point and for any necessary objections during their testimony.

26. I recall preparing Mr. Purkey to testify during trial but I do not recall specifics of that. I generally would not tell a defendant that they could not mention in their testimony the fact that they had told another person the same information before. I may have discussed with him not mentioning statements that he made to Dr. Peterson during his direct testimony where the court had granted the government's motion in limine to exclude Dr. Peterson's testimony that Mr. Purkey had recanted the kidnapping during his evaluations. I do not recall any discussions following Mr. Purkey's testimony about whether this issue should be readdressed with the court or whether Dr. Peterson should be called to testify that Mr. Purkey had recanted the kidnapping to him.

27. **Tattoo Issue** - I recall the government putting up a picture showing Mr. Purkey's tattoos during direct examination of the first witness during the trial. We had seen this picture, but it was our understanding that no attempt would be made to present these pictures to the jury until sentencing when the court had already ruled, over our objection, that this evidence would be relevant. When the picture was displayed, Mr. Duchardt was not initially paying attention until Mr. Purkey and I were both telling him that an objection should be made. We then went to the bench and the court sustained the objection, but, as I recall, the picture continued to be displayed for at least a couple of minutes before it was brought down. There was a large screen in the courtroom but there were also smaller screens in the jury box where the picture was displayed.

28. **Jury Vote on Mitigating Factors** - I recall that the jury did not mark anything on the verdict

7

form with respect to mitigating factors. I also recall that an objection was made and that this issue was raised on direct appeal, but I do not recall on what specific bases this was asserted as an issue.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Laura O'Sullivan

8