**Declaration of Mark D. Cunningham, Ph.D., ABPP**

I am a clinical and forensic psychologist, licensed as a psychologist in the States of Arizona, Arkansas, Colorado, Connecticut, Idaho, Illinois, Indiana, Louisiana, New Mexico, New York, Oklahoma, Oregon, South Carolina, Tennessee, and Texas. I am over age 21. I have personal knowledge of the facts contained in this affidavit and am competent to testify about them.

I was retained by Fred Duchardt, Esq. to evaluate Wesley Purkey regarding capital sentencing determinations and subsequently to testify in Mr. Purkey's capital sentencing.

While I am an expert in psychology and capital sentencing determinations including mitigation and "future dangerousness" (i.e., violence risk assessment at capital sentencing), I am not a "mitigation specialist" as that label is generally understood by experts in capital cases.

"Mitigation specialists" are typically social workers who are trained in interviewing people to obtain sensitive information and trained in gathering records and other information concerning a defendant's entire life history and background. Mitigation specialists identify family members and other third parties having knowledge of a capital defendant's background, obtain the contact information for these individuals, conduct interviews of these persons, obtain comprehensive records created in the defendant's life, and review all of the records obtained. The mitigation specialist organizes and provides these records to other mental health experts such as myself. The mitigation specialist also prepare a comprehensive and well-documented psycho-social history based on these records and interviews that is provided to other mental health experts, such as myself, in order to assist us in conducting competent and reliable evaluations. In essence, all of this information is gathered because it can be mitigating in its own right, but it is also necessary for mental health experts to have an extensive fund of information in order to ensure reliable evaluations and findings.

I did not perform the work of a mitigation specialist in Mr. Purkey's case. Regarding some capabilities of a competent mitigation specialist, such as locating persons or tracking down records, I lack the requisite knowledge or experience. I did not gather any records on my own. All of the records that I reviewed were provided to me by Mr. Duchardt. I evaluated Mr. Purkey and as part of that evaluation and to further inform his social history also interviewed his wife, his stepsons, his daughter, his cousin (Debbie Prothero), and his paternal aunt (Marguerite Hotchkiss). I did not, however, undertake a comprehensive investigation to identify, locate, and interview persons having knowledge of Mr. Purkey's background. I did not have contact information for and did not interview Gary Hamilton or any other potential mitigation witnesses having knowledge of Mr. Purkey's background.

After my initial evaluations of Mr. Purkey on December 18 and 19, 2002, I wrote to Mr. Duchardt listing "emerging mitigation themes/hypotheses and associated investigation needs." I was concerned with a number of issues, but several of those related to Mr. Purkey's self-reported traumatic sexual exposure and sexual abuse. Because Mr. Purkey's parents and other close relatives who were around during his childhood were dead, the only available witness to corroborate Mr.

1

Case 4:06-cv-08001-FJG   Document 47-11   Filed 10/16/07   Page 1 of 11

Purkey's statements to me on these topics was his brother Gary. Thus, I also listed him as a person to be interviewed. I also suggested the need to interview others that Mr. Purkey had confided in concerning the sexual abuse by his mother and other perverse family interactions. I was concerned not only with the details provided, but also believed that it was important to establish that Mr. Purkey had reported the abuse previously and was not just fabricating a "new" allegation in order to try to avoid the death penalty.

Because information from Mr. Purkey's older brother, Gary, continued to be important in providing corroboration of Mr. Purkey's self-report of being sexually abused by his mother, as well as to inform other perverse family interactions, I requested the telephone number of Gary Hamilton from federal habeas counsel, and subsequently conducted a telephone interview of Gary Hamilton on this date. Mr. Hamilton reported to me that he had been sexually abused in separate contexts by both his mother and his maternal grandmother over a period of many years beginning in his elementary school years. The recurrent instances with each involved displays of full body nudity, breast and mutual genital fondling, and simulated or attempted intercourse; and occurred in the respective homes of these maternal figures. Additionally, as he entered early adolescence, his mother took him to bars with her, represented him as her boyfriend, gave him alcohol, and engaged him in necking and mutual fondling. Mr. Hamilton also provided information regarding his mother's promiscuity, as well as the longstanding incestuous sexual relationship between his mother and his maternal grandmother's husband (step-grandfather to Gary and Wesley). Mr. Hamilton's descriptions represented critically important information, both in providing inferential corroboration of Mr. Purkey's self-report and in providing anecdotal detail regarding the disturbed interactions that constituted the primary relationships of Mr. Purkey's childhood.

Mr. Hamilton reported that he was interviewed by Mr. Duchardt, but was not queried regarding aberrant sexual interactions among family members. Such inquiries are a standard aspect of a comprehensive psychosocial history and are a particularly important component of interviews of family members when information has been provided by a defendant that sexual abuse had occurred.

I had also been provided with numerous records, including Mr. Purkey's Oregon Department of Correction Records, but I had not been provided with a comprehensive social history and records summary that would normally be done by a mitigation specialist. I had only been provided with essentially an index of almost 3,500 pages of records. Among the Oregon records, there is a note that Mr. Purkey had previously reported sex abuse to Rex Newton, M.D., as early as 1986 or 1987. Dr. Newton should have also been interviewed in the course of the mitigation investigation.

Relevant to my evaluation of Mr. Purkey's likelihood of violence if serving a life-without-possibility of release in the Bureau of Prisons, I was also concerned with any information regarding Mr. Purkey's positive growth and rehabilitation from any relevant background source but particularly from credible witnesses. In this regard, aside from Dr. Newton, I do not recall anyone ever mentioning to me the names of Floyd Bose or Dion Lieker.

I have now been provided with the draft declarations prepared for each of these potential

2

witnesses and believe that this information would have been very helpful to Mr. Purkey had it been presented to his sentencing jury and provided to me.

In particular, the information from Dr. Newton, a mental health expert is significant because it shows that Mr. Purkey was attempting to better himself and to rehabilitate himself many years prior to his capital charges when he had no arguable motive of simply trying to "fool" anyone and Dr. Newton clearly, as a prison employee, had not been retained to assist Mr. Purkey in any pending charges. Dr. Newton also could have provided substantial support for the fact that Mr. Purkey was clearly not an active member of any prison gangs and was deeply ashamed of the racist tattoos associated with that gang.

The information from Floyd Bose and Dion Leiker also is significant. As former law enforcement officers and people assisted by Mr. Purkey without any personal motivation to help himself, the information they provide clearly shows that Mr. Purkey has some redeeming value as a human being.

Even without this information, I believe my testimony for Mr. Purkey could have been much stronger in sentencing. I had prepared slides of areas that I believed should be addressed in my testimony. Although I do not recall specific discussions with Mr. Duchardt, my file contains a marked copy of the slides where I crossed off some information and some slides clearly as an indication that I would not address that area in my testimony. Seven pages of those slides are attached.

Some of the slides crossed off related to Mr. Purkey's family history of dysfunction. I do not recall why Mr. Duchardt chose not to present this evidence except as it related to Mr. Purkey's parents.

Some of the slides that were not crossed off, which meant that I understood I would be testifying to those matters, related to the sexual abuse of Mr. Purkey and his exposure to other sexual traumas as a child.

Specifically, I was prepared to testify, based on information provided to me by Mr. Purkey, that he had been exposed to such things as his parents having sexual intercourse with the door open, seeing his father walk around naked with a partial erection, and seeing his mother frequently in only a negligee. After his parents separated, he had also observed his mother having sexual intercourse with another man.

I was also prepared to testify about the details of the sexual abuse by Mr. Purkey's mother because I believe it is very important in providing mitigating information to a jury to provide the actual details of events rather than simply putting a label on it such as "sexual abuse." Mr. Purkey had reported, beginning as early as age eight, his mother was inappropriately touching his genitalia. After she separated from her husband, she would have him sleep with her and manually stimulate her sexually or to penetrate her with the handle of a hairbrush. She would also have him to rub lotion on

3

her breasts and genitalia. As he grew older, she had him to perform cunnilingus on her and she would manually stimulate him to orgasm. Ultimately, she sporadically engaged him in sexual intercourse.

Mr. Purkey reported that he had also been sexually abused at age eleven by "Hup," an older male who was a friend of his brother and was staying in the home for a time. Several times Mr. Purkey was awakened by Hup performing fellatio on him.

I do not recall why Mr. Duchardt did utilize the exhibits and the detailed testimony that I had prepared as opposed to just generally mentioning that Mr. Purkey had been sexually abused by his mother for years and abused once or twice by this older male friend of his brother. I believe this was a significant omission because this was important mitigating information in its own right but was also important in understanding Mr. Purkey's mental makeup.

I was aware that Mr. Duchardt retained other mental health experts and their reports were provided to me. I had no interaction and no consultations with the other defense experts, however, which is unusual in my experience in capital cases. It is also outside the norm not to have a mitigation specialist included in a capital defense team.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Mark D. Cunningham, Ph.D., ABPP

October 14, 2007.

4

## What's the Relevance of a Family's History or Legacy over Generations?

- The child is predisposed through heredity

- Family behavior patterns and effects are multi-generational
  - scripts
  - modeling
  - sequential damage



Incest/pathological sexuality
Psychological disorder
Alcohol or drug abuse

## Family Dysfunction from Generation to Generation

### Paternal family
- Grandfather was episodic drinker, chronic marital conflict, emotionally neglectful of children.
- Aunts and uncles engaged in fist fights between including knocking each other through walls and windows.
- Uncle got drunk and sexually abused his sister. Abused his children. Was mean and sarcastic.
- Aunt impregnated by married man, married him and physically abused. Was involved in witchcraft and the occult.
- Another aunt was controlling and a bully, easily offended, appropriated estate.
- Another aunt was prone to phobias and obsessions.

### Paternal family (continued)
- First cousin died of a drug overdose.
- Another first cousin committed suicide.
- Another first cousin was a prostitute.
- Another first cousin was an alcoholic.
- Another first cousin was a loner, couldn't hold a job, took tranquilizers.
- Another first cousin sexually abused his sister.

### Immediate family
- Father had a metal plate in his head. Alcoholic. Chronic marital conflict, violence, and separations. Abandoned Wes in teens. Committed suicide by gunshot to head.
- Mother promiscuous, emotionally disturbed alcoholic. Multiple psychiatric admissions for alcoholism, depression, personality disorder. Sexually abused Wes.
- Brother drug dependent. Multiple prison sentences.

Case 4:06-cv-08001-FJG    Document 47-11    Filed 10/16/07    Page 5 of 11

**Wes Purkey:**
## Pervasive Developmental Poisoning

### Neurological
- Probable fetal alcohol exposure
- Delayed speech development and speech disorder
- Attention Deficit Hyperactivity Disorder
- Childhood trauma
- Head injuries
- Toxic exposures from chronic drug abuse
- Brain damage demonstrated by PET and MRI scans
- Neuropsychological deficits

### Family
- Multi-generational family dysfunction
- Genetic predisposition to alcohol and drug dependence
- ~~Genetic predisposition to psychological disorder~~ *PARENTS ONLY*

---

**Wes Purkey:**
## Pervasive Developmental Poisoning (2)

### Parental

---

**Wes Purkey:**
## Pervasive Developmental Poisoning (2)

### Parental
- **Parental alcoholism and chaotic household**

---

## Parental Alcoholism and Chaotic Household

- Records reflect father began drinking excessively in late teens, mother from her twenties.
- Both parents drank at home on a daily basis.
- When parents went out they both came home drunk.
- Father hid bottles in the basement and the trunk of his car.
- Mother cried or yelled when drunk – her emotional response to intoxications was unpredictable
- Both parents were explosively violent -- you never knew what was going to happen, what would set them off.
- Home life was total anarchy.

---

- Father was eventually homeless. Mother became near non-functional.
- Both parents had multiple hospital admissions for alcohol-related problems in later adulthood.

## Effects of Alcoholism and Drug Abuse by Parent Figures

- Prenatal alcohol/drug exposure
- Inherited substance dependence vulnerability
- Modeled substance abuse
- Psychological injury
  - emotional detachment of parents
  - neglect by parents
  - increased risk of physical and emotional abuse
  - inconsistency and unpredictability
  - demands for premature responsibility
  - loss of childhood

- Broad social and psychological risk factor:
  - relationship problems
  - self-control and behavior disorders
  - feelings of defectiveness
  - psychological disorders
  - criminal behavior

---

Wes Purkey:
## Pervasive Developmental Poisoning (2)

### Parental
- Parental alcoholism and chaotic household
- **Observed domestic violence**

---

## Observed Domestic Violence

- Parents chronically engaged in yelling arguments

- Father regularly beat mother. She hit back, but was ineffectual – and resulted in the beating escalating.

- In their drunken fights parents threw things at each other, broke lamps and ashtrays.

- Father threw mother naked from the bedroom and into the hall – then followed her and continued beating her.

- Following the divorce, some of mother's boyfriends would beat her up while drunk.

- Mother had black eyes, busted lips, bruises.
- Wes attempted to intervene to protect his mother from father and boyfriends – once hit his father over the head with a liquor bottle when father had mother on the floor and was slapping her.

---

## Effects of Observed Domestic Violence

- Children who are exposed to parental violence, even if they are not targets of this violence, have reactions similar to those of children exposed to other forms of child maltreatment.

American Psychological Association Presidential Task Force on Violence and the Family (1996)

## Outcomes in Family Violence

Rochester Youth Development Study
- 1000 children followed from 7th and 8th grade
- Interviews of children and caretakers every 6 months
- Three types of family violence exposure studied
  - Spouse abuse
  - Abuse of children
  - Climate of violence and hostility

- **Rates of serious youth violence:**
  - If no family violence = 38%
  - If one type of violence = 60%
  - If two types of violence = 73%
  - If three types of violence = 78%

Thornberry, T.P. (December, 1994). Violent families and youth violence. Fact sheet #21. National Criminal Justice Resources and Statistics. U.S. Department of Justice.

---

Wes Purkey:
## Pervasive Developmental Poisoning (2)

### Parental
- Parental alcoholism and chaotic household
- Observed domestic violence
- **Parental neglect**

---

## Emotionally Neglected by Parents

- No provision for structure and consistency in the home.

- No values instruction or guidance – punishment was inconsistent and unrelated to severity of offense.

---

## Effects of Insufficient Parental Structure and Guidance

- Healthy child development requires structure, limit setting and guidance through discipline. This fundamental tenet is supported by research.

- In the absence of parental limit setting there is grave risk to psychological health and positive socialization.

- Children need order and external structures to develop internal structures and capacity for self-guidance.

- When guidance is not provided self-control does not develop and aggression can unfold.

- Children whose families fail to provide adequate supervision are more likely to exhibit delinquent behavior.

- **Quite simply, lack of parental structure and discipline contributes to aggressiveness and predisposes to violence in the community.**

Cantelon, S.L. (1994). Family strengthening for high-risk youth. Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice. Fact sheet #8.
Friday, J.C. (1994). The psychological impact of violence in underserved communities. Journal of Health Care for the Poor and Underserved, 6, 403-409.
Patterson, G. R., DeBaryshe, B. D., & Ramsey, E. (1989). A developmental perspective on antisocial behavior. American Psychologist, 44, 329-335.
Staub, E. (1996). Cultural-societal roots of violence. American Psychologist, 51, 117-132.

## Emotionally Neglected by Parents

- No provision for structure and consistency in the home.

- No values instruction or guidance – punishment was inconsistent and unrelated to severity of offense.

- Little to no affection except on occasion when drunk – then mom might precipitously shift from abusive to lovey-dovey.

- Almost no family or parent-child activities or recreations.

- No family meals except at grandmother's at Thanksgiving.

- Functionally abandoned by father at age 10 when parents divorced.

- Mother abandoned Wes to his aunt and the state in his early adolescence.

## Impact of Child Neglect

*More psychologically damaging than physical abuse*

- No stability or security in parental attachment
- No stability or security in daily life or practical care
- Basic physical and emotional needs go unmet

- Distorted primary structure - cognitive, perceptual, emotional, interpersonal
- Terror of world that is out of control
- Damaged capacity and skills to relate to others
- Identity of being incompetent and unlovable
- Absence of external controls leads to poor internal controls

- Markedly increased risk for psychological disorder
- Markedly increased risk for behavior problems in childhood, violent and criminal behavior in adolescence and adulthood

## Wes Purkey:
## Pervasive Developmental Poisoning (2)

### Parental
- Parental alcoholism and chaotic household
- Observed domestic violence
- Parental neglect
- **Physical and emotional abuse**

## Physically and Emotionally Abused by Parents

- Father beat Wes and Gary with a belt on their lower back, buttocks, and legs – left welts.

- Father hit the boy with his open hand to whatever part of their body he could reach.

- Mother slapped his face routinely – hard enough to leave a hand print.

- Mother and father ridiculed Wes' stuttering – mother threw glass of gin in Wes' face at family holiday meal for stuttering.

- When intoxicated mother spoke in a profane and obscene fashion.

- Slapped around by L. E. Carter, one of mother's boyfriends, after Wes intervened in Carter beating Velma.

### Wes Purkey:
### Pervasive Developmental Poisoning (2)

**Parental**
- Parental alcoholism and chaotic household
- Observed domestic violence
- Parental neglect
- Physical and emotional abuse
- **Abused and corrupted by older brother**

---

*Sponsor: U.S. Department of Justice*
### Impact of Abuse and Neglect on Criminality

- 877 cases of substantiated abuse and/or neglect
- Matched controls
- 15-24 years of follow-up

➢ 4.8 times more likely to be arrested as juveniles

➢ 2 times more likely to be arrested as adults

➢ 3.1 times more likely to be arrested for violent crime as adults

English, D.J., Widom, C.S., & Brandford, C. (2001). Childhood victimization and delinquency, adult criminality, and violent criminal behavior: A replication and extension, final report. National Institute of Justice, U.S. Department of Justice. NCJ 192291

---

### Abused and Corrupted by Older Brother

- Gary provoked fist fights with Wes on a near daily basis at times.
- Wes was both younger and smaller and always came out on the short end.
- Gary slapped Wes around.
- Abuse continued until Wes was 17.

- Introduced to shooting drugs by Gary

---

### Wes Purkey:
### Pervasive Developmental Poisoning (2)

**Parental**
- Parental alcoholism and chaotic household
- Observed domestic violence
- Parental neglect
- Physical and emotional abuse
- ~~Abused and corrupted by older brother~~
- **Traumatic sexual exposures**
- **Sexual abuse**

## Types of Sexually Traumatic Experience or Abuse

✓ Direct physical sexual abuse

Observed sexual abuse or assault

✓ Premature sexualization

✓ Perverse family sexuality

✓ Exposure to graphic sexual behavior

✓ Experienced as a minor by Wes

## Sexually Traumatic Experience

**Exposure to graphic sexual behavior**
**Perverse family sexuality**

*When drunk parents were less discrete:*
- Mom ran around in a negligee
- Left the door half-way open when having intercourse
- Saw father sitting on the side of the bed naked with mother naked beside him
- Saw father walk to bathroom naked with a partial erection immediately after intercourse

*After divorce mother brought men home to one bedroom residence:*
- Awakened to noises of them having sex
- Observed mom having intercourse on fold-out sofa
- Mom sitting on man's lap in kitchen the next morning or in negligee

## Sexually Traumatic Experience (2)

**Premature sexualization**
- When Wes was a teen his Father involved him in receiving fellatio from prostitutes.

**Sexual abuse by mother**
*Occurred only when she was intoxicated:*
- Began around age 8 in bath with mom and her focusing on washing his genitals.
- After divorce mother had Wes sleep with her – engaged him in manually stimulating her and penetrating her with hair brush handle.
- Had Wes rub her breasts and genitals with lotion.
- Instructed him to perform cunnilingus on her.
- Mother manually stimulated him to orgasm.
- After he reached puberty, mother initiated intercourse with him. Occurred sporadically depending on her access to him.
- Last intercourse around age 21-22 when both drunk

## Sexually Traumatic Experience (3)

**Other sexual abuse**
- When age 11 a male friend "Hup" of older brother stayed in the home for several months. Wes awakened to discover Hup performing fellatio on him. Recurred several times. Hup was approximately 5 years older.

Case 4:06-cv-08001-FJG    Document 47-11    Filed 10/16/07    Page 11 of 11