# LOGAN & PETERSON, PC

FORENSIC, ADOLESCENT AND ADULT PSYCHIATRY

### WILLIAM S. LOGAN, MD
### STEPHEN E. PETERSON, MD

428 WEST 42ND STREET
KANSAS CITY, MISSOURI 64111
TELEPHONE: (816) 842-2500
FAX:          (816) 842-9980

231 S. BEMISTON, SUITE 800
CLAYTON, MISSOURI 63105
TELEPHONE: (314) 236-4914
FAX:          (314) 236-4990

3600 BURLINGAME, SUITE 1A
TOPEKA, KANSAS 66611

DIAGNOSTIC INTERVIEW REPORT

Wesley Ira Purkey

01-00308-01-CR-W-2

**INTRODUCTION AND PURPOSE:**
Mr. Wesley Ira Purkey (DOB: 1/6/1952) confessed to the January 22, 1998 kidnapping, rape, and murder of a young Missouri woman named Jennifer. He confessed to this while pretrial for the October 28, 1998 murder of Mary Ruth Bales in Kansas City, Kansas. Mr. Purkey confessed so that he would spend his sentence in a Federal Penitentiary. On December 16, 1998, Mr. Purkey made a statement to FBI Special Agent Dirk Tarpley and Kansas City, Kansas City Police Detective William Howard. At the time, Mr. Purkey gave a 6-page statement to Agent Tarpley.

Ultimately, Mr. Purkey was charged with Capital Murder for the death of 16-year-old Jennifer Long. On December 18, 2001, Mr. Purkeys' attorney, Fred Duchardt, Esq. contacted Logan & Peterson, PC for a psychiatric evaluation of Mr. Purkey. The evaluation was to focus on diagnostic assessment, Mr. Purkey's mental state at the time of the charged offense, and mitigation of penalty. Attorney Duchardt was well aware of a previous diagnostic interview of Mr. Purkey by this writer referencing the October 28, 1998 bludgeoning death of 80-year-old Mary Ruth Bales.

Soon after, Mr. Duchardt forwarded a series of records regarding Mr. Purkey. It should be noted that a substantial portion overlapping of psychiatric background history regarding Mr. Purkey had already been completed as part of the Diagnostic Interview Report for the Mary Ruth Bales matter (Kansas v Wesley Purkey; 98-CR-2202).

**DESCRIPTION OF THE EVALUATION:**
Mr. Purkey was psychiatrically evaluated at CCA, the Federal Contract facility in Leavenworth, Kansas. This took place in one-half of a visitation cubicle. Total face-to-face time was 8.83 hours. This was divided into 1.6 hours on September 19, 2002, 2.16 hours on October 10, 2002, 4.0 hours on November 6, 2002, and 1.5 hours on December 30, 2002.

Mr. Purkey was well acquainted with this writer, clearly understood the limitations or privacy in this psychiatric assessment during a Federal Capital criminal case. He freely offered his opinions and questions as necessary. He understood there would be no effort to trick, upset, confuse, or anger him. He also clearly understood that anything learned during the

Case 4:06-cv-08001-FJG   Document 47-23   Filed 10/16/07   Page 1 of 65

Diagnostic Interview Report
Wesley Purkey
Page 2

assessment could be recorded in this report and certainly would be communicated to his attorney.

Mr. Purkey experienced a considerable number of mood shifts during the four assessment appointments. Uniformly, he experienced "very high" anxiety levels with obvious symptoms of psychomotor excitation, hypervigilance, irritability, mood dyscontrol, and nervousness.

No additional psychological tests were completed about Mr. Purkey, as the April 19, 2000 Diagnostic Interview Report had derived from interviews during December 1999 and March 2000 were more contemporaneous to the events at hand. In addition, Mr. Purkey completed some psychological testing at the United States Medical Center for Federal Prisons in Springfield, Missouri and that data was forwarded with Mr. Purkey's permission.

Given that the April 2000 diagnostic interview covered substantial social history and diagnostic elements, that information will be summarized as part of this assessment. Duplication from that report will be avoided.

On October 28, 1998, Mr. Purkey was described as having a DSM-IV diagnosis of Cocaine-induced Psychotic Disorder with Delusions; Dysthymic Disorder-Early Onset; Polysubstance Dependence (psychostimulants, alcohol, and hallucinogens); Personality Disorder Not Otherwise Specific (with antisocial, obsessive-compulsive and paranoid features); reported history of closed-head injury during high school with subsequent headache and blurred vision, amphetamine-induced seizure in 1988, history of intravenous drug use since age 16 (32 years), and history of drug-induced anxiety attacks. After having been released from the Kansas Penitentiary. Mr. Purkey found readjustment extremely stressful. He had spent more than a decade in prison. In September 1998, Mr. Purkey experienced a stimulant-induced anxiety disorder, which he thought was a heart attack. He sought treatment and was admitted to the Kansas University Medical Center. He continued to believe he was poisoned but still used Ritalin and crack cocaine. He did not perceive the seriousness of his drug dependency. In the few weeks before the Mary Bales' homicide, Mr. Purkey's abuse of Ritalin and cocaine accelerated to the point that he lost control of his drug use. The intensity grew to the point that he called the Kansas Bureau of Investigation to tell them he was not only using illicit drugs, but also was being poisoned. Clare Giada, his ex-wife, reported that Wesley Purkey developed drug-induced delusions during their stay in Wichita. Mr. Purkey thought drugs were being sprayed from the ceiling and that someone planted something in his chest. Jeanette Purkey, Mr. Purkey's wife, reported that Ritalin made Mr. Purkey hallucinate.

Mr. Purkey maintained his wife had been poisoning him. Subsequently, during this assessment, Jeanette Purkey admitted to poisoning Mr. Purkey.

In the prior assessment, on the day of the Bales' homicide, Mr. Purkey reported he was "too damned high to be a plumber," felt spaced out, and wanted to die. After he was incarcerated, Mr. Purkey's drug-induced difficulties resolved. He still showed substantial risk for severe decompensation into pre-psychotic irrational thinking or anger outbursts, as evidenced by the MMPI-2 and PAI-2 as well as clinical interview. His normally high level of suspiciousness would go way out of control when he was high on stimulant drugs such as cocaine.

Case 4:06-cv-08001-FJG    Document 47-23    Filed 10/16/07    Page 2 of 65

The diagnosis of Dysthymia, Early Onset, was made after it was clear that even though drug free, Mr. Purkey frequently felt dysphoric, was easily irritated, repeatedly tended to snatch defeat from the jaws of victory, and showed some paper-and-pencil psychological evidence of Dysthymia. He expressed an ongoing high level of anger, as well as a high level of anxiety. In that prior assessment, he tended to eschew medication treatment in the favor of attempting self-control. Previously it had been shown that Mr. Purkey had much better temper control when he was treated with Valium and Tegretol, respectively a benzodiazepine antianxiety agent, and a mood stabilizer.

Polysubstance Dependence is diagnosed when a person demonstrates a least a 12-month period of repeated substance use from at least three different drug groups. Mr. Purkey's primary drug of choice had been psychostimulants such as cocaine or Ritalin (methylphenidate). He had a very well documented and severe intravenous drug habit with very serious alcohol dependency. His drug use also included hallucinogens, stimulants, and sedative-hypnotics. Mr. Purkey showed a strong biological predisposition and socialization toward drug dependency. For example, his parents were both severe alcohol abusers and thus he inherited a genetic predisposition to serious alcohol dependency and risk for illicit drug dependency. His family environment fostered drug dependency. This included that his mother gave him sips of beer and other alcohol from the time he was age 9 or 10 years old. At age 13 he consumed alcohol for the first time. After age 14, his parents included him in adult drinking parties and supplied him with beer. During some of these alcohol parties, his intoxicated father offered Wesley money for prostitutes even though Mr. Purkey was only 14 or 15 years old. This was an extremely permissive and chaotic home life.

His intoxicated mother engaged him in sexual activity from his age 8 through age 11. By 1968 he was judged at St. Francis Hospital to have severe psychosexual problems. There was continued sexual activity with his mother up through age 22. Though by age 14 years old, Mr. Purkey knew his drinking behavior could get him in trouble, other than a detoxification at age 14 when he juvenile custody, he had no additional substance abuse treatment until incarcerated. In 1972 at the Kansas State Reception and Diagnostic Center (KSRDC), he was described as having problems with alcohol. In February 1976 he overdosed on Tranxene, a benzodiazepine sedative. In 1982 at the KSRDC records recorded that he had severe drug problems. The MMPI then showed very similar defects in judgment to the MMPI-2 used during the April 2000 assessment.

Mr. Purkey was introduced to intravenous drugs at a very early age by his older brother who gave him his first Preludin injection. Mr. Purkey was quite down at the time and this was the first time he ever felt happy in his childhood. He later used intravenous drugs as a teenager even though they induced paranoia and psychosis. Similarly, he diverted Ritalin, which had been intended for his two sons, to his own use. By September 1998 he thought he was being poisoned by family members and went to the hospital in a drug-induced anxiety state. He believed his family was poisoning his food and his wife attested to it. He also believed he was receiving shock treatments from his family while he slept and that his wife was poisoning his cigarettes.

Mr. Purkey suffered aspects of several different personality disorders, including Obsessive-Compulsive, Antisocial, and Dependent features. These described his very severe personality fragmentation, though no one

personality disorder fully described his difficulties. Factors that contributed to his suffering a personality disorder included that he clearly described himself as having been the victim of physical abuse by both his parents, the victim of emotional neglect by both parents, the victim of sex abuse by his mother, a witness to promiscuous sexual activity of his mother with numerous lovers, early introduction to alcohol by his mother's lovers, very intense anger responses even with the slightest provocation, preoccupation with rule adherence, inflexibility regarding ethics, inability to refrain from illegal activity, participating in illegal acts out of shame or desire for vengeance, considerable victim empathy after the fact, alternating between identification with authority and rebelling against it, and short-lived very intense mood swings.

These constituted obsessive-compulsive, antisocial, and dependent personality features. Obsessive-compulsive features included that Mr. Purkey rigidly adheres to a course of action he believed to be true. He frequently produced pages and pages of neatly written treatises on aspects of his case. Though he had not been trained in law, he believed his knowledge regarding legal matters superseded those of his attorney. When the attorney did not comply with his wishes, Mr. Purkey flew into an intense short-lived rage totally consistent with Intermittent Explosive Disorder. Intermittent Explosive Disorder was not diagnosed because of his overriding symptoms more consistent with personality disorder of longstanding nature. Antisocial personality features included that he had difficulty conforming to social norms since age 15. However, his upbringing was derived from being awash in abusive interactions, alcohol use, and very porous adult-child boundaries. Thus, the conditions were perfect for him to adopt abnormal behavior patterns. Next, he participated in drug use and stealing in early childhood in part due to the influence of his older brother who was also heavily addicted to intravenous drugs. Mr. Purkey demonstrated consistent adult behavior of being unable to refrain from illegal acts, thus spending considerable time incarcerated. In contrast to an antisocial stance, Mr. Purkey demonstrated considerable victim empathy and openness to interpersonal change. He wanted to somehow right the wrongs of his life through betterment while incarcerated. Mr. Purkey frequently expressed in the previous assessment that when he was taken from his parents' custody and placed with a maternal aunt, he felt his aunt's support, love, support, and non-punitive interventions. Her efforts were wonderful, but "probably too late for him." His concern for his wife's welfare, his boys' welfare, and remorse for having killed Ms. Bales and Ms. Jennifer Long was inconsistent with antisocial personality.

Mr. Purkey demonstrated ongoing developmental evidence of dependent personality features. These included his belief that his parents never provided adequate nurturance, that his parents were emotionally and physically unavailable, and that his sense of deep-seated anger derives from this. These were all separate from his sexual contact with his mother.

Mr. Purkey remained at extremely high risk for substance-induced medical difficulty. He was also at high risk for anxiety symptoms and physical acting out.

At the time of the Mary Bales' homicide, it was reasoned that Mr. Purkey was dealing with such distress at trying to adjust from incarceration to a life of freedom that he was severely impaired. This included substantial marital and sexual difficulty due to his drug use and substantial marital and sexual

difficulty due to the requirement of interacting with others. Mr. Purkey turned to drugs, alcohol, and prostitutes as a way to manage his mounting anxiety. He imposed high expectations for his success. Prostitution allowed him to maintain a scripted interaction, which was sexually fulfilling and temporarily reduced his anxiety. Mr. Purkey indulged in oral sex in exchange for drugs, and was having tremendous difficulty with a normal commitment to his wife. At that time, he had never been treated for his childhood experiences of physical, emotional, and sexual abuse. Such experiences can saddle young children with tremendous anxiety and severe anger control problems. Chronological history very clearly indicated that Mr. Purkey was vulnerable to pre-psychotic and psychotic decompensation with intense outbursts of anger. These outbursts could be short lived, unpredictable, and more likely if he were intoxicated on alcohol or other drugs. These were behaviors well modeled by both his parents for his entire formative years.

There was no indication that Mr. Purkey presented malingered symptoms or defensively under reported symptoms. In the 1999/2000 evaluation, Mr. Purkey's considerable victim empathy, sadness for his own family, and assumption of responsibility for his own actions was evident. At the same time, Mr. Purkey demonstrated significant improvement in his anger control when treated with Tegretol and Valium. This suggested some biologic basis for his loss of anger control over and above cocaine-induced intoxication. There was significant history of closed-head injury and potential for brain damaged. In 1999/2000, no records had demonstrated that. If there had been some evidence of closed-head injury over and above the headaches and dizziness demonstrated after a high school car accident and drug-induced seizures, those could have left him with irreversible personality changes.

With his background in mind, Mr. Purkey's mental functioning at the time of the Jennifer Long homicide was evaluated. Substantial records are integrated. All records were reviewed.

As a part of his assessment, Bruce A. Leeson, PhD, completed a neuropsychological assessment of Mr. Purkey. Dr. Leeson produced a report on January 5, 2003 after evaluating Mr. Purkey in April 2002 and December 2002. Dr. Leeson listed 16 sources as background for the neuropsychological assessment.

**INDEX OF MATERIAL:**
**A.    Medical records -**
1.    March 1, 1968 St. Joseph Hospital and Rehabilitation Center record of treatment (urethral discharge).
2.    March 8, 1968 St. Joseph Hospital and Rehabilitation Center record of treatment (car wreck).
3.    April 29, 1968 St. Joseph Hospital and Rehabilitation Center record of treatment (car wreck).
4.    May 19, 1968 St. Joseph Hospital and Rehabilitation Center record of treatment (cut finger).
5.    June 4, 1970 St. Joseph Hospital and Rehabilitation Center record of treatment (left hand).
6.    August 31, 1972 St. Joseph Hospital and Rehabilitation Center record of treatment (multiple lacerations).
7.    February 15, 1976 Wesley Medical Center outpatient record, History-Physical Exam-Progress Notes (reported overdose).
8.    May 30, 1976 St. Hospital and Rehabilitation Center record of treatment (involved in fight).

9. August 31, 1982 Institute of Logopedics Case History and handwritten letters by Wesley Purkey.
10. May 2, 1998 Via Christi Regional Medical Center Mental Status Review.
11. May 3, 1998 Via Christi Regional Medical Center, Wichita, Kansas History and Physical completed by Ralph Bharati, MD (people spraying him).
12. September 13, 1998 University of Kansas Hospital Record of Admission.
13. September 13, 1998 University of Kansas Emergency Treatment Record ("speed overdose").
14. September 13-14, 1998 University of Kansas Case Summary completed by David Meyers, MD AND Joseph Santiago, MD.
15. September ?, 1998 University of Kansas handwritten evaluation completed by Michael Leeson, MD, PhD.
16. September 14, 1998 University of Kansas Cardiovascular Stress Test Report completed by Julian J. Nunez, MD and David B. Wilson, MD.
17. September 16, 1998 Providence Medical Center Emergency Department Record face sheet and supplement report completed by Glen D. George, MD. (drug abuse).
18. December 19, 1998 Kansas City, Kansas Police Department (KCKS PD) Investigate Addendum/Clearance completed by Det. W.L. Howard, Jr. (photo line-up interview)
19. January 8, 1999 Federal Bureau of Investigation report by SA Dirk D. Tarpley and Det. William L. Howard, Jr.
20. January 12, 1999 Federal Bureau of Investigation report by SA Dirk D. Tarpley.
21. January 20, 1999 Federal Bureau of Investigation report by SA Dirk D. Tarpley.
22. April 10, 2002 Bill Hedrick, Warden, Federal Bureau of Prisons letter to The Honorable Sarah W. Hays.
23. August 16, 2002 Constance Reese, Warden, Federal Bureau of Prisons letter to The Honorable Sarah W. Hays.

**B. Oregon State Hospital, Mental Health Division medical and psychiatric records -**
1. November 26, 1986 Application and questionnaire for CITS completed by Wesley Purkey.
2. December 30, 1986 Assessment Summary.
3. November 27, 1986 Identification Sheet and questionnaire for CITS interview completed by Wesley Purkey.
4. Drug Use Inventory
5. December 7, 1987 narrative by Rex Newton.
6. December 19, 1988 Handwritten discharge from CITS.
7. December 30, 1988 CITS termination form completed by Mr. Purkey.
8. April 27, 1989 Thomas Lester, Unit Director, letter to John Caywood.

**C. Federal Bureau of Investigation records -**
1. December 16, 1998 Interrogation: Advice of Rights signed by Wesley Purkey.
2. December 16, 1998 Interrogation report completed by SA Tarpley and Det. Howard.
3. December 17, 1998 Handwritten record of the crime completed by Wesley Purkey.
4. December 17, 1998 Typewritten report of Wesley Purkey's handwritten record.
5. December 19, 1998 Investigative Addendum/Clearance report.
6. January 20, 1999 report by SA Tarpley.

7. Magazine articles discussing death and death row.
8. April 22, 1999 Wesley Purkey letter to Det. Howard.
9. May 14, ??? Wesley Purkey letter to "Howard."
10. August 16, 2001 report by SA John Brunelli.
11. September 26, 2001 (0829 hours) Telephone conversation between Det. Howard and Wesley Purkey.
12. September 27, 2001 (1430 hours) Telephone conversation between Det. Howard and Wesley Purkey.

**D.   United States District Court Transcripts of Hearings -**
1. October 25, 2002 Transcript of court hearings.

**E.   Medical records -**
1. March 8, 1968 St. Joseph Hospital and Rehabilitation Center Face Sheet (lacerations, cerebral concussion).
2. March 8, 1968 St. Joseph Hospital and Rehabilitation Center History and Physical completed by L.A. O'Donnell, MD.
3. August 31, 1972 St. Joseph Hospital and Rehabilitation Center Face Sheet (head injury & lacerations).
4. August 31 to September 3, 1972 St. Joseph Hospital and Rehabilitation Center progress notes by L.A. O'Donnell, nursing notes, laboratories, etc.
5. February 15, 1976 Wesley Medical Center Face Sheet (overdose).
6. February 15-17, 1976 Wesley Medical Center Discharge Summary completed by R.D. Murray, MD.
7. August 31, 1982 Institute of Logopedics Speech-Language Services document completed by Wesley Purkey.
8. May 2, 1998 Via Christi Regional Medical Center Face Sheet (Psychosis NOS).
9. May 2, 1998 Via Christi Mental Status Review (checkoff).
10. May 3, 1998 Via Christi Regional Medical Center History and Physical by Ralph Bharati, MD.
11. September 13, 1998 University of Kansas Medical Center Face Sheet (speed overdose).
12. Undated (9/3/98) Handwritten report by Michael Leeson, MD, PhD (paranoia).

**F.   Law enforcement -**
1. January 20, 1999 Federal Bureau of Investigation report completed by SA Dirk D. Tarpley.
2. February 25 to March 1, 2002 Forensic Report by Christina A. Pietz, PhD., ABPP.
3. April 10, 2002 Bill Hedrick, Warden letter to The Honorable Sarah W. Hays.
4. August 13, 2002 Forensic Evaluation completed by Christine Scronce, PhD.
5. August 16, 2002 Constance Reese, Warden letter to The Honorable Sarah Hays.
6. October 20, 2002 Linda McCandless, DO letter to The Honorable Sarah Hays.

**G.   Miscellaneous -**
1. November 14, 2002 Dr. McCandless letter regarding medicine changes at CCA.
2. November 15, 2002 Kansas City Star article; FBI finds bone fragments in search for Kansas City girl's body.

3.    April 18, 2003 USDOF-BOP May 29, 2002 MMPI-2 extended score report, raw
      data, and computer-generated report.
4.    June 18, 2003 USP Leavenworth Pharmacy Profile.
5.    March 21, 2002 Forensic report by Christina Pietz, PhD of USMCFP-
      Springfield, Missouri.
6.    August 13, 2002 Forensic evaluation by Christine Scronce PhD of FMC-
      Rochester, Minnesota.

H.    **Court documents -**
1.    October 10, 2001 Indictment # 01-00308-01-C-W-2, USA v Wesley Ira
      Purkey.

**SELECTED REVIEW OF MATERIAL:**
The following selections are drawn from the review of material.  These
entries serve one source of reported background information.

**1966 -**

December 30, 1966 St. Francis Hospital Brain Scan indicated no evidence of
brain tumor or other abnormality.

?/11/1966 St. Francis progress note added Wesley would be dismissed.
Diagnosis was Passive-aggressive Personality, Severe.  Prognosis was poor and
treatment was none.

Undated history added that Wesley's behavior changed after the car accident.
He had periods of amnesia.  He was impulsive and immature.  He was very
careless as if he wanted to be apprehended.  Mother always objected to
psychiatric care.  Mother was very neglecting and ill person emotionally.
Great-aunt took guardianship of Wesley against his mother's wishes to get him
into treatment.  After release, outpatient treatment would be tried.

December 30, 1966 St. Francis Hospital electroencephalography (EEG)
impression was borderline for the age suggestive of possible mild depression
of cortical activity in left frontal and temporal regions.  Repeat tracing
would be helpful for clarification.  January 9, 1967 EEG was within normal
limits for age.  Previously seen slowing of activity in the frontal and
anterior temporal regions was not present.

**1967 -**

February 14, 1967 St. Francis Consultation Record added that Wesley's aunt
and Wesley seemed mystified why he was in the hospital and was slated to go
to Larned.  Mrs. Burke said he was following her orders.  Dr. Newsome didn't
think Larned had a program for Wesley.  Would suggest to juvenile court that
Wesley stay at Lake Afton.

1967 St. Francis Physicians Orders added that Wesley's mother was not to
visit until cleared.  On ?/9/67, "mother may not visit."  January 1967
Nurse's Notes added that Wesley's mother visited and he agreed to have his
hair cut.  Mother says he "will do anything she asks."  January 6, 1967 Aunt
is visiting, Wesley hit fist on wall because of family situation.  January 6,
mother can't understand why she wasn't allowed to talk to Wesley.  "He even
promised me he would cut his hair."

**1968 -**

March 8-15, 1968 St. Joseph Hospital face sheet was for multiple lacerations, acute cerebral concussion, acute toxic state, and etiology unknown. 16 or 17-year-old Wesley was admitted after an auto accident. Eyes were remarkable in that am sense an anisocoria was found, with right pupil being larger than the left. Entrance diagnosis was acute cerebral concussion. Progress note added left pupil smaller than right-both react to light. Orders noted, unable to void. Wesley complained of severe headache, mostly occipital. 3/9/68 note added right pupil slightly larger than left, both react. April 29, 1968 St. Joseph radiology report noted skull examination in the PA occipital and each lateral projection failed to reveal evidence of fracture of other abnormality of the cranial all or intracranial structures. There was no evidence of increased intracranial pressure. Sella was normal.

November 17-21, 1968 St. Francis face sheet admit diagnosis was for aggressive behavior. Diagnosis was Passive-aggressive Personality. The Short-Stay Record added that Wesley was admitted per his aunt's request. He had been drinking and fighting. He had problems with authorities. His behavior was well controlled without medication. He was released to November 21.

November 17, 1968 diagnosis: rule out Schizophrenia latent, final diagnosis Personality disorder Antisocial…

1969 –

January 1969 (estimated) St. Francis progress note recoded Wesley was acting out and getting in trouble with the law. He was impulsive. He as admitted for evaluation. He was diagnosed as Adjustment Reaction/Adolescent. He would be in psychotherapy with Dr. Murphy. January 17 note added Wesley was angry at first but more acceptable after talking and understanding need for controls and structure. February 5, Wesley wanted to test his impulses over the weekend. He acted out on visit home. Denied drinking. Was angry with roommate and irritable. Would not discuss weekend visit. Wesley got drunk on the weekend. He showed good motivation but poor impulse control. Nurse's note added that alcohol was smelled on Wesley's breath. Phisohex was used to clean wounds on his arms. He ripped of 4 x 4s, was loud, agitated, and angry. Wesley got in a fight, and probably cut his hand when he broke his girlfriend's car window. Wesley fought with a 60-year-old neighbor. He went into the house to get a knife but didn't get a chance to use it. His aunt said she had to give him his whiskey to get him back in the car. Later, Wesley was angry and banging his fist against the wall and shouting because she couldn't make a phone call. He seemed hyperactive and restless. January 10, 1970 nurse note added that his aunt said Wesley went home from work and insisted he didn't have to go back to the hospital.

1970 –

October 28, 1970 Kansas Penitentiary report noted Wesley was involved in a car accident in 1968. He had deep lacerations on right upper front of his neck and head concussion. He was unconscious more than four or five hours and hospitalized for 12 days.

1971 –

May 5, 1971 KRDC evaluation noted that Wesley made a satisfactory adjustment until age 14. He began presenting inappropriate and illegal behavior and had a rather extensive juvenile record by age 18.

**1972 -**

June 12, 1972 Parole Board Report by Mohammed BenAmmar, noted that KRDC evaluated Wesley Purkey as Schizoaffective psychosis superimposed on an antisocial personality. He was recommended to therapy, voluntary requested therapy, and attended regularly since October 1971. Wesley was gaining insight and projected his future realistically. He was improving in his ability to relate to people. His "possibility to be adjusted to society seems to be fair." He had less possibility to be involved in antisocial behavior.

August 31, 1972 St. Joseph Hospital and Rehabilitation Center

face sheet was for multiple lacerations, face and forehead, acute cerebral concussion. L.A. O'Donnell, Sr., MD noted Wesley was admitted following an auto accident. Eighteen-year-old Wesley was in this hospital several years earlier after an auto accident. He was repairing his car, which was hit from behind. History added that Wesley lost consciousness for 1 or 2 minutes at the accident scene. Dr. L.A. O'Donnell noted that a psychologic consult was requested.

September 3, 1972 Dr. O'Donnell note added Wesley took "French Leave" of the hospital. He would be referred to a psychiatrist. Wesley needed psychiatric treatment much and had needed it for some time. September 9, 1972 Dr. O'Donnell progress note added Wesley "has had a severe emotional unstable background, both genetic and environmental and I think he is heading for trouble."

September 1972 Dr. O'Donnell progress note noted right eye appears dilated. Both pupils react to light but are unequal.

**1974 -**

January 10, 1974 Jose Sintos, MD, KSIR noted that Wesley should be placed in Medical Lay-In until his court hearing. The doctor reasoned, "The tremendous anxiety generated by the nearness of an outdate is prompting a depressive condition which could easily precipitate tragic events if he is left alone in the general population."

January 10, 1974 (12:45 pm) Wesley was in extreme anxiety. He cursed an officer and was written up.

February 15, 1974 DOC Psychological Summary by Steve Schlageck, MS noted that 23-year-old Wesley as serving a term of 10-21 for burglary. He was impulsive and dependent. He used peer judgment to make decisions. He showed disregard for social rules. Testing also indicated signs of organic deterioration. He had little insight. He did not learn anything during a three-month stay at Larned in 1973. Acting out was his prominent defense mechanism. He might continue to use alcohol and drugs. He was seen as a passive dependent personality with features of alcohol dependency.

April 10, 1974 KSIR Special Progress Report noted Wesley had referred himself for individual counseling. He was seen off and on from October 16, 1971 to February 22, 1972. The September 1971 Board advised him to seek group therapy. No vacancies were available so individual therapy was started. KRDC evaluation in May 1971 diagnosed Schizoaffective Psychosis superimposed on an antisocial personality. His affect tended to be flat but he exhibited no overt psychiatric symptoms. Dr. Paul Murphy was willing to see Wesley when he was paroled. He had been seen by Mr. BenAmmar in individual therapy since March 22, 1972.

August 30, 1974 KSIR note indicated Wesley had even in several car accidents. Had several abrasions, hospitalized five days for concussion.

September 26, 1974 KSRDC Medical Summary noted that 22-year-old Wesley denied severe head injuries or loss of consciousness. Counseling report noted that Wesley showed slight improvement in overall intellectual functioning. Drinking was the only thing that had interfered with his work outside prison. He was out for three months.

October 16, 1974 KSRDC psychiatric exam was by Richard Gellar, MD. General impression was that though calm and soft spoken, Mr. Purkey's childhood deprivation and continuing need for nurturance were quite apparent. He was appropriately oriented, affect was appropriate. Diagnostically, Wesley could best be described as have an "antisocial personality disorder." He could not function in society without structure and recognized this. "There must be some reason why I do dumb things…."

October 16, 1974 KRDC psychiatric evaluation added that 22-year-old Wesley was calm and exhibited a consistent detachment. When emotionally laden material was discussed, he appeared uncomfortable and uneasy. He tried to conceal inner anxiety. When confronted or if he perceived he was not going to get what he wanted, he instantly became tearful, hostile, and angry. He admitted slapping his wife "a couple times." He admitted overdosing five or six times but had no conscious thought to commit suicide.

1975 –

October 2, 1975 Hutchinson note added that Wesley got into a fistfight with another inmate. He had been in counseling with Chaplain Boyle.

1976 –

February 15, 1976 Wesley Medical Center progress noted no history of trauma.

February 17-25, 1976 Wesley Medical Center Discharge Summary added that 23-year-old Wesley was admitted after an overdose. His wife believed he drank alcohol and took Tranxene 5 tablets and Tylenol #3 amount unknown. Past history included car accident six years ago. Nursing note on 2/17 added that Wesley stated, "Look, there are 15 mice up there (pointing at ceiling) or maybe they are bus." He didn't appear alarmed about the hallucination. Wesley appeared confused at times and hallucinated.

October 21, 1976 note by Robert Wang, MD noted that Wesley had three head injuries in 1968, 1972, and 1976. The first in 1968 was a two-week hospitalization. January 1976 lasted three days at St. Joseph Hospital in Wichita. He didn't list the third injury. He drank beer occasionally, was a

drug addict, and used mostly heroin for seven years. He suffered chronic headache and runny nose. He had a fracture of his left cheekbone. In 1968 he had a head injury, fractured cheek and was unconscious for five days at St. Joseph Hospital. Neurological tests were within normal limits. He had chronic headaches.

November 16, 1976 KRDC psychiatric evaluation added that 24-year-old Wesley gave the impression of being a detached, distant individual who spoke in a very casual manner about his present and past offenses. There was not a hint of remorse.

1979 -

In February 1979, Wesley reported feeling anxious, depressed, frustrated, and was unable to sleep. He cut himself twice, but denied he wanted to kill himself, he "wanted to be heard." At that time he was on Valium and Sinequan. He was transferred to Larned. When released from KSP July 15, 1980 with a two-year parole, Wesley did not enter the halfway house program as directed. He went to Wichita and immediately began to steal to support himself and quickly returned to drug use.

Wesley indicated he did not intend to kill the man in the woods. He had never seen the man before. He thought perhaps he was shooting himself at the same time he was shooting the man. Psychiatric examination noted that Wesley whispered in an entirely different conversation from what he is talking aloud. His vocabulary was limited but intellectually he appeared average or a little above. Wesley came across as quite blasé even when talking about the stupidity of his crime. His emotional stance was not in keeping with his present predicament and the long sentence ahead of him. He stated very coldly how he had learned of his past hate toward authority.

Wesley presented in a self-recriminatory way and expressed an "autocritical" attitude. However, this attitude was not accompanied by sadness or depression. He might be quite manipulative and try to appease for secondary gains.

May 3, 1979 DOC note added that Wesley was admitted to the infirmary lock room after self-inflicted lacerations to his left wrist and forearm with possible tendon involvement.

May 19, 1979 Kansas DOC Psychiatric Consultation by R. Hemaya, MD noted Wesley felt pretty good. He had cut himself in April. He felt depressed but now felt his head was clear. He denied suicidal ideation presently. Three factors contributed to cutting himself, "getting attention, experiencing bitterness, and harming or killing himself." He felt he could keep himself together now. He was taking Sinequan. Counseling with Dr. Hemaya was recommended, as was observation by the mental health team. Wesley wanted to be transferred to north wing of A&T.

1981 -

May 18, 1981 KRDC Medical Summary noted that 29-year-old Wesley Purkey had polio with a crippling effect when he was 6 or 7 years old. He had no permanent disability from the polio. He had head injuries with loss of consciousness several times, the last time for an hour or so. He never had a skull fracture. He was hospitalized at St. Francis Hospital in Wichita for

pneumonia.  He was at Wesley Medical Center in Wichita for heroin overdose.
He was hospitalized at KSP after a knife fight.

**1982 -**

May 15, 1982 KRDC clinical evaluation added that Wesley was evaluated at the
Wichita Psychiatric Center during eighth grade.  Evaluation revealed he
experienced a serious personality disorder centered on psychosexual problems
of identification.  He subsequently was in therapy with Dr. Newsom and Dr.
Murphy.

May 19, 1982 KRDC Psychological Report added that Wesley was out of jail
approximately three weeks after being paroled in July 1980.  He used drugs
heavily during that time.  The MMPI suggested he might be highly rebellious,
non-conforming, and unreliable.  He might be moody and resentful, give a good
first impression, and give evidence of great insight.  He might tend to be
touchy and overly responsive to the opinions of others.

June 1, 1982 memo by noted Wesley bumped his head and was taken by ambulance
to the hospital while in jail. June 2, 1998 Wesley said, "Hey, fat son of a
bitch give me your breakfast, you're getting out and don't need it" to an
inmate.  Wesley then struck the inmate with a clenched fist three times and
then kicked him on the shoulder.  Inmates Penland and Rice were in fear of
their safety from Wesley.   June 5, 1982 note indicated Wesley was not to be
moved without extreme caution and lots of chains.

1982 Institute of Logopedics request for evaluation was by Purkey (no date).

He had been hospitalized after a car wreck, was in St. John's Hospital in
1969 for 10 or 12 days.

August 11, 1982 Disciplinary Report noted that Wesley was agitated,
belligerent and hostile because he had to follow the rules.

August 13, 1982 DOC memo indicated Wesley became increasingly hostile during
a staff interview.  He was returned to his cell and then threw his lighter
such that it smashed in several pieces.  Due to his volatile status he would
best be placed in segregation.

August 13, 1982 DOC memo indicated Wesley became increasingly hostile during
a staff interview.  He was returned to his cell and then threw his lighter
such that it smashed in several pieces.  Due to his volatile status he would
best be placed in segregation.

November 16, 1982 Kansas DOC Disciplinary Report noted that Wesley was
working behind the meal line and struck another inmate, Sylvester Jackson, on
the left side of his head with a piece of iron pipe.  Wesley then jumped over
the counter and ran for the door to the kitchen.  He struck Officer Avery
before being stopped.  Wesley was heard to remark, "I'm gonna kill that black
son-of-a bitch."  Mr. Jackson had threatened that he was going to kill Mr.
Purkey.  Mr. Purkey indicated he had had several run-ins with Mr. Jackson and
some of his friends.  Mr. Purkey knew they would kill him if he didn't act
first.

November 16, 1982 Disciplinary Report stated Wesley struck another inmate
with an iron pipe and then ran to the kitchen door.

November 18, 1982 Disposition of Disciplinary Case noted that Wesley another inmate had threatened Wesley. Wesley knew he would be killed if he didn't kill the other man.

**1983 –**

January 6, 1983 Iowa State Penitentiary Pre-sentence Investigation

Mr. Purkey's mother became neglectful of Gary and Wesley. The grandmother described the home situation and Wesley's mother in the following terms: "All she thought about was alcohol and men. There was always drinking and fighting in their home. She would leave for 5 or 6 days at a time."

In 1968 Wesley was involved in an automobile accident where he sustained a head injury. He was treated at St. Francis Hospital and St. John's Hospital in Wichita. He recovered from all injuries. In 8th grade he was referred for evaluation because of truancy and anti-social behavior at school. He complained of headaches and dizziness for which no organic basis could be found. December 29, 1966 St. Francis Hospital diagnostic workup revealed physical and neurological exams were within limits. Psychological evaluation revealed Wesley was experiencing a serious personality disorder centered on psychosexual problems of identification. He was recommended to the Boys Industrial School, but was never sent. He was in psychotherapy with Dr. C.F. Newsome and Dr. Paul Murphy until arrest in 1970.

August 19, 1983 Division of Adult Corrections health care report noted a history of 1977 head injury with loss of consciousness for 1.5 days. Wesley complained of headache.

December 7, 1983 health note noted "97" head injury, Wichita, short stay. Wesley was nervous.

**1984 –**

February 13, 1984 prison report indicated Wesley had come out of his sick cell and demanded eating utensils. He wanted a "fucking knife and fork." He was advised that in sick cell he could only have a spoon whereupon he stated, "fuck you" and returned to his cell. He was written up for leaving the sick cell.

Wesley denied saying fuck you to anyone. He wanted to know why he was in segregation status and felt he was having pre-hearing punishment. The committee found Wesley guilty of verbal abuse, disruptive conduct, and disobeying an order. Two days solitary was recommended.

November 1984 Disciplinary Report added that Wesley and others had threatened and physically assaulted another inmate. They wanted that inmate to give them $200.00.

1985 –

February 24, 1985, Wesley was disrespectful and mouthy. May 13, 1985 Wesley got in the officer's "face" when ordered to do something. August 12, 1985 Wesley threw his food on the floor because he didn't have enough potatoes.

1986 –

January 30, 1986 KDOC memorandum details Mr. Purkey's many placements in various prison facilities.

April 16, 1986 DOC Disciplinary Report added that Wesley attacked another inmate. The inmate had a bruised right eye.

April 15, 1986 DOC Seg note added that Wesley assaulted and committed battery on another inmate. It was suspected Wesley had attacked other inmates but they would not make statements.

July 1, 1986 Wesley "Form 9" typewritten note indicated he felt justified in showing anger. He was constantly confronted with lies. "Your god damn right I'm mad and I've vented this anger in the only way possible, after trying to bring a remedy to the situation in a productive manner."

November 27, 1986 CITS application noted that Wesley was serving time for Aggravated Robbery, 15 years to life; Aggravated Kidnapping, 15 years to life; and Aggravated Battery, 5 years to life. He began serving his sentence in July 1976. He was arrested for the first time at age 14.

November 27, 1986 CITS questionnaire by 34-year-old Wesley Purkey reported that he was divorced. He felt insecure and had doubts about his future. His problems were moderately to very severely upsetting. Wesley's father committed suicide at age 59. His mother died of cancer at age 55. During childhood he was both happy and unhappy, had school and family problems, had legal problems, and abused alcohol. He had been hospitalized at St. Francis Hospital in Wichita, Kansas as a teenager. He denied ever attempting suicide. His older brother had problems with the law.

Behaviors that applied to Wesley included impulsive reactions, nervous tics, sleep disturbance, and outbursts of temper. He was proud of writing articles, his physical endurance, and being realistic. Feelings that applied to Wesley included angry, annoyed, guilty, happy, conflicted, regretful, hopeful, lonely, and tense. One of his main fears was failure and having to return to prison. He was most likely to lose control of his feelings when under stress or feeling threatened. He was sad that his parents had died so "early on." If he got angry with someone, "It must be your fault." Physical sensations that applied were headaches, dizziness, tension, unable to relax, back pain, rapid heartbeat, and visual disturbances.

A pleasant sensation for Wesley was his grandparents' home. He had unpleasant childhood images, and images of seduction. He pictured himself as not coping and hurting others. Additional check-off questions added that Wesley did not believe he was a victim of circumstance, he deserved to be happy, did not have to make other people happy, and believed there was a right and wrong way to do things. He needed to come to terms with himself. He could help himself by changing negative perceptions.

December 30, 1986 Oregon State Hospital Assessment Summary added that Wesley had been locked up for 12 years without a break. He believed he might be released in the next three to four years and wanted counseling to adjust his thinking and attitudes. He was open, cooperative, and somewhat tense. He began using drugs at age 14 and by age 19 was addicted to heroin. He drank because, "I drank to block out things." Heroin was his primary drug choice followed by Percodan. Wesley's mother and father were alcoholics. They divorced when Wesley was 10 or 11 years old and an aunt raised him. He had sporadic contact with his mother and almost no contact with his father while growing up. His parents were both dead. He completed 9th grade and was now going to college at OSP. He liked to write and read history.

Wesley was oriented times three, short and long-term memory were intact. He had average intelligence and adequate social skills. He had a stuttering problem. He had been locked up for 12 years in a Kansas prison. He was transferred to break up a racial clique (Aryan Brotherhood) he was involved in. He wanted to change so he could "…make it when I get out."

Thirty-four-year-old Wesley Purkey had a character disorder and had spent his entire adult life behind bars. He "seemed" to have a great deal of anger and problems with authority issues.

Undated Oregon State Hospital check-off questionnaire for C.I.T.S. interview was completed by Wesley Purkey. His wife's personality was good, loving, and patient. Being sensitive, reasonable, polite and sexual were areas in which they were compatible. Wesley's ego was an area of incompatibility. He got along with his in-laws, and had two children who had no special problems. Sex was not discussed in his familial home and he learned about sex through magazines. He experienced anxiety or guilty "years ago" regarding masturbation and sex. He was abused as a child. People hurt Wesley if they did not trust him. A mother should be protective, sensitive, mature, and practical. A father should be responsible and objective. A true friend should be level. Wesley's wife would describe him as trying to hard to prove himself, and not being responsible. He was troubled by rejections from his family, "although it's justified!" Wesley didn't "care for" marijuana.

He had had several head injuries and several car accidents. Wesley's most significant memories or experiences included ages 6-10 being sexually abused, ages 11-15 trying to escape from home, ages 16-20 entering prison, 21-25, sent to prison for a crime he did not commit, ages 26-30 being paroled with a very vindictive attitude and returning to prison within more years than he could deal with, ages 31-35, he had a desire to understand himself. Staff noted that problem areas for Wesley Purkey included being institutionalized, having a criminal personality, and having a character disorder.

1987 –

November 6, 1987 Oregon State Penitentiary Discipline report noted Wesley Purkey admitted he hit Inmate Hatfield two or three times with his fist. He hit Hatfield because Hatfield was going to say that Purkey had raped him. They did engage in anal intercourse and Purkey said it was a "mutual thing." Purkey denied using a knife. He admitted that he drank three quarts of Pruno the evening of October 31, 1987. Purkey said he had been locked up for years and the sexual activity "just happened." Wesley Purkey would be permanently restricted from occupying a double cell for the remainder of his prison term.

December 7, 1987 Narrative by Rex Newton noted that he met with Wesley Purkey who was very angry, frustrated, confused, and scared. Wesley was angry with Mr. Newton because had not gotten him into Correctional Institution Treatment Services (CITS) counseling last summer as he had said he would do. Wesley had been in prison 13 years and was afraid of his eventually freedom in approximately three years. Mr. Newton thought Wesley did "fall through the CITS cracks". Mr. Newton would begin seeing Wesley monthly and then refer him to a CITS med therapist and eventually to Cornerstone.

**1988 –**

August 16, 1988 Oregon letter to Kansas DOC added that Wesley reported used a knife to threaten an inmate during an assault at Forest Camp.

December 13, 1988 Oregon State Discipline report noted that Mr. Purkey said there was liquid that had a foul smell coming out of his cell. Purkey said someone outside his cell was spraying him so he couldn't breathe. Mr. Purkey continued throwing the liquid from 3:00 am to 7:00 am after being advised to stop.

December 16, 1988 Oregon State Discipline report noted that Mr. Purkey said inmates had been spraying him with liquid from a small bottle. He found it very difficult to breath as a result of the spray and was concerned for his safety. He acknowledged snorting crack the previous day, but denied hallucinations. Mr. Purkey asked Inmate Ross "what the fuck he did." At that point, Mr. Purkey hit Mr. Ross in the face three to five times with his fist. Mr. Purkey would serve one-month segregation.

December 19, 1988 Oregon State CITS handwritten discharge summary noted that Wesley attended approximately three or four groups before choosing to discontinue. He went to Forest Camp and hopes to go to Cornerstone. He did not wish to participate in anything CITS had to offer.

December 30, 1988 Oregon State CITS termination summary by Mr. Purkey added that he understood himself much better after attending group therapy. His tensions and anxieties were greatly reduced.

**1989 –**

March 22, 1989 letter from Oregon to Kansas DOC noted that Mr. Purkey was in minimum custody until an incident at Forest Camp. He received a major disciplinary report and would be prosecuted for Sodomy. Other disciplinary reports since returning from Forest Camp included disobedience of an order, assault, possession of narcotics, etc.

April 27, 1989 Thomas Lester, Unit Director letter to John Caywood added that Wesley did not attend group callouts and was dropped from the group callout list on May 2, 1988.

October 13, 1989 Oregon State Discipline report noted that Mr. Purkey violated a rule. He said, "You fuck everything up bitch," to an officer and at another officer, "Fuck Andrews!" Said language was abusive and hostile.

**1990 -**

February 2, 1990 Oregon letter to DOC noted Wesley assaulted another inmate while at Forest Camp. He would be prosecuted for Sodomy in the First Degree.

June 24, 1990 Oregon State report noted Mr. Purkey denied disobeying an order. He had injected amphetamines into both arms during a 15-hour period. He later received a "hot shot" and could not recall being given an order. One of his close friends had left prison and other inmates wanted him to have some fun over that departure.

Mr. Purkey was examined in the infirmary. Fresh needle marks were observed, he was red faced, agitated, had rapid speech, unsteady balance, and pinpointed pupils. He admitted "shooting crank" and "seeing colors."

On August 2, 1990 Mr. Purkey stated to Nurse Barnet, "Fuck you little cunt."

August 9, 1990 Oregon State Medical Progress Note added Mr. Purkey saw no reason for a sack lunch. Says he is borderline diabetic. He became very angry.

August 29, 1990 Oregon State report added Mr. Purkey stated, "Fuck you, dump your own mop bucket…" when ordered to dump the bucket. He was apparently upset about a transfer that had not taken place.

September 9, 1990 Oregon State note added that Mr. Purkey was upset that two letters had been returned. He was not satisfied with why they were returned and stated, "Fuck you Reyes, I want to see the Watch Commander."

**1991 -**

March 5, 1991 DOC Seg Report added that Wesley was charged with threatening and intimidating another inmate.

March 25, 1991 DOC memo indicated Wesley was at risk to act out and use substances. He should remain at a facility fully equipped to deal with any acting out.

May 25, 1991 DOC memo added that Wesley was removed from medium security. His poor conduct record, substance abuse, and violent tendencies required transfer to a more secure facility.

**1992 -**

March 18, 1992 MHS psychological evaluation added that the MMPI was invalid. No conclusions could be drawn. He had two class 1 Disciplinary Reports in the past year for disobeying orders.

March 18, 1992 MMPI noted that Wesley's parents were both alcoholic. His father committed suicide. The great-aunt who raised him died on the day he was paroled in July of 1980. Wesley committed burglaries with his wife and she was incarcerated in the LCF East Unit. Wesley wanted to study hotel management when he got out. He had an AA sponsor and was part of a stuttering group. He received two Class I Disciplinary Reports the past year and was guilty of both.

MMPI results showed a person who appeared to be very low in anxiety and had good ego strength. He also appeared to be in a defensive posture. There was a very high elevation on a psychopathic deviate scale. The high elevations might suggest the classical picture of the psychopath. Poor social judgment, inability to profit from experience, antisocial behavior, and conflict with authority figures might be indicated. Wesley painted an ambiguous picture. His intellectual ability and level of education could mitigate his antisocial tendencies. On the other hand, he recently had two disciplinary reports.

**1993 -**

August 3, 1993 DOC Physician Orders added that Wesley was stressed at work and home. He still talked to mental health and wanted to sign a refusal for Actifed.

December 9, 1993 MHS report noted the focus of treatment was on deviant behavior cycles and their underlying dynamics. Special focus should be on anger and impulse control. He began group in a very sarcastic, angry fashion, then lowered his guard. He began to make good progress. He completed 30 hours of group. He had a chronic history of substance abuse, anger, and shame.

**1994 -**

July 20, 1994 Lansing MHS report used the MMPI and MCMI in addition to other psychological tests. Forty-two-year-old Wesley Purkey was serving a life sentence. This was his third incarceration and he had spent 18 years in prison. Family background history was totally dysfunctional. There were frequent divorces, promiscuity and alcoholism. Characteristics in Wesley's childhood included rejection, abandonment, inconsistency, and intimidation. His first serious offense was at age 19 and he had been incarcerated most of the time since that. At the beginning of this incarceration, Wesley received many disciplinary orders for violent behavior, disrespect, disobeying orders, and drugs. He was in Protective Custody a long time after being involved in drug trafficking, which resulted in his being stabbed by another inmate. He had completed several vocational programs and had positive response from supervisors.

Mental health history noted that Wesley was in psychotherapy for several months as a teenager due to severe personality disturbances. In his late 20s he made two suicide attempts evaluated as "a call for help."

Mr. Purkey participated well in the evaluation. He did not present symptoms of psychosis or significant personality disorder. Tests did not indicate organic brain dysfunction. He was in the average range of intelligence. Personality tests indicate quite stable personality traits. MMPI results showed he was amoral, hedonistic, egocentric, bright, and manipulative. His relationships with others were superficial and based on anger. He had problems with authority. MCMI strongly indicated a narcissistic component. Both tests indicated tendency for substance abuse and addiction. He also presented strong indicators of maturity, psychological health, good ability to cope with stress, and adjustment to difficult situations. Summary included that Wesley did not present symptoms of a major psychiatric process, nor suicidal tendencies. Test results indicated strong traits of antisocial personality that were outweighed by maturity and integrity of his

personality.  Czeslaw Doktor, MA believed Mr. Purkey did not present
indicators preventing him from obtaining minimum custody.

**1995 -**

October 15, 1995 DOC Disciplinary Report added that Wesley's drug screen
tested positive for THC and cocaine.

**1996 -**

October 14, 1996 DOC memo added that Wesley was granted minimum custody by
exception.  He was then found guilty of using stimulants and it was
overturned in 1996 and expunged from his record.  His supervisor said he did
excellent work.  Wesley wanted minimum custody again.

**1998 -**

May 2, 1998 Via Christi Regional Medical Center History and Physical added
that 45-year-old Wesley Purkey was fine until four or five days ago when he
started to act paranoid.  He thought someone was trying to poison him.  He
woke his wife saying while asleep he was sprayed with a poisonous mist
several times and his blood had poison in it.  He thought his house was wired
and they could see his wife, children, and himself all the time.  His wife
called the police three times the evening before due to his paranoid
behavior.  He was extremely anxious and suspicious.  Because he slept with a
drug dealer's wife, that dealer was going to have him killed.  They had been
married 11 years and his wife stated he was not on any drugs.  Wesley said he
used crank a week ago.  His urine was positive for methamphetamine.  He was
brought to the hospital because he was getting out of control with agitation,
anxiety, and paranoid behavior.

Mental Status noted Wesley's thoughts were organized.  Paranoid delusions
were present, as well as visual and somatic hallucinations.  During the
interview, Wesley suddenly got up and left the room saying they are "spraying
me with their mist."  He had benign homicidal and suicidal ideation.  He was
extremely fearful of being murdered.  Impression was Psychosis, NOS, Rule Out
Substance Abuse Psychosis, Crack Cocaine.  He would be admitted.

May 3, 1998 Via Christi Problem Update (handwritten) added Wesley was
discharged alert and oriented.  There was no thought distortion.  His wife
and ex-wife both came for discharge and both were supportive.  He was
encouraged to attend AA/NA.

September 13-14, 1998 University of Kansas Hospital Discharge Summary noted
that 46-year-old Wesley Purkey was admitted for having a history of IV drug
abuse, Polysubstance Abuse, and multiple tattoos after shooting intravenous
(40 mg) of crushed Ritalin and an unknown amphetamine.  UA was negative.  He
experienced approximately 2 to 2.5 hour of left upper chest pressure with
tingling in the left arm with anxiety and dyspnea cardiac stress that was
normal.  Final diagnosis was atypical chest pain, likely secondary to drug-
induced anxiety, and cellulites of bilateral forearms.

Undated KU Hospital handwritten consultation noted Wesley requested help with
"addiction issues."  He had been off drugs for 10 years but used three times
in the past six months.  He used "speed" (Ritalin).  He noted irritability
and anger and believed they predated resumption of speed.  He noted anhedonia

when "using" not otherwise.  Recent use interfered with work.  He was cooperative and recognized his problems.

December 16, 1998 FBI report noted that Wesley Purkey was interviewed at the Wyandotte County Prosecutors Office.  He was currently incarcerated as a result of the October 28, 1998 murder of Mary Ruth Bales.  It was made clear to Mr. Purkey that the sole purpose of this interview was to discuss the possible kidnapping, rape, and homicide of a Missouri woman referred to in Mr. Purkey's letter received by Det. Howard and forwarded to Special Agent Tarpley.  Mr. Purkey stated he would be willing to confess to the Missouri case if he would be allowed to spend his jail sentence in the Federal Penitentiary.

Mr. Purkey stated that sometime in January or February 1998 he applied for a job at Roto Rooter in Kansas City, Missouri.  After filling out the application and being given a short tour of the facilities at about 8:45 am, he drove to the area of Troost Street.  He stopped at a grocery store to buy orange juice and gin before going home.  While at the grocery store, he started a conversation with a white female whom he described as age 17-19, approximately 5'6" to 5'7", 140 pounds, chunky, dark brown hair, and wearing a brown jacket, plaid shirt, and blue jeans.  Wesley learned the woman's name was Jennifer.  Wesley asked Jennifer if she would like to "party."  Jennifer agreed and they drove to a liquor store for more gin.  Jennifer said she had been walking home from school after an argument with some black females at her school.

After obtaining the alcohol, Wesley mentioned he needed to go home to Lansing, Kansas for a few minutes.  Jennifer did not want to go.  At this point, Wesley placed a boning knife from the glove compartment on his right thigh on the front seat.  Although he did not verbally threaten Jennifer, he did say, "Bullshit, you're coming with me."  He had no intention of letting Jennifer out of his truck.

Mr. Purkey drove to Kansas via I-70 and took K-7 Highway to Lansing.  He pulled off various side roads along K-9 north and it was there that he raped Jennifer.  After raping Jennifer, Wesley stated he stabbed and killed her.  After she was dead, he placed her on the floorboard and drove around for about 30 minutes trying to figure out how to conceal his crime.  While driving on the back roads, he came upon a large wooden box along the side of the road.  He cut the front seat cover and wrapped Jennifer's body in it.  He then placed the body in the wooden box and put debris on top of the body for concealment.

While in "shock", Wesley drove to Snoopy's Bar in Leavenworth, Kansas.  He stayed there from around 11:00 am to 1:00 pm.  He then drove to his home where he stayed until his wife got home from work around 5:00 pm.

Responding to further questioning, Wesley stated he waited a day or two before returning to the body disposal site.  He then proceeded to an unknown location to dispose of the body.

At this point in the interview, Mr. Purkey refused to cooperate further until he received assurances from the United States Attorney in Kansas that the case would be prosecuted through Federal Court.  The interview was discontinued and Mr. Purkey was returned to the Wyandotte County Jail.

Upon locating the wooden box, Wesley spread a large blue tarp on the ground, removed Jennifer's body from the box, and placed her body on the tarp. He secured the tarp with twine and placed the body in the back of his pickup.

On December 16, 1998 Kurt J. Shernuk, Assistant United States Attorney for Kansas indicated his office would be willing to prosecute the case. Mr. Purkey would be required to fully cooperate with authorities.

On December 16, 1998, SA Tarpley and Det. Howard contacted Mr. Purkey at the Wyandotte County Jail. While enroute to the crime scene area, Mr. Purkey indicated no physical remains would be found and that he took extraordinary care to dispose of Jennifer's body. He then stated, "What I'm about to tell you is probably the most hideous thing that you guys ever heard of."

Wesley Purkey used his Sears charge card to buy a chainsaw two or three days after killing Jennifer. He cut Jennifer's body up and placed the body parts in large black plastic trash bags. Shortly after dismembering Jennifer's body, Wesley washed down his basement and the chainsaw using bleach and water to remove any signs of blood. Over the course of two or three weeks, he purchased two cords of wood and burned Jennifer's remains, bag by bag, at his residence.

After burning Jennifer's body in the fireplace, which took several days, he swept the fireplace. He put the ashes and bones in a plastic bad and eventually dumped them in a pond located on leased property near Wichita, Kansas in Clearwater, Kansas. Mr. Purkey and his family moved to Clearwater in May or June 1998. After about three months in Clearwater, the family returned to Kansas City where Wesley worked for Reddi Rooter Plumbing.

December 17, 1998 (10:00 am) FBI report was completed by SA Tarpley and Det. Howard. As a result of an interview, Wesley Purkey provided a three-page, handwritten note outlining his involvement in Jennifer's death. The following contents of that document by Mr. Purkey are as follows.

"After filling out a job application at Roto Rooter, Wesley drove down Truman heading east off Troost. He stopped at a store where he saw a girl walking by the store. He stopped her and began a conversation. He asked her if she knew which way Broadway was. He then asked if she wanted to get something to drink. After getting in the truck, Wesley learned Jennifer's name. She indicated she was on her way home after having some kind of problem with a couple of black girls.

They drove to a liquor store and bought gin and orange juice. Wesley then said he needed to "run back to my place real quick." He explained it was about a 20-minute drive to Lansing. Jennifer indicated, "I really don't want to go down there, how bout you take me back where you picked me up from." By this time they were going west on I-70 and Wesley said, "It won't take long just up and back." As he said that, he reached into the glove box and grabbed a knife that he stuck along his right thigh. He then drove straight to his house.

After arriving at his house, Wesley drove into the garage and using the automatic door closer, closed the garage door. They went into the back room in the basement where he his weights were. There was also one couch and a plastic black truck toolbox. They had sex "back there one time." They got dressed and Jennifer asked Wesley to please take her back. After getting

back in the pickup, they sat for a few minutes. Wesley then "raped and killed Jennifer in mine and my wife's house—may God forgive me—no one else will." He then wrapped Jennifer's body in the seat cover and put her in the plastic toolbox. He then sat next to the box and told her, "I was so fucking sorry? I know what I did is so terribly wrong…killing and hurting this young girl in mine and my wife's home…why!…What I am doing now is ripping my insides out, but I know it is right…Jennifer's family needs to know I wish I had her to give her back to them…"

Wesley indicated that he didn't know what to do next and then remembered a man he was in prison talking about using a chainsaw on a body and then throwing the body parts in the river. He went to Sears the next day and purchased an electric chainsaw. He began putting body parts in double large trash bags with partial leaves in them. The bags were "stacked against the far wall and I placed a blue tarp over them until I could figure out what to do with them." "Probably two or three days later," Wesley picked up a large plywood box. He put it along the north-front side of the fence in his back yard. He placed all the bags in that box. He then cleaned out the black plastic toolbox, emptied it, and gave it away. Over the next couple of weeks, he gathered cut wood, approximately two cords, stacked it in the basement and on top of the box. He threw away a plastic bag with a bra, panties, and socks at a curb on Michaels Road. He wasn't sure when he burned Jennifer's jeans, jacket, and shirt. He burned the bags over a week's period and the remaining ash was collected in three or four trash bags and put back in the box. Most of the teeth and partial jawbone were thrown out on County Road 5 and Michaels Road. The trash bags were dumped in a lagoon in Wichita or Clearwater.

After returning to the pickup, Jennifer pleaded with Wesley to take her back to Missouri. She said she would not be able to find his house and would not tell anyone what had happened. Wesley then realized he "needed to get rid of the victim." He did not want to return to prison. While Jennifer was in the cab of the truck leaning against the passenger door, he got the knife from underneath his right thigh and stabbed her one time in the chest just below the breast bone and held it there for several minutes. Mr. Purkey stated, "It's not like in the movies, they don't die right away. It took her some time before she died."

Realizing Jennifer had died, Wesley put Jennifer on the garage floor. Seeing blood on the seat cover, he removed it, put Jennifer it the seat cover, and returned her body to the basement. He placed Jennifer's body in the black plastic toolbox and then cleaned up blood in the basement. He even removed the baseboard molding on the paneled walls to conceal what had happened.

Wesley then drove to Snoopy's Bar, drank for several hours, and then returned home to meet his wife. After buying the chainsaw, Wesley cut up the body and placed body parts in double-lined large plastic black trash bags. He estimated it took 9 to 10 bags. He placed the bags on shelving in the basement. After placing all the body parts in bags, Wesley cleaned the basement. He indicated that several times while dismembering the body, he had to stop and clean the saw. It took approximately three to four hours to dismember Jennifer's body.

Several days later, Wesley stole a large wooden box from Studdards Moving and Storage. He placed it in his back yard and placed the bags in the box. Due to the cold temperatures, there was no odor present from the body parts.

Over a period of time he proceeded to burn the body parts in the fireplace after his wife left for work. He threw the knife out along the roadside on his way to Wichita.

December 19, 1998 FBI Investigative Addendum/Clearance report added that Wesley Purkey identified Jennifer without hesitation from a photograph. Wesley was very uncomfortable viewing the photograph and said he had a profound respect for Jennifer. He could not believe he had committed such a vicious act. He believed he might recall more information about Jennifer as time passed and would be willing to submit to hypnosis to recall details.

1999 -

Wesley completed an Undated Family Background Form. "On a service call for my company-using crack cocaine in the customer's home-I killed her." His mother physically abused Wesley when he was a child. Their relationship was poor. He had physically and mentally abused his spouse. He had been in frequent trouble since age 16. He left school because of peer influences and total lack of interest.

January 20, 1999 FBI narrative added that Wesley sat in the parking lot at Roto Rooter and smoked crack for five or six minutes before driving toward Troost Avenue.

April 22, 1999 Wesley Purkey letter to Det. Howard discussed drug lacking and "literal attempted murder" by his ex-wife and wife. He was more than willing to take a polygraph test and wondered if they would be willing to take one too.

May 14 Wesley Purkey letter to "Howard" addressed that Wesley was willing to be totally honest regarding the chainsaw. The ordeal needed closure for everyone and he was "ready to give closure."

2000 -

January 3, 2000 Physician Orders noted Wesley was having problems controlling his anger and was restless and had sleep difficulties. He was having flashbacks about killing a woman with a hammer. He declined meds, would ask for help if needed. September 2000 note added Wesley needed counseling after his crime. He didn't want to take meds. August 2, 2000 Physician Orders added that Wesley was very hateful and agitated. He beat on the cabinet in his cell and was very angry. He wanted immediate attention. August 2, 2000 note added Wesley was very agitated and said he had been sprayed for three days. He would be referred to mental health. May 31, 2000 note added that Wesley felt mad, angry and left without. He wanted Motrin for shoulder pain.

February 14, 2000 PHS Physician Orders was for Vistaril 75 mg at hs. Diagnosis was Adjustment Disorder NOS. Vistaril was now at 50 mg po hs.

March 30, 2000 Fourth Amended Complaint charging Wesley with killing Mary Ann Bales.

May 4, 2000 Health Screening form noted Wesley said he was treated for a mental condition—sleep. He denied suicidal or homicidal ideation. He took Zantac qhs. Inmate medication record recorded Zantac 150 mg bid.

May 12, 2000 DOC Disciplinary Report noted Wesley struck an inmate and knocked him to the floor.

May 18, 2000 KDOC Evaluation and Classification Report added that 48-year-old Wesley Purkey's affect was appropriate. He was mildly depressed and anxious about returning to prison. He denied suicidal or homicidal ideation. He had had aggressive outbursts that resulted in violence and death, particularly while under the influence of drugs. He was oriented to person, place, and time and did not show signs of a formal thought disorder. Speech was clear and goal directed. Attention and concentration were appropriate. Recent and remote memories were intact. Judgment appeared impaired and egocentric.

He reported multiple head traumas, none resulting in any aftereffects. The MMPI-2 was valid. Elevated scores likely reflected chronic pathology and some acute exacerbation. He was likely to present himself as outgoing and confident. He might appear superficially charming and fun to know. He would likely be manipulative and controlling in relationships. He could be very demanding and resent demands made on him. He would have very limited close relationships. Rules should not necessarily apply to him. He might feel he should be given anything he wants and resented limits placed on him. His response to conflicts might be violent.

He was likely a sensation seeker and might feel easily bored and frustrated. He might not anticipate consequences to his actions or understand how they might affect others. Project drawings were suggestive of impulsivity, immaturity, and limited interest in social interaction. His Bender scores were suggestive of possible organic dysfunction, likely secondary to chronic substance abuse.

He stated he committed the murder while he was high on crack cocaine. He did not feel he had received adequate mental health treatment, even though he had made numerous requests. He had insight into his problems but downplayed his actions and blamed substance abuse. He was currently in segregation due to a fight in the RDU. He would likely try to manipulate the system to get what he wanted. He could be aggressive if he felt others bothered him.

Diagnosis was Polysubstance Dependence with physiological dependence, in a controlled environment and Antisocial Personality Disorder. He was not interested in counseling at the present time.

May 19, 2000 Inmate Transfer File review diagnosed Polysubstance Dependence and Adjustment Disorder without mixed features and Antisocial Personality Disorder. September 22, 2000 reassessment diagnosis was Adjustment Disorder with Mixed Emotional Features and PTSD by Dr. Foster on November 3, 2000.

August 2, 2000 Mental Health Services (MHS) referral form added that Wesley was having paranoid delusions. "They have been spraying chemicals into my cell." He was anxious and complained of chest pain. He had no symptoms of delusional disorder or history of psychosis. He had mixed anxiety, depressed mood and insomnia.

September 27, 2000 therapy note noted that Wesley said Ms. Bales was a nice lady and didn't deserve to be beaten to death with a hammer. He had a mental evaluation from Menninger that staff didn't have. He would start anger management. Wesley wanted to know why he did what he did.

October 4, 2000 therapy note added that Wesley was having major problems with anger. Saw the back of a man's head that reminded him of the man who started him on cocaine. "There's that piece of shit." He wanted to hurt the man. It was not the man and Wesley was then upset with himself to allowing the rage to take over. He still didn't know why he murdered Ms. Bales. It was very stressful for him to discuss his rage and what it results in.

December 23, 2000 Physician Orders added Wesley was very agitated. He needed to talk to someone. On December 9, 2000 Wesley stated, "I need nerve pills."

December 29, 2000 MHS note added that Wesley's thoughts were very fast. He was very easily angered and unable to control emotions. Crisis level would be continued. Wesley threw a cup lid out of the cell when staff stepped away. On December 27, 2000, Wesley was "pissed…I don't trust MH either." He was angry that Ms. Hanson could not see him that day. December 5, 2000 therapy note added that Wesley was frustrated and angry trying to stand up for what he felt he needed in mental health. October 9, 2000 referral form referred to "irrational rage, refer to SOAP note of October 4, 2000.

2001 -

February 9, 2001 Physician Orders added Wesley wanted to try going without meds. He would ask for help if he started having problems.

February 9, 2001 MHS progress notes added that the doctor wanted to cut his medication. Wesley was working with children in the jail program and doing well. Violent movies made him dream about his crime. Diagnosis was Polysubstance Dependence, Adjustment Disorder with Mixed Emotional Features and Antisocial Personality Disorder.

August 16, 2001 FBI report by SA John Brunell indicated Wesley was given a letter written by Glenda Lamont, Jennifer's mother. Wesley indicated he would read the letter later. It "haunts him every night" and he would live with what he did until he died.

August 18, 2001 MHS therapist report noted that Wesley had been surprised over the weekend. He had been sent to shakedown and told to sit in a particular seat. He later learned that the FBI had brought Jennifer Long's mother to the prison. When he sat where he was told to, she could see him. Wesley possibly wanted to discuss another case, but was discouraged since the therapist would have to report what he said. He did stated, "I'm not going to say that I am not sorry for this woman." (Jennifer's mother). His demeanor indicated he knew more than he was willing to tell. He would not confess to a murder if it carried the death penalty. June 6, 2001 therapist note added that Wesley requested to be seen by for mental health. His perception was that he had been put off because he was serving a life sentence. He should be seen. May 31 note added that Wesley was handling anxiety and stress without medication. March 22 Wesley now understood the therapist's position about not discussing the other "case." He tried to assess how he left every including himself down.

Wesley's primary problem was explosive anger leading to legal ramifications as well as a springboard for substance abuse. Interventions included use of cognitive, RET, and didactic therapy modalities to foster understanding and prosocial change. Axis I was Attention-Deficit/Hyperactivity Disorder. Axis II: Borderline Personality Disorder.

September 26, 2001 Telephone conversation between Det. Howard and Wesley Purkey noted that Wesley had told Det. Howard that his ex-wife substituted his drugs. Wesley stated that the man his ex-wife was living with was now in a "vegetarian coma" because of drugs being switched on him. Wesley could not understand why no drug were found in his system when he was hospitalized at KU. He had been doing amphetamines "for days."

September 27, 2001 FBI telephone conversation between Det. Howard and Wesley Purkey added that Wesley was not willing to return and be interviewed at the Wyandotte County Jail. He was not going to make another confession. The one he gave was given under false pretense.

October 23, 2001 initial assessment form noted Wesley was emotionally stable and had no indication of mental illness.

November 2, 2001 through February 1, 2002 CCA Segregation Hearing Reports noted that Wesley was a chronic behavior problem, was aggressive, and was a threat to others. June 24, 2002 Wesley was presented a safety risk to staff. He was violent and had emotional outbursts toward staff.

November 4, 2001 CCA Disciplinary Report added that Wesley became angry when told he would not be handcuffed in the front. He had fallen and hurt his back and requested to be handcuffed in front. He yelled obscenities and caused a scene in segregation.

2002-

January 21, 2002 CCA Disciplinary Report noted that Wesley became angry and banged on the control room window.

January 25, 2002 a grievance was filed against Wesley for verbal aggression toward staff that attempted to deliver a written response from a previous grievance.

February 5, 2002 Facility Emergency Flow Sheet noted that Wesley refused assessment and told the nurse to "get the hell out of here…I don't need a fucking nurse."

February 4, 2002 grievance addressed that Wesley refused dental treatment and called the dentist a fucking liar.

February 4, 2002 grievance noted that when Wesley complained about medication taken from two containers the nurse said, "Oh well, fuck it, I'll just throw out your medication if you don't take it, take me to court, you like doing that anyway."

February 6, 2002 Incident Statement noted that Mr. Purkey was in the administration office to discuss his grievances. He became more and more agitated and eventually asked to be returned to his cell.

February 2, 2002 CCA Disciplinary Report was by Officer Nydia Bell. Wesley had been verbally abusive and shouted profanity at her.

February 5, 2002 CCA Disciplinary Report added that Wesley was enraged over board results. He threw an ink pen and hit George Westbrook in the face. He

yelled and called Mr. Westbrook dirty names, saying over and over that Mr. Westbrook had "set him up."

February 17, 2002 HSC clinic note reported that Wesley refused to sign a release for medical and dental records from his previous facility. He also refused to sign a refusal form.

March 2i, 2002 Forensic evaluation by Dr. Pietz diagnosed Polysubstance dependence and Antisocial Personality. She found no mental illness.

April 1, 2002 Wesley Purkey written note stated he was having problems getting his medication. When he complained he was not refusing his medications.

April 3, 2002 Prisoner Information Request written by Wesley added that the CCA medical staff were incompetent and to stay away from him.

April 4, 2002 HSC clinic note added that when the nurse tried to give Wesley his medicine, he was verbally abusive, and refused the medication.

April 8, 2002 Incident Statement added that during pill call Wesley and the nurse got in a conversation that escalated to an argument.

April 8, 2002 letter by Wesley detailed that he had broken a tooth, wanted dental care, and did not get that care. He requested a soft diet but was refused. He had problems eating and was experiencing severe pain.

April 15, 2002 CCA Disciplinary Report added that Wesley broke escort and stepped toward the dentist. He yelled loudly at Dr. Nowlen.

April 15, 2002 CCA note added that Wesley was seen throwing coffee and hitting another inmate.

April 15, 2002 CCA note added that all movement of Mr. Purkey would be videotaped, per Warden Lawrence. Wesley refused food because his tooth hurt. May 8, 2002, Wesley began eating again most of the time. On February 9, 2002, Wesley refused his Depakote.

April 16, 2002 Wesley Purkey letter to Warden Lawrence. Wesley apologized for the incident at the infirmary. He had started back on medication and had a "hell of an adjustment 10-day period or so." Mood swings was a side effect of the Tegretol and BuSpar. He did not step toward Dr. Nowlen.

April 18, 2002 report by Mr. Duchardt added that Wesley had not been receiving medications correctly since being at CCA. Because of that his condition had worsened substantially. Medication had been started again. Wesley stopped medication again because he broke a tooth, was in pain and could not eat. The psychiatric medication irritated his empty stomach. His condition deteriorated again.

Wesley also resisted dental treatment while being handcuffed behind his back in the dental chair because of pain. If CCA staff had permitted treatment earlier, the situation would have been better. Wesley's condition was continuing to deteriorate to the degree he could not assist counsel.

April 19, 2002 HSC psychiatric note added that Wesley apologized for his behavior at the last visit. Since medication was restarted he still had mood swings, occasional confusion, and a "tint" sensation with his glasses. There was a history of closed head injury in high school.

April 21, 2002 CCA note indicated Wesley did miss his medication on April 5, 6, and 7 through no fault of his own.

April 22, 2002 security scale noted Wesley had two homicide charges. He became very violent for no reason. He was dangerous.

May 3, 2002 HSC clinic note added that Wesley became angry and requested to be taken back to segregation. (Didn't want to be handcuffed behind his back during dental treatment.)

May 8, 2002 Warden/Administrator's answer to Wesley added that Wesley's abuse of the grievance system had placed a burden on staff. Wesley wrote grievances against anyone who did not comply with his demands.

Undated grievance form noted that all of Wesley's grievances had been filed. Copies were not made until grievances were answered and returned.

May 10, 2002 Incident Statement noted Wesley refused to attend a psychiatric appointment.

June 17, 2002 CCA data form noted Wesley had numerous Aryan brotherhood-specific tattoos. June 18, 2002 form added that he had a history of sexually aggressive behavior.

June 20, 2002 Intake Health Screening added that Wesley had past and current mental health problems. He took medication and had taken medication in the past. He wanted to talk to mental health staff.

July 10, 2002 Wesley's grievance added that he believed Officer Wellingham was basically harassing him. He had made threats against Wesley to other prisoners. Wesley was in fear of his safety.

August 13, 2002 Forensic evaluation by Dr. Scronce diagnosed Polysubstance Dependence and Antisocial Personality Disorder. Mr. Purkey's psychiatric medications were those for persons with impulsivity and aggression, not antisocial behavior. He tended to lose focus when he became angry. He was very difficult to engage when angry about other matters. Dr. Scronce viewed these as maladaptive personality style rather than mental illness.

August 26, 2002 Purkey grievance added that he was still fighting the issues of dirty and cracked food trays. He had gotten sick from eating food on a tray. Answer to the grievance noted that Wesley was disrespectful to the officer when they discussed the dirty trays.

September 2002 grievances and responses noted that dirty food trays were being used in the segregation unit. Wesley complained about this several times. Officer Ray's answer to Wesley included that he appreciated Wesley's efforts regarding the never-ending occurrence of cracked trays. He thanked Wesley for his persistence.

Undated grievance by Wesley added that he believed Officer Wellingham had told other inmates that Wesley killed and raped two women. Wesley thought this put his life in danger and that Officer Wellingham maliciously did it.

Testimony by Dr. Shine stated that patients with Bipolar Disorder could become irritable or manic. Medications like Tegretol can help the irritability, agitation, or racing thoughts. (P 11)

Dr. Shine believed that the way Wesley talked to nursing staff indicated he was quite stable. (P 16) He had periods of anger, especially at some staff that didn't meet his requests right away.

Christine Scrone, PhD had two interviews with Wesley. In the first he was very angry about a visit he was trying to arrange with his wife. He wasn't sure the visit would be approved so was very angry and upset. (P 20) Dr. Scronce indicated prominent irritability and mood lability could be symptoms of a mood disorder such as Bipolar Disorder. (P 23) Wesley was taking Tegretol when she saw him. She did see some of the irritability in Wesley.

October 10, 2002 Linda McCandless, DO letter to The Honorable Sarah Hays noted that Wesley refused to be seen for psychiatric follow-up visits. During an April 3, 2002 visit, Wesley became angry necessitating termination of the interview. At that time, his mediation was Tegretol 200 mg 3 times daily and BuSpar 15 mg 3 times day. On a second visit April 19, 2002, Wesley apologized for his behavior and indicated his mood swings had lessened. He believed this was due to medication. He complained of "occasional confusion" and "tint" sensations with his glasses and having some nausea. He was more appropriate during this visit and smiling and personable.

Mr. Purkey's final visit with Dr. McCandless was May 3, 2002. Upon arrival, he made reference to being handcuffed. He also complained of being videotaped during transportation to Dr. McCandless' office. He was told he would not be videotaped during the session. He became angry and requested to be returned to the segregation unit. He stated, "I want it to be known that the psychiatrist wants this to be taped." He was again informed there was no taping being done.

Since May 3, 2002, Wesley refused follow-up appointments. Dr. McCandless continued to monitor his medication levels, but had informed him October 9, 2002 that she would begin to taper his medication with the plan to discontinue it. She would not continue to see Wesley without monitoring his ongoing treatment. It would be left to Mr. Purkey to decide if he wanted to continue medication by seeing Dr. McCandless.

October 25, 2002 United States District Court Transcript of Hearing on Motion to Suppress interviewed the following people:
Dr. Kent Eiler Nowlen, Dentist, Pages 3 through 12
Linda McCandless, MD, Psychiatrist at CCA Pages 12 through 18
Martio Willingham, Corrections Officer at CCA Pages 19 through 40
Andre Ford, Chief of Security Leavenworth Pages 40 through 60
Tyrone Morning, Corrections Officer at CCA Pages 60 through 65
Stacy Appleby, Transportation Supervisor at CCA Pates 65 through 71
James Dixon, Corrections Officer at CCA Pages 71 through 83
Bruce Roberts, Classification Coordinator Officer Pages 83 through 95
William Howard, Jr., Detective, KCMO PD, Pages 95 through 180
Dirk D. Tarpley, FBI agent, Pages 180 through 211

(Continuation) Wesley Purkey, Defendant, Pages 4 through 91

October 25, 2002 United States District Court Transcript of Hearing on Motion to Suppress added that Dr. Kent Eiler Nowlen, dentist, believed Wesley Purkey did not need a dental appliance in order to eat properly.

Dr. Linda McCandless provided medications for Mr. Purkey. She was not going to discontinue certain medications he was currently receiving. She had received Stephen Peterson, MD's letter and had not had time to review it. She was not sure Mr. Purkey was more anxious, but had been angry on 2 of 3 occasions when they met. She would evaluate Dr. Peterson's medication suggestions when she next saw Mr. Purkey.

Officer Marteto Willingham helped with the major move on the Segregation Unit on May 14. He denied seeing any torn up documents from Mr. Purkey's cell. No items were ever thrown out when a move was completed. Mr. Purkey had two lock boxes in his cell. Officer Ford could not recall whether he personally moved things out of Mr. Purkey's cell on May 14. Mr. Purkey kept legal papers in the lock boxes, which he padlocked. Officer Ford had looked inside the boxes when checking for contraband and found none. Mr. Purkey was very neat and would never leave his cell without locking his lockbox.

Security Chief Andre Ford believed that Mr. Purkey was out of the institution on May 18. The officer that supposedly was working when the incident occurred was not at work that day. He believed it was not possible that the incident could have happened and the accusations were unfounded. Mr. Ford reviewed nearly all grievance forms. They were dated and given a number. No date or number was on the grievance form so CCA might have never received the grievance form.

Officer Tyrone Morning had working in the Segregation Unit about four or five months. He knew Wesley Purkey. Wesley was not allowed to have padlocks to lock the gray boxes where he kept legal papers. Officer Morning had never worked a shift with Officer Willingham.

Officer Stacy Appleby had been Transportation Supervisor since February 2002. She had participated in a videotaping of Wesley Purkey but could not recall the dates. She didn't recall an incident of taping when Wesley's cell had been moved from one place to another. She had never been present when Wesley had difficulties with Officer Willingham. She knew Wesley made complaints that he lost legal materials.

Officer James Dixon had been employed 11 months at CCA. Officer Dixon did not work on May 14, 2002. He knew there were verbal conflicts between Wesley and Officer Willingham. Officer Dixon wrote an incident report referencing verbal confrontation between Wesley and Officer Willingham. Officer Dixon knew nothing about a plastic bag with legal material in it. He was not aware of Officer Willingham purposely throwing away Wesley's legal documents.

Bruce Roberts was the Classification Coordinator Officer and had been at CCA about 10 years. He was not directly involved in incidents involving Wesley and threats or comments that Officer Willingham made again him. Officer Roberts had to restrain Wesley in his office when Wesley threw an ink pen and struck him in the face. Wesley had been in his office numerous times for discipline reports. He remembered Wesley asking him about some torn up legal papers. There was no record of the papers Wesley talked about.

William Howard, Jr. was a detective for the Kansas City, Missouri Police Department. He had been employed since October 1982. He first came in contact with Wesley Purkey in 1998 during the investigation of the homicide of Mary Ruth Bales. While housed at Wyandotte County Jail, Mr. Purkey at times confided in Det. Howard through an Inmate Contact Form. On December 15, 1998 Mr. Purkey indicated through a note that he wanted to talk to Det. Howard about a kidnapping and homicide. The note gave Wesley Purkey's "name and current address. Victim was a 17-19 year old, kidnapped in Missouri, brought back to Kansas, murdered, body never found, probably listed as missing." Mr. Purkey indicated he wanted to talk to an FBI agent and wanted to serve time in a federal facility rather than a state facility. On December 16, 1998 Mr. Purkey was taken to the District Attorney's office to meet with FBI Agent Tarpley. Mr. Purkey signed a Miranda Waiver. It was established early on that the Mary Bales case would not be discussed. However, Mr. Purkey indicated he intended to plead guilty in that case and wanted to confess to the kidnap, rape, and murder of a Missouri woman. No guarantees were made to Mr. Purkey that he would receive a life sentence in exchange for a confession. On December 17, 1998, Mr. Purkey without hesitation identified Jennifer Long from a photograph. Mr. Purkey expressed remorse for killing Jennifer Long and was having trouble dealing with what he had done.

At no time did Det. Howard discuss the death penalty or what sentence Mr. Purkey might receive. Mr. Purkey indicated that he deserved the death penalty. Sometime in April 1999, Mr. Purkey sent a communication form to Det. Howard. Mr. Purkey was very very angry with Agent Tarpley. He would not have talked to Agent Tarpley or Det. Howard if he had known "the feds had the death penalty." Mr. Purkey sent additional forms to Det. Howard on April 22 and May 14, 1999. In the May 14, 1999 communication, Mr. Purkey discussed how he disposed of Jennifer Long's body. Det. Howard again met with Mr. Purkey on August 14, 2001 at the Hutchinson Correctional Facility. Det. Howard had a letter from Glenda Lamont, Jennifer's mother. A brief meeting was held and Mr. Purkey left abruptly and was very angry. On September 26, 2001 Mr. Purkey had a phone conversation with Det. Howard in which he indicated he had read the Lamont letter and wanted to help the family. However, he then indicated he would not say anything else. Det. Howard indicated to Mr. Purkey that he in fact had no control over what would happen. Mr. Purkey should talk to Agent John Brunell. Wesley sometimes had to be settled down. "If you get Wes in the right frame of mine, he will talk to you…but when he's agitated, he goes off on a tangent."

Det. Howard's final contact with Mr. Purkey was on September 27, 2001. In that phone contact, Mr. Purkey indicated that he would not do anything further to help find evidence of Jennifer's death. At no time during any of their conversations did Mr. Purkey ever indicate he wanted to talk to an attorney. Det. Howard believed Mr. Purkey's primary goal was to convince Det. Howard and Agent Tarpley that he had killed Jennifer Long. His stated goal appeared to be that he wanted to be housed in the Federal Penitentiary. He didn't like the Wyandotte County Jail, and was afraid of the Lansing Penitentiary. There were "gang bangers and he was too old for that crap." Mr. Purkey had too many enemies at Lansing and did not want to return there.

Cross Examination of Det. Howard noted that in their last conversation, Mr. Purkey confirmed that everything he told Det. Howard was the truth. There was a lot of corroborating evidence to support Mr. Purkey's claim that he

killed Jennifer Long. Mr. Purkey mentioned that drugs were the reason for the things he had done. He suspected his ex-wife might have "laced him with drugs at one time." Det. Howard had no control over what happened to Mr. Purkey. Mr. Purkey felt "tricked" by Agent Tarpley.

During recross examination, Det. Howard again indicated that at no time did he or Agent Tarpley make promises to Mr. Purkey that he would be sent to a federal institution. They made no guarantees of any kind regarding sentencing, the death penalty, or where he might be housed. Mr. Purkey would have to convince the U.S. Attorney that he was telling the truth since Jennifer's Long's body could not be found.

Dirk D. Tarpley had been an FBI agent 12 years. On December 16, 1998, Agent Tarpley met with Nick Tomasic and Det. Howard at the Wyandotte County District Attorney's office. Following that meeting, a meeting was held with Mr. Purkey and Det. Howard. Mr. Purkey signed the Miranda Waiver.

Initially, Mr. Purkey was evasive but wanted to know if a federal crime had been committed if the FBI would be willing to take it. Mr. Purkey did not like the DOC of Kansas and wanted to serve his time in a federal facility. There was no discussion of what sentence he would receive or about the death penalty if he confessed to a crime. Mr. Purkey did not seem confused when told Agent Tarpley could not make any promises.

Mr. Purkey told Agent Tarpley about Jennifer Long. On December 17, 1998 Mr. Purkey gave Agent Tarpley his handwritten confession to the murder of Jennifer Long. He did not invoke his right to remain silent. On another occasion Mr. Purkey was very angry and told Agent Tarpley that someone had told him he could get the death sentence. Agent Tarpley said that was possible. After that, Mr. Purkey refused to enter a room after he saw Agent Tarpley. Agent Tarpley agreed with Det. Howard's testimony. Agent Tarpley did not name specific attorneys at any time when talking to Mr. Purkey. Agent Tarpley thought Mr. Purkey was willing to discuss the Long case if he could serve time in a Federal Penitentiary.

Mr. Purkey remembered the general terms of the conversations with Det. Howard and Agent Tarpley. He took notes but they were destroyed at Wyandotte County Jail when he was away from his cell. The notes were in a plastic bag sealed with masking tape. While outside in the exercise area, Mr. Purkey could see into his cell. He saw Officer Willingham remove the plastic trash bag containing his torn-up notes and other legal papers. That bag was considered trash and was taken away. Mr. Purkey stated filed a grievance even though CCA had no record of that grievance. Mr. Purkey filed a second grievance when he returned from Rochester.

Wesley Purkey's understanding in December 1998 was that for his full truthfulness he would be given a life sentence without parole in the federal system. Agent Tarpley never told Wesley that he could not make any promises or deals. The interviews were not videotaped. Det. Howard and Wesley did talk about religion. After the Bales case had been completed, Wesley was taken to a conference room to meet with Det. Howard and Agent Tarpley. Wesley had not requested the meeting. Wesley indicated they should talk to his attorney. Wesley stated Agent Tarpley said, "…An attorney would just fuck things up." Mr. Purkey did not believe there was a typical standard for the grievance process. Sometimes the grievances had no numbers. Mr. Purkey agreed that he did not want to go back to the Kansas penal system. That was

one reason he decided to talk about Jennifer Long. He also wanted to let her family know what had happened. Mr. Purkey understood his constitutional rights when he talked to Det. Howard and Agent Tarpley.

Mr. Purkey did not tell Agent Tarpley that he wanted to serve his time in the federal prison system. What he wanted was that in exchange for information pertaining to the Long case he would agree to a life sentence from the federal courts and then to serve time in the federal system. Mr. Purkey recalled driving to Lansing with Det. Howard and Agent Tarpley. He remembered driving around Lansing and going past his former home. Mr. Purkey indicated that Det. Howard became upset, "I'm tired of this shit…" It was fair to say the officers did not believe Mr. Purkey was being truthful with them.

Mr. Purkey believed they discussed the agreement again before giving Agent Tarpley his handwritten confession. He told the truth in that document. He was confessing to the kidnapping, rape, and murder of Jennifer Long. Mr. Whitworth believed the notes were crucial to Wesley's defense, he had good recall, and was not was not being unfairly prejudiced.

Mr. Purkey didn't have his notes and couldn't remember specific dates and details. However, it was his understanding that he had an agreement with the officers and with Agent Tarpley that if he confessed to the homicide he would get a life sentence without parole in federal custody. Some lawyer told Mr. Purkey the feds had a death penalty after he had confessed. There had been no discussion of the death penalty.

November 4, 2002 Incident Statement added that Wesley fell in the shower. When the officer tried to remove his handcuffs, Wesley fell to the floor. November 6, 2002 statement added that a Deputy Marshall said Wesley was planning to slip in the shower so he could sue the marshals and CCA. It was interesting that Wesley had fallen twice in the shower over the weekend.

Undated Leavenworth County memo added that Wesley had not given any indication of having any behavioral problems at the Leavenworth County Jail.

## BACKGROUND INFORMATION FROM INTERVIEW OF THE PATIENT:
### Introduction –
Mr. Purkey was again advised of the lack of privacy in this assessment. He understood there would be no tricks played on him by this writer during this assessment. The entire process of the evaluation was re-explained so he was comfortable participating. It would not be videotaped or audiotaped. To his best recollection, none of his interactions at MCFP-Springfield, FMC-Rochester, or with the police were ever videotaped.

Through this first appointment, Mr. Purkey showed substantial stuttering. He was quite embarrassed about this.

Mr. Purkey was asked what was left over from the prior evaluation and he still had questions about one proverb. Again, the answer was not given out.

### Past medical history –
At the first appointment, Mr. Purkey was being treated with BuSpar and Tegretol. The Tegretol/BuSpar combination decreased his anxiety level by decreasing his highs, but did not control anxiety like Klonopin had. At one point he traded BuSpar for Klonopin. This gave him the first good night's

sleep he had had in a considerable period of time. After that night's sleep, he was finally able to focus on his legal work, did not experience fatigue, and did not feel hung over. Subsequently, without Klonopin, he attended a court hearing and "was about to blow a fuse." The court hearing was to be stopped because Mr. Purkey was unable to control his own behavior and "didn't want to be that way." That his wife did not show up for the visitation is what set him off.

Mr. Purkey was quite angry with Dr. McCandless the CCA psychiatrist. He felt angry about the medication and that he was not receiving any Klonopin. He thought one-half pill of Zoloft per day was not enough. He felt so distraught that he was "beating his head on the walls" and focused on Dr. McCandless.

He had images of chainsaws and beating a woman to death. He was urged to not focus on Dr. McCandless, to focus on his case, and to exercise as a way to find calm until his medicine could be readjusted. Mr. Purkey then provided a handwritten note of his thoughts. He had written this down to counter FMC-Rochester's assertion he had no rapid thoughts. He wrote this pad of thoughts in one to two days after they "threw out his paperwork." Mr. Purkey was quite distraught.

December 30, 2002 meeting with Mr. Purkey took place after he was placed on 0.5 mg of Klonopin twice per day and 50 mg of Zoloft. Klonopin hadn't helped at all because the dose wasn't high enough. He wanted his attorney to make the doctor give him increased medicine. He wanted to go to court to show the doctor was "a cunt under film." He was furiously tired of being jerked around. Mr. Purkey then offered that in order to give himself some respite from his anger and anxiety, he would save three days of Klonopin and take 3 mg at a time. This helped him focus, be able to lie down, and sleep. It even kept him from grinding his teeth.

Mr. Purkey then offered that he was very tired and had not slept well for three days. He felt so anxious that he couldn't think, he had rapid thoughts, and felt like he was in a zoo. The Klonopin effect only lasted 12 to 15 hours but during that time he could focus and remain calm.

Even though he was still on the Zoloft, it didn't impact his level of anxiety. He had managed to lose about 12 pounds.

He reiterated that on that third day when he took 3.0 mg of Klonopin he would have relief of anxiety, from the noise, and from his racing thoughts. The racing thoughts concluded swirling cacophony of his trial, his case, his life, life without parole versus the death penalty, having been poisoned, and being in the zoo. The only thing that helped without medicine was to listen to his headphones and let his thoughts blur into the songs. He was not about to exercise stating, "Yoga wouldn't save him from the death sentence." Again, Mr. Purkey launched into a litany of anger over attorneys, court process, and many things he thought were done wrong.

He wanted to go over the records and possibly demonstrate his need for additional medicine such as Klonopin. He really believed that Klonopin worked well. Mr. Purkey was advised that it would be difficult to obtain Klonopin, as it was not on the penitentiary formulary. Even so, Mr. Purkey still wanted it. He had great difficulty speaking with the female jail psychiatrist at CCA because he thought she was providing inconsistent care.

Presently, Mr. Purkey was refusing to have his appointments with the CCA psychiatrist videotaped. Thus, he believed she was just now "rubberstamping CCA tactics." The only way Mr. Purkey would allow himself to be seen by the CCA psychiatrist was if his attorney was present.

His dosage of BuSpar had been 15 mg PO 3 times per day. It did not provide any significant anxiety relief. Tegretol was 200 mg PO 3 times per day.

Tegretol and BuSpar had been started together so he really had a difficult time separating their effects. He thought their combination resulted in more stable moods and less fluctuation. However, the intensity of his moods was the same.

Mr. Purkey was not having any side effects from the Tegretol. His last level was a month earlier. When he missed 3 or 4 doses of Tegretol he experienced headaches, confusion, perception of color changes, and vivid racing bizarre pictures in his mind. For example, he might see distorted faces or horse races, etc. He suppressed those by lying down and concentrating on music in his headphones. During those times, he was unable to focus on anything else. Thus, he believed that Tegretol was providing some help.

Separate from the spikes of anxiety he felt around court dates, Mr. Purkey experienced mood swings. He tried not to act out on them or use them as an excuse to show anger. However, Klonopin had helped him focus and deal with these frustrations much better than BuSpar. Without Klonopin, Mr. Purkey finds himself quite internally aggressive. When any of the CCA guards cross him or do something he perceives as unfair, his immediate response is, "Come on, suit up, let's go." That is, he finds his anger almost impossible to control.

Mr. Purkey believed he was in better health because he quit smoking on October 13, 2001. He had no access when at Federal Medical Center-Rochester, so stopped smoking a pack per week. He had no access or interest in tobacco in any form.

There was nothing new in his review of systems. He had no seizures. He was experiencing pulsating frontal headaches. These were brought on by stress when he "can't calm down." He actually felt his blood pressure rising during these times. The only thing that took his mind off those headaches was to focus on and listen carefully to rock and roll music of the 70s to 90s. He did not listen to "Heavy Metal." He occasionally listened to jazz. The music allowed him to consciously choose to focus on relaxing.

**Present functioning -**
Mr. Purkey the precipitously clinched his hands and stated, "My parents didn't give a fuck…I feel my bad behavior is so deep even though I know it is childish." He knows it is childish to "break up what he has paid for" meaning his property in prison, but he does it anyway when he feels overwhelmed.

Mr. Purkey believed that he had long-term memory problems. These were worsened. He thinks that was due to his past and allows him to try and put it in a better perspective. He has accepted responsibility for his actions and was aware of behaviors that led to creating his personality style.

Mr. Purkey believed he was not a bad person but that he did bad things and that no one had looked into the effect of his penitentiary experiences. Previously he had recounted seeing much violence and denigration.

At one point, he recalled having participated in a Hutchinson Correctional Facility jail program like "Scared Straight." He could relate to the troubled young men who attended. They had problems with drugs, with their parents, and that no one was there to nurture them. The experience made him feel he could help them "not go where he had gone." This gave him hope. That was in great contrast to his experience at the Wyandotte County Jail where his circumstances were so bad that he cried out, "Oh God, stop this heart now." He believes it has made him stronger to face those circumstances.

Mr. Purkey offered that this writer was the first to put his life in perspective versus the treatment at Springfield and Rochester, Minnesota. He especially chafed at Dr. Pietz' comments at USMCFP that no matter what happened in his life "it still didn't change what you did." She was so antagonistic toward him that she spoke to him through the solid door food hole. In fact she screamed, "You are here because you raped and killed women." Dr. Pietz also said Mr. Purkey tried to manipulate his report with a tiny pencil. In reaction, Mr. Purkey refused to take the MMPI with a small pencil because of Dr. Pietz' attitude toward him. All these problems with her took place even though he was taking BuSpar and Tegretol.

Mr. Purkey was certain his case would go to trial. He felt heartened that the subject of poisoning was no longer taboo. He had uncovered actual evidence to back up his assertions that he had been poisoned. First, his wife was more talkative and admitted that she had tried to poison him. Second, his wife reportedly still possessed his ponytail, which had been cut off after the charged offense. Again, Mr. Purkey wanted that checked because he still believed his wife's poisoning of him had relevance to the present crime.

Mr. Purkey was feeling better because he found that he had mood shift triggers that came in two forms. The first was when he just woke up and there was a different activity on the day such as facility change or a family event. This was an internal thing. Externally, he might wake up "so fucking mad and can't do it that he becomes irrational." He finds he cannot stop this onset of irrational behavior and then fights to "get a grip." Sometimes it takes him three and a half or four days to get back together. Mr. Purkey was never certain what made him feel better. He did not feel the BuSpar was helping enough. He thought the Tegretol was probably helping.

He was greatly disturbed because his 24-year-old daughter was angry with him, so was not letting him see his 6-week-old granddaughter. This made Mr. Purkey feel so anxious that he became non-functional. He also then recalled that this kind of anger "in the system" is acceptable especially in the "cesspool of the penitentiary." He doesn't want that kind of anger that had kept him alive before when he was in the penitentiary. For example, he was so debilitated by the disagreement with his daughter that his thoughts spun around and he then saw bright and black flashes in front of his eyes. It helped him to think it through by writing his daughter. In this writing he shared that they were both hurting. He would attempt to reconcile whether or not his daughter would write back.

Mr. Purkey explained that his 24-year-old daughter Angie lives 1.5 miles from CCA prison. Angie's husband was jailed at nights due to marijuana possession and a DUI subsequently followed by three urinalyses positive for illicit drugs. Mr. Purkey believed his daughter was physically safe with her husband because he was a hard workingman.

Mr. Purkey was emotionally prepared for the hearing on October 17, 2002, but he still found it difficult to prepare for the encounters in the courtroom. He was especially anguished by the thought that the victim's family would stare at him. This was the hardest thing for him because he understood their grief, bitterness, and pain. He also melded some of the victim's experiences with his awareness that Angie, his daughter, was ashamed by his actions and that he was in prison.

Mr. Purkey very much wanted to show the remorse he felt so the victim's families could see it. He vacillated between an intense desire to "fight for his own life" and not plead guilty to the death penalty. He had felt this ambivalence for a very long time. He then observed that before he had these cases, he had never done any murders and yet he had done many things he wished he hadn't. His feeling of shame for having done wrong had been with him since he was a youngster with his mother. For example, she never let any children come over to their house. Since 11 or 12 years old, he was unsure how to proceed in life. He never stopped to think about how to relate to others back then. He knows his self-worth was very low and he tried to hide it. That was one thing that caused him to act so badly. He felt bereft, as there was no one there to help him. There was no one to take the place of his parents and help him.

Mr. Purkey admitted to longstanding suicidal ideation and frequent thoughts of self-harm. He found himself frequently self-destructive. When he was younger, he would steal even though he had money with the hope to "get away from his home," meaning his mom. He did not want to get away from his aunt or brother. Mr. Purkey believed his older brother "guided him down the hill" by beating him and introducing him to drugs.

Mr. Purkey was never secure in his entire life. Only drugs gave him a sense of security, especially when he took his mother's Valium. The Valium reduced his tension, anxiety, and fearfulness. Mr. Purkey is not sure he ever felt secure at any time in his life, except when he was married, at the end of one Kansas prison sentence, and with his Master Plumbing skills. Even so, when he feels increased internal pressure, he tends to feel distress or self-destructive. When asked if he ever had any relative security, meaning something that gave him a sense of purpose, Mr. Purkey commented that he liked to work toward goals, to stay organized, and that he liked to stay married. He had been married three times, twice to the same woman. Even so, he "became comfortable with chaos" so that when there was comfort and relaxation it meant something was wrong.

Mr. Purkey still did not yet know how to handle his internal anxiety. He was practicing to control it, but still had trouble.

On October 10, 2002, he had several observations about himself that he wished to share. The first regarded a 1982 Ft. Grant County Jail Arizona blackout (Bates #001583). He had a blackout while in the chow line. He is not sure what happened but he had been there on transfer from Florence, Arizona, a

State prison. This was the time when he had his initiation into the Aryan Brotherhood as a matter of physical safety.

Next, he referred to behavioral changes after a 1957 Chevy motor vehicle accident when he was treated at St. Francis Hospital (Bates #000287). He is not sure if he had treatment but referred to the doctor's name J.L. Ibarra.

Next, he recalled the July 10, 1988 Kansas State Reception and Diagnostic Center completed by Dr. Targownik (Bates #001545). Mr. Purkey recalled Dr. Targownik's compassion and his anti-prison stance. Mr. Purkey found Dr. Targownik sincere, especially since he revealed he had been a Nazi Concentration Camp survivor. Mr. Purkey felt that Dr. Targownik's favorable attitude toward him made him feel respected.

**Self-assessment of strengths and weaknesses -**
Mr. Purkey thought his best qualities were his tenacity, resilience, compassion, and willingness to grow. He thought he could recognize his mistakes and that he would attempt to overcome his mistakes despite how he died.

He endorsed areas of self-improvement as his false pride, that he manipulates others to boost his self-esteem due to his internal sense of insecurity, and his harshness. He tended to be overly sensitive to others and highly self-critical. He tended to let other people make their mistakes and then capitalize on them. He also tended to project blame onto others. He tended to misperceive others and feel others were maliciously acting toward him even when they were not. For example, he writes his wife and then tears the letter up because he projects his feelings into her. He then calms himself down and rewrites the letter in a more reality-based manner.

Mr. Purkey now believes he is sincerely motivated to make his life better. Yet, he still over-reacts and "gets angry when others don't acknowledge his effort." He often sees his own over-reaction that arises from feeing insecure. He then "emotionally beats himself to death." At times, he can stop his over-reaction with self-talk until he falls asleep. Unfortunately, it is very easy for him to slip back into an anger response when "he feels he is being fucked by CCA." Then, he can't focus on what he needs to deal with such as his criminal defense.

He was unsure what to do about his wife, Jeanette, because she wanted him pleased and happy. Now he "sucks up to her a whole bunch." This was when he caught her using his drug supply and he wanted her to stop. It had angered him that she did not appreciate how he was providing for the family and felt he deserved those drugs rather than her. She apparently felt trapped and wouldn't use it much. He wanted his wife to see that he had been locked up and very depressed. This was all before the present charged offense. Mr. Purkey could not understand why she didn't need to use drugs like he did. She used cocaine and he sent money to help her.

When Mr. Purkey was asked about the robberies he committed, he had no idea why he really did them. Some were planned, but most were impulsive. He was not sure of his motivations but just found it too easy to give into "ignorance."

**Preparation for October 17, 2002 –**
Mr. Purkey thought the October 17, 2002 hearing was quite critical. He believed he had uncovered lies by the FBI and he needed to do well in the Motion hearing. He wanted to convince the judge about the abuses he experienced at CCA. He was certain the cops at CCA intimidated him with their 300-pound size and by the words that he was not a "16 year old girl or an 80 year old woman."

At the hearing, Mr. Purkey testified for three and one-half hours. He thinks he did pretty well even when AUSA attempted to get him mad. Mr. Purkey stuck to the truth and told it all without losing control. He certainly did not fabricate evidence, wanted good documents, and was fully aware that "one lie would negate all his other cases" against the federal government. He was even able to use exhibits he had prepared at the county jail, which he had previously forgotten.

**LCF experiences –**
Mr. Purkey offered that he saw 10 to 15 murders when he was incarcerated at Lansing Correctional Facility. He "can't just let go of them." He changed his behavior since having been at Lansing and on the advice of this writer to "use the pen and paper to handle problems." He thought that was an appropriate alternative to physical acting out or violence. He feels he would not go back to violence as a problem-solving technique because "that part of his life is over." He still noticed that occasionally his self-talk becomes crazy and he whips himself into frenzy. Also while on the streets, he tended to stir up his wife when he was agitated.

The judge listened to all the information and did not provide a ruling on that day. Mr. Purkey remembered his ideas about The Green River killer, which he had passed on to Dr. Bill Howard.

After Mr. Purkey told this writer about the dismemberment, he began to experience nightmares. The nightmares were specifically about the dismemberment process.

**Present relationship with his attorney –**
Mr. Purkey trusts his attorney, Fred Duchardt but finds that Mr. Duchardt is "not perfect." Fred listens to him and that helps a great deal, although they occasionally "bump heads." Mr. Duchardt's assistant, Laura O'Sullivan, periodically visits and they have resolved Mr. Purkey's difficulty with her, frequently stating that she has to "speak with Fred" when Mr. Purkey asks questions. As early as September 2002, Mr. Purkey believed his conditions of confinement at CCA were highly unsatisfactory and were causing him difficulty-paying attention to his criminal case.

Mr. Purkey had filed a Motion to dismiss his case because CCA took a bag of his legal work and put it in the trash. He also had dental problems that the CCA staff was "ignoring." Mr. Purkey wanted a Motion to Dismiss applied because CCA had destroyed evidence. Mr. Purkey indicated that he was physically threatened by one of the guards. Mr. Purkey also felt that he was being retaliated against for the Motion to Dismiss because he was held in Administrative Seg, which required 23 hours in his cell and one hour out.

When he was at the Medical Center for Federal Prisoners in Springfield undergoing the evaluation by Dr. Pietz, he was kept in the 10D Unit. He felt

he "shouldn't have been there" meaning in that particular unit.  However, he was much more comfortable with the Federal system as he knew it much better.

Mr. Purkey had great difficulty with Laura O'Sullivan appearing with Fred. He preferred Fred's style and that Fred helped him stay stable. He wanted to stay on medicines because he needed the medicines for anxiety.  He broke form and used this writer's first name in a desperate attempt to express how much he needed antianxiety treatment.  He again stated, "I have been a Valium addict" because I was so anxious.  He did to want Klonopin to get high but "just wants relief, sleep, the ability to concentrate, and the ability to function."  Mr. Purkey had taken notes from the FBI, CCA, and Purkey transcripts to give to his attorney.  He believed his compassion for others would be readily evident to those who saw him at the hearing.

**EVENTS OF THE CURRENT LEGAL SITUATION:**
After release, he felt trapped because he wanted to be by himself all the time.  He had great trouble because he "came right out of the joint" to have to take care of three boys and a daughter.  He found comfort in first "working his ass off" and was happy to come home to a dog and play ball. However, when bills came he felt stressed and tried to adjust to the life changes.  He could not stop worrying because living in the penitentiary had been so simple.

Mr. Purkey was then asked to see if he could understand a pattern of anxiety behavior that made the penitentiary "simplicity" seem to appealing.

Mr. Purkey commented that on the day of Mary Bales' murder he was going to sign a bank note for a new home.  He had an excellent job and $10,000.00 to $12,000.00 of tools in his van.  Yet, he did not feel he fit in due to his background.  On the day of Jennifer's murder, there were no big worries as he had applied for a new job and was "just strolling along."  He could not come up with any real reason but his daughter said, "his selfishness caused two deaths."  He thought she was angry for not being there after he left Lansing in the 1980s.

He knows that when he left Lansing he could have stayed off drugs but "didn't know how to deal with" life outside the penitentiary.  His first job as with Clarks Mechanical as an Industrial Plumber but he was fired as he "needed to learn more."  This made him feel increasingly insecure because while in Lansing he had hoped to have a "cakewalk."  After Clarks Mechanical, he worked at C.J. Plumbing, which was a "better job due to more money."  He lowered expectations of himself and felt more comfortable in part because C.J.'s wife was a Larned Correctional facility counselor.

Mr. Purkey felt bad for overselling his abilities to Clark Mechanical. However, he ultimately worked at Reddi Rooter where he could call for help so he didn't feel so pressured.  He knew that at Clark he was overselling and that was "fucked up because he was compensating for his insecurity and handicap."  He perceived his stuttering as a handicap.  He didn't stutter when angry or slowly started speaking.  He thinks he always stuttered, especially after his mother threw whiskey in is face and yelled, "Shut the fuck up."  He also stuttered after she "beat him down."  Just talking allows him to stutter less.  He was immensely conscious of his stuttering.  He liked to use bridge words to make the stuttering less prominent.  When he was in the Oregon penitentiary he worked very hard to develop bridge words and use them.  However, those lists were torn up and that was frustrating.  He finds

it easy to normally onset words with a breath but people misinterpret him when he does that. His stuttering is worse when he is sad, blue, or fatigued. He also does better if he knows a subject well and has practiced with the words. If angry, tired and knows a subject poorly, he tends to stutter a lot. He truly wished he didn't stutter and is constantly embarrassed by it.

After January 22, 1998, he worked at Roto Rooter. Before Roto Rooter he worked at C.J. Plumbing, leaving because he did not get a raise of $2.00 per hour. He was last at C.J. Plumbing about the same time of year. Then he went into self-employment working for $12 to $15.00 an hour and "having lots of work." He needed insurance for his family and wanted "secure work." He did the self-employed plumbing for about three months under no business name. He also did plumbing and siding in Lansing. He was actually doing quite well except that he felt stressed about any amount of money he made. He seemed happier to be making less money because there were fewer bills. He loved his wife. He never was able to overcome the sexual difficulties he felt with his wife because she "didn't meet his needs due to the after-baby body changes." He found sexual intercourse with her less appealing because her vagina was not tight enough. He couldn't broach the subject with her but they tried anal sex as a way to give him a greater sense of tightness. He was unable to communicate this to her about his changed relationship toward her. He knew something was wrong and because of that their sexual relationship basically just stopped. They tried other techniques to increase the stimulation and she learned to focus on oral sexual stimulation of him. This was more pleasing. However, he felt bad because it did not satisfy her sexually.

After he had been out of prison for about three months, meaning approximately June 1998, Mr. Purkey got caught with his wife's girlfriend, Beth. This was when his sexual relationship with his wife was very poor. He felt a lot of frustration, often going to bars for quickies with dancers, or using prostitutes on Central Avenue. Depending on the level of frustration, he sought outside sex up to two or three times per week. It became a regular activity of his and he would make excuses to get cigarettes or lunch, or even help the women get to drug therapy. He never felt good about going out on his wife so he used the money he made to buy Jeanette nice things and new furniture. At times, some of these girls called his home and he would make it sound like they were calling about plumbing jobs. There were times when he would come home with his wedding ring off and he would make some sort of excuse.

Beginning in about March 1998 they moved to Wichita, Kansas for four months. They went there because his ex-wife, Clare, convinced him to come see his daughter whom he hadn't seen for about 15 years. Jeanette didn't confront him about this. While there, Mr. Purkey fought with his wife so he could leave and arrange for sexual liaisons. In reality, he wanted her to comfort him so he would not leave. He felt a tremendous need to be wanted and loved and cherished. During their disagreements she would feel affronted and not stop him from leaving.

His wife had been proud of him because they were "making a go of it." He would use her encouragement to feel proud of his own efforts. He always felt "destined to fail," meaning, "Every time I was doing well I would mess it up." In contrast, he liked service work. He had trouble staying with each employer out of "fear that he would be discovered." His fear was that they would discover he "had a lot to learn."

The emotional pressure mounted so that he used alcohol and drugs again. He would go to bars with other women than Jeanette, as she hated them. From the first time he used drugs he "let loose to forget about everything else." This meant he wanted to forget about his three kids, that his daughter needed her dad, and his "numerous failures." He just went into a "partying mode" so he used cocaine, methamphetamine, and had sex with women. Prostitutes were the best partners because there was no emotional commitment. ***

Before that three-month period, he never used any prostitutes before then. He carefully kept his drug use from his wife but used "all he could get." He did not have to pay for illicit drugs because Clare, his ex-wife, had a boyfriend who provided cocaine, marijuana, and methamphetamine. He used methamphetamine in joints. He often would get too drunk and too wasted but never propositioned Beth, a friend of Jeanette's, in the bar. Around that time, Beth made herself available for sex but he did not partake it. He wished that Jeanette would have reacted to Beth's sexual advances but Jeanette said nothing. This meant to Mr. Purkey that his wife gave assent to him being sexually involved with Beth. He really expected his wife to "slap him down." Clare would have done that. Unfortunately, because she didn't, he interpreted her silence as "not no is yes." Thus, he and Beth were "going to have fun." They frequently had sex as their only contact. There was much teasing and sex in the bar bathroom. This was pretty good sex. He liked the sex with Beth because it was "something new" as she had no kids and he felt energized by his sexual thoughts about her.

In one instance, they were at a party and he "rubbed on Beth at the pool." Others noticed but nothing was said. After the party was over he was pretty "hazy" because he was drunk and did not realize how he got home. However, when he got home Beth was on the couch, Clare was on the opposite couch, and Jeanette was in the bedroom. He immediately approached Beth sexually and she responded. He did not recall waking up on the couch but is certain he had good vaginal sex with her and they exchanged oral sex on each other. Mr. Purkey felt the next day he had been watched. The next day Beth called and told Jeanette, his present wife, about the previous night that sex never happened. However, Mr. Purkey labored under the "biggest guilt trip in the world." He decided he would never do that again ever, would begin AA, would deal with his shame, and would deal with his guilt. He went to AA that night. It really helped to stop all drugs and alcohol.

Later, Jeanette revealed that she had watched him have sex with Beth. He responded by trying to give her material things and using sex to make up for his lapse. The sex was not good because she was not inattentive to him. Thereafter, his relationship with Jeanette greatly deteriorated. He loved her and couldn't divorce her. He just "kept going," and used prostitutes to relieve his sexual tension. He really felt the sex with prostitutes was good because it was "no commitment, and a new thrill." He preferred one named Liz. He did not know why sex was so comforting.

Mr. Purkey stayed off all alcohol and drugs until he went to a party about one month before January 1998. He used cocaine for the first time in October 1997 but the high was different than with methamphetamine. He preferred meth because he could work while high but the crack cocaine just "whacked him out." He also did not like that cocaine gave him increased sexual desire but deprived him of an erection.

From June 1997 through October 1997, his relationship with Jeanette was "just a show." They did not hug or love each other any more. This was all from his end because she tried to increase the sexual adventurousness. He knows he still loved her but kept his sexual frustration under wraps. She tended to blame herself for his lack of sexual satisfaction and he denied that there was anything wrong. Even so, he kept up the show of getting her Teddy Bears, taking her flowers, and going out to romantic dinners. During that period they only had sex one time when they were in Wichita.

In October 1997, he worked at a Union company earning $26.00 per hour. He quit because he hated the pipe fitting union because he wasn't going to be a "pipe monkey." He earned many bonuses when he was at Lee's Summit working 12 to 14 hours per day, even a few hours on weekends. They loved the money.

Before Wichita, Kansas, he quit a job with the promise of a better track by being his own boss. He worked fewer hours to live in the Oak and Sage area apartments. He also worked part-time for himself but began to use alcohol and drugs again. He "cleaned himself up for the piss test" at Roto Rooter. He didn't like working for himself because the hours were too long, he had no leisure time, he was too tired, and he was too cold. Working for himself always made him feel like he had to "catch up on other things" because work absorbed too much of his life. Jeanette's mother and father encouraged him by saying, "Look at what you got in such a short time." They tended to use her against him. His wife didn't realize that he was also going to "T&A bars" and clubs and drinking because he "just wanted to leave everyone." He would occasionally come home mad and they would engage in sex. This was not particularly satisfying sex, but anything was better than nothing and he thought she enjoyed it. Mr. Purkey was certain that despite her desire to please him, his wife never understood his sexual needs. During the holidays at the end of 1997, they got into the spirit of buying nice gifts and shopping together. They kind of showed each other love by what they bought. However, the debt made him worry and "work more." He was proud of the money but he was too tired. He earned extra money at $10.00 to $12.00 an hour so he could buy his own tools.

Even today when he is with her, Mr. Purkey still loves his wife. He was never able to tell her that she just can't satisfy him sexually but "it is not her fault." He found it easier to "take the guilt than to hurt her by honesty." He did not want to hurt her because she had been "hurt all of her life." Mr. Purkey recounted that Clare's father had raped her, and guys and "fucked her and left her."

He did not want his boys to have a dad like "I hadn't." The boys knew nothing of the relationships he had with outside women. His son, John, is about 18. His other son, Izzy, is not biologically his as Jeanette was pregnant with him when they met. Mr. Purkey believed they did many things together and he taught them many things.

There were many problems during Thanksgiving, Christmas, and New Years, but they were only with Clare and her daughter. The principal arguments were about going to Wichita. Jeanette argued with him because she felt if they went to Wichita "she'd lose him." There were no separations from Jeanette at the time but he did see other women from his jobs. Tearfully, Mr. Purkey recounted that with those women he drank beer or smoked a joint, danced, and regardless of what happened he would not stay with them. Then, he would find a prostitute to get sexual relief without any kind of emotional attachment.

Sometime in December 1997 or January 1998, Jeanette challenged him because he was working a lot. Her girlfriend then moved into their basement and paid $250.00 per month. At this time, Mr. Purkey felt drained, achy, confused, and nearly paranoid. He thinks perhaps he was working too many hours. He accused Jeanette of causing fights over everything. He accused her of not wanting to move to Wichita and for looking for a way out of moving to Wichita, but he felt like he couldn't leave his boys. Tearfully, Mr. Purkey recounted that he felt closer to them than he did to Jeanette. At that point, John's dad wanted to re-enter his life. It seemed like his ex-wife cared more about the boys than their own "flesh and blood" in Wichita. He felt manipulated by Clare who arranged to have her boys around him during the holidays. He knew he loved the boys more than Jeanette and left her out of the "daily stuff."

Mr. Purkey's paranoia was increasing because he was using drugs in order to be able to work. He hid his meth use from Jeanette. He used drugs and hid it from his boss so he could catch up with his deadlines. He became very irritable with his sons. He would scream at traffic problems. He decided to go to Roto Rooter to decease his stress. He also thought Roto Rooter would give him his own truck. He wanted to go to Roto Rooter in order to avoid interacting with other people because he "needed to be by himself." He wanted to work and not make small talk with anyone. He did well, but would occasionally get lost.

At one point, he used the Roto Rooter truck when he and Jeanette were looking at a new place in Wichita. His boss thought he had "took off" and took the Roto Rooter van even though Mr. Purkey did not think he was doing anything wrong. Mr. Purkey felt affronted that his "place was invaded" and the boss had let his dogs lose. This was not long after Jennifer was killed.

Jennifer was killed on January 22, 1998. This was the day that he passed his urinalysis and put in his application at Roto Rooter. He had been using marijuana so he was quite paranoid. He smoked a small joint before writing up the application. When he applied for Roto Rooter he toured the plant and found it fascinating because he liked the equipment. He easily passed the checkout at Roto Rooter. However, he felt depressed and stressed because this new job meant, "here we go again," that he was far from home and "should have been happy." He knows that on the application there was a box for "convictions and felonies' and he answered "no." He was somewhat comforted by the knowledge that once hired on at Roto Rooter he could train with a partner and looked forward to that.

On the day of Jennifer's death, he left Roto Rooter in his own truck. He was headed toward a second hand shop to buy a rocking chair. Along some street he picked up Jennifer whom he had not known before. He wanted one-half rock of cocaine and then went looking for it in different car lots because there was nothing to do. He was looking for a big Chevy pickup. She looked like a streetwalker to him, meaning a prostitute. When he picked her up he had already smoked one rock and pulled up asking her the best way to Broadway. He asked her to go "party." To him this meant a date with a prostitute. After he picked her up, he got something to drink and Gin for her. They drove along Truman Road. He drank Jack Daniels. She wanted orange juice so he stopped at doughnut shop for orange juice to give her and Coke for him.

Jennifer then offered she had been in a fight with two black girls at her high school. He commented that he thought she was a streetwalker because she

did not have a book bag. He also thought she was 19 years old. He still wanted to smoke crack and told her he wanted to go to Kansas City, Kansas so she said, "sure." They were looking for a house to buy crack but found none. They then went to a gas station where he paid a guy $50.00 for three rocks.

Jennifer wanted to go to Kansas City, Kansas with him. At that point, he had his work knife with him. This was a 3-inch blade pocketknife. He told the FBI that he held the knife to her to insure that he got a "federal crime of kidnapping." His wife knows the truth that they drove around Leavenworth, Kansas and Jennifer didn't mind. They kept drinking and purchased more orange juice at the K-7 Town & County. They went in to the T&C lot together. They went in together and bought cigarettes. He smoked more of the crack. There was no sex between them and no "partying." He was waiting for the alcohol to "have its effect so they could have a private party at his place."

Mr. Purkey thought of having sex immediately with Jennifer when he picked her up. Her story about school didn't matter at all. He might have been less interested in her because she was not a prostitute. All he remembers is that they were getting high and nervous. When they went to his house his wife was gone. He did not rape her at a car wash because it was too cold.

Jeanette was working at the Airport Ramada. She was in housekeeping.

When Mr. Purkey drove to his home he parked in the garage. Jennifer used the bathroom and he used the bathroom. He put 98.9 on the radio, put pillows on the floor, and told her to sit next to him. He kissed her but she was not "sure it was right" because he was so much older than her. Mr. Purkey did not want to have sex with Jennifer in his bedroom because that was his first house with his wife.

He turned the Playboy Channel on to "put her in the mood for sex." Unfortunately, he felt she wasn't really interested in that.

The fireplace was not lit. Jennifer was willing and got some lotion for lubrication because she said she was a virgin. Mr. Purkey liked that story because he "hadn't met many of those." He took her shirt and shoes off. She declined his encouragement her to touch his penis and he said that was "okay." At that point, she was wearing shoes, socks, pants, and panties. He could tell she was sexually experienced, found the interaction nice, and felt lonely. They kissed and caressed each other but she declined his putting his hands between her legs because she "didn't feel right due to their ages." He asked her to try it, continued, and used two fingers in her vagina, then felt she was a virgin. This made him embarrassed because of his desire for her, but she wanted him to quit. He climbed onto her and she said she did not want to have sex. He lifted her legs and was "too aroused to stop" and had vaginal sex while she was not willing. Even though his clothes were on, he remembered that the crack had increased his sexual desire. Afterward, Jennifer said she would not say anything if he would just release her. He did not think releasing her was good, but allowed her to put her clothes back on, remarking at how pretty she was.

They only had intercourse once. He felt she "could have enjoyed it" if she had wanted to. He seemed to feel he developed much more of a relationship with her and knew she was a good person. He felt guilty, thinking to himself, "This ain't the kind of girl you use." Mr. Purkey felt Jennifer was

a "good girl." He saw her mother and felt sadness and did not feel good about what he did.

Ultimately, he killed her at home. He believed she came to his house willingly so it wasn't kidnapping. He told the kidnapping story "for the FBI so he could get into the federal system."

This was another situation in which "not no is yes."

Ultimately, Mr. Purkey "winged his story" to the FBI. He burned her body in the fireplace. He did not keep anything of Jennifer's. He tired to show respect after having done this to her by "holding her, caressing her, apologizing, and finding a place to put her to rest." He did not want her to be found in "a barrel", a reference to John Robinson's actions.

After the sex, Jennifer wanted to go home. He took her to the sally port in the garage, which was a room in the basement. The room had a couch, weight bench, and chairs. This was a place he tattooed on weekends. He talked with her and grabbed her by the hand. She wanted to go home and he reminded her that he could go to prison. She said she would not tell anyone. However, Mr. Purkey remembered that she knew where he lived. She that stated she couldn't find the place. She became very scared and said she wouldn't tell on him. In this interaction Jennifer said, "What will we do?" She tried to reassure him but he held on to her arm too tightly for her to feel comfortable. She pulled away and said she was going home but tripped on the weight bench. He grabbed her and in the process the weight bench flipped on to them.

At that point he saw a knife "in her hand." He took it from her, cutting his hand in the process. She asked him to please not hurt her and to let her go home. He thinks he stabbed her 15 times because there was "blood everywhere and holes all through her." While he stabbed her he kept hearing "the pops of the holes." He knows that knife stabbings ripped her throat, cheek, and arms. He could hear her gushing air. While he was stabbing her he kept thinking he didn't want this to happen. He did not want her to get away and that was why he was killing her. He knew he did not have to kill her if she hadn't wanted to get away.

Once Jennifer was dead, he caressed her, pushed her hair back, and cleaned up her bloody face. He thinks he sat with her for 15 minutes and knew she was dead. There was blood on the walls, floor, the couch, and cabinets. He "got rid of all of it." On that day all he did was hide her body. Then he took care to hide any of the traces of evidence. That is, he washed down the area. He put her in a toolbox, which was in that room. This toolbox was one he had stored clothes in. He put her in it with her clothes on.

Jeanette arrived home about 5:30 or 6:00 pm. They watched the Playboy movie and then had sex after that. About an hour later he began to clean up the basement. Soon, the boys arrived home from school. He cleaned up "for that day." Later, he washed the other room, burned the shelves, and thought about what to do with Jennifer's body in the box. He thinks that when he put her in the box she "sighed a few times." He did not stab her anymore but checked her pulse and heart, knowing that she was dead.

He put her in the toolbox knowing there was nothing to stop the smell. He wasn't that concerned because it was cold. He took no special means to keep

her body cold.  He started dismembering her the next day with his electric chain saw in the garage.  Her body never came out of the toolbox.

After he dismembered her, her body parts were put in bags and he put her back in the box.  He put leaves on the box.

Next, he took out the wood shelves and told his wife that he was going to tear out the shelves to make the room better for a girl who would move in.  He washed the walls 10 to 12 times, cleaned to the drain every time, and made sure the drain was well rinsed.  His wife didn't question this because she knew he was a "clean freak."  He didn't know it, but he used so much water that he knocked out the phone line, not discovering it until 10 days later.  He moved the body parts several times.  The first time was with his son, John.  He told John they had trash to move to a Missouri site.  He put the bags in a wooden box from an old construction site.  Jennifer's body was in five or six bags at the time.  He took the bags to a dumpster but got them back the next day as he was concerned they might be discovered.  When they went back to get the bags, John saw a trail of blood.

At that point, Mr. Purkey bought several cords of wood and had to reopen these bags as the parts of her body were too large to burn.  He cut the parts into smaller parts so they could be burned.

Mr. Purkey watched the burning process and "felt terrible."  It made him feel horrible to have to break up her skull, to break up her long bones, to take her teeth out, and to make sure that he cleaned everything up.  He only worked certain hours but sometimes his boys were home.

He felt terrible because he knew she wouldn't have been dead except for the situation he caused.

Mr. Purkey dismantled the chain saw and cleaned it up.  He cut other people's wood for "weeks" and used diesel fuel to clean up the chain saw so there would be no trace of Jennifer on it.

When Mr. Purkey used the chainsaw he just tried to cut things up by size but found it very hard to cut up the tissue.  He really did not know what he was doing.  He had not read any Bob Berdella books. This was no fantasy of his, to cut Jennifer's body up, and did not give him any sexual excitement.  He undressed Jennifer's body before he dismembered her body and burned part of the clothes.  He did not burn her panties, bra, or socks.  He told the FBI where they were.  He also told the FBI the location of her jaw and teeth along Highway 5.  He even attempted to show the FBI where he had done that.  On the one hand, this was horrible.  He found the intestines were hard to cut.  Her hair bound up the saw.  He held her heart and looked at it because he had never seen a human heart.  He didn't care to see the sex organs and it didn't matter anyway because he had cut straight up the pelvis.

He had many fires in his fireplace.  After burning some of Jennifer's body, he would sweep out the fireplace, wet-dry vac the fireplace, Clorox the fireplace, and dumped the ashes.

Mr. Purkey deposited bags of ashes from the wood and Jennifer's body in the farm pond.  He thinks there could have been small bones in there but he didn't really check.

The first night after Jennifer was dead; he cut his hair to change his appearance. He told his wife that his job required it. This is the 10-inch ponytail she has and he is sure that it will show what drugs she poisoned him with.

He did not read any Ed Gein books. However, he was fascinated with the appearance of Jennifer's brain.

Mr. Purkey did not have any flashbacks afterward. He had no idea about her jewelry. His relationship with Jeanette was the same, although he felt more stressed. He cleaned up the open basement area and then rented it. He even washed his weights down to make sure there was no blood on them.

During this time, he felt suicidal because he felt "totally worthless." He knew his life was over whether he was caught or not. He increased the intensity of his drinking and his dope. He almost "over amped" several times when he used "10 Ritalin in a spoon." He did not entertain any homicide and suicide ideas. He would never hurt his boys or his daughter.

He had one flashback about Jennifer. That was when he was with Ms. Bales. When he killed Ms. Bales, he saw Jennifer's head caved in. That was very upsetting, so he covered Ms. Bales' head up with a cloth. To this day, he cannot figure out why he killed Jennifer because a rape conviction would have only given him five additional years.

Mr. Purkey stated there were no other bodies.

As he expressed himself, he cried freely. He then offered he was still quite angry with his parents because "they needed this done to them." He was very embittered that they are free even though they caused this in him. Just explaining what happened caused him to feel somewhat more relieved.

Once his catharsis was finished, Mr. Purkey related how bad he felt about what he did to Jennifer.

After Mr. Purkey told this writer about the dismemberment, he began to experience nightmares. The nightmares were specifically about the dismemberment process.

He recounted again how he looked at her heart and it had two holes in the mid-sternal area. He actually saved the heart at least for a time, and there were things he wouldn't tell this writer because of his death warrant. Even so, the entire set of events swirled through his mind especially since he "never wanted it to take place anyway."

Mr. Purkey clarified that when Jennifer ran he chased her down in an instinctive way. Instinctively the knife came up and he used it in a rage. He felt himself "going off" and he couldn't stop stabbing her but he did not intend to kill her.

Jennifer didn't say anything and he didn't say anything. He really wanted to go back and change his life, especially since he turned 51 years old. He tried to express that he was dealing with his life struggles. He felt like he lived in two or three worlds. These included life in the penitentiary, his past, his wrong thinking, and his bad marriage. He wished he could have admitted to his wife that he needed prostitutes.

Mr. Purkey clarified that he used a whore to get two rocks for himself and one rock for Jennifer. Neither had sex with the whore, but Jennifer was in the truck during the whole time.

When Mr. Purkey made a statement to the FBI he told them on the second day of interrogation that he wanted an attorney. He told the agents that he would make a deal with them that he would "not come out of the federal system." He was certain in a "LWOP deal" in exchange for telling the FBI agents where Jennifer's remains were. He only gave information about the events because he believed he had a "life sentence" and "could get down the road." Before the last appointment, Mr. Purkey had read the book by John McCain entitled *Faith of My Father*. This gave him some coping mechanisms because he strongly identified with John McCain's "real suffering, real principles and real values." The readings made Mr. Purkey wish he had parents like that, who communicated and gave love. He was especially inspired by John McCain's refusal to leave the Vietnamese prison unless all other prisoners of war came with him.

SUMMARY OF PSYCHOLOGIC TESTING:
January 5, 2003 Psychological Assessment completed by Bruce A. Leeson, PhD - This testing was completed in April 2002 and December 2002. Mr. Purkey was found to be "totally cooperative." Dr. Leeson indicated that he reviewed 16 sources of information and provided six salient elements of history as they pertained to head injury and neuropsychological focus of his assessment.

The salient records included a March 8, 1968 St. Joseph's Hospital admission in Wichita, Kansas for a motor vehicle accident. Mr. Purkey was diagnosed with cerebral concussion and spent approximately one week in Intensive Care following the accident. He also had multiple lacerations of the left face, anterior neck, and shoulder. Thereafter, Mr. Purkey was troubled by headaches, episodic dizziness, and blurred vision for eight months. He also had social difficulties in school. Second, on April 29, 1968, Mr. Purkey was again treated at St. Joseph's Hospital in Wichita, Kansas for contusions and multiple facial abrasions related to a motor vehicle accident. X-rays did not show fracture of the skull or spine and there was no indication of a neurological workup. Third, Mr. Purkey was admitted to St. Joseph's Hospital in Wichita on August 31, 1972 after his car had been rear-ended while he was working on the engine under the hood. Mr. Purkey reportedly lost consciousness for several minutes. Admitting diagnosis was multiple lacerations of the face and forehead, as well as acute cerebral concussion. Discharge diagnosis added "plus emotional instability and behavior problems, partly genetic and partly environmental." Fourth, Mr. Purkey was treated at St. Joseph's Hospital in Wichita on March 28, 1976 for a facial contusion. He likely had a green-stick fracture of the left cheekbone. The attending physician noted that following a car accident a few years earlier; Mr. Purkey's behavior had changed. This included onset of impulsiveness, immaturity, and "doing things very carelessly as if he wants to be apprehended." Last, Mr. Purkey had been knocked unconscious during a fight on a basketball court in the Oregon Department of Corrections.

Dr. Leeson summarized his findings. These included the PAI-2, which showed some inconsistent responses to similar items. However, Mr. Purkey answered in a reasonably forthright manner and did not attempt to present an untoward impression. Mr. Purkey was described as suffering from a history of severe substance abuse, prominent stress, prominent anxiety, and mild to moderate

depression.  He endorsed items that suggested he was pessimistic, dwelled on thoughts of worthlessness, dwelled on thoughts of hopelessness, and dwelled on thoughts of personal failure.  He had a significantly higher than average risk for suicide.

On a test of memory malingering, Mr. Purkey was not malingering and had put forth a reasonable effort on that task.  Mr. Purkey "performed within expected limits on most measures of clinical brain function with the exception of planning and sequencing, response inhibition, olfactory acuity, and sustained focused attention."

Intelligence and memory testing by WAIS-III and Wechsler Memory Scale-III, noted that Mr. Purkey scored average or low average on IQ scores.  His full scale IQ was 90, with a performance of 85, and verbal of 94.  He showed relative strengths in verbal subtests and vocabulary subtests with significant weaknesses in comprehension, social judgment, and abstract reasoning.  He showed significant weakness on block design, a measure of spatial reasoning.  Dr. Leeson reasoned that the difference between performance and verbal IQs was enough to suggest brain-based cognitive dysfunction.  Mr. Purkey's Wechsler Memory Scales were in line with the WAIS-III, meaning that he functioned in the low average to average range.

Dr. Leeson performed a series of executive function tests.  He listed the tests and their significance.  Mr. Purkey showed some evidence of frontal brain impairment on the basis of the results of the Trail Making, Design Fluency, Color-Word Interference, Sorting, Tower Test, Proverb Test, and Test of Variables of Attention.  Mr. Purkey had some temporal lobe region dysfunction on the basis of verbal fluency and sorting results.  He showed average or slightly better than average abstract reasoning on 20 questions and average functioning in word context.  Mr. Purkey also reportedly had difficulty with olfactory impairment (the capacity to smell, possibly suggesting damage to the underside of the frontal lobes, the ventral surface of the frontal lobes).

Dr. Leeson conceptualized that a description of Mr. Purkey's behavior must include frontal lobe dysfunction as a significant element.  When distressed, Mr. Purkey was likely to act quite impulsively and without the ability to modify his actions.  In Dr. Leeson's view, Mr. Purkey had a brain-based disorder so that in situations where expectations were unclear and there was emotional arousal, his actions may not be considered, tempered, or moderated.  Intoxication would exacerbate his problems.

Dr. Leeson added that Mr. Purkey had significant anxiety and moderate depressive symptoms at the time of the assessment.  He was being treated with BuSpar at the time but produced a valid assessment.  His success as a plumber was somewhat surprising to Dr. Leeson given Mr. Purkey's difficulties with spatial reasoning.  Dr. Leeson reasoned that Mr. Purkey might have sustained a degree of right parietal lobe damage that he overcame by compensation.

Dr. Leeson reasoned that the aggregated results showed a "subtle but consistent pattern of deficits that are likely reflective of frontal lobe dysfunction."  There was no clear frontal lobe syndrome, but Mr. Purkey evidenced factors often seen with this difficulty.  Mr. Purkey also showed the inability to complete some timed tests.  Dr. Leeson advanced that when aroused by task challenge or time constraints, "Mr. Purkey's behavior is likely to become disorganized, inefficient, and inflexible."  Dr. Leeson

could not determine when Mr. Purkey sustained frontal lobe trauma. The 1968 motor vehicle accident represented a leading hypothesis, especially in view of a physician's later reference to Mr. Purkey's maladaptive behavior. Mr. Purkey's rich history of polysubstance abuse was "significantly linked to head injury, although directionality cannot be inferred…"

It is clear from Dr. Leeson's report that the majority of his assessment took place during April 2002. This was only about a month before the MMPI-2 was administered to Mr. Purkey at the US Medical Center for Federal Prisoners in Springfield, Missouri.

**MMPI-2 May 29, 2002 –**
This answer set was re-run at Logan & Peterson, PC. Mr. Purkey produced a valid MMPI-2. He cooperated, admitting to a number of psychological problems in a frank and open manner. Such persons with this profile tend to be blunt and may openly complain to others about their psychological problems. Such persons tend to be quite self-critical and may appear to have inadequate psychological defense mechanisms. He may be seeking psychological help due to feeling that things were out of control and unmanageable.

Symptomatically, Mr. Purkey produced a 46/64 profile with very high definition. These were likely to be accurate portrayals of his personality and symptoms. Persons with this profile tend to be chronically maladjusted. Behaviors like that include immaturity, self-indulgence, manipulating others for their own ends, obnoxious, hostile, aggressive, and rebellion. Despite difficulties with others, such persons tend to refuse to accept responsibility for their problems. Such persons may have exaggerated or grandiose ideas of capacity and personal worth. Such persons are likely to be hedonistic and may overuse alcohol or drugs. Such persons tend to be "quite impulsive and may act out against others without considering the consequences." Suspiciousness, aloofness, and inapproachability are common. Paranoia and externalizing blame are likely present. There may have been past attempts at suicide. A high degree of anger is also endorsed. A high potential for explosive behavior at times is possible. The world is viewed as threatening and such persons believe they have been unjustly blamed for others' problems. This person may feel he is getting a raw deal out of life and may have an inability to control anger. Verbal or physical attack is possible when the person is angry. This 46/64 profile is very rare, occurring in less than 1 percent of the MMPI-2 normative sample of men. The 46/64 profile was one of the more common 2 point codes in prison settings. This was a very stable profile.

Interpersonally, the MMPI-2 suggested that Mr. Purkey had difficult interpersonal relationships. He could be resentful and quite uncompromising. He may have manipulative and self-serving behavior that causes great difficulty for people close to him. He may go into rages because of his poor impulse control and low frustration tolerance. He tends to blame others for his problems that he has helped create. His petulant and demanding behavior may place a great deal of strain on his marriage. He may be threatening or physically abusive when he feels frustrated. His marriage was likely quite problematic. He reported a number of marital problems possibly important to understanding his current psychological difficulties. Interpersonally, he viewed his home life as unpleasant and lacking in both love and understanding. He felt intensely angry, hostile, and resentful of others. He would likely like to get back at them. He was competitive, uncooperative, and likely to be very critical of others.

Diagnostically, the MMPI-2 suggested that Mr. Purkey was suffering from a personality disorder. Probably this took the form of paranoid personality or passive-aggressive personality. He had symptoms of a paranoid disorder. He also had many characteristics of a substance abuser. He acknowledged these problems. His typology was not consistent with those of typical convicted felons.

From a treatment standpoint, Mr. Purkey was unlikely to seek psychological treatment on his own. He tended to resist psychological interpretation, could argue with others, and could rationalize or blame others for his problems. He acknowledged his problem with alcohol or drugs.

Visual inspection of the MMPI-2 results in comparison to John R. Grahams *MMPI-2; Assessing Personality and Psychopathology*, 3rd Edition, added some additional elements. First, validity scales suggested that Mr. Purkey may have some very deviant social or religious convictions or may manifest clinically severe neurotic or psychotic disorders. He may have presented himself in an unfavorable light. This could have been a plea for help or may be confusion resulting from organic or functional difficulties. Such persons tend to be ineffective in dealing with problems of their daily lives, and have little insight into their own motives and behavior. Generally these persons are socially conforming, inhibited, and have a slow personal tempo. However, their outlook on life is characteristically cynical, skeptical, caustic, and disbelieving. They tend to be quite suspicious about the motivations of others. The 46/64 code type noted that such persons tend to be immature, narcissistic, and self-indulgent. These are passive-dependent persons who make excessive demands on others for attention and sympathy. However, they resent even the most mild demands made on them by others. Men with this code type tend not to get along well with others in social situations, and are especially uncomfortable around members of the opposite sex. Such persons avoid deep emotional involvement. Poor work histories, marital problems, repressed hostility, and anger are very common. Sarcasm, irritability, sullenness, argumentativeness, and generally obnoxious behavior are also possible. Such persons especially resent authority. Such persons tend to deny psychological problems, rationalize and transfer blame, and accept little or no responsibility for their own behavior. These persons are somewhat unrealistic and grandiose in their self-appraisal. They tend to deny serious emotional problems, so they are generally not receptive to traditional counseling or psychotherapy. Among psychiatric patients, passive-aggressive personality, Paranoid Schizophrenia, and Pre-psychotic or Psychotic Disorder is likely. Alcohol abuse and difficulties with the law are common. Vague emotional and physical complaints are common. Such persons frequently feel nervous, depressed, indecisive, and insecure.

**DIAGNOSTIC FORMULATION:**
More than sufficient information was gathered to provide a psychiatric diagnosis of Mr. Purkey. This diagnostic formulation is derived from the prior psychiatric assessment, update of his functioning, discussion of the events of the charged offense, review of extensive institutional records, review of law enforcement reports, review of paper-and-pencil psychological testing from USMCFP-Springfield, and neuropsychological testing by Bruce Leeson, PhD. Mr. Purkey's general psychiatric functioning has not appreciably changed over the interval from the prior assessment. A biopsychosocial model is utilized with Mr. Purkey. This means his present functioning is discussed under three broad areas. These are the biological,

psychological, and socialization influences on his capacity, thinking, and behavior.

Biological elements are commonly thought of as developmental abnormalities, traumatic exposures, toxic exposures, and intoxications that cause either permanent or temporary functional abnormalities in brain functioning. Psychological contributors are crucial developmental experiences during childhood, young adulthood, and adulthood that impact Mr. Purkey's formation of his personality structure. These can be both positive and negative experiences, and either transient or permanent. Socialization contributions are generally thought of as situational elements that contribute to a person's behavior for a specific instance or set of circumstances. These will be described and then summarized according to DSM-IV-TR diagnostic format. The DSM-IV-TR is the current model for a psychiatric diagnosis. As with any complex human behavior and the evolving nature of the DSM-IV-TR, not all behaviors fit neatly into diagnostic categories.

Biologically, Wesley Ira Purkey was born with a strong predisposition to substance abuse and dependence. Both his parents were addicted to alcohol, demonstrated many maladaptive behaviors in their use of alcohol. His first degree relative, his brother, also had substantial alcohol and drug abuse difficulties. These maladaptive behaviors included encouraging Wesley Purkey to drink alcohol and use drugs in his pre-teen and teen years. He was also included in adult parties while he was still very much an impressionable minor and of tender years.

Second, biologically, Mr. Purkey suffered several head injuries as described in clinical records and by Dr. Leeson. At least two of these included lengthy periods of unconsciousness and sequela of headaches for several months. These head injuries likely caused frontal lobe and temporal lobe brain damage as described in Dr. Lesson's January 5, 2003 report. Notably, serial records from St. Joseph's Hospital in Wichita, Kansas noted that from August 1972 through May 1976, Mr. Purkey underwent a behavioral change as a consequence of a car accident. In addition, the paper-and-pencil MMPI-2 completed on May 29, 2002 by Mr. Purkey suggested that organic impairment and pre-psychotic disorders are likely.

While there are no evident obvious seizures, Mr. Purkey demonstrated paradoxical rage attacks, not inconsistent with a history of temporal lobe and frontal lobe dysfunction. The temporal lobes are thought to be the seat of emotional control, while the frontal lobes the seat of judgment, impulse control, and the ability to modulate hedonism. Mr. Purkey's repeated history of overwhelming rage attacks, seeking pleasure through illicit drug use, and frequent inability to refrain from becoming angry even when he knows better, is consistent with frontal lobe brain damage. Such behavior is also complicated by severe personality fragmentation.

Third, Mr. Purkey had had a 30-or-more-year history of intravenous drug abuse, using all manner of injectable drugs, and use of all manner of ingestible drugs. As late as September 1998, he had bilateral forearm cellulitis from injecting crushed Ritalin. His very lengthy use of drug puts him at high risk for blood born diseases, exposure to over-dose levels of psychostimulants which can result in multi-infract dementia, toxic adulterants, infectious injections, and carrier compounds not meant to be injected. Along the same lines, Mr. Purkey engaged with numerous prostitutes of unknown cleanliness, thereby exposing himself to many possible sources of

sexually transmitted diseases such as Hepatitis C. He had some documented sexual encounters in prison, also exposing him to potential infectious agents.

Fourth, Mr. Purkey has been in a number of fights which could have caused concussions. The most recent was just before transfer to USP Leavenworth in June 2003. Prior to transport, officers slammed his face against something so hard that he suffered facial lacerations, requiring up to 20 stitches. Such an impact might be forceful enough to cause injury of his brain by bouncing it off the front and back of the inside of his skull. No medical reports are available about that. The mechanics of this injury could cause further damage of the frontal and temporal lobes, as well as potentially at the occipital lobes.

Psychological contributions to his current behavior include that he perceived his family as sexually, physically, and emotionally abusive. He previously described physical beatings by is parents, intense wholly inappropriate early exposure to adult situations such as being recommended to prostitutes by his father, and longstanding reported sexual abuse by his mother. He also reported physical beatings by his older brother who also introduced Wesley to illicit substances. Mr. Purkey always felt bad about himself, never felt good about his accomplishments, and found the only relief from intense childhood distress, probably due to Post-traumatic Stress Disorder, only by injection of intravenous narcotics. Other than that, he never experienced any happy childhood memories. When he was ultimately placed with his maternal aunt, he loved the nurturing environment, valued her efforts on his behalf, and yet felt it was already too late for him even in his early teen years.

Mr. Purkey harbors deep bitterness toward his parents. He strongly believes a substantial portion of his behavioral dyscontrol arises from the intense abuse experience he received at their hands. While he was frequently angry and at times suicidal about this, Mr. Purkey more intensely carries a deep burden of feeling unworthy. He feels unworthy of success and frequently defeats potential successes either through anger outburst, drug use, dangerous sexual liaison, or inability to overcome his internal disintegration. A good example of his deep self-doubt is that he never feels he ever measures up to anyone's expectations, frequently buoys himself up by boosting his skills to others, and then fears discovery that he might be a fraud of some kind. This cycle of failure, intense self-doubt, deep anxiety, depression, and anger control problems are not uncommon in persons who have been victims of childhood Post-traumatic Stress Disorder.

Second, Mr. Purkey has a deep sense of needing to be wanted, desired, and taken care of. When his needs for affection and nurturance are not met, he can fly into a rage, not unlike an infantile rage, then have extreme difficulty calming himself. Many times during these rages, he cannot recall what his motivations are except that he has lashed out instinctively. At times it seems he cannot stop the rage response until it has run its course, dissipated his pent-up feelings, and left him feeling transiently powerful. According to his self-report and direct observation, Mr. Purkey seems to have much better control over his rage attacks when he is on a therapeutic dose of Tegretol and an adequate dose of antianxiety such as Valium or Klonopin. He managed much psychological distress as a young man by stealing his mother's Valium. Over the course of the present assessment, Mr. Purkey showed substantially increased emotional control when he was on between 2 and 3 mg

of Klonopin per day. He was much more able to focus on preparing his defense, avoid extreme overly-emotional responses to interactions with others, and be less dependent on intense focused relaxation techniques to control his nearly continuous, almost overwhelming anxiety.

Third, Mr. Purkey's early experience of sexual victimization by his mother and abnormal exposure to prostitutes at the encouragement of his father, predisposed him to develop an abnormal attitude toward his own sexuality. This was not biologically determined by a psychologically mediated behavior largely ingrained due to the early trauma. As an adult, Mr. Purkey has come to value frequent sexual release as the only reliable soothing experience in his life. There was a ritualized, scripted, anonymity to most experiences as indicated by his love for his wife, but preference for anonymous sex with prostitutes. This likely represents an important control of intimacy issue for him, which he must have never learned as a child. He clearly separates affection from sexual release, frequently engaging many women in potentially self-destructive manners, even taunting his wife when feeling that she could not provide the specific sexual sensation he needed. While this had specific socialization elements to it, the beginnings of his sexual difficulties arose from childhood victimization and excessive stimulation.

Fourth, in the death of Jennifer Long, Mr. Purkey was experiencing intense emotional distress. This included marital distress due to sexual dissatisfaction, intense guilt about not making enough money, intense guilt about making money but not being good enough as a plumber, intense guilt about needing anonymous sex which he kept from his wife, excessive alcohol intake, and intense crack cocaine use. It may have been that Jennifer Long personified the fantasy of the skilled prostitute because he had such intense distress over his difficulties adjusting to life on parole. When it became increasingly clear that she could not comply with his sexual ritual, his fantasy for at least temporary relief from his intense distress was destroyed. Thus, he attempted to alter her behavior to make her comply with his perceived notion of what a "virgin" prostitute should do, and how a prostitute should comply with his wishes. Recall that he said "she could have enjoyed it" that is the rape. Jennifer was unable to do that and a rage attack began to build. He realized the potential for continued freedom was completely over, by his own misjudgment of her as a prostitute. Most likely, the rage began as humiliation at his own poor judgment. Thus, he never initially intended to kill, dismember, burn, and dispose of Jennifer Long's body. They arose as a natural consequence of his desperation to salvage something of a normal life, using his most reliably defense mechanism, that of acting out. However, he was too damaged, impaired, and untreated to refrain from killing and disposing of Jennifer Long.

Socially, Mr. Purkey has always tried to perceive himself as a good person who has done bad things, but still deserves forgiveness. His rendition of his family life strongly suggests that he never felt valued, never felt he had been given the benefit of the doubt, and never really felt his parents nurtured him. He developed a pattern of seeking comforting sexual releases, however short lived, usually with women, and striving for the financial American dream through hard work. He always found himself caught up in self-defeating behaviors. These self-defeating behaviors were pervasive whether it was not sharing critical disagreements with his wife, Jeanette, or engaging with other women who could not do anything other than damage his relationship with Jeanette, or engaging with other women who could not do anything other than cause him more suffering. A classic example of that is

his sexual involvements with friends of his wife, allowing himself to be manipulated by his ex-wife Clare, seeking sexual fulfillment in numerous prostitutes, and seeking to redress any wrongs to Jeanette with sham sexual interest, as well as lavish gifts. He had tremendous capacity for hard work, though it is unclear how well he could sustain working for any employer due to his difficulties with authority figures and his intense self-criticism. He constantly had difficulty prioritizing what needed to be done so that he was either over-worked or financially over-stretched, or over-tired, or feeling unappreciated, or over-burdened by trying to right the wrongs to his children and significant others. Thus, Mr. Purkey really never had any reasonable unfettered access to just feeling good about himself. He had to be somehow sexually related to a woman, be high, be drunk, be successful, be nurtured or he would be stuck having to face what he thought was his own tragic life. It is not surprising that he found intense comfort at the experiences of Senator John McCain who reportedly vividly described intense seeking to do right, intense individual suffering, intense suffering within a group, and perseverance through to success at the end.

These biological, psychological and social impacts on Mr. Purkey's behavior are presently active, were active at the time of the Mary Bales homicide in October 1998, were active in January 1998 during the Jennifer Long homicide, and were active in Mr. Purkey throughout both his formative and adult years. He is still in need of intense psychiatric treatment with medications. Despite his deep psychological fragmentation, he periodically can reflect on and gain new understandings in his behavior. During the present evaluation, Mr. Purkey expressed real remorse for his killing of Jennifer Long. He also expressed great empathy for those he also hurt such as his wife and the Long family.

Using the current diagnostic model, the DSM-IV-TR, the following diagnosis describes Mr. Purkey's functioning at the time of the charged offense, January 1998, and at present.

Axis I:      Cocaine Abuse with Hypersexuality (January 1998 at the time of the Jennifer Long murder).
Alcohol Abuse (January 1998, at the time of the Jennifer Long murder).
Dysthymia-Early Onset.
Polysubstance Dependence, Severe (Psychostimulants, Alcohol, and Hallucinogens).
Partner Relational Problem (Extreme marital distress with severe marital-sexual disharmony, extremely poor communication, verbal and physical abuse of his spouse, and financial distress).

Axis II:     Personality Disorder Not Otherwise Specified (with borderline, antisocial, obsessive-compulsive, and paranoid features).

Axis III:    Documented history of closed-head injuries (March 1968, August 1972, May 1974, and 1977); mild frontal and temporal neuropsychological brain dysfunction as assessed by Dr. Leeson and reported January 2003; amphetamine-induced seizure in 1988; 32-year history of intravenous drug use; drug induced psychosis in May 1998; history of drug-induced anxiety attacks (September 1998); and unconfirmed reports of poisoning by his ex-wife.

At the time of the offense, Mr. Purkey was suffering from cocaine and alcohol abuse. He consumed three rocks of cocaine before the kidnapping, rape, and killing of Jennifer Long. He had been a chronic cocaine user and reported a hypersexual response to the euphoria caused by the rock cocaine. In addition, he drank an unknown quantity of distilled liquor. This would have disinhibited his sexual and violent impulses. Together, the hypersexuality and disinhibition readily contributed to the loss of impulse control at the time of Jennifer Long's killing. The effects of these two drugs have long abated.

Mr. Purkey has a very strong history of polysubstance dependence, starting in pre-teen years and continuing up through his recent adult years. He has intense severe dependency on hallucinogens (marijuana), psychostimulants such as methamphetamine or cocaine, narcotic pain medicines, and alcohol. He has used these drugs to modulate his very dysphoric mood. He traces this dysphoria and Dysthymic Disorder all the way back to early childhood. He has never experienced a time in his life when he actually felt relieved, happy, and relaxed with himself, except when high on drugs.

In 1972, an SRDC evaluation said alcohol use could cause him problems. In February 1976, he overdosed on Tranxene, a sedative. In 1982, SRDC recorded that he had severe drug problems.

At the time of the charged offense, there was no clear indication he was suffering from substance-induced psychosis though he has had periods of substance-induced seizures, drug-induced anxiety, drug-induced delusions, and severe drug seeking behavior. Examples of the drug-induced delusions included that between January and October 1998, he believed he received shock treatments when he slept, that drugs were being sprayed from the ceiling, that something was planted in his chest, and that someone was poisoning his cigarettes. Presently, Mr. Purkey is clinging very tightly to the belief that part of his loss of behavioral control was due to being poisoned by his ex-wife, Clare Giada. Though there has been no objective support for this, his wife, Jeanette, reportedly confirmed that there was an attempt to give him poison.

When intoxicated on psychostimulants, Mr. Purkey was at high risk for pre-psychotic decompensation especially when in distress. Previous psychological testing during December 1999, March 2000, and May 2002, showed that Mr. Purkey had high risk for psychotic decompensation (MMPI-2 in March 2000 and May 2002), risk for intense suspiciousness (PAI-2 in December 1999), and high risk for surprise violence especially under the influence of cocaine or other drugs.

Mr. Purkey has given substantial clinical evidence of very poor control of his aggressive responses. He has very severe problems conforming to expected rules, especially male authority. At present, Mr. Purkey is illicit drug free but still has been at high risk for violent loss of control.

Dysthymia Early Onset is diagnosed when a person shows depressed mood, irritability, and some symptoms of depression without Major Depressive Disorder. Mr. Purkey continues to demonstrate considerable evidence of early onset, meaning before age 21, Dysthymia. He frequently feels dysphoric, is easily irritable, tends to become overwhelmed with distress and defeats positive interventions, consistently shows evidence on the MMPI-2 and PAI-2 Dysthymia, and expresses a high level of ongoing anger. He demonstrates some

short-lived symptoms of Major Depression, including suicidal thoughts, which are somewhat, mollified by mood stabilizing and antianxiety medications. His treatment history with antidepressants has shown less clear efficacy. The MMPI-2 from that era showed very similar defects in judgment to the recent two MMPI-2 exams, meaning in 2000 and 2002.

Personality disorders are applied to specific personality functioning when there is an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture. The pattern must be manifested in at least two of the following that include cognition, affectivity, interpersonal functioning, and impulse control. The enduring pattern is inflexible and pervasive across a broad range of personal and social situations. This enduring pattern leads to clinically significant distress or impairment. The pattern is stable and of long duration with its onset traceable to adolescence or early adulthood. The enduring pattern cannot be accounted for as a manifestation of another mental disorder and not the effects of a substance.

As in April 2000, Mr. Purkey presented a constellation of life experiences, severe maladaptive responses, and personality fragmentation that overlap at least three areas of personality disorder. These were previously described as having been the victim of physical abuse by both parents, emotional neglect by both parents, sexual abuse by his mother, witness to promiscuous sexual activity by his mother, early introduction to alcohol by some of his mother's lovers, early introduction to alcohol by his father, very intense anger response with even the slightest provocation, preoccupation with adherence to rules, inflexibility regarding ethics, the ability to refrain from illegal activity, sexualization of affection, participating in illegal acts out of some aspect of shame or vengeance, considerable victim empathy, alternating between strong identity with authority and actively rebelling against it, and numerous short-term mood swings.

These were previously described as obsessive-compulsive, antisocial, and dependent personality features. Mr. Purkey was showing more borderline features in January 1998. These included his intense efforts to avoid real or imagined abandonment, a pattern of unstable intense interpersonal relationships which alternate between extreme idealization and devaluation, intense identity disturbance, potentially self-damaging impulsivity, recurrent suicidal behavior or gestures, affective (emotional) instability with marked reactivity of mood, chronic feelings of emptiness (dysphoria), inappropriate or intense anger, and transient stress-related paranoia or severe dissociation. At the present time, this is his predominant personality disorder, however, his behavior, thinking, affectivity, and identity strongly overlapped the other personality disorders, which have been previously described. These include obsessive-compulsive features in that Mr. Purkey rigidly adheres to a course of action he believes to be true, he produced numerous pages of neatly written obsessively reasoned treatises. He was obsessively devoted to the productivity of work to the exclusion of all leisure activities except sexuality. He had few friends. He had inflexible ideas about matters of morality, such as his right to sexual pleasure. He also showed a stubborn rigidity that frequently put him at odds with authority figures, attempts to calm himself, and with those who cared for him. At times he had rage attacks not inconsistent with Intermittent Explosive Disorder. Mr. Purkey demonstrated substantial antisocial personality features. These included a pattern of disregard for the violation of the rights of others occurring since age 15. As previously

discussed, he had considerable problems conforming to social norms since age 15. He was awash in porous adult-child boundaries as well as alcohol, drug use, sexual abuse by his mother, fostering the use of prostitution by his father, physical abuse by his brother, without safe haven. It is not surprising that he adopted abnormal behavior patterns. Next, he participated in stealing and drug use early on in childhood, ultimately becoming heavily addicted to intravenous drugs. He spent considerable time of his adult life being unable to refrain from using illegal drugs, unable to refrain from illegal acts, spending considerable time incarcerated, and feeling intensely uncomfortable in any situation other than the penitentiary environment. In contrast, he also demonstrated substantial victim empathy and openness to interpersonal change, somewhat inconsistent with pure antisocial thinking. Also uncharacteristic for an antisocial personality organization, he expressed intense remorse for the dire situation of his wife, his boys' welfare, remorse for having killed Mary Ruth Bales, and remorse for having killed Jennifer Long.

He has had severe problems complying with rules and regulations as applied to him, especially when he is in distress through depression, overwhelming anxiety, or mood instability. Some of this difficulty may be mediated by the consequences of severe abuse combined with frontal and temporal lobe brain damage. This would also reduce the likelihood of purely antisocial behavior, and put it more in the category of personality changes due to brain damage.

Mr. Purkey demonstrates substantial dependency personality features in that he has tremendous needs to be taken care of by those around him. Of the dependent personality features, he had substantial difficulty disagreeing with his wife or explaining his need for different sexual stimulation lest she disapprove of him. He also put in great amounts of energy ensuring himself that he had a stable of women for which he could readily obtain sexual satisfaction. He tended to prefer the anonymity of sex with prostitutes or the excitement of self-destructive sex with either his ex-wife or his wife's girlfriend. He also felt extreme anxiety when faced with having to take care of his family and his marriage and himself outside the situation of incarceration

As the consequences of his severe personality fragmentation, he suffered severe psychosexual immaturity. This was first described in 1982 at the Wichita Psychiatric Center. Mr. Purkey effectively confused emotional sustenance, security, and safety with sexual release or orgasm. Of the few joys in his life besides his children, he became highly reliant on sexual release as his way to buffer his constantly harsh self-judgment and belief that he was inherently worthless. These are not separated as a paraphilia because the behavior derives from maladaptive anxiety responses to his childhood experiences, which may have included consequences of the multiple traumas.

Axis III diagnoses are physical difficulties which impact the primary psychiatric condition on Axis I. They can also contribute to complications of Axis II personality disorders. In this instance, Mr. Purkey now has adequate demonstration of having suffered closed-head injuries as a teenager with the  altering his behavior as observed by St. Joseph's Hospital in Wichita during 1972 to 1976.

The present assessment strongly indicates neuropsychological evidence of mild frontal and mild temporal brain damage. It was Dr. Leeson's

°

neuropsychological opinion that these most likely derived from the traumatic events, which he listed in his report. Certainly, the neuropsychological evidence confirms Mr. Purkey's clinical presentation of dysphoria, marked spikes of anxiety, near inability to control his rage attacks, rigid obsessive almost ritualized violent responses, and a ritualized sexual release pattern. The functional impairment captured by the neuropsychological testing done by Dr. Leeson confirms clinical history of impulse control problems, anger control problems, psychological rigidity, consistent behavioral control problems, and vulnerability to substance abuse. It may ultimately be shown that his ponytail has evidence of poisoning or at least evidence of marijuana and cocaine abuse. Regardless, Mr. Purkey shows an interpersonal rigidity with strong need for a well defined structure, highly consistent with having suffered brain damage.

**DISCUSSION:**
The following discussion derives from the diagnostic assessment and formulation.

**1. Mental state at the time of the charged offense –**
At the time of the Jennifer Long murder, Mr. Purkey was suffering mental disease from untreated severe psychiatric difficulties and intense emotional distress, which significantly reduced his mental capacity. This reduced mental capacity greatly contributed to Mr. Purkey's actions during the commission of the charged offense (Diminished Capacity), by depriving him of normal impulse control.

This reduced mental capacity arose from untreated psychiatric illness (a.k.a. mental disease), which resulted in severely maladaptive behavior, and was further complicated by untreated severe substance dependency. Diagnostically, this maladaptive behavior is a combination of untreated Dysthymia, Severe Personality Disorder, Severe Partner Relational Problems, Mild frontal and temporal Neuropsychological Deficits, all further complicated by impaired reasoning when intoxicated. Even without any intoxication, Mr. Purkey's mental capacity remains impaired on a day-to-day basis. During the present assessment, he showed some improvement in day-to-day functioning only when substantially medicated with appropriately dosed psychiatric medications.

During the time of the charged offense, he felt tremendous pressure to succeed, felt near inability to succeed at the level he set for himself, and suffered constant worries that he was somehow failing to live up to what was expected of him. He suffered extreme marital distress by his numerous sexual indiscretions with prostitutes, with his ex-wife, and with at least one friend of his wife. He also had intense sexual conflict because he could not adequately describe his sexual needs nor explain to his wife the psychological meaning of sexual release for him. He actively hid his sexual behavior and drug use but felt ashamed. He constantly felt overwhelmed and not measuring up for which he maladaptively sought sex, alcohol, and drugs to mollify his feelings of inadequacy. He was locked into a pattern of rigid sexual acting out to contain his intense anxiety over finances, marital infidelity, and how to function outside the penitentiary.

At the time of the charged offense, Mr. Purkey was not being adequately treated with antidepressant, mood stabilizing, and antianxiety agents. He was lurching from one activity to another, hoping no one would really

track down how badly he perceived that he was doing. At the time he kidnapped Jennifer Long, he had just completed the application process for Roto Rooter in the Kansas City area. He actively smoked crack cocaine, used, marijuana, and drank alcohol. These served as a strong disinhibition for his hypersexual impulses.

After he killed Jennifer Long, he obsessively hid the evidence with the modicum of hope that he could preserve his freedom. However, at the same time he felt tremendous guilt for his actions, even to this day. He is troubled by nightmares and guilt for killing Ms. Long.

At the time of the charged offense, he experienced a kind of instinctive hunting response to Jennifer Long's attempting to run away. He unleashed a tremendous amount of anger in the numerous knife blows. Mr. Purkey chose not to share some things about this experience, but this strongly suggests that he unleashed unwarranted pent-up anger on this young woman. The anger was very highly influenced by his intoxicated state, his extreme psychological distress, and his fear that he would never measure up in any context. He ultimately recovered enough to hide his actions from his wife, his sons, and dispose of Jennifer Long's remains in a nearly undetectable way. Due to the desires of self-preservation through avoiding the death penalty, a desire to give the Long family some rest at the loss of their daughter, and a desire to clear his mind, Mr. Purkey readily confessed. Subsequent to his confession, even though there had been several with slightly different emphasis, large portions of his descriptions remain consistent. Subsequently he suffered nightmares, anxiety, and depression as he faces the reality behind his words of remorse for Jennifer Long's killing. This is not an untypical response.

Though Mr. Purkey has severe personality disorder, he did not demonstrate any malingering or deceptiveness regarding the events of the charged offense. Rather, he seemed to find catharsis in telling his story. Probably he hoped to put some of this to rest for himself and for the family of Jennifer Long. He still is having substantial impulse control problems, nearly overwhelming anxiety, and moderate depression. Generally he has found some relief when more properly treated with mood stabilizing, antidepressants, and antianxiety medications.

2.   **Mitigation of penalty –**
A number of factors strongly suggest potential of mitigation for Mr. Purkey. These include the following in no order of priority.

   a. At the time Mr. Purkey killed Jennifer Long, he was intoxicated on crack cocaine and distilled liquor. It is well documented that this combination has caused him to have very poor anger control and control over his hypersexuality.

   b. Mr. Purkey was not a casual substance abuser. He had more than 32 years of severe polysubstance dependence that had never been effectively treated. He was unable to refrain from using illicit substances and frequently used them to the point of total loss of mental control. That is, he had become violently angry, delusional, paranoid, unconscious, and severely self-destructive when intoxicated, especially with crack cocaine. His polysubstance abuse arose directly from severe childhood emotional deprivation, physical abuse, and sexual abuse, all of

which had gone untreated in his adult life. He unconsciously relied on an extremely poor coping mechanism that was to act out physically or sexually when in distress, especially if intoxicated.

c. Mr. Purkey suffered severe psychosexual maldevelopment, which directly contributed to the killing of Jennifer Long. This maldevelopment took the form of intense need for anonymous sexual release through intercourse with prostitutes. Mr. Purkey mistook Jennifer Long for a prostitute. When he realized she was not going to be able to fulfill his pathological sexual need, he gave into a violent response toward the failed fantasy. He had learned to believe that he was a failure because of his childhood experiences. During childhood his parents, especially his mother, subjected him to rampant multiple-year sexual abuse beginning before he was a pre-teen. She exposed him to her many sexual liaisons with numerous suitors. This warped his idea of intimacy, relatedness to others, and the normal purposes of sexuality in relationships. For him, sexual climax was the only reliable good thing in his life. He frequently turned to that in times of immense emotional distress throughout his life. Mr. Purkey's father furthered the abnormal sexual development by fostering use of prostitutes, beginning when Mr. Purkey was age 14 years old. Mr. Purkey never developed a normal capacity to relate emotionally to women. In his relationships with his wives and girlfriends, there were prominent co-mingling of verbal abuse, physical abuse, and sexual apology. That is, sex could right all wrongs, or at least make them feel less intense for a short period of time. Mr. Purkey's need for sexual release continued during long periods of incarceration.

Thus, Mr. Purkey developed a cycle of anxiety or anger resulting in rising emotional tension that he could not express. When his inner discomfort became over pressurized, Mr. Purkey either acted out violently or found a way for sexual release. The sexual release gave him a short period of sense of well being. However, this was soon over shadowed by recurrent worries, anxiety or depression and feelings that he would never measure up no matter how hard he tried. This closed the circle and created a cycle of acting out.

It is not surprising that in the emotional intensity of his complex and difficult reorientation to parole, he sought sexual release but it resulted in guilt-laden violence and hiding his deeds. The neuropsychological data suggests that some of this rigidity and inability to refrain arouse from the consequences of brain damage.

d. Mr. Purkey showed mild frontal lobe and temporal lobe brain damage. The frontal lobes are responsible for control of impulses, judgment, and ability to defer gratification. The temporal lobes are considered the seat of emotion and modulate emotional control. Persons with temporal lobe damage even if it is mild, frequently have substantial problems controlling impulses. Those difficulties are substantial blocks to normal behavior even in the absence of Mr. Purkey's polysubstance abuse,

intoxicated state, and childhood victimization.  Combining all of those with intense marital distress and guilt over failing, or perceiving he failed his wife by his numerous trysts, would be immensely stressful on an injured brain.  Separate from Dr. Leeson's findings, are six reports that Mr. Purkey suffered brain damage during his developmental years.  Those episodes of brain damage an 11-year period from 1966 through 1977.  These are tabulated as follows:

   i.   1966 - behavioral change after car accident.
   ii.   March 1968 - acute cerebral contusion with anisocoria and occipital headache.  (Anisocoria results form trauma to the iris or the optic nerve.)
   iii.   January 1969 - impulsive, hyperactive, restless.
   iv.   August 1972 - facial lacerations with acute cerebral contusion, unconscious 1 to 2 minutes.
   v.   February 1974 - DOC impulsive and dependent; organic deterioration; best defense is acting out.
   vi.   1977 - DOC closed-head injury with loss of consciousness for one and a half days.
   vii.   July 1994 - Lansing Correctional Facility no organic brain damage.

These medical records demonstrate that Mr. Purkey has an organic basis, that is a basis of brain damage, for at least some of his loss of emotional control when aroused.  By arousal, it is meant that Mr. Purkey becomes overwhelmed and cannot function normally when he is in emotional distress.  The cause of the distress can be internally generated, from complicated interactions with others, from not getting his way, from getting his way when he wanted someone to control him and they didn't, from intoxication, from shame, and from anger.  Mr. Purkey has been well described as having rage responses wherein he loses control of his ability to behave any other way until he discharges his intense feelings.  Then, he comes to awareness of what he did and feels remorse if he wronged someone.  Mr. Purkey demonstrates much better emotional control when he is on a therapeutic dose of Tegretol and an adequate dose of Klonopin.  Respectively, these are a mood stabilizing agent and an antianxiety agent.  He even described color hue changes when he inadvertently was deprived of his Tegretol dose, suggesting that Tegretol was correcting a brain function abnormality.  Similarly, adequate doses of benzodiazepines such as Klonopin, gave him much greater control over his anger response, especially if it arose from a sense of shame or humiliation.  Thus, from a multifactoral origin, Mr. Purkey most likely experiences periodic intense losses of emotional control, either violently or sexually, as a result of abnormal brain functioning.  These episodes are worsened when he feels a built up of internal distress, such as on January 22, 1998, regardless of the cause.

  e.  The events of Jennifer Long's killing took place while Mr. Purkey was making an unsuccessful attempt to adjust to life on parole.  Recall that he had spent the majority of his adult years incarcerated.  His first serious incarceration was from 19 years old until his mid forties.  Before that, he knew the traumas of

his parents and then was arrested for the first time by 14 years old. Thus he never developed a normal social pattern. He largely knew how to manage himself in a highly controlled environment where violence management was often the only order of the day. Though he wanted to succeed, his intensely low self-esteem, severe self-denigration, described by one as "auto criticism" prevented him from making a smooth adjustment to parole. He had very few untested tools to make the adjustment as his primary adolescent to adult socialization had taken place in prison. He felt traumatized by the violence he encountered in prison, an additional stressor. In a fashion very consistent with Borderline Personality Disorder, Mr. Purkey saw that he could better himself, started to make a go with full time employment and a healthy relationship with his wife, but fell into old psychopathologic patterns. These patterns were the self-defeating behaviors resulting from his untreated childhood abuse experiences, untreated very severe substance abuse, abnormal prison socialization, and intense internal criticism that he really didn't belong outside of prison. It is not that he felt he deserved to remain incarcerated all his life, but that life as a free man was psychologically too complicated given the emotional damage he had suffered. He simply could not muster the internal resources on his own to manage the basic tasks of life outside the penitentiary. A good example of his inability to manage the pressures was that he tried to juggle a new job, relationship with his wife, relationships with his children, an intrusive relationship with his ex-wife, relationship with a girlfriend, use of numerous prostitutes, financial resources that hadn't been required of him for more than 20 years, taking on a house payment, buying furniture, assuming the role of a parent, and dealing with all of his childhood traumas completely alone. Note that it is particularly telling that Mr. Purkey wanted to secure a sentence in the Federal Penitentiary because that is the social system he understood and had adapted to.

f. Even now, he is deeply troubled by his behavior. He finds the rage attacks dysphoric. He want to better himself. He wants to express the great sadness that he feels for his actions toward Jennifer Long and others. He wants to find internal peace. Even his battle for an adequate dose of Klonopin has the character of an injured man seeking what he needs to manage himself. Thus, despite considerable antisocial behavior at times, Wesley Purkey labors under the severe impairment of chronic mental disease.

Stephen E. Peterson, MD
Diplomate, American Board of Psychiatry and Neurology 1992
ABPN Subspecialty in Forensic Psychiatry 1994, Recertified March 2003

Date Signed: 8/18/03
SEP/ns