## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

WESLEY IRA PURKEY, )
)
Movant, )
)
v. ) No. 06-8001-CV-W-FJG
)
UNITED STATES OF AMERICA, )
)
Respondent. )
)

## SUGGESTIONS AND MEMORANDUM OF LAW IN SUPPORT OF
## MOTION UNDER 28 U.S.C. § 2255, TO VACATE, SET ASIDE,
## OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

Movant, Wesley Ira Purkey, by court-appointed counsel, hereby submits this Memorandum

of Law in Support of the Motion Under 28 U.S.C. § 2255 to grant him a new trial and to vacate, set

aside and/or correct his conviction and death sentence.

**Argument**

I.      **Purkey was denied due process of law during trial and sentencing and his sentence was based on an arbitrary factor in violation of the Eighth Amendment due to government counsel's deliberate misconduct in repeatedly referring to Purkey's desire to serve a life sentence in a United States Penitentiary as a desire to go to "Club Fed."**

On December 15, 1998, after sending a note expressing his desire to talk to a Federal Bureau

of Investigations (hereinafter "FBI") Agent concerning a kidnaping and murder, Purkey talked to

Detective Bill Howard of the Kansas City, Kansas, Police Department. After Purkey expressed that

he would like to confess to a kidnaping and murder, in part, because he was facing a life sentence

in Kansas and he would rather serve a life sentence in the federal prison system, Howard asked

Purkey if he "wanted to go to Club Fed." Doc. #136 (October 17, 2002 Hearing) at 100.

1

During a pretrial suppression hearing, Howard testified that it was him (and not Purkey) that used the phrase "Club Fed." *Id.* Nonetheless, in opening statements during trial, government counsel asserted that Purkey confessed because he wanted to serve his sentence in a federal penitentiary, which is called "Club Fed" due to better conditions than in state prisons. Tr. 402. During Detective Howard's testimony, government counsel continued to use the phrasing of "Club Fed" in questioning Howard concerning discussions with Purkey about the federal prison system. Tr. 424. Even during the testimony of FBI Agent Dirk Tarpley, who was not even present during the December 15 discussion with Purkey, government counsel continued to assert in questioning that Purkey "wanted to go serve his time at Club Fed." Tr. 596, 601. Finally, in closing arguments during the trial, government counsel continued to assert that Purkey sought to go to "Club Fed," as if Purkey had been the one to use the language rather than it being the language used only by Detective Howard. Tr. 1102. This knowing attempt to create a wholly false impression violated Purkey's right to due process of law under the Fifth Amendment and violated the Eighth Amendment's requirement of a reliable basis for a sentence of death.

Prosecutors have an "overriding duty of candor to the court, and to seek justice rather than convictions." *United States v. Foster*, 874 F.2d 491, 495 (8th Cir. 1988). Indeed, they are representatives of "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Berger v. United States*, 295 U.S. 78, 88 (1935). Thus, a prosecutor's primary obligation is neither to win cases nor to secure certain sentences, but to seek justice. *Id.* at 88. Accordingly, although prosecutors "may strike hard blows" in pursuit of justice, they are "not at liberty to strike foul ones." *United States v. Holmes*, 413 F.3d 770, 775 (8th Cir. 2005) (quoting

2

*Berger*, 295 U.S. at 88); *Smith v. Grose*, 205 F.3d 1045, 1049 (8th Cir. 2000) (same); *United States v. Cannon*, 88 F.3d 1495, 1502 (8th Cir. 1996) (same).

The Due Process Clause prohibits the use of argument and testimony the prosecution knows or reasonably should know to be false or misleading. *Miller v. Pate*, 386 U.S. 1, 6-7 (1968); *Mooney v. Holohan*, 294 U.S. 103 (1935). Indeed, reversal is required when false evidence is presented regardless of whether the government deliberately elicits false evidence or whether "though not soliciting false evidence, [the prosecutor] allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also United States v. Barham*, 595 F.2d 231, 241 (5th Cir. 1979) ("It is immaterial whether or not the prosecution consciously solicited the false evidence"). Even the deliberate elicitation of evidence which merely creates a false impression falls within the ambit of *Mooney* and its progeny. *See, e.g., Alcorta v. Texas*, 355 U.S. 28 (1957) (finding due process violation where prosecution deliberately elicited testimony creating a false impression); *see also* Wayne R. LaFave *et al.*, CRIMINAL PROCEDURE § 24.3(d), at 496 (2d ed. 1999) ("Taken together, *Mooney* and its progeny establish a constitutional obligation of the prosecution as an entity *not to deceive the fact finder . . . .*") (emphasis added).

As the Eleventh Circuit Court of Appeals declared in reversing a capital case, "Little time and no discussion is necessary to conclude that it is improper for a prosecutor to use misstatements and falsehoods." *Davis v. Zant*, 36 F.3d 1538, 1548 (11th Cir. 1994). When the prosecutor "intentionally paint[s] for the jury a distorted picture of the realities" of the evidence, reversal is required. *Id.* at 1549. This rule is mandated, because "[s]uch conduct perverts the adversarial system and endangers its ability to produce just results." *Brown v. Borg*, 951 F.2d 1011, 1015 (9th Cir. 1991). A conviction or death sentence by "a jury . . . laboring under a Government-sanctioned

3

false impression of material evidence," *Barham*, 595 F.2d at 242, cannot stand.  Reversal is required under this line of cases upon proof that false evidence was presented, the prosecution knew the evidence was false, and "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury."  *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue*, 360 U.S. at 271).  This standard for prejudice constitutes a lower threshold than that required to prove a *Brady* violation;[1] in fact, this standard is "equivalent" to the harmless error standard enunciated in *Chapman v. California.*[2] *United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985).

Furthermore, improper questions by a prosecutor can prejudice a defendant, regardless of the actual testimony and other evidence elicited.  As the Court observed in *Berger*, 295 U.S. 78, 88, "improper suggestions [and] insinuations [by a prosecutor] . . . are apt to carry much weight against the accused when they should properly carry none."  Here, there is far more than a reasonable likelihood that government counsel's argument and elicitation of misleading testimony contributed to the jury's decision in sentencing and violated the Fifth and Eighth Amendments by injecting an arbitrary factor into the sentencing determination.

"Misleading prosecutorial comment which negatively impacts 'the need for reliable sentencing in capital cases,' offends the Eighth Amendment."  *Miller v. Lockhart*, 65 F.3d 676, 683 (8th Cir. 1995) (citation omitted).  Specifically, a jury's discretion to impose a death sentence must be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  *Gregg v. Georgia*, 428 U.S. 153, 189 (1976).  The jury must make an "individualized determination" of the appropriate sentence based on "the character of the individual [defendant] and

---

[1]*Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[2]386 U.S. 18 (1967).

the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879 (1983). In short, the Supreme Court has consistently held that a decision to sentence a defendant to death may not be based on considerations or arguments that are "constitutionally impermissible or totally irrelevant to the sentencing process." *Id.* at 885.

Here, government counsel created the false impression that Purkey referred to the federal penitentiary as "Club Fed" and that "Club Fed" had more lenient prison conditions that the Kansas Department of Corrections and other prison systems. As a result, a juror concerned about lenient prison conditions in the federal system and whether that served as proper punishment would likely be inclined to vote for a sentence of death rather than life imprisonment. A vote for death in order to avoid "lenient" prison conditions for the defendant is not a vote properly based on the nature of the crimes and the circumstances of the offenses, *see Woodson v. North Carolina,* 428 U.S. 280, 304 (1976), but is instead a vote based on an arbitrary and impermissible factor, which is impermissible. *Johnson v. Mississippi,* 486 U.S. 578, 584 (1988) (quoting *Zant v. Stephens,* 462 U.S. 862, 884-85 (1983)) (capital sentencing decision "cannot be predicated on mere 'caprice' or on 'factors that are constitutionally impermissible or totally irrelevant to the sentencing process'").

Thus, in addition to the violation of due process, government counsel's improper argument and questioning about "Club Fed" violated the Eighth Amendment's prohibition of a capital sentencing decision based on materially unreliable evidence. The Supreme Court has held that the capital sentencing process must facilitate the responsible and reliable exercise of sentencing discretion, and that there is a "special 'need for reliability in the determination that death is the appropriate punishment' in any capital case." *Johnson*, 486 U.S. at 584 (quoting *Woodson*, 428 U.S.

5

at 305).  The Eighth Amendment's demand for reliability mandates that a conviction and death sentence based in whole or in part on false or misleading evidence cannot stand.

**II.     Purkey was denied the effective assistance of trial and appellate counsel in violation of the Fifth and Sixth Amendments due to counsel's numerous omissions and errors in the trial and sentencing.**

A claim of ineffective assistance of counsel must be examined under the standard established in *Strickland v. Washington,* 466 U.S. 668 (1984).  The *Strickland* standard is satisfied if a petitioner establishes both that his attorney's representation "fell below an objective standard of reasonableness," 466 U.S. at 688, and that the petitioner was "prejudiced" by his attorney's substandard performance, *id.* at 692.

In the § 2255 Motion in grounds II through X, Purkey asserted claims of ineffective assistance of counsel during the trial and sentencing.  Each of these claims will be set forth below in detail.

**A.     Failure to object to the government's misconduct during the trial in repeatedly referring to Purkey's desire to serve a life sentence in a United States Penitentiary as a desire to go to "Club Fed."**

Trial counsel's conduct was deficient in failing to object to the "Club Fed" references and the implication that this was Purkey's phrasing during government counsel's opening statement, examinations of Detective Howard and Agent Tarpley, and government counsel's closing argument during trial.  While counsel ultimately attempted to mitigate the damage in his sentencing argument that federal prison was no "club fed", "there is no evidence that he made an intelligent, tactical decision not to object" to the government's improper argument.  *Wynters v. Poole*, 464 F. Supp. 2d 167, 180 (W.D.N.Y. 2006).

6

Purkey was prejudiced because trial counsel's "failure to object exacerbated the prejudicial effect of the prosecutor's statements." *Girts v. Yanal*, 501 F.3d 743, 757 (6th Cir. 2007).

**B.** **Making an unfulfilled and prejudicial promise to the jury during opening statements in the trial that Jennifer Long's friends and family would testify that there was no kidnaping.**

During his opening statement during the trial, Purkey's counsel asserted, consistent with Purkey's testimony and the defense theory, that Jennifer Long had not been kidnaped. Counsel then asserted, without any good faith basis or basis in fact, that Long's family and friends would even testify that there was no kidnaping. Tr. 413.

Counsel's conduct was deficient because counsel promised the jury evidence that he could not and did not present. "[T]he foundation for this claim is the broken promise as opposed to the decision not to pursue a particular line of testimony." *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 260 (7th Cir. 2003). Counsel's conduct had no basis in strategy because counsel had no indication prior to trial that Long's family and friends would testify that there was no kidnaping. Exhibit 1 (Declaration of Laura O'Sullivan).[3]

Counsel's conduct was prejudicial during trial and sentencing because counsel's promise to the jury went unfulfilled and, indeed, was contradicted by Long's family and friends who did not give the promised testimony. "[L]ittle is more damaging than to fail to produce important evidence that had been promised in an opening." *Id.* at 257 (quoting *Anderson v. Butler,* 858 F.2d 16, 17 (1st Cir.1988)). *See also People v. Briones*, 816 N.E.2d 1120 (Ill. App. Ct. 2004); *People v. Morgan*, 719 N.E.2d 681 (Ill. 1999); *People v. Lewis*, 609 N.E.2d 673 (Ill. App. Ct. 1992); *State v. Moorman*,

---

[3]Exhibits 1 through 24 are attached to the § 2255 Motion. Exhibits 25 through 29 are attached to this pleading as Attachments 1 through 4.

7

358 S.E.2d 502 (N.C. 1987); *State v. Zimmerman*, 823 S.W.2d 220 (Tenn. Crim. App. 1991); *Montez v. State*, 824 S.W.2d 308 (Tex. Ct. App. 1992).

The prejudice was heightened because, not only did the witnesses fail to testify as promised, the testimony presented was to the opposite effect: i.e., that Long had never been known to get in the car with a stranger. Tr. 892-93. The government also capitalized on counsel's deficient conduct by reminding the jury in closing arguments that counsel's promise had gone unfulfilled. Tr. 1097. *See Ouber v. Guarino*, 293 F.3d 19, 28 (1st Cir. 2002) ("A broken promise of this magnitude taints both the lawyer who vouchsafed it and the client on whose behalf it was made").

### C. Failure to prepare and present evidence to rebut the uncorroborated self-serving testimony of government witness Michael Speakman.

During trial, the government presented testimony from Inmate Michael Speakman, who had been Purkey's cellmate at the Correctional Corporation of America (hereinafter "CCA") facility for a while prior to trial. He testified, consistent with his pretrial allegations, that Purkey boasted that he was confined "for killing people." Tr. 682. While counsel cross-examined Speakman concerning the government's Rule 35 Motion for Reduction in Sentence in exchange for his testimony and other matters, counsel presented no witnesses during trial or sentencing in rebuttal.

Counsel's conduct was deficient because counsel and Purkey had notice of Speakman's intended testimony. Purkey had informed counsel prior to trial that Speakman's allegations were false and had provided counsel with the names of inmates, officers, and CCA volunteers that would impeach Speakman's testimony. Exhibit 5 (O'Sullivan Notes from August 29, 2002; October 8, 14, 15, and 27, 2003). Specifically, Purkey informed counsel that Inmate Cornelius Peoples, Officer Melvin Lister, and CCA Volunteer Sam Hoffmeier could and would testify, contrary to Speakman,

8

that Purkey never talked about his crimes with other inmates let alone boast about them to inmates or officers.  Nonetheless counsel did not develop and present evidence from these witnesses.

Counsel's conduct was not based on a reasonable strategic or tactical decision.  Counsel was aware that Speakman had an obvious motive to testify against Purkey.  Counsel was also clearly aware of the suspect nature of jailhouse snitch testimony.  As noted by the United States Court of Appeals for the Second Circuit:

> As a general matter, we note that numerous scholars and criminal justice experts have found the testimony by "jail house snitches" to be highly unreliable.  Several reports have found that jailhouse informants have a significant incentive to offer testimony against other defendants in order to curry favor with prosecutors and that the proffered testimony is oftentimes partially or completely fabricated.  Thus, "the use of jailhouse informants to obtain convictions may be 'one of the most abused aspects of the criminal justice system.'"

*Zappulla v. New York*, 391 F.3d 462, 470 n.3 (2nd Cir. 2004) (citations omitted).  Nonetheless, counsel did not investigate in order to present rebuttal evidence.  This was clearly deficient conduct. *See, e.g., Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003) (counsel was in ineffective in capital trial and sentencing for numerous reasons, including failing to adequately investigate and present evidence to impeach an accomplice and a jailhouse snitch); *Roberts v. State*, 602 S.E.2d 768 (S.C. 2004) (counsel was ineffective in murder case for failing to adequately impeach a jailhouse snitch to establish that it was impossible, due to the location of his cell and the defendant's, that the defendant made any incriminating statements to him without it being heard by numerous other inmates and staff).

No strategy could explain counsel's inaction because counsel could not make a reasonable decision not to present the testimony of rebuttal witnesses without ever having talked to them.  In short, where counsel has failed to interview the potential witnesses, "the presumption of sound trial

9

strategy [in not calling the witnesses to testify] founders . . . on the rocks of ignorance." *White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005). *See also Marshall v. Cathel*, 428 F.3d 452, 471 (3rd Cir. 2005) (Counsel's failure to interview witnesses he believed to be hostile to the defendant was ineffective because "counsel's 'beliefs' are not a substitute for informed strategy"); *Soffar v. Dretke*, 368 F.3d 441, 474, *amended*, 391 F.3d 703 (5th Cir. 2004) ("an actual failure to investigate cannot be excused by a hypothetical decision not to use its unknown results"); *Anderson v. Johnson*, 338 F.3d 382, 393 (5th Cir. 2003) (Counsel's belief that a witness would not be credible did not excuse counsel's failure to interview the witness because, "[i]n a claim grounded in failure to interview, the 'quality' and potential persuasiveness of the [witness] is largely immaterial"); *Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005) ("C]ounsel could not have evaluated or weighed the risks and benefits of calling [a witness] as a defense witness without so much as asking [him] what he would say if called"); *Hamblin v. Mitchell*, 354 F.3d 482, 492 (6th Cir. 2003) ("[B]ecause counsel does not know what an investigation will reveal is no reason not to conduct the investigation. Counsel was obligated to find out the facts not to guess or assume or suppose some facts may be adverse"); *Holsomback v. White*, 133 F.3d 1382, 1388 (11th Cir. 1998) (Counsel"could not have made an informed tactical decision" concerning the benefits versus the risks of presenting the testimony of a witness that counsel had not interviewed); *Ross v. State*, 954 So. 2d 968, 1006 (Miss. 2007) ("[i]t is not reasonable to refuse to investigate when the investigator does not know the relevant facts the investigation will uncover"); *Johns v. State*, 926 So. 2d 188, 196 (Miss. 2006) ("The decision not to interview witnesses, particularly your own, cannot be considered an effective strategic choice").

If counsel had adequately prepared and presented the evidence, both Cornelius Peoples, an inmate, and Melvin Lister, a correctional officer, would have rebutted Speakman's testimony. Both

10

would have testified that Purkey never talked about his crimes or his case and certainly never boasted or talked about "killing people," especially to Speakman because he was a well-known "jailhouse snitch." Exhibit 26 (Declaration of Cornelius Peoples); Exhibit 27 (Declaration of Melvin Lister). Sam Hoffmeier also would have testified that Purkey never talked or bragged about his crimes. Exhibit 25 (Sam Hoffmeier Declaration). "There is no plausible reason other than counsel's self-inflicted ignorance" for not presenting this available evidence. *Cargle*, 317 F.3d at 1214.

Purkey was prejudiced during trial but especially during sentencing because Speakman's testimony cast doubt on Purkey's credibility and the evidence and information that Purkey was remorseful. If the available evidence rebutting Speakman's testimony had been presented there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different.

> **D.  Failure to obtain the services of a mitigation specialist or to otherwise adequately investigate, prepare, and present mitigation evidence.**

The sentencing phase is "the most critical phase of a death penalty case," *Smith v. Mullin*, 379 F.3d 919, 939 (10th Cir. 2004) (quoting *Romano v. Gibson*, 278 F.3d 1156, 1180 (10th Cir. 2002)), because "the jury is called upon to make a 'highly subjective, unique, individualized judgment regarding the punishment that a particular person deserves,'" *Turner v. Murray*, 476 U.S. 28, 33 (1986) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 340 n.7 (1985)). The "fundamental issue," by definition, is only whether life imprisonment or death is the appropriate punishment. *Spaziano v. Florida*, 468 U.S. 447, 459 (1984).

"[B]ecause the defendant's guilt is often clear. . . 'avoiding execution [may be] the best and only realistic result possible.'" *Florida v. Nixon*, 125 S. Ct. 551, 562 (2004). As a practical matter, most defendants who are convicted of capital murder have "little or no chance of avoiding the death

11

sentence unless the defense counsel gives the jury something to counter both the horror of the crime and the limited information the prosecution has introduced about the defendant." *Romano*, 239 F.3d at 1180 (quoting Jonathon P. Tomes, *Damned If You Do, Damned If You Don't: The Use of Mitigation Experts in Death Penalty Litigation*, 24 Am. J. Crim. L. 359, 364 (1997)).

The sentencing body's possession of the fullest information possible concerning the defendant's life and characteristics is, therefore, highly relevant, if not essential, to the selection of the appropriate sentence. *Lockett v. Ohio*, 438 U.S. 586 (1978). If the sentencer fails to consider "those compassionate or mitigating factors stemming from the diverse frailties of humankind," an unacceptable risk exists that the death penalty will be imposed in spite of factors that warrant a less severe penalty. *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). A jury can consider evidence in mitigation, however, only if defense counsel vigorously investigates and presents the available evidence. Here, counsel did not fulfill their obligations and Purkey was greatly prejudiced. *See, e.g., Karis v. Calderson*, 283 F.3d 1117, 1135 (9th Cir. 2002) ("the failure to present important mitigating evidence in the penalty phase can be as devastating as a failure to present proof of innocence in the guilt phase"); *Tokman v. State*, 564 So. 2d 1339, 1342 (Miss. 1990) ("It is critical that mitigating evidence be presented at capital sentencing proceedings"); *Marquez-Burrola v. State*, 157 P.3d 749, 764 (Okla. Crim. App. 2007) ("[M]itigation evidence can, quite literally, make the difference between life and death in a capital case").

In assessing whether counsels' conduct was reasonable, the Supreme Court held in *Strickland*:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words,

12

counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690-91; *see also Williams v. Taylor,* 529 U.S. 362, 396 (2000) (counsel's failure to discover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on the defendant's voluntary confessions because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background").

Subsequently, in *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court further examined the scope of the duty to investigate. The Court described the issue as "whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*," 539 U.S. at 523 (emphasis in original), "under prevailing professional norms," *id.* (quoting *Strickland*, 466 U.S. at 688). The "prevailing professional norms" include both the American Bar Association ("ABA") Standards for Criminal Justice, as well as the ABA Guidelines For the Appointment and Performance of Counsel in Death Penalty Cases ("Guidelines"), which are "well-defined norms" for the conduct of counsel appointed in capital cases. *Wiggins*, 539 U.S. at 510.[4]

As the Court observed in *Wiggins*, a case that was tried in 1988, the 1989 ABA Guidelines "provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 510 (quoting 1989 Guideline 11.4.I(C) (emphasis added)).

---

[4]*See also Hamblin*, 354 F.3d at 487 (the ABA Guidelines "represent a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases. The ABA standards are not aspirational . . . . [t]hey are . . . longstanding norms. . . .").

13

Counsel's conduct in *Wiggins* fell short of the professional standards because no "social history report" was prepared even though counsel had funds available to retain a "forensic social worker." 539 U.S. at 524. Counsel also "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* "The scope of their investigation was also unreasonable in light of what counsel actually discovered" in the records available to them. *Id.* at 525 (citation omitted).

> In assessing the reasonableness of an attorney's investigation, . . . , a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support the strategy.

*Id.* at 527. In *Wiggins*, "counsel were not in a position to make a reasonable strategic choice . . . because the investigation supporting their choice was unreasonable." *Id.* at 536. Counsel's conduct was deficient in this case in precisely the same fashion as in *Wiggins*.

As addressed in more detail in the § 2255 Motion, as early as January 2002, almost two years prior to trial, Purkey's lead counsel submitted a proposed budget to this Court, which included an estimate of costs for a "mitigation specialist." As counsel observed in that filing, "Use of mitigation specialists is a common practice in death penalty cases, and mitigation specialist services have been approved in all of the death penalty cases which have been tried to date in the Western District of Missouri." Exhibit 6 (Proposed Budget). Counsel's observation of the "routine" nature of appointment of mitigation specialists in capital cases was consistent with the revision of the ABA Guidelines in February 2003, which include specifically that a properly constituted capital defense

14

team should consist of "no fewer than two attorneys," "an investigator," and "a mitigation specialist." 2003 Guideline 4.1(A)(1). *See also* 2003 Guideline 10.4(C)(2).

Nonetheless, despite lead counsel's recognition that a mitigation specialist is routinely recognized as an integral part of a capital defense team, lead counsel did not actually seek the funding for or retain a mitigation specialist. Counsel's course did not change when co-counsel urged him to do so early in the case, when the ABA Guidelines were revised to specifically include these provisions in February 2003, or even in June 2003 when *Wiggins* was decided and co-counsel encouraged him again to obtain the services of a mitigation specialist for the trial then scheduled and conducted beginning with jury selection on October 28, 2003. Exhibit 1 (Declaration of Laura O'Sullivan).

Instead, on April 11, 2002, counsel submitted a funding request for Mark Cunningham, Ph.D. as "a mitigation/sentencing specialist," which counsel defined in the request as "a person who . . . is able to explain, in detail, what means are available within the Bureau of Prisons to effect the safe and secure exaction of the punishment of life imprisonment" and a person able to determine whether the defendant "is likely to pose a danger while incarcerated, and what steps can be taken through the correctional systems available to address any such risk of danger." Exhibit 7 (Ex Parte Request #3 – Cunningham).

Contrary to the definition of a "mitigation/sentencing specialist" that lead counsel provided to the court in seeking funding for Dr. Cunningham, "mitigation specialists," as that term is generally accepted, are not experts dealing solely in the area of future dangerousness and adaptability to confinement. It was generally accepted in the capital defense community, in general, and in the federal capital defense bar, in particular, even before 1998 that mitigation specialists

15

typically have "graduate degrees, such as a Ph.D. or masters degree in social work." Judicial

Conference of the U.S., Subcomm. On Federal Death Penalty Cases, Comm. On Defender Services,

*Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense*

*Representation* at 24 (1998).

Indeed, as is clear from *Wiggins*, development of a "social history report" by a "forensic

social worker" or similarly qualified person was routine as early as 1989 even in Maryland, 539 U.S.

at 524, which then and now has only very limited numbers of cases in which the government seeks

the death penalty as compared to many jurisdictions.[5]  Legal commentators writing on the subject

of capital defense also noted the need for a full life history through trained investigators well before

the 2003 Guideline revisions that were only "a codification of longstanding, common-sense

principles of representation understood by diligent, competent counsel in death penalty cases."

*Hamblin*, 354 F.3d at 487 ("The ABA standards are not aspirational . . . . [t]hey are . . . longstanding

norms. . . .").  *See, e.g.,* Dwight H. Sullivan, Jerry L. Britain, Michael N. Knowlan, and Cheryl

Pettry, *Raising the Bar: Mitigation Specialists in Military Capital Litigation*, 12 Geo. Mason U. Civ.

Rts. L.J. 199, 227-28 (2002).  The 1989 Guidelines even recognized the need, in preparing for

capital sentencing, for counsel to retain "trained investigators to interview witnesses and to assemble

demonstrative evidence."  1989 ABA Guideline 8.1 Commentary (quoting Goodpaster, *Effective*

*Assistance of Counsel in Capital Cases*, 58 N.Y.U. L. Rev. 299, 344-45 (1983)).  State, federal, and

even military courts were also recognizing the need for trained mitigation investigators and

specialists long before Purkey's trial.  *See, e.g., United States v. Murphy*, 50 M.J. 4, 13 (C.A.A.F.

---

[5]According to the Death Penalty Information Center's website, Maryland has executed only five inmates since 1976 and currently only has eight inmates on death row.  *See* http://www.deathpenaltyinfo.org/state/.

16

1998) (in finding ineffective assistance of counsel in a capital case, the United States Court of Appeals for the Armed Forces relied, in part, on a "post-trial social history" compiled by a "forensic social worker"); *United States v. Curtis*, 46 M.J. 129 (C.A.A.F. 1997) (finding counsel ineffective in sentencing based, in part, on the post-trial work of a mitigation expert).

Given these circumstances, counsel knew or reasonably should have known at the time of his appointment that a social worker or at least someone with similar training or focus just on the life history and background was routine in capital cases and that a "mitigation specialist" is not a specialist simply in future dangerousness and adaptability to confinement. At minimum, by February 2003, counsel should have been aware that:

> Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. . . .
>
> The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

2003 Guideline 4.1 Commentary. Utilizing a mitigation specialist and utilizing a team approach "combines the different skills, experience, and perspectives of several disciplines" and allows counsel "to delegate many time-consuming tasks to skilled assistants and focus on the legal issues in the case." 2003 Guideline 10.4 Commentary. Use of a mitigation specialist independent of

17

testifying experts also allows that person to serve "as part of the defense team covered by the attorney-client privilege and work product doctrine." *Id.*

Despite the specialized training and skills of mitigation specialists and the wide recognition of the need for these services in a capital defense team, lead counsel chose not to retain a mitigation specialist. As counsel later informed the court in supplemental requests for funding for Michael Armstrong, an investigator, and for mental health experts, counsel chose to "dispense[] with" the requested mitigation specialist in order to obtain "budgetary savings." Exhibit 12 (Supplemental Expert Request for Investigator). *See also* Exhibit 13 (Supplemental Expert Request for Psychiatrist); Exhibit 14 (Supplemental Expert Request for Dr. Cunningham).

Counsel's choice to dispense with necessary services for budgetary reasons was unreasonable because counsel must "demand . . . all resources necessary." 2003 Guideline 10.4(D). While it is certainly laudable and necessary for court-appointed counsel to be cost-conscious, counsel cannot sacrifice the client's interests for budgetary reasons. "Defense counsel has a duty to take all necessary steps to ensure that available mitigating evidence is presented," including "seeking funds from the court and specifying why they were necessary." *Marquez-Burrola v. State*, 157 P.3d 749, 765 (Okla Crim. App. 2007). *See also Rios v. Rocha*, 299 F.3d 796, 803 (9th Cir. 2002) ("[R]eluctance to ask for public funds to hire his own investigator was not a proper reason for failing to pursue an initial investigation into potentially feasible defenses"); *Garcia v. Portuondo*, 459 F. Supp. 2d 267, 288 (S.D.N.Y. 2006) ("Deciding that investigation is costly is not, as *Strickland* requires, equivalent to a reasonable and informed decision that investigation is unnecessary"); *Ex parte Briggs*, 187 S.W.3d 458, 467 (Tex. Crim. App. 2005) ("Counsel is most assuredly not required to pay expert witness fees or the costs of investigation out of his own pocket, but a reasonably

18

competent attorney–regardless of whether he is retained or appointed–must seek to advance his client's best defense in a reasonably competent manner," including seeking necessary funding).[6]

Irrespective of whether a mitigation specialist should have been retained by counsel or not, the investigation actually conducted by counsel was inadequate despite counsel's assertion that "the same quality of work" was done for Purkey, even without a mitigation specialist. Exhibit 12 (Supplemental Expert Request for Investigator). *See also* Exhibit 13 (Supplemental Expert Request for Psychiatrist); Exhibit 14 (Supplemental Expert Request for Dr. Cunningham). "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing," *Wiggins*, 539 U.S. at 533. *See also Rompilla v. Beard*, 545 U.S. 374, 383 (2005) (there is no requirement that defense counsel "scour the globe on the off-chance something will turn up"); *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997) (counsel need not have "a scorch-the-earth strategy"). Nonetheless, a decision not to investigate "must be directly assessed for reasonableness in all the circumstances," *Wiggins*, 539 U.S. at 533 (quoting *Strickland*, 466 U.S. at 691), and "an attorney must look into readily available sources of evidence," *Hall*, 106 F.3d at 749-50.

---

[6]It should also be noted that it is doubtful that foregoing retainer of a mitigation specialist and increasing the workload of counsel and the mental health experts was *actually* cost-effective because the hourly rates for mitigation specialists are generally much cheaper than attorney rates and mental health expert rates.

> Because the hourly rates approved for mitigation specialists are substantially lower than those authorized for attorneys, the appointment of a mitigation specialist or penalty phase investigator generally produces a substantial reduction in the overall costs of representation.

Judicial Conference of the U.S., Subcomm. On Federal Death Penalty Cases, Comm. On Defender Services, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* at 10 (1998).

19

"Because the scope of mitigation evidence which may be considered by the jury in sentencing is much broader than the range of relevant information which may be considered in determining guilt or innocence, counsel is under a greater obligation to discover and evaluate potential evidence of mitigation." *United States ex rel. Emerson v. Gramley*, 883 F. Supp. 225, 243 (N.D. Ill. 1995), *aff'd*, 91 F.3d 898 (7th Cir. 1996).

> The responsibility of the lawyer is to walk a mile in the shoes of the client, to see who he is, to get to know his family and the people who care about him, and then to present that information to the jury in a way that can be taken into account in deciding whether the client is so beyond redemption that he should be eliminated from the human community.

*Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001) (quoting Stephen B. Bright, *Advocate in Residence: The Death Penalty As the Answer to Crime: Costly, Counterproductive and Corrupting*, 36 Santa Clara L. Rev. 1069, 1085-86 (1996)).

In *Wiggins*, as noted previously, the Supreme Court held that the ABA Guidelines reflect "well-defined norms" for capital defense counsel's performance. 539 U.S. at 524. The well-defined norms in capital cases even as early as 1989 required that counsel's investigation for sentencing "should begin immediately upon counsel's entry into the case." 1989 Guideline 11.4.1(D)(2)(C). *See also* 2003 Guideline 10.7 Commentary ("The mitigation investigation should begin as quickly as possible"). "[I]investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 524 (quoting 1989 ABA Guideline 11.4.1(C).

More specifically, the mitigation investigation should include the gathering of records and conducting interviews on numerous topics, such as the defendant's history of mental illness, his

20

family and social history, including physical, sexual, or emotional abuse, and his prior correctional history  1989 Guideline 11.4.1(D)(2)(C);[7] 2003 Guideline 10.7 Commentary.  The investigation should include  "[a] multi-generational investigation" because it "frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment." 2003 ABA Guideline 10.7 Commentary.  Interviews should be conducted with the client, his family, and "virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others." *Id.*

The Guidelines warn that, in conducting interviews of the client and others, some information "is very personal and may be extremely difficult for the client [or witness] to discuss." *Id.* Specifically, in the context of describing the training and function of mitigation specialists, the Guidelines warn that the interviews must "elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse)." *Id.*[8]

---

[7]"Collect information relevant to the sentencing phase of trial including, but not limited to: medical history, (mental and physical illness or injury of alcohol and drug use, birth trauma and developmental delays); educational history (achievement, performance and behavior) special educational needs including cognitive limitations and learning disabilities); military history (type and length of service, conduct, special training); employment and training history (including skills and performance, and barriers to employability); family and social history (including physical, sexual or emotional abuse); prior adult and Juvenile record; prior correctional experience (including conduct or supervision and in the institution/education or training/clinical services); and religious and cultural influences."  1989 ABA Guideline 11.4.1(D)(2)(C).

[8]Even before the 2003 revision to the Guidelines, authors experienced in capital litigation also warned of these common-sense principles.

> Interviews are sensitive because of cultural, psychological, and other barriers that must be overcome to ensure that family secrets are disclosed. . . . Regardless of the culture, life-history investigation is invasive of privacy–seeking the darkest, most
>
> (continued...)

No one in the defense team performed even near these standards.  As is detailed in the § 2255 Motion, during an entire year after appointment, counsel did not interview any possible mitigation witnesses that could address any aspect of Purkey's life prior to his parole from prison in March 1997 other than his wife, ex-wife, daughter, and step-sons.  Purkey's brother, Gary Hamilton, was not interviewed until March 2003 other than a brief phone call with counsel.

Counsel knew at the time of that interview and included in his listing of mitigating circumstances to be developed:  (1) "abandonment by parents in childhood"; and (2) "sexual abuse by mother."  Exhibit 9 (To Do List).  Dr. Cunningham, based on his initial review of records and evaluation of Purkey, had also listed as "emerging mitigation hypotheses" the following:

> Multigenerational family distress
> Genetic predisposition to substance dependence
> Genetic predisposition to mental illness
> Fetal alcohol exposure
> Parental alcoholism
> Parental neglect and abandonment
> Observed family violence
> Physical and emotional abuse
> Inadequate structure and violence
> Corruptive influence of brother

---

[8](...continued)
shameful and intimate secrets of the client's family.

. . . .

> Witnesses should always be interviewed in person.  The information needed in mitigation is simply not disclosed to strangers over the telephone.  Full disclosure comes only in person with great patience, no matter how skilled the interviewer.

Russell Stetler, Capital Cases, The Champion, National Association of Criminal Defense Lawyers, at 38-39 (Feb. 1999).  *See also* Dwight H. Sullivan, Jerry L. Britain, Michael N. Knowlan, and Cheryl Pettry, Raising the Bar: Mitigation Specialists in Military Capital Litigation, 12 Geo. Mason U. Civ. Rts. L.J. 199, 214 (2002) ("To be successful in obtaining accurate and complete information, these interviews must be done in person, not by phone").

Traumatic sexual exposure

Dr. Cunningham also specifically listed Hamilton as a person that needed to be interviewed concerning specific listed areas, including "observation of parental sexual activities," "observation of mother's promiscuity," possible sexual abuse by Gary's friend "Hup," and "sexual interactions" between Purkey and his mother. Dr. Cunningham also listed the need to investigate whether Purkey had told others, specifically listing his wife and ex-wife, about being sexually abused by his mother and the timing of those reports. In addition, Dr. Cunningham noted the need to interview "corrections officers and mental health providers," who had known Purkey. Exhibit 10 (Letter from Dr. Cunningham to Duchardt dated December 19, 2002).

Nonetheless, counsel conducted only a single interview of Hamilton in his home in Nebraska in March 2003. And, rather than being sensitive to the difficulty of the topics for the witness, counsel even took his teenage son to that interview. "Counsel thus essentially foreclosed any helpful disclosures from those most likely to know, first-hand, the pertinent facts." *Cargle v. Mullin*, 317 F.3d 1196, 1210 (10th Cir. 2003). According to Hamilton, counsel did not even ask questions about the aberrant sexual interactions among family members, which, as stated by Dr. Cunningham, would be "a standard aspect of a comprehensive psychosocial history and are a particularly important component of interviews of family members when information has been provided by a defendant that sexual abuse had occurred." Exhibit 11 (Mark Cunningham, Ph.D., Declaration). *See Ex Parte Gonzales*, 204 S.W.3d 391, 397 (Tex. Crim. App. 2006) ("[A]n objective standard of reasonable performance for defense counsel in a capital case would have required counsel to inquire whether the defendant had been abused as a child").

23

Other than this single interview and those addressed above, which were focused more on Purkey's drug usage and allegations that he had been poisoned by his wife and others prior to these crimes, counsel did not conduct any other interviews concerning Purkey's social history and background other than brief phone calls with Hamilton's daughter, Purkey's cousin (Debbie Prothero), and Purkey's paternal aunt, Marguerite Hotchkiss. *See, e.g., Harries v. Bell*, 417 F.3d 631 (6th Cir. 2005) (counsel ineffective in capital sentencing for limiting the background investigation to a few phone calls with family members and making limited records requests); *United States v. Murphy*, 50 M.J. 4 (C.A.A.F. 1998) (counsel's "attempt[] to develop an extenuation and mitigation case by correspondence and telephone" was inadequate).

Like counsel in *Wiggins*, Purkey's counsel's conduct was deficient because the evidence revealed that the "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." 539 U.S. at 526. "Counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* at 524. "The scope of their investigation was also unreasonable in light of what counsel actually discovered" and "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses." *Id.* at 525 (citation omitted).

Purkey was prejudiced by counsel's failure to adequately interview social history and background witnesses. For example, as is addressed in detail in the § 2255 Motion and its Exhibits, counsel could have easily countered the government's allegation that Purkey had recently fabricated–for the sole purpose of avoiding the death penalty–information that he had been sexually abused by his mother. Counsel could have and should have countered this information with

24

Purkey's prior prison records that reflected his report of the sexual abuse more than 15 years prior to trial, Exhibit 17 (Portion of Oregon Department of Corrections Records), and he did so in a correctional setting where there was no possible motivation for doing so except in attempting to get mental health counseling.

Counsel could also have presented the testimony of Dr. Rex Newton, the mental health expert employed by the Oregon Department of Corrections who counseled Purkey following his report of the childhood sexual abuse. Dr. Newton could have provided powerful mitigation from a clearly disinterested witness that Purkey was "a throw away kid," who was abused and never got adequate parenting, but he very much wanted to face his demons with therapy and treatment. Dr. Newton also would have provided disinterested and credible testimony that, contrary to the government's arguments and evidence and the tattoos on his body, Purkey was not involved in racist prison gangs and, indeed, was ashamed of his tattoos. Exhibit 18 (Rex Newton, Ph.D., Declaration).

If counsel had adequately investigated, counsel also could have presented the testimony of Margaret "Peggy" Noe and her daughter, Evette, in mitigation. Peggy was named in some of Purkey's Wichita Police Records that were obtained by trial counsel. Specifically, on April 4, 1974, when he had been taken into "protective custody" for public drunkenness and taken to the hospital, she was listed as his common law wife. Thus, she was obviously a person that should have been interviewed in a background and social history investigation. She could have been easily located because Purkey has remained in contact with her and her daughter over the years and could easily have provided contact information for her.

Margaret Noe would have testified that she has known Purkey since the second grade. She became close friends with him when they were both in their early 20's. Purkey confided in her then

25

that his mother had sexually abused him for a long time.  She also personally observed that Purkey's mother lived with her step-father essentially as husband and wife.  Ms. Noe also could have testified that Purkey had once saved her life and that he took a special interest in her daughter.  Exhibit 28 (Declaration of Margaret Noe).  Evette Noe also would have testified that Purkey has always been like a father to her.  He has always given her positive encouragement and emotional support to end an abusive marriage and negative behavior.  Exhibit 29 (Declaration of Evette Noe).

Purkey was also prejudiced by counsel's failure to interview other background witnesses, such as Floyd Bose and his daughter, Dion Leiker.  As detailed in the § 2255 Motion, both of these former law enforcement officers would have testified that Purkey assisted their family by providing them with information and closure following the murder of a family member.  Leiker also would have testified that Purkey is compassionate.  He provided emotional support and convinced her to escape an extremely violent marriage.  He also helped her understand her grandson's problems after her grandson was sexually molested.  Exhibit 21.

Although counsel did present mitigation evidence through retained mental health experts, Purkey was prejudiced by not having these disinterested, lay witnesses testify on his behalf.  "The jury was called upon to determine whether a man whom they did not know would live or die." *Collier v. Turpin*, 177 F.3d 1184, 1204 (11th Cir. 1999).  Counsel's duty was to "humanize the defendant for the jury, show his character in the best light available, and bring his good qualities to the fore."  *State v. Williams*, 794 N.E.2d 27, 50 (Ohio 2003), *modified on reconsideration*, 814 N.E.2d 818 (Ohio 2004).  The jury should have "heard first-hand accounts" and "personal testimony" from these witnesses in support of the expert testimony.  *Powell v. Collins*, 332 F.3d 376, 400 (6th Cir. 2003).  These witnesses could have given the jurors "*objective and specific* examples

26

of why [Purkey's] life should be spared" and could have provided the information that "illuminates the man whose life [was] in their hands." *Marquez-Burrola v. State*, 157 P.3d 749, 766-67 (Okla Crim. App. 2007). In short, these witnesses could have provided the testimony that "would have humanized" Purkey for the jury. *Williams v. Anderson*, 460 F.3d 789, 805 (6th Cir. 2006).

These witnesses not only could have provided substantial, credible, and humanizing mitigating information in their own right,[9] but their testimony would also have provided substantial support for Dr. Cunningham's testimony rebutting the government's assertion of future dangerousness. In addition, the testimony of Margaret Noe and Dr. Newton was also relevant corroborating information that would have supported Dr. Peterson's testimony and established that Purkey did not just "make up" the report of sexual abuse in order to escape the death penalty. In short, their testimony would have ""corroborated [Dr. Peterson's] testimony and bolstered the credibility of his response to the prosecution," who attacked him and Purkey by essentially asserting that Purkey had recently fabricated an allegation that his mother had sexually abused him. *Hovey v. Ayers*, 458 F.3d 892, 926 (9th Cir. 2006). With respect to Dr. Newton, in particular, his testimony "coming as it did from [a] doctor[] who had no connection to the defense or incentive to invent a diagnosis and thus who [was] invulnerable to charges of fabrication, could very well have made the difference in a life as opposed to death verdict." *Id.* at 927.

---

[9]In addition to the witnesses discussed above, if counsel had adequately investigated and presented the available evidence, Debbie Prothero, Purkey's cousin, and her husband, Russ Prothero, would have testified. While neither condones Purkey's crimes, both understand that he is, as Dr. Newton described, "a throw away" kid that never had a chance for a normal life given his dysfunctional parents and their emotional, physical, and sexual abuse of him. Nonetheless, they love Purkey and would have testified in his behalf.

The overall prejudice is especially clear because the jury spent approximately twelve hours in deliberations before reaching a verdict of death, even though it found no mitigating circumstances at all. *See, e.g., Williams*, 794 N.E.2d at 54. If all of the available mitigating evidence had been presented, "there is a reasonable probability that at least one juror would have struck a difference balance." *Wiggins*, 539 U.S. at 537.

**E.      Failure to adequately prepare and present the expert testimony of Bruce Leeson, Ph.D.**

During sentencing, one of the expert witnesses presented by counsel was Bruce Leeson, Ph.D., who testified on the basis of neuropsychological testing that Purkey suffers from frontal and temporal lobe dysfunction. During cross-examination, however, it became apparent that he had not been provided with sufficient information and/or had not been adequately prepared by defense counsel for the government's cross examination. Specifically, Dr. Leeson was not aware that Purkey had completed some college courses or that he was "a jailhouse lawyer." Tr. 1616. He also was not aware of neurological examinations of Purkey following head injuries in car accidents, even though Dr. Leeson had referred to these head injuries as a possible source of neurological dysfunction. He was also unaware of other prior expert reports that formed the basis for government cross-examination. Tr. 1626-31.

Counsel's conduct was deficient in failing to provide Dr. Leeson with sufficient records and failing to adequately prepare him for cross-examination. "[W]hen experts are placed on the stand with virtually no preparation or foundation, a capital defendant has not received effective penalty phase assistance of counsel." *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998).

> A defense attorney in the sentencing phase of a capital trial has "a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client[ ] facts that the experts do not request." Regardless of

28

whether a defense expert requests specific information relevant to a defendant's background, it is defense counsel's "duty to seek out such evidence and bring it to the attention of the experts."

*Hovey*, 458 F.3d at 925.

Counsel's conduct was prejudicial because Dr. Leeson's credibility was severely challenged before the jury simply because he had not been adequately prepared to address the prior reports and other information.

> The clear implication of the prosecution's argument was that [Dr. Leeson] was uninformed about the subject of his diagnosis and that his conclusions stemmed from a general misunderstanding of the facts. Even if the background information did not change [his] diagnosis, he at least would have been able to testify more knowledgeably about the case and better weather the prosecution's attempts to discredit him. He would have been able to anticipate the prosecution's questions during cross-examination and explain [his opinions] . . . . Instead, [he] was caught by surprise, in an embarrassed and vulnerable situation. He was entirely discredited by his lack of critical information, information that lay in the hands of [Purkey's] counsel.

*Hovey*, 458 F.3d at 929. If Dr. Leeson had been adequately prepared and able to explain that his findings of neurological dysfunction, which were an integral part of the defense theme in mitigation, were not rebutted by the information the government used in cross-examination, there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different.

29

**F.     Failure to adequately prepare and present the expert testimony of Stephen Peterson, M.D.**

As is addressed in detail in the § 2255 Motion, Dr. Stephen Peterson, a forensic psychiatrist retained by counsel, testified in sentencing.  He detailed Purkey's report of sexual abuse by his mother in his report prepared in April 2000 in connection with Purkey's prior murder conviction in Kansas.  He also noted in his August 2003 report prepared in connection with this case that Purkey's prior report of the sexual abuse to Dr. Newton was documented in the Oregon Department of Corrections records.

During sentencing, Dr. Peterson testified only generally that Purkey was "severely sexually and physically and emotionally abused in childhood" and he "developed abnormal psychosexual ideas."  Tr. 1748.  The only detail he included in his testimony was that Purkey had reported pervasive sexual abuse by his mother from age six to 14 and he witnessed her sexual involvement with her boyfriends after his father left.  Tr. 1750.  He also mentioned Purkey's father paying for prostitutes for him at a young age and how each of these things resulted in Purkey having substantial difficulties with "emotional detachment" to women.  Tr. 1750.  He also mentioned Purkey's prior diagnosis of "psychosexual problems of identification."  Tr. 1752.

During cross-examination, however, Dr. Peterson "admitted" that the only prior report of sexual contact with his mother was her 1972 report that Purkey allegedly raped her.[10]  Tr. 1817.  He also testified on cross that he was the only one Purkey told about sexual abuse in detail because he was the only one to ask.  Tr. 1824.  At the time, he was not aware, of course, that Purkey had

---

[10]Purkey was never charged with this alleged offense because law enforcement officers reported that Mrs. Purkey was intoxicated and appeared to have mental problems, the examining doctor found no evidence of sexual assault, and Mrs. Purkey's aunt, who lived in the home, reported that Purkey was not even present in the home at the time of the alleged rape.

provided some of this information to Margaret "Peggy" Noe 20 years before or that Purkey had also provided detailed information on this topic to Dr. Cunningham.

Dr. Peterson was aware, however, but had simply forgotten that the Oregon Department of Corrections Records reflected Purkey's prior report of being sexually abused as a child. Nonetheless, counsel failed to even point out those records in redirect or to even direct him to his own report, which referenced in detail the prior Oregon reports.

Counsel's conduct was deficient in failing to prepare Dr. Peterson to testify concerning the details of the sexual abuse he was aware of, failing to provide him with the information concerning the details of the sexual abuse Dr. Cunningham was aware of, failing to develop the additional information that Dr. Newton and Peggy Noe could have provided, and failing to even correct the false perception created during cross-examination.

As addressed in more detail above, the prior records and information from Dr. Newton and Noe "would have strengthened" and "confirmed" Dr. Peterson's opinion that Purkey had, in fact, been sexually abused by his mother and that he was not simply fabricating an allegation in order to avoid the death penalty. *Hovey*, 458 F.3d at 926.

Dr. Peterson also should have been prepared and questioned on the stand by counsel concerning the details of the horrid abuse Purkey endured from his mother rather than just the "conclusional testimony" that Purkey was sexually abused. *Lewis v. Drake*, 355 F.3d 364, 368 (5th Cir. 2003). This was "wholly inadequate to present to the jury a true picture of the tortured childhood" Purkey experienced. *Id.* at 369. The mere label of "sexual abuse" tells the jury nothing about "a defendant's troubled childhood, [which] will present him in a more sympathetic light to a jury." *Turpin v. Lipham*, 510 S.E.2d 32, 41 (Ga. 1998).

31

The prejudice is especially clear "[w]here, as here, the very matter as to which defense counsel has been ineffective becomes one of the linchpins of the prosecutor's closing." *Commonwealth v. Alvarez*, 740 N.E.2d 610, 618 (Mass. 2000). Here, because Dr. Peterson was not adequately prepared beforehand or redirected even after the very damaging cross, government counsel was free to argue without objection or contradiction by defense counsel that Dr. Peterson's "findings were a fairy tale" and that the evidence of Purkey's horrible childhood was simply "the old abuse excuse." Tr. 2267-68. If counsel had performed adequately, there is a reasonable probability that at least one juror would have struck a different balance in sentencing and the outcome would have been different.

### G. Failure to adequately prepare and present the expert testimony of Mark Cunningham, Ph.D.

As is addressed in detail in the § 2255 Motion, Dr. Cunningham, a forensic psychologist, was prepared to testify about the details of Purkey's sexual abuse by his mother. Specifically, he could have testified that, beginning as early as age eight, Purkey's mother was inappropriately touching his genitalia. After she separated from her husband, she would have Purkey sleep with her and manually stimulate her sexually or to penetrate her with the handle of a hairbrush. She would also have him to rub lotion on her breasts and genitalia. As he grew older, she had him to perform cunnilingus on her, and she would manually stimulate him to orgasm. Ultimately, she engaged him in sexual intercourse. Exhibit 11.

Counsel's conduct was deficient in failing to elicit this testimony. Dr. Cunningham had prepared slides, discussed them with counsel, and was prepared to testify about the details of the sexual abuse of Purkey and his exposure to other sexual traumas as a child. Nonetheless, counsel did not question him about the detail. This was apparently simple oversight rather than any strategy.

32

Just as with Dr. Peterson, counsel's failure to adequately present the available evidence was prejudicial.

> **H.      Failure to adequately prepare and present the lay testimony of Gary Hamilton in mitigation.**

Counsel's conduct was deficient in failing to prepare Purkey's brother, Gary Hamilton, for his testimony. If he had been adequately prepared, Hamilton would have testified that Purkey started abusing alcohol and drugs when he was just a child because he was emulating Hamilton. He would have testified in detail about the violence in the home with Purkey's father physically abusing Purkey's mother. Finally, he would have provided more information about his own sexual abuse by his mother and his grandmother and his mother's sexual abuse by her step-father even as an adult.

Purkey was prejudiced by the failure to adequately prepare Hamilton because his testimony only provided "skeletal testimony," *Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003), and a "hollow shell" of the events of Purkey's childhoods, *Collier v. Turpin*, 177 F.3d 1184, 1201 (11th Cir. 1999).

> The jury was called upon to determine whether a man whom they did not know would live or die; they were not presented with the particularized circumstances of his past and of his actions on the day of the crime that would have allowed them fairly to balance the seriousness of his transgressions with the conditions of his life. Had they been able to do so, . . . it is at least reasonably probable that the jury would have returned a sentence other than death.

*Id.* at 1204.

> **I.      Failure to adequately investigate and prepare witnesses, which resulted in counsel calling alleged "mitigation" witnesses that were prejudicial.**

Counsel's inattention and lack of preparation for sentencing also manifested itself in counsel's presentation of "mitigation" witnesses that provided information that was more harmful than helpful to Purkey. Specifically, the very first witness called by the defense was Dr. William

33

Grant, a Bureau of Prisons employee. He testified concerning the medications he had prescribed for Purkey, but also made it clear that he prescribed these medications based on the recommendation of Dr. Peterson and because Purkey was "on trial for his life" and the medications were not otherwise inappropriate. Tr. 1410, 1415, 1417. He then testified on cross-examination that while Dr. Peterson reported that Purkey suffered "anxiety" others, presumably himself included, would call it "attitude, belligerent, irritable." He also testified that it "seems to be more acceptable to be anxious than to be irritable, angry and aggressive" and that Purkey has "real anger control problems." Tr. 1416.

Counsel also called Mark Russell, a counselor at USP-Leavenworth, presumably to testify that it was no "club Fed." On cross-examination, however, Russell acknowledged that Purkey was housed in a unit for inmates that had behavioral problems and were administratively segregated. He also testified that Purkey was the only pretrial detainee there and he was sent because he "was a management problem" and was "demanding." Tr. 1656. He also testified that he had heard that Purkey has a long history of assaultive behavior in prison. Tr. 1658.

Counsel's conduct was deficient in failing to adequately interview these witnesses before putting them on the witness stand. "[C]ounsel could not have evaluated or weighed the risks and benefits of calling [these witnesses] . . . without so much as asking [them] what [they] would say if called." *Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005). If counsel had done so, it would have been clear that their testimony was not "mitigating" and, in fact, was more harmful than helpful to Purkey. Their testimony was, in fact, prejudicial to Purkey.

34

### J.     Conclusion

While the Eighth Circuit has rejected consideration of "the cumulative effect of trial counsel's errors in determining *Strickland* prejudice," *Middleton v. Roper*, 455 F.3d 838, 850 (8th Cir. 2006), Purkey submits that this is an erroneous interpretation of *Strickland*, *Williams*, and *Wiggins*.  A finding of prejudice under *Strickland* requires that a petitioner "show that there is a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different."  466 U.S. at 694.  Prejudice is established if "there is a reasonable probability that *at least one juror* would have struck a different balance" but for counsel's errors. *Wiggins*, 529 U.S. at 537.

The *Strickland* standard is the same as the standard used for judging the "materiality" of evidence unconstitutionally suppressed by the government.  *United States v. Bagley*, 473 U.S. 667, 676 (1985) (adopting the test enunciated in *Strickland* for resolving Sixth Amendment claims of ineffective assistance of counsel).  Thus, the Supreme Court's analysis in *Kyles v. Whitley,* 514 U.S. 419, 434 (1995), of the proper application of the "materiality" standard is equally applicable to the "reasonable probability" analysis under *Strickland.*

Analysis in this appropriate light reveals that this Court must apply a cumulative prejudice analysis. *Kyles*, 514 U.S. at 436 (the prejudice must be "considered collectively, not item-by-item"). The United States Supreme Court's opinion in *Williams*, 529 U.S. at 399, also requires that the Court consider "the entire postconviction record . . . as a whole and cumulative of mitigation evidence presented originally" in conducting its prejudice analysis and finding counsel ineffective for failing to adequately prepare and present mitigation evidence.  "[A]s a whole" implies a cumulative analysis.  Likewise, in *Strickland*, the Court stated, "The defendant must show that there is a

35

reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different."  466 U.S. at 694 (emphasis added).  If the Court did not intend a cumulative analysis it would have discussed the prejudice analysis in terms of "individual error" or error by error evaluation instead of formulating the prejudice test in light of counsel's "errors."

Finally, it should be noted that a majority of the Circuit Courts of Appeals have held that cumulative prejudice analysis is appropriate under *Strickland.  See Pavel v. Hollins*, 261 F.3d 210 (2nd Cir. 2001); *Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999); *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000); *Martin v.  Grosshans*, 424 F.3d. 588 (7th Cir.  2005); *Turner v. Duncan*, 158 F.3d 449 (9th Cir. 1998); *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003).[11]

**XII.    Purkey was denied due process of law and his right to fair trial in violation of the Fifth and Sixth Amendments during trial and sentencing and his sentence was based on an arbitrary factor in violation of the Eighth Amendment due to government counsel's deliberate misconduct in repeatedly telling the jury that Purkey had just walked into court and recanted the kidnaping of Ms. Long.[12]**

First, the government knew that in December, 1998, Purkey told Agent Tarpley and Detective Howard that he had kidnaped Ms. Long in Missouri and forced her to accompany him to his home in Kansas, where he killed her.  But it knew more than that.  It also knew that in the month after it obtained the indictment against Purkey, he recanted the kidnaping to its star witness – Michael Speakman.  On November 2, 2001, Speakman spoke with the FBI, advising them that

---

[11]*See also United States ex rel. Madej v. Schomig*, 223 F. Supp. 2d  968 (N.D. Ill. 2002); *Miller v. Senkowski*, 268 F. Supp. 2d 296 (E.D.N.Y. 2003); *In re Gay*, 968 P.2d 476 (Cal. 1998); *Acker v. State*, 787 So.2d 77 (Fla. Dist. Ct. App. 2001); *People v. Briones*, 816 N.E.2d 1120 (Ill. App. Ct. 2004); *State v. Gondor*, 860 N.E.2d 77 (Ohio 2006); *Mata v. State*, 141 S.W.3d 858 (Tex. Ct. App. 2004); *State ex rel. Humphries v. McBride*, 647 S.E.2d 798 (W. Va. 2007); *State v. Thiel*, 665 N.W.2d 305 (Wis. 2003).

[12]The numbering of the arguments from this point match the numbering of the claims asserted in the § 2255 Motion.

36

Purkey had said: (I) "[the] girl was with him partying"; (ii) "[he] did not snatch [her]"; and (iii) "[it was] not forcible with girl." Exhibit 24 (Brunell Rough Notes dated 11/02/01).

Almost six weeks after receiving Dr. Peterson's August 13, 2003 report, the government moved *in limine* to preclude Dr. Peterson from testifying that Purkey had told him during various interviews in 2002 that he had not kidnaped Ms. Long. Doc. #337. In that September 25, 2003, motion, the government asserted, "the United States has learned *for the first* time that the defendant is now claiming that the victim accompanied him voluntarily from Missouri to Kansas." Doc #337, p. 2 (emphasis added). A month later, Purkey's confession served as the centerpiece for the government's case-in-chief. Tr. 429-35, 490-92, 534, 538, 572, 956-60. To bolster that confession, AUSA Whitworth elicited from Agent Tarpley that "[r]ight before this trial" was the first time he had ever heard that Purkey had claim3d not to have kidnaped Ms. Long. Tr. 566. This strains credulity. Tarpley was the Government's lead investigator and the Speakman 302 that described Purkey's recantation to Speakman appeared over Tarpley's name. Exhibit 2. Having planted this illicit seed through its lead investigator, the Government then exacerbated the lie by telling the jury that Purkey had just "change[d] his story" in order to avoid the death penalty – "he's trying to get out of it." Tr. 1135. AUSA Whitworth emphasized, "All the way up, all the way through this case up until recently it's been I kidnaped her, I kidnaped her, I kidnaped her." Tr. 1135.

To arrive at the truth, our system imposes on prosecutors the "duty to serve justice, not just win the case." *Berger v. United States*, 295 U.S. 78, 88 (1935). AUSA Whitworth, then, was obliged to elicit and argue the truth. *Giglio v. United States,* 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959). Instead, he elicited false testimony that served only to mislead the jury on *the* critical question before it – Purkey's credibility as to whether he kidnaped Long. Purkey must show

37

that such error deprived him of due process, i.e., that the prosecution knew or should have known of the fallacy it created and that there is a reasonable likelihood that that fallacy *could have affected* the jury's judgment. *See United States v. Martin*, 59 F.3d 767 (8th Cir. 1995) (citing *United States v. Nelson*, 970 F.2d 439, 443 (8th Cir. 1992)). It clearly did.

In *United States v. Bigeleisen*, 625 F.2d 203, 205 (8th Cir. 1980), the government's key witness against Bigeleisen was John Paul Moore. In exchange for Moore's cooperation, the government agreed to contact the sentencing judge and the United States Parole Commission. *Id.* On direct, the following took place:

> Q. Now, do you have an agreement with the government concerning your cooperation at this time?
>
> A. No, I do not.
>
> Q. By that I mean, is there anything that you are supposed to get in relation to testifying?
>
> A. No, there is not.

*Id.* at 206. The government did nothing to correct Moore's false testimony. *Id.* The government then "argued that Moore decided to testify because Bigeleisen stopped giving him 'silence money.'" *Id.* at 208. Noting that "[w]hether he had an agreement regarding his testimony was central to the jury's credibility evaluation," the Eighth Circuit reversed Bigeleisen's conviction and remanded for a new trial. *Id.*

In *United States v. Foster*, 874 F.2d 491 (8th Cir. 1988), the Eighth Circuit again addressed this situation. There, in exchange for their cooperation, Mattingly, Buckley, and Jackson were all granted various forms of immunity before trial. *Id.* at 494. On direct examination, the prosecutor asked Mattingly whether "any promises" had been made concerning whether she could be

38

prosecuted in Minnesota, and Mattingly responded: "Not to my knowledge." *Id.* The prosecutor made no attempt to correct Mattingly's faulty recollection, but did ask Mattingly whether she believed she would be prosecuted in Minnesota, and Mattingly said "No." *Id.* Similarly, the prosecutor asked Buckley on direct whether any promises had been made to him about whether or not he would be prosecuted in Minnesota, and Buckley responded, "There have been no promises at all." Again, the prosecutor made no attempt to refresh Buckley's faulty recollection that he had been promised use immunity in exchange for his cooperation. The promise not to prosecute Jackson in Minnesota was fully elicited. *Id.*

The Eighth Circuit noted that under *Giglio* "[a] new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Id.* at 495 (citations omitted). The Eighth Circuit reversed, observing,

> After reviewing the conflicting evidence presented to the jury in this case, we are unable to say that there was no reasonable likelihood that the false testimony could have affected the judgment of the jury. Buckley and Mattingly were critical witnesses in the government's case, and their testimony was directly contradicted by Foster. In a case resting essentially on the credibility of the witnesses, the failure to inform the jury of the promises made to the witnesses was prejudicial.

*Id.* at 495.

In *Davis v. Zant*, 36 F.3d 1538, 1549 (11th Cir. 1994), the defendant testified that his codefendant had "stepped forward and confessed to this crime about three months ago…." *Id*. at 1546. The prosecutor immediately objected, "That's not true and it's not evidence." *Id.* But the codefendant *had* confessed, and the prosecutor *knew* it six months before trial. *Id.* at 1547. Nonetheless, the prosecutor argued that the defense was a "last minute fabrication" that was "'thought up' during trial." *Id.* at 1547-1548. "[T]he prosecutor intentionally painted for the jury a distorted picture of the realities of this case in order to secure a conviction [and death sentence]."

39

*Id.* at 1549.  The Eleventh Circuit reversed Davis' conviction and death sentence because the

prosecutor's "patently dishonest" tactics rendered Davis' trial fundamentally unfair.  *Id.* at 1551.

Here, AUSA Whitworth knew well in advance of trial that Purkey had recanted his false-confession.

Indeed, the Government's own star witness claimed to have heard Purkey talking about his case and

saying that Ms. Long had gone with him voluntarily – to party, this is precisely what Dr. Peterson

described in his August 13, 2003 report.  On November 2, 2001, Speakman told the FBI, including

lead investigator Tarpley,

> Immediately after flushing the newspaper, Purkey initiated a conversation with him,
> indicating that, as a cell mate, he felt he owed him an explanation regarding the
> article and the murder of the girl.  Purkey explained his case was different than the
> ongoing Keith Nelson and Pamela Butler incident, in that *Purkey did not "snatch"*
> *the girl from the street* as Nelson did.  Purkey described *the initial contact with the*
> *girl as more like they were "partying," and that is [sic] was not forcible*.

Exhibit 2 (Speakman 302, Transcribed 11/28/2001) (emphasis added).  Thus, since just a month after

the Government obtained its indictment,[13] it knew that Purkey was recanting his statement that he

had kidnaped Ms. Long.  Exhibiting temerity, however, AUSA Whitworth used his lead investigator

to tell the jury that Mr. Purkey had just recanted "[r]ight before this trial."  (Tr. 566).  Such gross

misconduct cannot be countenanced.  "A lie is a lie, no matter what its subject, and if it is in any way

relevant to the case, the district attorney has the responsibility and duty to correct what he knows

to be false and elicit the truth."  *Napue,* 360 U.S. at 269-270.

The entire focus of this case was Purkey's credibility with regard to whether he kidnaped Ms.

Long or whether she went with him voluntarily.  It cannot be said that there is no reasonable

likelihood the jury's decision was not impacted by the government's misleading and false argument.

*See Giglio*, 405 U.S. at 154-55 ("Here the Government's case depended almost entirely on Taliento's

---

[13]The grand jury returned the indictment on October 10, 2001.  Doc. #1.

testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."). Likewise, here, Purkey's credibility was the central factor in the case. The Government obtained the upper hand by lying to the jury. Death is different from any other sentence. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1977). It is the most solemn decision jurors must make, and, here, the Government lured the jurors to make their decision based upon false evidence. Purkey is entitled to a new trial.

**XIII. Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel failed to impeach Agent Tarpley's testimony that he had only heard of Purkey's recantation "[r]ight before this trial."**

As addressed above, AUSA Whitworth argued and elicited from his lead investigator, Agent Tarpley, that "[r]ight before this trial" was the first time he had ever heard that Purkey was claiming not to have kidnapped Ms. Long:

> A. [Agent Tarpley] No, he never told me that he didn't kidnap her.
>
> Q. [AUSA Whitworth] When is the first time you ever heard about that story?
>
> A. *Right before this trial*.

Tr. 566 (emphasis added). Counsel was ineffective for failing to impeach Agent Tarpley.

The prejudice prong of *Strickland v. Washington*, 466 U.S. 668 (1984) requires a defendant in Purkey's position to show that "there is a *reasonable* probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (emphasis added). The United States Supreme Court has stressed that "the adjective

41

["reasonable"] is important." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). In *Kyles*, the Court observed:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Id*.; *see also Strickland*, 466 U.S. at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"); *Nix v. Whiteside*, 475 U.S. 157, 175 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice"). As explained in *Strickland* itself:

> "[R]easonable probability of a different result" is thus *less than a preponderance of the evidence*. It is present when an evaluation of all of the evidence that should have been before the jury is "sufficient to undermine confidence in the outcome."

*Strickland*, 466 U.S. at 693 (emphasis added) (citation omitted).

Failing to impeach a key prosecution witness can constitute ineffective assistance of counsel.

*Driscoll v. Delo*, 71 F.3d 701, 709 (8th Cir. 1995). For example,

> At Driscoll's trial, the state offered the eyewitness testimony of two inmates, Joseph Vogelpohl and Edward Ruegg. First, Vogelpohl took the stand and told the jury that he saw Driscoll stab Officer Jackson in the upper left part of his chest. Vogelpohl also testified that after witnessing Driscoll stab Jackson, he returned to Driscoll's cell to continue watching television as he had been before the disturbance began. According to Vogelpohl, Driscoll returned to his cell a while later and, before changing his clothes, said to Vogelpohl: "Did I take him out, JoJo, or did I take him out." On cross-examination, Driscoll's lawyer questioned Vogelpohl about his prior convictions, about his intoxication level on the night in question, about the beatings he and other inmates received from corrections officers after the riot, and about whether he had discussed the case with other inmates. Driscoll's lawyer also raised some question as to whether Vogelpohl also possessed a knife. (internal citations to the record omitted).

*Id.* at 709-710. The Eighth Circuit affirmed the district court's issuance of a writ of *habeas corpus*, concluding that there could be "no objectively reasonable basis on which competent defense counsel

could justify a decision not to impeach Vogelpohl.  *Id.* at 710.  "[C]ounsel's failure to impeach Vogelpohl was a breach with so much potential to infect other evidence that, without it, there is a reasonable probability that the jury would find reasonable doubt of Driscoll's guilt."  *Id.*

Similarly, in *Harris v. Artuz*, 288 F. Supp. 2d 247, 259 (E.D.N.Y. 2003),[14] counsel rendered ineffective assistance when he failed to cross examine Deas and other witnesses concerning the alleged shooting of Deas's hand.  Harris was convicted of murdering a man while allegedly trying to rob him of his coat. *Id.* at 251.  He was also convicted of assault for *shooting* another man in the hand during the incident. *Id.*  The evidence against him consisted primarily of the testimony of four eyewitnesses, one being the man who was purportedly shot in the hand.  *Id.*  Relevant medical records, however, showed the following:

- A "Triage Form" for Gregory Deas from Woodhull Medical and Mental Health Center indicating, under "chief complaint," that Deas was "assaulted 30 min ago hand stab wound of right hand." "Laceration" is circled on the form, with the location indicated as "R hand."

- An "Ambulance Call Report" for Gregory Deas in which the "chief complaint" indicates that Deas told personnel, "I was stabbed." The "presumptive diagnosis" is "stab R hand." Under "comments" is the statement that "pt. c/o stab wound to the hand."

- An "Emergency Department Nursing Flow Chart" stating that Gregory Deas was in the hospital "to get hand R stitched." Under "assessment intervention" is written "lac to R hand yesterday," and "2" lac. to "R palm." The chart also indicates that Deas had previously had surgery for a gunshot to the groin area.

- An Emergency Department form indicating as the "chief complaint" a "laceration to right hand." The treating physician's notes of the physical examination indicate "yesterday cut in Rt. Hand." The diagnosis is "Rt hand laceration." There is also a sketch of a hand with an indication of a V shape on the palm, with the two arms of the V labeled "2 cm" and "3 cm."

---

[14]Affirmed by *Harris v. Artuz*, 100 Fed. Appx. 56 (2nd Cir. 2004).

*Id*. at 258.  "[T]hese records contradict the testimony of all four of the prosecution's eyewitnesses, strongly suggesting the possibility that the witnesses colluded in their testimony in an effort to frame petitioner for a crime that was committed by one of them."  *Id*. at 251.

Failing to impeach these eyewitnesses cannot reasonably be dismissed as strategic – there was no downside to the impeachment.  Defense counsel's theory of the case--that petitioner was misidentified by the four witnesses – would have been aided rather than impeded by the evidence undermining their veracity.

> To the contrary, counsel's failure to impeach the witnesses foreclosed a strong line of defense that could have been presented to the jury in tandem with the misidentification theory or, more likely, could have supplanted the weak claim of misidentification altogether. Defense counsel, because he failed to use the medical records available to him, was unable to argue to the jury that Deas or possibly another of the four eyewitnesses was in fact Acevedo's killer.

*Id.* at 259.  Finding prejudice from this dereliction, the district court noted that "any reasonable juror would be forced to ponder how four friends managed to testify to the same, physically impossible details."

Similarly, here, counsel's failure to impeach Tarpley had no downside.  Counsel had told the jury from the beginning that the case should not be in federal court because there was no kidnaping. *See* Tr. 408, 411, 413.  Nonetheless, he let the Government portray this as a desperation defense concocted on the eve of trial.  As defense counsel readily admitted, Purkey's credibility was central to the case: "It is ironic that both we and the government are *absolutely dependent on one man's credibility* and believability in this case, and that one man is Wes Purkey." Tr. 1104 (emphasis added).

Any reasonably competent attorney would have impeached Tarpley with the November 2001 302 *bearing his name* that clearly reports that Purkey was denying that he kidnapped Ms. Long *two*

44

*years before trial*.  Trial counsel had the information to attack Tarpley's testimony.  Indeed, Purkey had recanted the kidnapping to both Duchardt and O'Sullivan, as well as Mic Armstrong (defense investigator) and Dr. Peterson (defense expert).  Still, counsel stood silent.  Letting the jury form a belief that Purkey was lying when it was really Tarpley who was lying sounded the death knell for Purkey.  But for counsel's dereliction, there is a reasonable probability that the jury would have decided the case differently, and this Court should vacate Purkey's conviction and death sentence.

**XIV.  Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel failed to correct the government's deliberate misconduct in asserting that Purkey had just walked into court and recanted the kidnaping for the first time because counsel both knew that Purkey had disclaimed the kidnaping since their very first meetings with him two years before trial.**

As addressed above, in his initial statements to Tarpley and Howard, Purkey concocted the story about kidnaping Ms. Long in an effort to avoid serving life in the cesspool of Kansas prisons. It was nearly three years later before the government obtained an indictment against Purkey, and he immediately – in October, 2001 – denied the kidnaping to Duchardt.  Again, in January, 2002, when Purkey had his initial meeting with O'Sullivan, he denied having kidnaped Ms. Long.  Also, during his first interview with Mic Armstrong, he denied having kidnaped Ms. Long.  And, when Purkey met with Dr. Peterson that autumn, he also recanted the kidnaping to him.  Two months before trial, Dr. Peterson authored a report, noting Purkey's insistence that he had not kidnaped Ms. Long and Purkey's reason for fabricating the kidnaping.  Exhibit 23.

As expected, when trial began on October 29, 2003, Purkey's confession served as the centerpiece for the government's case-in-chief. Tr. 429-35, 490-92, 534, 538, 572, 956-60. To fend off any defense that Purkey did not kidnap Ms. Long, government counsel elicited from Tarpley that "[r]ight before this trial" was the first time he had ever heard that Purkey was claiming not to have

kidnaped Ms. Long.  Tr. 566.  Counsel knew this to be untrue.  Under these circumstances, reasonably competent counsel would have informed the court that, unless the government corrected its misstatement of fact, counsel would become a necessary witness, thus necessitating a mistrial. Instead, counsel sat silent.

A lawyer cannot act as an "advocate *at a trial* in which the lawyer is likely to be a necessary witness."  Missouri Supreme Court Rules of Professional Conduct, Rule 4-3.7 (emphasis added).[15] "[This rule] has been interpreted to mean an attorney is a 'necessary witness' only if 'there are things to which he will be the only one available to testify.'" *Droste v. Julien*, 477 F.3d 1030, 1035 (8th Cir. 2007) (quoting *State ex rel. Wallace v. Munton*, 989 S.W.2d 641, 646 (Mo. App., S.D. 1999)).  Both Duchardt and O'Sullivan were necessary witnesses to rebut the government's specious assertion during summation that "[a]ll the way up, all the way through this case up until recently it's been I kidnaped her, I kidnaped her, I kidnaped her."  Tr. 1135.  Duchardt could have testified that Purkey had immediately and consistently recanted the kidnaping to him, and the same is true of O'Sullivan.

*United States v. Givens*, 88 F.3d 608 (8th Cir. 1996) presented the defendant's attorney with a similar problem.  There, the defendants – Kenneth Givens, Robert Turner, and Guinn Kelly – were members of the St. Louis Police Department who also worked as security guards at a federal housing project. *Id.* at 610.  They were accused of inflating their hours so that it appeared that they worked more at that project than they had.  *Id.*  At trial, one of the first witnesses called by the government was Captain Hagger, the defendants' supervisor at the police department.  *Id.*  Hagger testified about

---

[15]This Court has adopted this Rule.  Rule 83.5(c)(2).

46

the policies of the police department regarding their officers' employment in part-time jobs, and the defendants were interested in discrediting his testimony. *Id*.

While cross-examining Hagger, Givens's attorney, C. John Pleban, approached the bench and described for the court a conversation that he had with Hagger during which no one else was present. *Id.* Apparently, Hagger had told Pleban that he suggested to Givens that Givens resolve the problem of overstated hours on his time cards by working extra hours. *Id.* Under Pleban's cross-examination, however, Hagger denied making any such suggestion to Givens, and Pleban informed the court that if, on further cross-examination, Hagger denied the substance of their conversation, Pleban might have to testify to impeach Hagger. *Id.* Counsel for the other two defendants agreed that they too wanted to elicit this testimony for purposes of impeachment. *Id.* The court disqualified Pleban as Givens's attorney and declared a mistrial. *Id.* The Eighth Circuit noted, "While the district court conceivably could have made a finding of hardship that would have enabled Mr. Pleban to testify and represent Mr. Givens, we believe that the court chose the better path in disqualifying Mr. Pleban." *Id.* at 611.

In *United States v. Kliti*, 156 F.3d 150 (2nd Cir. 1998), Abdelgwad was a key government witness at trial and testified extensively about Kliti's involvement in the credit card and counterfeit check scheme. *Id.* at 155. During his cross-examination of Abdelgwad, Sarikas – Kliti's attorney – sought to ask about a conversation he had with Abdelgwad before trial. Outside the jury's presence, Sarikas told the court that Abdelgwad went to Sarikas's office to thank Sarikas for representing Abdelgwad during the bond hearing and told Sarikas and others "that Kliti had 'absolutely nothing to do with this [the charged offenses] and that he [Abdelgwad] would let the authorities know about that.'" *Id.* at 155.

47

Concerned that Sarikas would become an unsworn witness if he questioned Abdelgwad about this statement during cross-examination, the court engaged in the following colloquy aimed at letting Sarikas question Abdelgwad about the exculpatory statement, without having Sarikas become an unsworn witness:

> THE COURT: I wonder whether or not this could be done and it would certainly eliminate some of the concerns I have, by asking the witness [Abdelgwad] whether or not in the presence of Mr. Hamid and certain other individuals that are not going to be named or you could name Mr. Kliti, but just not yourself that he made a certain statement.
>
> [THE GOVERNMENT]: Without indicating –
>
> THE COURT: Without indicating it was in counsel's office, without indicating counsel was present.
>
> MR. SARIKAS: I would do that. What would happen, however, if he said no to that, would I have to more specifically refer?
>
> THE COURT: No. You said you had Mr. Hamid available. On the other hand, I don't know Mr. Hamid can testify to it -- can he?
>
> MR. SARIKAS: It really depends. I brought him [Hamid] here for two reasons.
>
> THE COURT: Mr. Abdelgwad is not a defendant. My concern is did you say to me and you, of course, can't testify and you would become kind of an unsworn witness here. You ask the question, the jury thinks you're an honest sort, they're going to accept that it was said even though he denies it.

*Id.* at 155-156.

All parties then agreed that Sarikas could avoid the unsworn witness problem by cross-examining Abdelgwad without referring to where the statement was made or whether Sarikas was present. *Id.* at 156. Cross-examination resumed and Abdelgwad flatly denied making the exculpatory statement. *Id.* Sarikas did not press Abdelgwad further on this issue, pursuant to the agreement. *Id.* At that point, the only witness, other than Kliti, who could testify about the

48

exculpatory statement, was a witness who asserted his Fifth Amendment privilege against self-incrimination and refused to testify.  *Id.*

Sarikas was in a clear conflict because he was faced with the choice of (1) testifying on behalf of his client, which would result in his disqualification, or (2) not presenting evidence of the exculpatory statement.  *Id.*  Finding prejudice from Sarikas's failure to testify, the court pointed out that Abdelgwad's credibility was essential to Kliti's conviction.  *Id.* at 157.  Abdelgwad testified extensively about his and Kliti's participation in the scheme, and he was the only witness who provided direct evidence of Kliti's use of the counterfeit bank checks to pay the credit card companies as specified in the indictment. *Id.*  Sarikas's testimony about the exculpatory statement would have been important impeachment evidence to attack Abdelgwad's credibility.  *Id.*

As in *Givens* and *Kliti,* counsel should have apprised the court of the situation as soon as the government began asserting that Purkey had just walked into court and recanted the kidnaping for the first time.[16]  Duchardt and O'Sullivan should have immediately approached the bench.  At the bench, counsel should have outlined for the court that Purkey had immediately and persistently insisted to them that he had not kidnaped Ms. Long.  Instead, counsel sat quietly and said nothing. Without impeaching Tarpley and without contradicting the government, counsel simply relied on argument.

> The government would want you to believe that the first time they ever heard anything about Mr. Purkey saying this wasn't a kidnaping was just a few weeks ago. Baloney. You know why that's baloney? Well, I can understand them wanting to forget about Michael Speakman…. But you know what, Michael Speakman told them in 2001 that Wes Purkey told him there was no kidnaping. They knew about it.

---

[16]Indeed, a reasonably competent attorney would have responded to the Government's motion *in limine* to emphasize that the Government had known about the recantation since Speakman provided his story to the FBI.

49

Tr. 1106. Counsel's argument, of course, was not evidence for the jury to consider. *See, e.g., United States v. Rusan*, 460 F.3d 989, 993 (8th Cir. 2006). Purkey's veracity and credibility were absolutely critical to his case. The jury knew he lied at some point, and counsel's inaction created a reasonable probability that the jury would decide Purkey was lying at trial not in his concocted confession. His conviction and sentence should be vacated.

**XV. Purkey was denied the effective assistance of trial and appellate counsel in violation of the Fifth and Sixth Amendments when counsel failed to object to the government's deliberate misconduct in asserting that Purkey had just walked into court and recanted the kidnaping for the first time and when appellate counsel failed to assert this ground on direct appeal.**

**A. Trial Counsel were Ineffective in Failing to Object to the Government's Deliberate Misconduct.**

As fully discussed in point XII, the government knew two years before trial that Purkey was recanting the kidnaping. Nonetheless, on September 25, 2003, the government moved *in limine* to preclude Dr. Peterson from testifying that Purkey had told him during various interviews in 2002 that he had not kidnaped Ms. Long. Doc. #337. In that motion, the government asserted, "the United States has learned *for the first* time that defendant is now claiming that the victim accompanied him voluntarily from Missouri to Kansas." Doc #337, p. 2 (emphasis added). Despite having a plethora of information to refute the government's claim, trial counsel did not respond to this false allegation.

Then right out of the blocks during trial, the government hit hard, eliciting from Agent Tarpley that "[r]ight before this trial" was the first time he had ever heard that Purkey was claiming not to have kidnaped Ms. Long. Tr. 566. Again, trial counsel did not respond to the false allegation. Government counsel then told the jury that Purkey had just "change[d] his story" in order to avoid the death penalty – "he's trying to get out of it." Tr. 1135. Government counsel emphasized, "All

the way up, all the way through this case up until recently it's been I kidnaped her, I kidnaped her, I kidnaped her." Tr. 1135. And, again, trial counsel lodged no objection.

As argued in point XII, Purkey's conviction and sentence should be vacated due to the government's deliberate misconduct. Reversal is also required due to counsel's ineffectiveness in failing to object to the misconduct.

Duchardt and O'Sullivan had ample warning that the government would engage in this deceitful tactic with the jury from the government's motion *in limine* asserting that it had just learned of Purkey's recantation. Doc. #337. Though the government's assertion was absolutely false, Duchardt and O'Sullivan did nothing to correct it. Reasonably competent counsel would have filed suggestions in opposition to the government's motion to bring the lie to the court's attention, thus pre-empting any deception of the jury. But, of course, Duchardt and O'Sullivan did not respond to the government's motion and let sleeping dogs lie. "Unfortunately, when a prosecutor does act unfairly, there is little a defendant can do other than rely on his or her attorney to lodge an appropriate and timely objection. *A failure to make such an objection can have devastating consequences for an individual defendant.*" *Hodge v. Hurley*, 426 F.3d 368, 377 (6th Cir. 2005) (emphasis added) (writ of *habeas corpus* issued because throughout closing argument, the prosecutor commented on the credibility of witnesses and misrepresented the evidence).

Failing to object to prosecutorial misconduct can constitute ineffective assistance of counsel. *Gravley v. Mills*, 87 F.3d 779 (6th Cir. 1996).

> The most compelling evidence of counsel's incompetence was her failure to object to very serious instances of prosecutorial misconduct. During the course of the trial, Gravley's counsel failed to object to, *inter alia*: (1) the initial introduction of Gravley's silence at his second interrogation; (2) Gravley's probation revocation hearing transcript, which dealt with an otherwise unrelated conviction for negligent vehicular homicide, being introduced as an exhibit; (3) the state's cross-examination

51

of Gravley about his post-arrest silence at his probation revocation hearing; (4) an erroneous jury instruction sought by the state that told the jury that it could consider Gravley's prior criminal record to explain what had taken place at trial; and (5) the state's final argument which invited the jury to consider constitutionally protected silence as evidence of Gravley's guilt and recent fabrication. Counsel's failure to recognize that the prosecution was continually making improper comments concerning Gravley's post-arrest silence was a critical error, *especially since Gravley's credibility was such an important issue in the case*.

*Id.* at 785-786 (emphasis added).

Here, nothing was more important to Purkey's case than his own credibility. *See, e.g.,* Tr. 1104 ("It is ironic that both we and the government are *absolutely dependent on one man's credibility* and believability in this case, and that one man is Wes Purkey") (emphasis added). The government sought the upper hand by misleading the jury to believe that Purkey's recantation of the kidnaping had come not two years before trial but *right before trial*. Counsel's only reaction to the government's blatant misconduct came in final argument:

> The government would want you to believe that the first time they ever heard anything about Mr. Purkey saying this wasn't a kidnaping was just a few weeks ago. Baloney. You know why that's baloney? Well, I can understand them wanting to forget about Michael Speakman…. But you know what, Michael Speakman told them in 2001 that Wes Purkey told him there was no kidnaping. They knew about it.

Tr. 1106.

This late argument by counsel did nothing to remove the taint conveyed by the government's deceptive tactic. Misrepresenting facts in evidence can amount to substantial error because doing so "may profoundly impress a jury and may have a significant impact on the jury's deliberations." *Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974)). This is particularly true when a prosecutor misrepresents evidence. Juries are generally confident that a prosecuting attorney is faithfully observing his obligation as a

52

representative of a sovereignty. *Washington v. Hofbauer*, *supra* (citing *Berger v. United States*, 295 U.S. 78, 84 (1935)).

This Court must assess whether any given strategy not to object was constitutionally deficient. *Washington*, 228 F.3d at 704. In *Washington*, defense counsel explained his failure to object as part of a broader strategy to show that his client had such a bad character "that it was so bad that this young lady would have a real reason to make up something of this nature." *Id.* at 705, fn. 7. But,

> an objection would have prompted the judge to inform the jurors that, counter to the prosecutor's suggestion, they could not convict Washington because he was the "type" of person who would commit the alleged crime; we then would presume that the jury heeded that instruction in rendering its verdict. On the other hand, Keston's silence allowed the prosecutor's improper use of that evidence, as well as its improper suggestions to the jury of how to consider that evidence, to go uncorrected. For this reason, and because this was a close case riding on Washington's credibility..., Washington was prejudiced by his counsel's failure to object to the closing argument.

*Id*. at 705.

Similarly, here, this was a close case riding entirely on Purkey's credibility. Counsel's defense strategy was to refute the kidnaping element of the charge by attacking it head-on. *See, e.g.,* Tr. 408, 411, 413. Indeed, he called the defense investigator to help with that. Tr. 893-900. Objecting to the government's misconduct would have supported that theory. It is often asserted that a prompt objection would only highlight the damaging information and that a curative instruction would not unring the bell,[17] but "doubts over the effectiveness of objections and curative instructions would preclude ineffectiveness claims in every case such as this, no matter how

---

[17]Such was argued in *Washington*, but as the Sixth Circuit noted, "Under this analysis, if [counsel] truly worried that the impropriety was too great for an instruction to overcome, he should have objected and called for a mistrial, rather than chosen not to object at all." 228 F.3d at 706, n.10.

outrageous the prosecutorial misconduct might be." *Washington*, 228 F.3d at 706. The simple fact is that there is no reasonable strategy for not objecting to correct the government's gross misconduct, and counsel's failure to do so did irreparable harm to Purkey.

### B. Appellate Counsel were Ineffective in Failing to Challenge the Government's Deliberate Misconduct on Appeal

There is no constitutional right to an appeal; that right is statutorily created. *McKane v. Durston*, 153 U.S. 684, 687 (1894). Where an appeal is granted by statute, equal protection and due process converge to require the assistance of an effective attorney. *Smith v. Robbins,* 528 U.S. 259, 276 (2000). In the non-capital context, appellate counsel need not raise every non-frivolous claim of error. *Evitts v. Lucey,* 469 U.S. 387, 394 (1985) (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). However,

> the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Strickland*, 466 U.S. at 715 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)) (plurality). The ABA Guidelines take into account this need for heightened reliability in capital cases in identifying what a reasonably competent appellate attorney must do in a capital case.

> Post-conviction counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules. Counsel should make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review.

In discussing the precise duties of appellate counsel in the post-conviction setting, the ABA commentary notes the paramount importance of appellate counsel's duty to "proceed, like all post-

54

conviction counsel, in a manner that maximizes the client's ultimate chance of success." 2003

Guideline 10.15.1 Commentary:

> As Subsection C emphasizes, it is of critical importance that counsel on direct appeal proceed, like all post-conviction counsel, in a manner that maximizes the client's ultimate chances of success. *"Winnowing" issues in a capital appeal can have fatal consequences.* Issues abandoned by counsel in one case, pursued by different counsel in another case and ultimately successful, cannot necessarily be reclaimed later. *When a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited.*

*Id.* (footnote omitted) (emphasis added).

Appellate counsel in capital cases must raise all arguable legal issues for the client; nothing less will facilitate the court's review of the death sentence. *See Ellis v. United States*, 356 U.S. 674, 674-675 (1958) (appellate counsel acted more like *amici curiae*; much more is required); *accord Thompson v. State* 492 N.E.2d 264, 278 (Ind. 1986) (appeal counsel simply listed possible errors for the court to independently review). Counsel must "research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful." *United States v. Reinhart*, 357 F.3d 521, 525 (5th Cir. 2004) (counsel rendered ineffective assistance in failing to brief and argue Reinhart's accountability as it related to his sentence); *Roe v. Delo,* 160 F.3d 416 (8th Cir. 1998) (appellate counsel failed to argue that the trial court erroneously blurred the distinction between first and second degree murder); *Bell v. Lockhart,* 795 F.2d 655 (8th Cir. 1986) (appellate counsel rendered ineffective assistance in failing to properly advise client of the risks of waiving a direct appeal because post-conviction appeal was not an adequate substitute); *Matire v. Wainwright*, 811 F.2d 1430, 1438 (11th Cir. 1987) (ineffective assistance when appellate counsel failed to raise issue of prosecutor's improper use of defendant's post-arrest silence in state's case-in-chief); *Ballard v. United States*, 400 F.3d 404 (6th Cir. 2005) (appellate counsel rendered ineffective assistance in

55

failing to raise *Apprendi*[18] error); *Mapes v. Tate*, 388 F.3d 187 (6th Cir. 2004) (appellate counsel rendered ineffective assistance in failing to argue that the trial court erred in refusing to let the jury consider mitigating factors related to an out-of-state conviction).

In determining whether counsel performed effectively on appeal, the *Strickland* test applies. *Smith v. Robbins*, 528 U.S. 259, 287 (2000); *accord Bell v. Lockhart*, 795 F.2d at 657. Movant must show both that counsel's representation fell below an objective standard of reasonableness and that the deficiencies prejudiced him. *See Strickland*, 466 U.S. at 687-88. As fully discussed, *supra*, the ABA Guidelines provide the best glimpse at what level of performance is required to meet the objective standard of reasonableness. One court has identified the following questions as relevant to the reasonableness inquiry:

(1) Were the omitted issues "significant and obvious"?

(2) Was there agreeably contrary authority on the omitted issues?

(3) Were the omitted issues clearly stronger than those presented?

(4) Were the omitted issues objected to at trial?

(5) Were the trial court's rulings subject to deference on appeal?

(6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

(7) What was appellate counsel's level of experience and expertise?

(8) Did the petitioner and appellate counsel meet and go over possible issues?

(9) Is there evidence that counsel reviewed all the facts?

(10) Were the omitted issues dealt with in other assignments of error?

---

[18]*Apprendi v. New Jersey*, 530 U.S. 466 (2000).

(11)  Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Whiting v. Burt,* 395 F.3d 602, 616 (6th Cir. 2005) (citing *Mapes v. Coyle*, 171 F.3d 408, 427-28 (6th Cir. 1999)).

But, what about prejudice?

Although [analyzing for prejudice] necessarily involves an evaluation of the underlying claims, it does *not* require a decision on or a determination of these issues. All that is required is a determination that, based on the nature of the underlying claims, there is "a reasonable probability that, but for his counsel's [failings] . . ., [the defendant] would have prevailed on his appeal."

*Mapes v. Tate*, 388 F.3d 187, 194 (6th Cir. 2004) (citing *Strickland, supra*); *accord Roe v. Delo*, 160 F.3d at 420.

Thus, "[Purkey] must show that there is 'a reasonable probability' – 'a probability sufficient to undermine confidence in the outcome,' but less than a preponderance of the evidence – that his appeal would have prevailed had counsel's performance satisfied constitutional requirements." *United States v. Cross*, 308 F.3d 308, 315 (3rd Cir. 2002) (citing *Strickland*, 466 U.S. at 694-695) ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome").

The assessment of prejudice should proceed on the assumption that the decision maker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies (sic) of the particular decision maker, such as unusual propensities toward harshness or leniency. Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry.

*Strickland*, 466 U.S. at 695; *accord Roe v. Delo,* 160 F.3d at 420 ("Our review of these cases leaves us uncertain whether the Missouri Court of Appeals would have found plain error had this issue been

57

raised in Roe's direct appeal. But the question before us is limited to whether there is a reasonable probability that the outcome would have been different, the test for determining whether Roe received constitutionally ineffective assistance of counsel").

A reasonably competent attorney would have presented this issue on appeal. Counsel was clearly aware of this issue – Purkey emphasized its importance at sentencing. *See* Transcript of Sentencing 3-5. As fully argued in point XII, the government's misconduct here was similar to that in *United States v. Bigeleisen*, 625 F.2d 203, 205 (8th Cir. 1980), and *United States v. Foster*, 874 F.2d 491 (8th Cir. 1988). There is a reasonable probability that had this misconduct been presented to the Eighth Circuit it would have reversed. The entire focus of this case was Purkey's credibility with regard to whether he had kidnaped Ms. Long or whether she went with him voluntarily. *See Giglio*, 405 U.S. at 154-55 ("Here the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."). At the very least, Purkey is entitled to a new appeal.

**XVI. Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel tied Purkey's hands while testifying, telling him that he could not mention having told Dr. Peterson that he did not kidnap Ms. Long and that if he did, his entire testimony would be struck by the court.**

When trial began on October 29, 2003, Purkey's confession *was* the government's case-in-chief. Tr. 429-35, 490-92, 534, 538, 572, 956-60. Without his confession, the government could not prove its case, and right out of the gate, Duchardt told the jury it would hear that Purkey did not kidnap Ms. Long.

58

> We're in federal court in Kansas City, Missouri and Wes Purkey is charged with having kidnapped Jennifer Long and having taken her by force to Kansas for the purpose of committing forcible rape. *That's not true. That didn't happen.*

Tr. 408 (emphasis added).

> Did he kill her? The evidence will be yes. Did he kidnap her and take her there as the government has charged in this federal charge? No.

Tr. 411.

> What you will hear in the evidence from witnesses who are friends of Jennifer Long, from family members, and from the information that Wes Purkey gave to the police, is that there was *no kidnaping*.

Tr. 413 (emphasis added). As addressed above, Duchardt's promise that Ms. Long's friends and family would refute the kidnaping obviously went unfulfilled. Interestingly, he did not promise the jury that it would hear *from Purkey* – just from Purkey's confession and Ms. Long's friends and family.

As it turned out, the jury did not hear Ms. Long's friends and family refute the kidnaping, and, on November 4, 2003, *immediately* before court reconvened to hear the defense case-in-chief, Duchardt informed Purkey that he would be testifying because the defense had nothing else on which to base its argument that there was no kidnaping. Oddly, O'Sullivan had absolutely no indication that she would be questioning Purkey until an hour before having to do so. Duchardt told her she would be conducting the direct examination of Purkey at the same he told Purkey he had to testify. O'Sullivan had *less than one hour* in which to prepare herself and her client. Understandably, that hour is something of a blur to O'Sullivan – "I recall preparing Mr. Purkey to testify during trial but I do not recall specifics of that." Exhibit 1 (emphasis added). During that hour, however, O'Sullivan warned Purkey not to mention that he told Dr. Peterson that he did not kidnap Ms. Long. *Cf.* Exhibit 1 ("I may have discussed with him not mentioning statements that he

59

made to Dr. Peterson during his direct testimony where the court had granted the government's motion *in limine*").[19]  Indeed, she told Purkey that if he mentioned his statements to Dr. Peterson, the court would strike his *entire* testimony.  Neither she, nor Duchardt prepared Purkey to face cross-examination.  He was left to flounder on his own.

When court convened, counsel made a record regarding Purkey's right to testify.  Tr. 887-888.  Duchardt asked whether he had discussed Purkey's *right* to testify with Purkey several times.  Tr. 887.  Purkey agreed, "I think the latest being about *15 minutes ago*."  Tr. 888 (emphasis added).  Purkey then said he had decided "to offer my testimony."  Tr. 888.

A similar situation arose in *Commonwealth v. Wesley*, 2005 Pa. Dist. & Cnty. Dec. LEXIS 141 (Pa. C.P. 2005).  In *Wesley*, trial counsel met with Wesley "the day before trial, for approximately two hours in length."  *Id.* at 15.  "Despite the fact that the trial was set to commence in less than 24 hours, [Wesley] was not prepped to testify during that meeting."  *Id.*  Instead, counsel explained that, based on his years of experience, the trial would take two full days, and, since Wesley would testify last, counsel was confident Wesley would not testify on the first day.  *Id.*  Counsel told Wesley that "they would prepare his testimony after the first day of trial."  *Id.*

Unfortunately for Wesley, the Commonwealth had rested with approximately 90 minutes remaining in the first day of trial.  *Id.* at 16.  Trial counsel asked for a side-bar in which he indicated he had two witnesses, including Wesley.  *Id.*  Counsel's explanation of his first witness' testimony

---

[19]On September 25, 2003, the government had moved *in limine* to preclude *Dr. Peterson* from testifying about Purkey's recantation. Doc. #337.  The government argued, "[D]efendant's recent fabrication is a shallow attempt to put on his defense through his psychiatrist while at the same time denying the government the opportunity to cross-examine defendant concerning his changed story." *Id.* at 3. Right before trial, this Court sustained the government's motion.  Doc. #440.

60

prompted the Commonwealth to object that her proposed testimony was not irrelevant, and the court

agreed. *Id.* With only Wesley left to testify, counsel requested a recess:

> [Defense counsel]: I think I asked for a recess.
>
> The Court: No, not now.
>
> [Defense counsel]: Then I need at least a half an hour with my client, because I really need to talk to him about some points and I -- I don't know. I thought this would go the full – I thought that my case would get going tomorrow. If I made a miscall, which obviously I did, it's my fault. I have him prepared to testify tomorrow morning….

*Id.* at 16-17. Interestingly, at the post-conviction hearing, counsel testified that Wesley "expected

and prepared to testify." *Id.* at 17. The court disagreed and granted Wesley a new trial, "15 minutes

of preparation is in no situation adequate to prepare a defendant to testify when on trial for rape,

sexual assault, burglary, and a myriad of other offenses." *Id.*

Likewise, here, it may well be that counsel and Purkey discussed his *right* to testify many

times throughout the proceedings; however, it is clear that counsel did not tell Purkey he had to

testify or prepare him to do so until an hour beforehand. An hour of preparation is in no way

adequate to prepare a defendant who is on trial for his life to testify. *Wesley, supra*.

What little "preparation" that was done was limited to telling Purkey what he could not say

lest his entire testimony be struck. Counsel may as well have told Purkey that he could not testify

at all. "A criminal defendant clearly cannot be compelled to remain silent by defense counsel."

*United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992); *see also Brooks v. Tennessee*, 406

U.S. 605 (1972) (whether to testify is not only an important tactical decision for a defendant, but

also a matter of constitutional right); *Harris v. New York*, 401 U.S. 222, 225 (1971) (criminal

defendant is privileged to testify in his own defense or to refuse to do so).

61

It is important to remember that while defense counsel serves as an advocate for the client, it is the client who is the master of his or her own defense. *See Faretta v. California*, 422 U.S. 806, 820 (1975) ("The counsel provision supplements this design. It speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant"); *Mulligan v. Kemp,* 771 F.2d 1436, 1441 (11th Cir. 1985) (Trial counsel "is still only an *assistant* to the defendant and not the master of the defense"). When an individual stands accused of criminal conduct, the choice to tell his side of the story has ramifications far beyond the more immediate goal of obtaining an acquittal. It is, after all, the *defendant's* day in court. The decision to testify in his own defense, like the decision to plead not-guilty and proceed to trial, provides the defendant with an opportunity directly to meet the charges against him. To tell a client it is his decision whether to testify but that if he does testify he cannot honestly and completely describe his defense is "to imprison a man in his privileges and call it the Constitution." *Adams v. United States ex rel. McCann,* 317 U.S. 269, 280 (1942).

Here, O'Sullivan imprisoned Purkey. On direct examination, she elicited that Purkey had not kidnaped Ms. Long; that she had gone to his home voluntarily. Tr. 927-935. She did not, however, address what the State presented in its case-in-chief, namely that Purkey had waited to deny the kidnaping until "[r]ight before this trial." *See* Tr. 566. That left Purkey open to attack on cross-examination: "here recently you have come up with this new story that you didn't kidnap her?" Tr. 1008. Believing that his *entire* testimony would be struck if he documented his recantations, Purkey simply replied, "That's true." Tr. 1008. Of course, as addressed above, it was not true, and the government knew it wasn't true and so did counsel. Two years earlier, Speakman had reported that "Purkey explained his case was different than the ongoing Keith Nelson and Pamela Butler incident, in that Purkey did not 'snatch' the girl from the street as Nelson did. Purkey

62

described the initial contact with the girl as more like they were 'partying,' and that is [sic] was not forcible." Exhibit 2.

"Proper planning prevents poor performance." *Wesley*, 2005 Pa. Dist. & Cnty. Dec. LEXIS 1419 at 14-15. There was no proper planning here – indeed, news that O'Sullivan would be examining Purkey came as a complete shock to them both. There was absolutely no basis for O'Sullivan telling Purkey that any of his testimony, let alone his entire testimony, would be struck if he mentioned that he had recanted to Dr. Peterson. There was no reason that Purkey could not testify that he had denied the kidnaping from the time of the indictment to anyone who would listen – e.g., Duchardt, O'Sullivan, Armstrong and Dr. Peterson, and, indeed, Dr. Dietz. The entire basis for the government's motion *in limine* was that it needed a chance to cross-examine Purkey on his recantation not that his recantation was not admissible through himself. Doc. #337 at 3. The gag-order that counsel imposed on Purkey denied him a fair trial and was not the result of any reasonable strategic or tactical decision. This Court should vacate his conviction and death sentence.

### XVII. Purkey was denied the effective assistance of trial counsel in violation of the Sixth Amendment when counsel failed to call Dr. Stephen E. Peterson to testify that Purkey had denied kidnaping Ms. Long when he had interviewed Purkey in 2002.

In December, 1998, Purkey told lead investigator Tarpley and Detective Howard that he had kidnaped Ms. Long in Missouri and forced her to accompany him to his home in Kansas, where he killed her. But, as addressed above, following indictment, he recanted the kidnaping.

Purkey continued to deny the kidnaping throughout the course of his case. On August 13, 2003, Dr. Peterson authored his report, which detailed his work on Purkey's case. He had interviewed Purkey four different times in late-2002: September 19, 2002; October 10, 2002;

63

November 6, 2002; and December 30, 2002. During those interviews, Purkey told Dr. Peterson that Ms. Long went with him voluntarily. Exhibit 23 at 45-46.

Because of Dr. Peterson's August 13th report, on September 25, 2003, the government moved *in limine* to preclude Dr. Peterson from testifying that Purkey had told him during the various interviews that he had not kidnaped Long. Doc. #337. In that motion, the government argued, "[D]efendant's recent fabrication is a shallow attempt to put on his defense through his psychiatrist while at the same time denying the government the opportunity to cross-examine defendant concerning his changed story." *Id.* at 3.

Right before trial, this Court sustained the government's motion. Doc. #440. Trial began on October 29, 2003, and, immediately, government counsel elicited from it's lead investigator and member of the prosecution team that "[r]ight before this trial" was the first time he had ever heard that Purkey was claiming not to have kidnaped Ms. Long. Tr. 566. Then, during cross-examination of Purkey, government counsel asserted, "here recently you have come up with this new story that you didn't kidnap her?" Tr. 1008. Believing O'Sullivan that his *entire* testimony would be struck if he documented his recantations, Purkey simply replied, "That's true." Tr. 1008. Not only did defense counsel not correct this on re-direct, they did not rebut it by calling Dr. Peterson to testify. This failure amounted to ineffective assistance of counsel.

It is true that counsel's failure to call a witness "is precisely the sort of strategic trial decision that *Strickland* protects from second-guessing." *Sanders v. Trickey*, 875 F.2d 205, 212 (8th Cir. 1989). Oddly, here, however, counsel's defense strategy was to refute the kidnaping element of the charge by attacking it head-on. *See, e.g.,* Tr. 408, 411, 413. Indeed, he called the defense investigator to help with that. Tr. 893-900. And, as addressed above, he told Purkey an hour before

64

calling him to the stand that he had to testify because the defense had no other means of refuting the kidnaping.  Calling Dr. Peterson to testify about Purkey's prior consistent statement in order to rehabilitate Purkey would have supported counsel's defense theory and bolstered Purkey's credibility which was central to his defense.

Prior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited.  *Tome v. United States*, 513 U.S. 150, 157 (1995). A trial witness's prior consistent out-of-court statement, however, is *not hearsay* if it is "offered to rebut an express or implied charge against the declarant of recent fabrication…." *United States v. Bercier*, 2007 U.S. App. LEXIS 25490 (8th Cir. 2007) (quoting FRE 801(d)(1)(B)). In *Tome*, resolving a conflict in the circuits, the Court held that, to be admissible as non-hearsay under Rule 801(d)(1)(B), a prior consistent statement must have been made "before the charged recent fabrication."  513 U.S. at 167.

In *United States v. Street*, 66 F.3d 969, 976 (8th Cir. 1995), Ranger Coe described Street[20] as having spoken many obscenities. On cross-examination, Street brought out that Coe had made no mention of such obscenities in his grand jury testimony.  *Id.*  In redirect-examination of Coe, the government introduced into evidence Coe's report, which was written shortly after the incident.  *Id.* at 977.  In it, Coe described Street's obscene statements in virtually the same terms that he testified to at trial.  *Id.*  On appeal, Street sought reversal, arguing that Coe's report constituted inadmissible hearsay.  *Id.*  The Eighth Circuit disagreed, "The statement was offered to rebut a charge of recent fabrication of testimony and was consistent with Coe's testimony at trial."  *Id.*

---

[20]Street was convicted of forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with park rangers while they were engaged in or on account of the performance of their official duties.  18 U.S.C.S. § 111(a).

Here, Dr. Peterson's testimony would have been admissible on this same ground. It would have described Purkey's prior consistent out-of-court statement, offered to rebut the government's unfounded charge that Purkey had fabricated his recantation "[r]ight before this trial." Dr. Peterson could have testified that Purkey told him a year before trial that: Purkey invited Ms. Long to party with him, thinking he was talking to a prostitute. Exhibit 23 at 45. "[She] wanted to go to Kansas City, Kansas with him." *Id.* at 46. He told the FBI that he kidnaped her, however, so that he would get a "federal crime of kidnaping." *Id.*

These prior consistent statements came long before the charged recent fabrication, and reasonably competent attorneys would have offered them. Nothing was more important to Purkey's case than his own credibility. *See, e.g.,* Tr. 1104 ("It is ironic that both we and the government are *absolutely dependent on one man's credibility* and believability in this case, and that one man is Wes Purkey.") (emphasis added). The government sought the upper hand by misleading the jury to believe that Purkey's recantation of the kidnaping had come not two years before trial but *right before trial*. And the simple fact is that there is no reasonable strategy for not calling Dr. Peterson, who was ready, willing and able to testify. Counsel's failure to do so did irreparable harm to Purkey. This Court should vacate Purkey's conviction and death sentence.

66

**XVIII.    Purkey was denied his right to due process of law when the court accepted the jury's verdict finding Purkey guilty of kidnaping resulting in death because no reasonable juror could have found beyond a reasonable doubt that Purkey kidnaped Ms. Long from Missouri and forced her to go to his home in Kansas.**

As addressed above, in December, 1998, Purkey told Tarpley and Howard that he had kidnaped Ms. Long in Missouri and forced her to accompany him to his home in Kansas. He lied. He lied so that it would be a federal crime and he could get out of the cesspool of the Kansas Department of Corrections. Nearly three years later, in October, 2001, Purkey was indicted for the kidnaping, rape, and murder of Ms. Long. The government, however, had absolutely no evidence of a kidnaping *except* Purkey's confession. Its entire case rested on that.

A defendant may not be convicted based solely on his own admissions. *Opper v. United States,* 348 U.S. 84 (1954). But the *Opper* Court rejected the traditional understanding of the *corpus delicti* rule, and held, instead, that the corroborating evidence need not prove the essential elements of the crime. *Id.* at 93. Rather, the corroboration must prove that the confession itself was reliable, and must prove any elements of the crime to which the defendant did not confess. But the confession, if proven reliable, may serve as the only evidence reaching the *corpus delicti*. *See id*. at 93-94; *see also Smith v. United States*, 348 U.S. 147, 156 (1954) ("All elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused").

*Opper*, then, imposes a "two-pronged" corroboration requirement on the government. *United States v. Lopez-Alvarez,* 970 F.2d 583 (9th Cir. 1992). While the Government need not introduce independent evidence of the *corpus delecti* in conformance with the traditional test, "it must introduce sufficient evidence to establish that the *criminal conduct at the core* of the offense has

occurred." *Id.* at 592 (emphasis added). Additionally, the Government "must introduce independent evidence tending to establish the *trustworthiness of the admissions*, unless the confession is, by virtue of special circumstances, inherently reliable." *Id.* (emphasis added).

Here, the criminal conduct at the core of the offense was the alleged kidnaping of Ms. Long. Without a kidnaping, the government had absolutely no case. Yet, the only evidence of a kidnaping is Purkey's confession, and no reasonable argument can be made that his confession was trustworthy. Indeed, as addressed above, less than a month after it obtained its indictment, the government knew from its star witness, Michael Speakman, that Purkey denied kidnaping Ms. Long.

In *United States v. Norris*, 428 F.3d 907, 910 (9th Cir. 2005), officers went to Norris's home to ask him about allegations that he had sexually abused his niece. "Norris informed the officers that he had no problem talking to them." *Id.*

> Norris was calm and cooperative. He admitted having sexual contact with the victim on November 25, 2000. Norris stated that he put his penis between the little girl's legs, touching her vaginal area and rubbing back and forth. He went on to describe a similar incident of sexual contact with T.V. that occurred sometime during the summer of 2000. Norris stated that during the incident that occurred in the summer, he also used his hands to touch the victim's vaginal area.

*Id.* at 911. Count two charged Norris with causing contact between his penis and T.V.'s vulva during the summer of 2000. *Id.* at 914. "However, the government produced no evidence to corroborate Norris's confession that the core of the act, Norris's touching of his niece's vulva with his penis during the summer of 2000, actually occurred." *Id.* at 915. On several occasions, when asked by the government how many times Norris touched her "private" with his "dick," the girl responded "once." *Id.* The only other evidence presented by the government that the sexual act alleged in count two actually occurred was the statement by the girl's mother that the girl stayed with Norris at times during the summer of 2000. *Id.* This evidence did not sufficiently corroborate

68

Norris's confession regarding the sexual misconduct, and the court reversed Norris's conviction on count two. *Id.* at 915-916.

In *Gonzalez-Jasso v. Rogers*, 264 F.2d 584, 585 (D.C. Cir. 1959), Gonzalez-Jasso was born of Mexican parents in El Paso, Texas, and thereby became a dual national of the United States and Mexico. When he was eleven, he moved with his parents to Mexico. *Id.* On three separate occasions, he sought to re-enter the United States from Mexico, and each time, he was examined under oath before a Board of Special Inquiry and admitted in response to questions that, on some undetermined date in 1944, he had voted in a Mexican election. *Id.*

In June, 1955, Gonzalez-Jasso entered the United States at El Paso, representing himself to be an American citizen. *Id.* at 586. Alleging that Gonzalez-Jasso was not a citizen, but an alien without proper documentation, the government instituted deportation proceedings. *Id.* At the deportation hearing, he acknowledged his prior admissions before the Boards of Special Inquiry, but testified that those admissions were untrue and that in fact he had not voted in the 1944 Mexican election or in any other Mexican election. *Id.* He tried to explain his reasons for making the prior admissions and offered evidence that he had been ineligible to vote in the 1944 Mexican election. *Id.* The Government offered no evidence other than the records of the Boards of Special Inquiry, and the Special Inquiry Officer found that Gonzalez-Jasso had lost his U.S. citizenship. *Id.*

> The only evidence to show that [Gonzalez-Jasso] voted in the Mexican elections came from his own lips, and was later *repudiated from the same source*. The earlier statements are of course receivable in evidence. But to establish a sound basis for expatriation, these statements must be satisfactorily corroborated, and the totality of the evidence must rise to the standard set by the Supreme Court.

*Id.* at 587 (emphasis added). Rejecting the idea that his admissions were trustworthy simply because they had been made under oath, the court of appeals held that "there is no sufficient evidentiary basis

69

for concluding that [Gonzalez-Jasso] voted in the 1944 Mexican elections and thereby expatriated himself. *Id.*[21]

The same can be said here. Here, the only evidence that Purkey kidnaped Ms. Long came from his own lips, and was later repudiated by that same source. Indeed, here, the corroborating evidence led inextricably to the inference that Ms. Long voluntarily accompanied Purkey to his Kansas home. Purkey fabricated this story to create a federal crime so that he would not spend the rest of his life in the Kansas state prison system. Purkey knew that Ms. Long drank gin and orange juice; he knew that she was having trouble in school; and Ms. Long did not leave when she had the chance, e.g., when she used the rest room at the convenience store on Highway 7 and when Purkey had to stop at various stop lights along Highway 7.

The government clung to Purkey's confession because that's all it had. Rather than offering substantial evidence to corroborate Purkey's false confession, the government simply undertook to convince the jury that Purkey's repudiation of the kidnaping was unbelievable. It accomplished that feat by misleading the jury to believe that Purkey repudiated the kidnaping, not two years before trial, but "[r]ight before this trial." Tr. 566.

But for the government's misleading tale of deceit, no reasonable juror could have found beyond a reasonable doubt that Purkey kidnaped Ms. Long.

**XIX. Purkey was denied his right to effective assistance of counsel when appellate counsel failed to argue that no reasonable juror could have found beyond a reasonable doubt that Purkey kidnapped Ms. Long from Missouri and forced her to go to his home in Kansas.**

---

[21]Pointing to the rule announced in *Opper,* the court noted, "We need not go so far as to say that these rules, or any others in the field of criminal law, are directly applicable to cases like the present. But they provide a helpful analogy. If uncorroborated admissions are insufficient to convict a man of a crime, they should hardly suffice to deprive him of his citizenship." *Id*.

70

As fully discussed in point XV, appellate counsel must render effective assistance. *Smith v. Robbins,* 528 U.S. 259, 276 (2000). *See Roe v. Delo,* 160 F.3d 416 (8th Cir. 1998) (appellate counsel failed to argue that the trial court erroneously blurred the distinction between first and second degree murder); *Bell v. Lockhart,* 795 F.2d 655 (8th Cir. 1986) (appellate counsel rendered ineffective assistance in failing to properly advise client of the risks of waiving a direct appeal because post-conviction appeal was not an adequate substitute).

Appellate counsel has a duty to "proceed, like all post-conviction counsel, in a manner that maximizes the client's ultimate chance of success." 2003 Guideline 10.15.1 Commentary. Here, counsel omitted the most significant issue that can be raised for a criminal defendant – the fact of his innocence of the crime charged. "[I]f the evidence introduced at trial was insufficient to sustain the conviction, trial counsel's failure to argue this issue on appeal necessarily amounted to ineffective assistance of counsel." *Commonwealth v. Cardenuto*, 548 N.E.2d 864, 867 (Mass. 1990); *accord Commonwealth v. Cormier*, 668 N.E.2d 1326, 1327 (Mass. App. Ct. 1996) ("the ineffectiveness of counsel in failing to argue the sufficiency of evidence on appeal necessarily also resulted in the failure to raise on appeal the double jeopardy argument that, if the evidence was insufficient to sustain the conviction, the defendant could not be retried").

As fully discussed in point XVIII, a defendant may not be convicted based solely on his own admissions. *Opper v. United States,* 348 U.S. 84 (1954). Purkey was, and reasonably competent attorneys would have challenged the validity of his conviction on appeal. *See United States v. Lopez-Alvarez,* 970 F.2d 583 (9th Cir. 1992).

In *Fagan v. Washington*, 942 F.2d 1155, 1156 (7th Cir. 1991), Fagan was shot in the back, but not seriously injured, by a member of a rival Chicago street gang. Two nights later Fagan met

71

with other members of his gang, and they decided to seek revenge. *Id.* Between six and thirteen gang members, including Fagan and someone called "Dede," went to a game room where the rival gang hung out. *Id.* A dozen or so people were standing on the sidewalk outside the game room. *Id.* Most of the Disciples, including Fagan and Dede, walked past this other group and then, when they were as much as forty-five feet away, Fagan and Dede turned and started shooting. Fagan wielded a .22 caliber rifle and Dede carried a shotgun. *Id.* Both fired several shots before fleeing. *Id.* When the melee was over, two people were wounded and one – Billy Green – was dead. Green was found on the sidewalk in front of the game room.

> It was for the murder of Green, together with lesser crimes related to that murder, that Fagan was tried in a bench trial, convicted, and sentenced. But Green was killed not by a .22 caliber rifle or by a shotgun but by a single shot from a .38 caliber pistol that  someone – obviously not Fagan – pressed against his back before firing.

*Id.*

Under Illinois law, "a person is legally accountable for the conduct of another when . . . either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." *Id.* (citation omitted).

> Their common design embraced the killing of Billy Green on the sidewalk in front of the game room by any member of the group. But not by a nonmember. The judge did not mention or, as we read his words, even allude to that possibility. Instead he assumed, incorrectly in our view, that the bullet that killed Green must have come from a gun fired by one of the Black Gangster Disciples. He may have forgotten that he had excluded from evidence a bit of hearsay that another Black Gangster Disciple besides Fagan and Dede had been armed.

*Id.* at 1160. Fagan had a winning claim for his direct appeal, but his lawyer failed to raise it. *Id.* at 1157. No tactical reason – no reason other than oversight or incompetence – has been or can be

72

assigned for the lawyer's failure to raise the only substantial claim that Fagan had. *Id.* Fagan was entitled to his freedom, and so is Purkey.

Here, as addressed above, the only evidence that Purkey kidnaped Ms. Long came from his own lips, and was later repudiated by that same source. *See Gonzalez-Jasso v. Rogers*, 264 F.2d 584, 587 (D.C. Cir. 1959) ((The only evidence to show that [Gonzalez-Jasso] voted in the Mexican elections came from his own lips, and was later *repudiated from the same source*. The earlier statements are of course receivable in evidence. But to establish a sound basis for expatriation, these statements must be satisfactorily corroborated, and the totality of the evidence must rise to the standard set by the Supreme Court.").

But for the government's deceit in misleading the jury to believe that Purkey repudiated the kidnaping, not two years before trial, but "[r]ight before this trial," Tr. 566, no reasonable juror could have found beyond a reasonable doubt that Purkey kidnaped Ms. Long. Nothing but oversight or incompetence can explain counsel's failure to challenge the sufficiency of the government's evidence on appeal. Had it been raised there is a reasonable probability that Purkey's conviction would have been vacated.

73

**XX.  Purkey was denied due process in violation of the Fifth Amendment and was sentenced based on arbitrary factors in violation of the Eighth Amendment when his jury did not vote on obvious mitigating evidence.**

The Federal Death Penalty Act of 1994 is a weighing statute.  In deciding whether to recommend the death penalty the jury must weigh the aggravating circumstances and mitigating circumstances and it can only recommend the death penalty if the aggravating circumstances sufficiently outweigh the mitigating circumstances.  *See United States v. Hammer*, 404 F. Supp. 2d 676, 801 (D. Pa. 2005).  Under this sort of system, "the failure appropriately to consider mitigating circumstances can have an adverse affect on the weighing process and result in an inappropriate sentencing outcome."  *Id.*  Errors regarding either aggravating factors or mitigating factors "conceivably could distort the weighing process, thus calling into question the propriety of a death sentence."  Lisa R. Duffet, Habeas Corpus and Actual Innocence of the Death Sentence After *Sawyer v. Whitley*: Another Nail Into the Coffin of State Capital Defendants, 44 Case W. Res. L. Rev. 121, 148 (1993).

Hammer argued that "the jury failure to find, consider and weigh undisputed or conceded mitigating factors is a circumstance that render's Hammer's sentence arbitrary."  *Hammer*, 404 F. Supp. 2d at 690.  There, the 2255 court made the following findings:

**DD. The Erroneous Findings Relating to Mitigating Circumstances.**

1697. During the Government's closing argument on July 21, 1998, the prosecutor stated that "Mr. Hammer has no cognitive disorders."

1698. No evidence was presented at the time of trial in 1998 directly rebutting Dr. Gelbort's testimony that Mr. Hammer suffered from cognitive disorders or deficits.

1699. Although the testimony of Dr. Gelbort relating to cognitive disorders or deficits was not rebutted by the Government, eleven jurors concluded that Mr. Hammer failed to prove by a preponderance of the evidence that he suffered from cognitive deficits.

74

1700. Although the evidence presented at the trial indicating that Mr. Hammer was sexually abused as a child was not rebutted by any evidence presented by the Government, six jurors concluded that Mr. Hammer failed to prove by a preponderance of the evidence that as a child he was a victim of sexual abuse.

1701. Although the Government during its closing on July 21, 1998, conceded that Mr. Hammer had done certain good deeds in his life, seven jurors concluded that Mr. Hammer failed to prove by a preponderance of the evidence that even though incarcerated for most of his life he had managed to go some good things.

1702. During the penalty-phase proceeding on July 9, 1998, Dr. Mitchell was asked the following question:

> Based on your knowledge of Mr. Hammer to a reasonable degree of scientific certainty and psychological certainty, does he right now suffer from a major mental disease or defect as characterized in the DSM?

1703. Dr. Mitchell answered that question in the affirmative and stated that his diagnosis was major depressive disorder. Id.

1704. No evidence was presented at the time of trial rebutting Dr. Mitchell's testimony that Mr. Hammer suffered from a major mental disease or defect.

1705. Although no evidence was presented by the Government rebutting Dr. Mitchell's diagnosis, twelve jurors concluded that Mr. Hammer failed to prove by a preponderance of the evidence that he suffers from a major mental disease or defect.

*Id.* at 790-791 (internal record citations omitted).  From this, the district court concluded that "The jury's defective answers with respect to mitigating factors renders the penalty phase of the trial defective."  *Id*. at 801.  Consequently, Hammer received a new trial.  *Id.*[22]

Purkey's case is even worse than Hammer's.  Here, the jury refused even to *acknowledge* the obvious mitigating factors.  The verdict form required the jury – in accord with 18 U.S.C. 3593(d) and (e) – to account that it had indeed lawfully considered the evidence in mitigation presented by Purkey.  Doc. #487.  The jury, however, left blank the entire section of the verdict form

---

[22]The government's appeal is pending before the Third Circuit in *United States v. Hammer*, No. 06-9001.

Case 4:06-cv-08001-FJG     Document 52     Filed 11/30/07     Page 75 of 84

related to findings upon mitigation evidence. Doc. #487. It failed to *acknowledge,* let alone *consider*

the following obvious evidence in mitigation:

* * *

11. Mr. Purkey's past criminal behavior is attributable, at least in part, to his alcohol and drug dependence.

12. As a child, Mr. Purkey suffered from slow speech development, and for his entire life, Wesley Purkey has suffered from the disability of stuttering.

13. While incarcerated, Mr. Purkey was the victim of serious physical abuse, that is stabbings.

14. While incarcerated, when given the opportunity to do so, Mr. Purkey completed a significant number of hours of college coursework.

15. While incarcerated, when given the opportunity to do so, Mr. Purkey received training and became qualified as a plumber.

16. Mr. Purkey has offered to donate a portion of his liver to his sister-in-law who is dying of liver failure.

* * *

18. The disappearance of Jennifer Long was solved only because Mr. Purkey came forward and admitted that he had killed Jennifer Long, and directed authorities to evidence about the killing.

* * *

21. Mr. Purkey is the father of Angie Purkey Genail, and the two have carried on a loving, father-daughter relationship, with Mr. Purkey providing Angie Purkey Genail advice, nurturance and emotional support, even while he has been incarcerated.

22. Angie Purkey Genail loves her father Mr. Purkey very much.

* * *

24. Mr. Purkey is the grandfather of Angie Purkey Genail's children Mikey, age 4, and Haley, age 1, and has carried on a loving, grandfatherly relationship,

76

> particularly with Mikey, speaking with Mikey on the telephone on numerous occasions.

* * *

27.    In the past three years, Mr. Purkey has volunteered to offer good advice to many young men in trouble about how to avoid a life of crime, and would continue to do so if sentenced to life imprisonment without possibility of release.

Doc. #484, pp. 33-36; Doc. #487, pp. 9-16. The government offered nothing to rebut these patently obvious mitigating factors.

It is one thing for a jury to decide not to give much if any weight to the evidence in mitigation; it is quite another for a jury to decide not to acknowledge that evidence at all. The failure of Purkey's jury to vote even on obvious mitigating evidence violated the Due Process Clause of the Fifth Amendment and subjected Purkey to a death sentence based upon arbitrary factors in derogation of the Eighth Amendment. Like the *Hammer* court did, this Court should recognize that the failure to vote on obvious mitigating factors violates the Federal Death Penalty Act. This Court should then vacate Purkey's sentence of death and order a new sentencing trial.

**XXI.    Purkey was denied due process of law and his right to a fair and impartial trial during trial and sentencing and his sentence was based on an arbitrary factor in violation of the Eighth Amendment due to the cumulative effect of government counsel's deliberate misconduct.**

Repeated improper arguments and statements by the government during trial requires reversal when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Darden v. Wainwright,* 477 U.S. 168, 181 (1986). The same standard applies when evidence is inappropriately placed before the jury. *Romano v. Oklahoma,* 512 U.S. 1, 12 (1994). *See also Middleton v. Roper*, 498 F.3d 812, 820 (8th Cir. 2007).

77

In determining whether due process has been violated by the prosecutor's actions, the court must

> (1) measure the type of prejudice that arose from the argument [and evidence]; (2) examine what defense counsel did . . . to minimize the prejudice; (3) review jury instructions to see if the jury was properly instructed; and (4) determine if there is a reasonable probability that the outcome . . . would have been different. . . .

*Miller v. Lockhart*, 65 F.3d 676, 683 (8th Cir. 1995). The court must also consider

> (1) the cumulative effect of [the] misconduct; (2) the strength of the properly admitted evidence of [defendants'] guilt; and (3) the curative actions taken by the court.

*United States v. Hance*, 501 F.3d 900, 908 (8th Cir. 2007).

Each of the individual instances of government misconduct cited throughout the § 2255 motion and this memorandum were material and require reversal without reference to any other claim. In addition, however, the cumulative nature of the material prejudice from the government's misconduct, including from the misconduct cited during the direct appeal, requires reversal.

A prime example of the government's deliberate misconduct came early in the testimony of the very first witness, Bill Howard. Without warning to defense counsel, government counsel displayed a picture of Purkey naked from the waist up in order to call the jury's attention to his tattoos that included, among other things, a Nazi swastika and other arguably racist symbols. Tr. 419-20. While defense counsel's objection was sustained, the pictures were displayed before the jury for at least a couple of minutes, Exhibit 1, and no instruction was given to the jury. This was intentional misconduct because these pictures were not relevant to any issue in the trial. This conduct was also material during the trial because it unfairly purported to reflect on Purkey's character and, thus, his credibility.

78

Even after this Court sustained the objection to the pictures of the tattoos, government counsel returned to this improper theme in cross-examination of Purkey. Specifically, government counsel asked Purkey if Ms. Long saw the "Nazi Swastika on your arms?" Again, trial counsel's objection was sustained. This time the Court instructed the jury to "disregard the comment about the defendant's tattoos and swastika," but the damage had been done, such that this misconduct was still prejudicial. Tr. 1010-11.

When combined with the Government's repeated improper attacks on Purkey's credibility in falsely arguing that he had just recanted the kidnaping right before trial, it is clear that this misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643; *Darden*, 477 U.S. at 181. The only evidence of kidnaping was from Purkey's initial confession. Thus, his credibility was the primary issue at trial. Without these improper attacks on his credibility, there is a reasonable probability that the outcome would have been different and Purkey would have been acquitted.

Even assuming that Purkey was not prejudiced during trial, the prejudice was manifest in sentencing in violation of due process and in violation of the Eighth Amendment. "Misleading prosecutorial comment which negatively impacts, the need for reliable sentencing in capital cases offends the Eighth Amendment." *Miller*, 65 F.3d at 683 (citing *Caldwell v. Mississippi,* 472 U.S. 320 (1985)).

Here, in cross-examining Dr. Peterson in sentencing about whether he was "aware [that Purkey] threatened to run my head through yesterday in court," government counsel again engaged in misconduct. While trial counsel objected and the court sustained the objection, the damage was again already done and the jury was not even given an instruction to disregard the allegation.

79

Finally, government counsel engaged in misconduct during cross-examination of Dr. Peterson in asserting that there was no "prior report" of Purkey having been the victim of sexual abuse. Tr. 1817. Government counsel was in possession of the Oregon Department of Corrections Records reflecting Purkey's prior report of being sexually abused as a child. Government counsel was also in possession of Dr. Peterson's report specifically citing these records. Thus, government counsel knew that a false perception was being created by the implication that Purkey had just "made up" this report in order to escape the death penalty. Just as the prosecution had during trial, government counsel deliberately created a false impression in order to cast doubt on Purkey's credibility and to negate a significant portion of his mitigation.

The cumulative impact of the government's repeated deliberate misconduct violated due process and Purkey's right to a fair and impartial trial under the Fifth and Sixth Amendments of the United States Constitution. This misconduct also injected an arbitrary and capricious factor in the jury's sentencing deliberations in violation of the Eighth Amendment to the United States Constitution.

**XXII. Purkey was denied the effective assistance of counsel guaranteed by the Sixth Amendment due to the cumulative effect of counsel's deficient conduct and the resulting prejudice.**

As is addressed in Point II above, Purkey submits that this Court must apply a cumulative prejudice analysis in reviewing the claims of ineffective assistance of counsel. *See Pavel v. Hollins*, 261 F.3d 210 (2nd Cir. 2001); *Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999); *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000); *Martin v. Grosshans*, 424 F.3d. 588 (7th Cir. 2005); *Turner v. Duncan*, 158 F.3d 449 (9th Cir. 1998); *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003). *But see Middleton v. Roper*, 455 F.3d 838, 850 (8th Cir. 2006).

80

Each of the individual instances of trial counsel's deficient conduct cited throughout the § 2255 motion and this memorandum were prejudicial and require reversal without reference to any other claim. In addition, however, the cumulative nature of the prejudice requires reversal.

With respect to prejudice in sentencing, the jury was deprived of powerful mitigation evidence due to counsel's failure to adequately investigate, counsel's unreasonable advice to Purkey that he should not testify in sentencing concerning his background and his remorse,[23] and this Court's error in excluding the testimony of Dr. Mark Cunningham regarding Purkey's fetal alcohol exposure. The prejudice was enhanced by this Court's error in limiting counsel's ability to impeach the government's psychiatrist, Dr. Park Dietz, concerning an error that the doctor made when testifying in the case of *Yates v. State,* 171 S.W.3d 215 (2005) in testifying that the facts of an episode of a television show on which he consulted, "Law & Order," were very similar to those in *Yates* when no such episode existed.

The prejudice from counsel's errors during trial require that Purkey's conviction be set aside. Even assuming, however, that the resulting prejudice from counsel's errors during the trial does not require reversal, the prejudice from these errors and the court's errors in sentencing, requires that Purkey's death sentence be set aside.

---

[23]This issue was raised as Claim XI in the § 2255 Motion.

81

## *Conclusion*

Based upon all of the above argument and the entire record of this prosecution, Purkey respectfully requests that the Court vacate his conviction and sentence.

Respectfully submitted,

Teresa L. Norris, Esq.
P.O. Box 11744
Columbia, SC 29211
(803) 765-1044  (Phone)
(803) 765-1143  (Fax)
teresa@blumelaw.com

Gary E. Brotherton, Esq.
2101 Chapel Plaza Court, Suite 13
Columbia, Missouri  65203
(573) 875-1571  Phone
(573) 875-1572  Fax
GEBrotherton@LegalWritesLLC.com

By:     /s/ Teresa L. Norris
        Court-Appointed Counsel for Purkey

Dated: Columbia, SC
       November 30, 2007

82

## Certificate of Service

This will certify that, on today's date, this Memorandum of Law was served upon the United States by filing via CM/ECF.

/s/ Teresa L. Norris
Teresa L. Norris

Dated: Columbia, SC
November 30, 2007

83

## Attached Exhibits

1) Exhibit 26 – Declaration of Cornelius Peoples
2) Exhibit 27 – Declaration of Melvin Lister
3) Exhibit 28 – Declaration of Margaret Noe
4) Exhibit 29 – Declaration of Evette Noe

84