# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | | |
|---|---|---|
| **WESLEY IRA PURKEY**, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | Case No. 06-08001-CV-W-FJG |
| | ) | Crim. No. 01-00308-01-CR-W-FJG |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent. | ) | |

## GOVERNMENT'S SUGGESTIONS IN OPPOSITION TO
## MOTION UNDER 28 U.S.C. § 2255

The respondent, the United States of America, appears by John F. Wood, United States Attorney, and Matt J. Whitworth, First Assistant United States Attorney, Western District of Missouri, and provides the following suggestions in opposition to movant Wesley Ira Purkey's motion under 28 U.S.C. § 2255:

## I. Background

### A. *Procedural History*

On October 10, 2001, a grand jury in the Western District of Missouri returned a one-count indictment charging that on January 22, 1998, Wesley Ira Purkey, kidnapped 16-year-old Jennifer Long and transported her from Kansas City, Missouri, to Lansing, Kansas, for the purpose of forcible rape, resulting in the death of Jennifer Long, in violation of 18 U.S.C. §§ 1201(a), 1201(g) and 3559(d). On October 24, 2001, Purkey made his initial appearance before United States Magistrate

Judge Sarah W. Hays. Purkey was arraigned on November 9, 2001, and entered a plea of not guilty to the indictment.

On November 7, 2002, a one-count superseding indictment was returned, charging the same crime as outlined in the initial indictment, but adding a "Notice of Special Findings" section, that included the intent factors and aggravating circumstances the grand jury found in support of the death penalty.

On November 21, 2002, the Government filed its "Notice of Intent to Seek the Death Penalty" against Purkey.

Purkey filed a multitude of pretrial motions, including a motion to suppress his confessions to law enforcement agents; a motion to prohibit the seeking of the death penalty as an alternative to the suppression of his statements; a motion to dismiss due to the destruction of defense evidence; a motion to prohibit the Government from seeking the death penalty due to the alleged unconstitutionality of provisions of the Federal Death Penalty Act; and a motion to strike duplicative aggravating factors. All of these motions, as well as several others, were denied by this Court.

A jury was empaneled and trial commenced on October 28, 2003, before this Court. On November 5, 2003, the jury found Purkey guilty of the kidnapping and murder of Jennifer Long.

The penalty phase of the trial began shortly thereafter. On November 19, 2003, the jury unanimously concluded that the aggravating factors presented by the

-2-

Government outweighed the mitigating factors submitted by Purkey and found that Purkey should be sentenced to death.

On January 23, 2004, following a denial of Purkey's motion for a new trial, this Court sentenced Purkey to death.

On February 2, 2004, Purkey filed his notice of appeal with the United States Court of Appeals for the Eighth Circuit. On November 7, 2005, the Eighth Circuit issued an opinion affirming Purkey's conviction and sentence in *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005).

In his appeal to the Eighth Circuit, Purkey raised the following issues:

1.      Whether the district court correctly denied Purkey's motion to suppress his confessions where they were voluntarily made and he was never promised a life sentence.

2.      Whether the district court correctly denied Purkey's motion to prohibit the Government from seeking the death penalty as an alternative relief to the suppression of Purkey's statements where the confessions were voluntary and no promises were made that he would receive a life sentence in exchange for his confessions.

3.      Whether the district court correctly denied Purkey's motion to dismiss based on destruction of evidence where the testimony of the corrections officers were more credible than that of Purkey, there was no evidence to suggest the officers acted in bad faith or to suggest the notes possessed exculpatory value and despite the

-3-

destruction of the alleged notes Purkey was able to testify concerning his recollection of the interviews with investigators.

4. Whether the district court properly denied Purkey's pretrial motion to prohibit the Government from seeking the death penalty due to Indictment Clause violations where the superseding indictment cured any defects and where the grand jury is not required to make findings on non-statutory aggravating factors or to make findings on the question of whether aggravating factors sufficiently outweigh mitigating factors.

5. Whether the district court properly excluded jurors whose beliefs against capital punishment would have prevented or substantially impaired their ability to follow the law and the court's instructions.

6. Whether the district court properly excluded the testimony of Dr. David Preston during the guilt phase of the trial where Dr. Preston was not qualified to testify as to Purkey's state of mind at the time of the offense or at the time of the confessions.

7. Whether the district court correctly instructed the jury on the elements of the kidnapping statute where the instruction, in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury.

8. Whether the district court correctly denied Purkey's request for a mistrial where there was no prosecutorial misconduct and the district court's remedial actions cured any possible error.

9. Whether the district court abused its discretion in refusing to allow Purkey to testify that his father had introduced him to prostitutes when he was a boy, where such testimony was irrelevant to the issue of whether Purkey had kidnapped the victim, Jennifer Long.

10. Whether the district court properly excluded evidence of Government witness Michael Speakman's prior bad acts which did not result in a conviction and which did not, by their nature, tend to impugn his credibility.

11. Whether the district court properly excluded the testimony of Jeanette Purkey regarding her alleged poisoning of Purkey where it was incompetent and unreliable and the testimony of Dr. Cunningham regarding Purkey's alleged fetal alcohol exposure where it was irrelevant, speculative and likely to mislead the jury.

12. Whether the district court correctly denied Purkey's request for surrebuttal testimony in response to the testimony of Government expert Dr. Mayberg where the proffered testimony of defense expert Dr. Peterson offered nothing new and was merely cumulative.

13. Whether the district court properly exercised its discretion when it limited impeachment of Dr. Park Dietz on a collateral issue involving an alleged mistake made by Dr. Dietz on a totally unrelated case.

14. Whether the question regarding Dr. Peterson's opinion with regard to the death penalty was appropriate where the question was designed to show the possible bias of the witness.

15.     Whether the district court correctly refused to grant Purkey's request for allocution during the sentencing phase where a criminal defendant in a capital case has no due process right to make an unsworn statement before a jury that is not subject to cross-examination.

16.     Whether the district court properly denied Purkey's motion to strike aggravating circumstances as unconstitutionally duplicative where the factors were not duplicative and the court's instructions to the jury cured any risk that the weighing process would be skewed.

17.     Whether the district court's jury instructions requiring a sentence of death, if aggravating factors outweighed mitigating factors, were correct statements of law under the FDPA.

18.     Whether the district court correctly denied Purkey's request to require the jury to record its determinations regarding mitigating factors where the FDPA does not require a jury to make specific findings regarding mitigating factors.

19.     Whether the question concerning a threat made by Purkey during trial was proper, where it was asked in good faith and where the district court's remedial actions cured any possible error.

After his conviction and sentence were affirmative by the Eighth Circuit, Purkey next requested a review by the United States Supreme Court. On October 16, 2006, the Supreme Court denied Purkey's request for a writ of certiorari. *See Purkey v.*

-6-

*United States*, 127 S.Ct. 433 (2006).  On November 30, 2008, Purkey filed his current motion pursuant to 28 U.S.C. § 2255.

**B.**     ***Factual History – Guilt Phase Evidence***

  *1.*     *Disappearance of Jennifer Long*

On January 22, 1998, Jennifer R. Long, a 16-year-old sophomore at East High School in Kansas City, Missouri, attended her first two classes in the morning.  (Tr. 711, 858.)  Ms. Long apparently had a disagreement with some girls in her class and left school before the third hour.  (Tr. 485, 930.)  Her mother, Glenda Lamont, reported her daughter missing to the Kansas City Police Department the same day.  (Tr. 864.)  Ms. Lamont and Ms. Long's father, William Long, searched desperately for their daughter for months, distributed missing person flyers, contacted her friends, but never saw their daughter after January 22, 1998.  (Tr. 848-49, 861, 864-67.)  Ms. Long's parents had no clue concerning the fate of their daughter until December 1998.  (Tr. 432.)

  *2.*     *Mary Ruth Bales Homicide*

Approximately nine months after Jennifer's disappearance, on October 27, 1998, Mary Ruth Bales, an 80-year-old Kansas City, Kansas, widow, called a plumbing company about a leaking pipe.  (Tr. 1215-18.)  The company sent Purkey, who had learned the plumbing trade while in prison.  (Tr. 914-15, 1218-19.)  Purkey went to Ms. Bales' home to diagnose the problem and agreed to make the necessary repairs.  (Tr. 1219-20.)   The next day, October 28, Purkey smoked crack cocaine with a

prostitute and then drove to the home of Ms. Bales with the prostitute in his work van. While the prostitute waited outside the Bales residence, Purkey went inside intending to rob Ms. Bales. (Tr. 1222-28.) After entering the residence, Purkey viciously bludgeoned the 80-year-old grandmother to death with a claw hammer. While Ms. Bales lay dead in her bedroom, Purkey and the prostitute smoked crack cocaine and ate food from Ms. Bales' kitchen. (Tr. 1222-27.) Purkey then left but later returned to clean up the crime scene. When he was apprehended by authorities, he confessed to Ms. Bales' vicious murder. (Tr. 1228-37.)[1]

Purkey pled guilty to the murder and aggravated robbery of Ms. Bales in Wyandotte County, Kansas, district court on April 28, 2000. (Tr. 985.) Purkey received a life sentence for this homicide and must serve at least 15 years before he will be eligible for parole. (Tr. 985.)

3.     *Purkey Contacts Authorities Concerning Jennifer's Disappearance*

On December 15, 1998, while awaiting trial on the Bales murder, Purkey sent a letter to Detective Bill Howard of the Kansas City, Kansas Police Department stating that he wished to discuss his involvement in the murder of a young woman he had kidnapped from Missouri in January 1998, nine months before the murder of Ms. Bales. (Tr. 421-22.) After receiving the letter, Detective Howard met briefly with Purkey in the Wyandotte County Jail. Purkey informed Detective Howard he wanted to speak

---

[1]The jury did not hear the details of the Bales homicide until the sentencing phase of the trial.

with an FBI agent.  Purkey told Detective Howard that he wanted to confess because he was "pushing 50, that his life was pretty much over, that he didn't want to go back to the Kansas penitentiary system, and that he had a lot of enemies in the state pen and wanted to serve his time in the federal penitentiary."  (Tr. 423.)  Purkey thought the federal system would be more "comfortable."  (Tr. 424.)

The next day, December 16, 1998, Purkey was interviewed by FBI Special Agent Dirk Tarpley and Detective Howard at the Wyandotte County Prosecuting Attorney's Office.  Before the interview, Purkey was advised of his constitutional rights and signed a waiver form. (Tr. 426-27, 480-81.)  Purkey signed the form and indicated he understood his rights. (Tr. 426-27.)  Agent Tarpley informed Purkey that they could not discuss his involvement in the Bales murder because he was represented by counsel in that case.  (Tr. 481.)  Purkey agreed only to discuss the kidnapping and murder described in his letter of December 15.  (Tr. 481.)

Purkey again told the investigators that he intended to plead guilty to the Bales homicide but feared spending the rest of his life in the Kansas Department of Corrections.  Purkey explained that he had too many enemies in the state penitentiary. As a result, Purkey said he was willing to confess to the kidnapping, rape, and murder of a female from Missouri if he could serve his state time in a federal penitentiary.  (Tr. 481-84.)  During the initial interview, Agent Tarpley did not make any promises to Purkey concerning his sentence.  (Tr. 482.)  Purkey did not request a lawyer and there was no discussion concerning the death penalty.  (Tr. 483.)  Purkey wanted Agent

-9-

Tarpley to talk to the United States Attorney's Office but Agent Tarpley told him that he would not talk to the United States Attorney's Office until he knew what crime Purkey was confessing to in detail. Purkey then confessed and provided the details of the kidnapping, rape, murder, and dismemberment of 16-year-old Jennifer Long. (Tr. 484-88.)

Later that day, Agent Tarpley met with an AUSA from the District of Kansas to discuss the potential kidnapping case. Agent Tarpley testified there were no discussions concerning any potential sentence Purkey would receive and that the AUSA simply wanted more information and evidence to connect Purkey to the crime. (Tr. 489.)

Over the course of the next several days on December 17, 18 and 21, Purkey gave detailed confessions, including a handwritten confession on December 17. (Tr. 507, 555.) On each occasion Purkey met with investigators he was given *Miranda* warnings and acknowledged he understood his constitutional rights. Agent Tarpley testified Purkey wanted to spend his life sentence from the State of Kansas on the Bales murder in the federal penitentiary and that there were never any discussions at any time with Purkey concerning what his sentence would be for a kidnapping conviction. Purkey never was offered a life sentence in exchange for his confession to the kidnapping of Ms. Long. (Tr. 490, 567, 573, 597.)

Following Purkey's confession, investigators confirmed Ms. Long's disappearance on January 22, 1998. The victim's mother had reported her daughter

missing the same day.  Detective Howard obtained a photograph of the victim and prepared a photographic lineup.  Purkey was presented with the photographic lineup at the Wyandotte County Jail and immediately, without hesitation, identified Ms. Long as his victim.  (Tr. 432-35.)

    4.    *The Kidnapping, Rape, and Murder of Jennifer Long*

The investigation revealed that on January 22, 1998, Purkey had applied for a position as a plumber with the Roto Rooter plumbing company, located in Kansas City, Missouri.[2]  Purkey had an early morning interview and after a short tour of the facilities he left the building at approximately 8:45 a.m.  Purkey was driving a white 1988 or 1989 Ford Ranger pickup truck.  (Tr. 484-85.)  Following the interview, Purkey stopped his truck in a parking lot and smoked a rock of crack cocaine and then proceeded east on Truman Road.  (Tr. 925.)  Purkey then drove east on Truman Road and stopped at a grocery store for the purpose of purchasing some orange juice and gin to drink before heading back to his home in Lansing, Kansas.  (Tr. 485.)  At that point, Purkey observed a young white female whom he believed to be approximately 17 to 19 years of age.  During a conversation with the girl he learned that her name was Jennifer. Purkey asked the girl if she wanted to get something to drink with him.  Jennifer then entered the pickup without, according to Purkey, any threats or force.  (Tr. 485.)

_____

[2]Purkey's employment application was later recovered by investigators confirming that he applied for a job at Roto Rooter on January 22.  (Tr. 518; Gov. Exh. 31.)

The two then drove to a liquor store a few miles away and purchased gin and orange juice. Purkey soon learned that Jennifer was in high school and that she had left school during the morning after arguing with some female classmates. (Tr. 485.)

Purkey then informed Jennifer that he wanted to go to his home for a few minutes, which was in Kansas. Jennifer told Purkey that she did not want to go to Kansas and that she wanted to be dropped off. At that point, Purkey reached over into the glove box, pulled out what he described as a boning knife and placed it under his right thigh in the presence of Jennifer. Purkey claimed that it was at that point that he decided not to let Jennifer out of his truck. (Tr. 487.)

Purkey then drove west on Interstate 70 from Missouri into Kansas. Purkey drove north on K-7 Highway to his home in Lansing. (Tr. 487, 493-94.) Upon arrival, Purkey parked in his garage, which was located behind his home. Purkey took Jennifer into his basement; she asked him to please take her back home. (Tr. 510.) Holding a knife in his hand, Purkey ordered Jennifer to take her clothes off and lie down on the floor where he then raped her. (Tr. 997.)

Following the rape, Purkey told her that he had just finished a long sentence in the penitentiary and did not want to return. Jennifer told Purkey that she had been a virgin. This increased Purkey's fear. (Tr. 942.) Jennifer begged Purkey to let her leave. (Tr. 1017.) A brief struggle ensued and Purkey became enraged and began stabbing Jennifer in the chest, neck, and face, eventually breaking off the blade of the knife inside of her body. (Tr. 942-43, 1017-18, 1024.) Following the murder, Purkey

-12-

put Jennifer into a large tool box designed to fit into the back of a pickup truck. (Tr. 1024-25.) Purkey changed his clothes and got rid of the victim's backpack. Purkey then drove to Snoopy's Bar in Lansing and had several drinks. (Tr. 1025-26.) Purkey next drove to the Sears store in Lansing and purchased an electric chainsaw for $59.[3]

Purkey drove back to his home with the chainsaw and began the process of cleaning up the crime scene, wiping away the blood with water and bleach on multiple occasions. (Tr. 1026-27.) Over the next several days, while his wife was at work and his stepchildren were at school, Purkey dismembered the victim with the chainsaw while she was lying inside the tool box. (Tr. 1028-29.)[4] Purkey described in detail the dismemberment of the victim's body, indicating the chainsaw frequently became clogged with the flesh of the victim. (Tr. 1029.) Purkey put the body parts in plastic bags and mixed in leaves and debris from his back yard. (Tr. 1029-30.) Purkey burned the body parts in his fireplace. (Tr. 491-92, 1030.) Purkey also purchased two cords of wood and used diesel gasoline to accelerate the burning process. (Tr. 492, 646-47, 1030.)

---

[3]Investigators later recovered a copy of the receipt from Sears confirming Purkey had purchased the electric chainsaw on January 22, 1998. (Tr. 501, 1022, Gov. Exh. 24.)

[4]The tool box was later recovered by investigators at the home of Purkey's friend, Patrick Howe. Purkey gave the tool box to Mr. Howe following the murder. (Tr. 730-32, Gov. Exh. 30.) The box has several chainsaw cut marks in the bottom and on the sides. (Tr. 730, 810-18, 1029.)

Purkey next cleaned up the chainsaw utilizing gasoline to remove the blood and human debris. (Tr. 1032.)[5] Purkey made his three stepsons help him wash down the basement although they had no idea that a murder had taken place there. (Tr. 648-49, 1030-31.) Purkey also swept the ashes out of the fireplace after burning the victim's body parts. The bones that did not burn up were crushed by Purkey with a hammer. (Tr. 1033.) The bags with the bones and ashes were taken by Purkey south to Clearwater, Kansas, after his family moved from Lansing in March 1998. (Tr. 517, 1034.)

Purkey moved to Clearwater, a rural area south of Wichita, in March 1998, and rented a mobile home located on the property. Purkey threw the bags with the ashes and bones of the victim into a septic pond located on the property. During an interview with Agent Tarpley, Purkey drew a map with an arrow pointing to the area in the pond where he had thrown the bones of the victim. (Tr. 543, 1034, Gov. Exh. 34B.) The septic pond was later filled in with dirt by the owner of the property. An FBI search team eventually excavated the pond, sifting approximately 80 tons of dirt, in an effort to locate the bones of Jennifer Long. (Tr. 561-64.) Crushed human bones of an individual under the age of 25 were recovered from the pond in the area where Purkey indicated he had thrown the remains of the victim. (Tr. 789.) Human bones also were found in the sweepings from the ash pit of the fireplace at Purkey's former home.

---

[5]The chainsaw was recovered by investigators from the home of Purkey's stepfather, Edward Wiley. (Tr. 639-40, Gov. Exh. 26.)

(Tr. 781-83.)  All of the bones recovered by the FBI appeared to have been burned. (Tr. 781-94.)  Purkey admitted the bones recovered from the septic pond were those of the victim.  (Tr. 1034.)

The FBI also recovered a burned ring from the ashes of the fireplace ash pit. The ring was shown to the father of the victim who told investigators it looked very similar to a ring his daughter wore on a chain around her neck.  (Tr. 846-47.)

Purkey's defense at trial was that he did not kidnap the 16-year-old victim and that she had gone with him to Kansas voluntarily.  (Tr. 934, 1014.)  Purkey's claim at trial was inconsistent with all of his previous statements to investigators in which he steadfastly insisted that he had kidnapped the victim.  By its verdict, the jury rejected Purkey's defense during the guilt phase of the trial returning a verdict of guilty on November 5, 2003.  The jury retired to deliberate at noon and delivered the guilty verdict at 2:40 p.m.  (Tr. 1138, 1141-42.)

### C.    *Penalty Phase Evidence*

The Government called nine witnesses in its case-in-chief during the penalty phase.  (Tr. 1210-1403.)  Purkey called 19 witnesses, including four doctors to testify concerning his alleged mental disorders. (Tr. 1406-1955.) In rebuttal, the Government called four expert witnesses, including three doctors, to rebut Purkey's diminished mental capacity and brain damage claims.  (Tr. 1962-2225.)

-15-

### 1. *Purkey's Prior Criminal History*

Prior to Purkey's conviction for Jennifer's murder, he had spent most of his adult life incarcerated in various prisons in the states of Kansas, Arizona, and Oregon. Purkey had 13 prior felony convictions before receiving the sentence of death in this case, including a 1971 conviction for first-degree burglary; 1976 convictions for robbery and theft; a 1978 conviction for aggravated escape from custody; a series of convictions for robbery, kidnapping, assault and firearms violations stemming from a 1981 crime spree; and the May 2000 conviction for the murder and robbery of Ms. Bales. (Tr. 975-86, 1211-14.) Purkey received a life sentence as part of his 1981 crime spree but was eventually paroled in March 1997 after serving approximately 16 ½ years on the life sentence. (Tr. 985.)

### 2. *Murder of Mary Ruth Bales*

As earlier stated, Purkey confessed to the beating death of Mary Ruth Bales, which occurred in October 1998, and later pled guilty; he was sentenced to a term of life imprisonment with eligibility for parole after 15 years. (Tr. 1238, 1243.) The jury heard testimony from Detective Howard concerning the gruesome beating of the 80-year-old victim. She had defensive wounds on both of her hands, apparently trying to ward off the hammer blows from Purkey. (Tr. 1236.) She also had multiple wounds on her head. Purkey caved in her cranium and her face utilizing the claw side of the hammer. (Tr. 1237.)

### 3. *Kidnapping and Shooting of Gregg Carlberg*

Gregg Carlberg testified that he was the victim of a kidnapping, aggravated battery, and aggravated assault by Purkey in 1980. Carlberg was kidnapped from a convenience store in the summer of 1980 in Wichita, Kansas. (Tr. 1245.) He then was driven to a wooded area by Purkey and an accomplice, robbed of $40, and subsequently shot in the head and shoulder while being forced to lie down in an abandoned bathtub in the woods. (Tr. 1250-54.) Purkey later admitted to shooting Carlberg in the back of the head. (Tr. 1256.) Carlberg suffered serious injuries including paralyzation for several months, a stroke, and permanent neurological damage. Part of the bullet Purkey fired into Carlberg's head remains lodged in the back of his skull. (Tr. 1253-54.)

### 4. *Aryan Brotherhood Membership*

Ken Lucas, a gang expert with the Arizona Department of Corrections, testified that Purkey was an active member of the Arizona Aryan Brotherhood, a violent white supremacist prison gang, while confined in a Florence, Arizona prison in the early 1980s. (Tr. 1340-48, 1352-54, 1360.) Lucas also testified concerning the meaning of many of the tattoos that appeared on Purkey's body and their association with the Aryan Brotherhood. (Tr. 1361-67.)

### 5. *Prison Sexual Assault of Gary Hatfield*

Gary Lee Hatfield, a former inmate of slight stature who briefly served time with Purkey in the Oregon Department of Corrections in 1987, testified Purkey forcibly

-17-

sodomized him at knife point and then beat him in the kitchen of the prison camp where they were serving prison sentences.  (Tr. 1270, 1273-77.)

William Porter, District Attorney for Tillamook County, Oregon, was the prosecuting attorney assigned to prosecute the Hatfield sodomy allegation.  (Tr. 1315-17.)  He testified he eventually dismissed the forcible sodomy charge against Purkey because Purkey cooperated in an internal prison investigation that resulted in criminal charges against prison employees.  Purkey also was assaulted as a result of his cooperation by another inmate and suffered injuries.  Consequently, Porter decided to dismiss the sodomy charges against Purkey.  Porter testified that Hatfield never recanted his allegations that Purkey had beaten and forcibly sodomized him in the kitchen of the prison camp.  In addition, Porter described the incriminating evidence contained in his files, including photographs of injuries to Hatfield as a result of the assault.  (Tr. 1318-29.)

### D.    *Mitigation Evidience*

Purkey called a large number of mitigation witnesses to testify during the sentencing phase of his trial.  Many of the witnesses testified about the difficult circumstances of Purkey's childhood and his neglectful, alcoholic mother, and abusive alcoholic father.  These witnesses included a prison psychiatrist, a criminal defense attorney who formerly represented Purkey, several former inmates who had previously been incarcerated with Purkey, a friend and pastor, a friend who was a tattoo artist, an administrator from the Hutchinson Correctional Facility who had supervised Purkey

-18-

while he was a custodian, a former parole officer from the State of Kansas, an aunt, a friend who was incarcerated with Purkey at the Hutchinson Correctional Center, Purkey's daughter, a brother, a prison minister, a clinical psychologist with the Missouri Department of Corrections, a correctional counselor from the United States Penitentiary at Leavenworth, a radiologist from Kansas University Medical Center, a forensic psychiatrist, and a clinical and forensic psychologist who testified as a mitigation specialist.

The first witness, Dr. William Grant, is a Bureau of Prisons psychiatrist. Dr. Grant testified that he had prescribed three medications to Purkey. Dr. Grant testified the medications were designed to address Purkey's depression, anxiety, and anger. (Tr. 1406-16.)

Dennis Messoline, a defense attorney who formerly represented Purkey against an allegation of a prison rape, testified on Purkey's behalf in an effort to discredit government witness Gary Hatfield. Hatfield accused Purkey of anally raping him at knife point while they were incarcerated together at a state prison camp in Oregon. Hatfield testified as an aggravation witness on behalf of the Government. Messoline testified that he was eventually able to have the rape charged dismissed. (Tr. 1422-48.)

Nealy Vinson, a former inmate who was incarcerated with Purkey and Hatfield in Oregon was also called to discredit Hatfield's account of the sexual assault by Purkey. Vinson testified that Purkey got along well with other inmates and that he was

-19-

not a racist.  Vinson also testified that Purkey was not violent during his incarceration in Oregon.  (Tr. 1449-60.)

Randy Masterson, another inmate who was incarcerated with Purkey in Oregon, testified Purkey was not a racist, got along well with the other inmates, and was not involved with the Aryan Brotherhood prison gang in Oregon.  Purkey called Masterson to discredit Hatfield.  Masterson testified that he had sexual relations with Hatfield in a broom closet at the prison.  Masterson also testified that he was the homosexual lover of Purkey for two and a half years.  (Tr. 1468-76.)

Linda Skeen, a friend of Purkey, testified that she was a pastor at the Faith and Evangelistic Center in Leavenworth, Kansas.  Skeen testified that she was a friend of Purkey's while he was on parole in 1997 and 1998.  Skeen testified that Purkey was always nice when in her home and that she and her husband referred to Purkey as "Uncle Wes".  (Tr. 1478-84.)

Patrick Howe, a friend of Purkey and a tattoo artist, testified that Purkey asked him to cover up his Nazi swastika and Aryan Brotherhood tattoos.  Howe testified that he tried to cover up the tattoos with skin toned ink, but the process was unsuccessful. (Tr. 1485-90.)

Dominic Genuik, a Public Service Administrator at the Hutchinson Correctional Facility in Kansas, testified that Purkey was an auditorium custodian while incarcerated at his institution.  Genuik testified that Purkey participated in a program called JAIL (Juvenile Assistance Information Liaison), a program similar to the Scared Straight

program. The purpose of the program was to counsel juvenile offenders not to violate the law and to share prison experiences. Inmates participating in the program would share with the juveniles the consequences of negative behavior in an effort to discourage participation in criminal activity. Genuik testified that Purkey was not a racist, counseled both African-American and Hispanic juveniles, and he did not consider Purkey to be a security threat at the institution. (Tr. 1491-98.)

Michael Gibbons, a correctional counselor from the Lansing Correctional Facility, testified that he was Purkey's former parole officer in Kansas. Gibbons testified that Purkey participated in a drug and alcohol counseling program, a family counseling program, and that he was employed while on parole. Gibbons testified that Purkey had no employment problems while under his supervision. Gibbons further testified that while Purkey was on parole he admitted to Gibbons that he was having a drug problem and sought to gain admission into a drug counseling program at the Kansas University Medical Center. (Tr. 1502-15.)

Marguerite Hotchkiss, Purkey's 78-year-old aunt, testified she was the sister of Purkey's father. She testified in detail about Purkey's neglectful and disadvantaged childhood. She further testified that when Purkey was five years old he could not speak words and would only grunt. She said that Purkey was a stutterer as he got older and that stuttering was a common trait of Purkey's family. Hotchkiss testified that Purkey's father, Jack, was an alcoholic, had suffered a head injury requiring a metal plate, suffered terrible headaches, and was always drunk. She also testified that Jack Purkey

-21-

lost a good job at Boeing Aircraft in Wichita, Kansas, because of his alcohol problem. She further testified that Jack Purkey committed suicide in 1984. She further testified that Purkey was involved in a terrible automobile accident and was hospitalized. Hotchkiss also testified about her love for Purkey and that she would continue her relationship with him if he was granted a sentence of life without parole. (Tr. 1520.)

Robert Lopez, a fellow inmate who was incarcerated with Purkey at the Hutchinson Correctional Facility in Kansas, also worked as a custodian with Purkey. Lopez testified that Purkey was not associated with the Aryan Brotherhood prison gang at the Hutchinson facility. He testified that Purkey read the Bible frequently and he considered Purkey to be a friend who had counseled him about staying out of gangs while in prison. Lopez also testified Purkey was not a racist and would help African-American inmates with legal work. He testified Purkey represented other inmates, never fought with other inmates, counseled juvenile offenders, and did not use drugs in prison. Finally, Lopez also testified that in his opinion, Purkey loved his daughter very much. (Tr. 1530-40.)

Angie Genail, Purkey's daughter, testified about her relationship with her father. She displayed a large number of photographs of Purkey's family and described for the jury the individuals in each photo. She testified Purkey's parents, Genails' grandparents, were alcoholics. She testified that Purkey had shared with her that his mother had thrown alcoholic drinks in his face when he was a child. She testified that she had a good and loving relationship with Purkey and he always had kept in contact

Case 4:06-cv-08001-FJG   Document 73   Filed 05/20/08   Page 22 of 60

with her even though most of his adult life he had been incarcerated. She testified Purkey was a good grandfather to her son and that she would maintain a relationship with Purkey if he was given a life sentence. She testified that she loves her father and he is always supportive. (Tr. 1541-48.)

Gary Hamilton, Purkey's brother, testified that Jack Purkey was his step-father and Purkey's father. Hamilton testified that Jack Purkey was an alcoholic who had lost his job at Boeing Aircraft and his step-father lived on skid row in Wichita after losing this job. He testified that Jack Purkey beat both he and Purkey and their mother frequently. He testified that Purkey's mother, Velma Purkey, would bring men home to have sex in front of both he and Purkey when they were children and in their teen years. He further testified their mother sexually abused them both. He also testified that both he and Wes had been diagnosed as bipolar. He testified that he also had prior felony convictions for property theft crimes, but he had decided to change his life in the 1970s and had not been in trouble with the law since that time. He further testified that Purkey had volunteered to donate part of his liver to help his sick wife who had liver disease. (Tr. 1548-63.)

Reverend John Otto, a prison minister at the Hutchinson Correctional Facility, testified that he counseled Purkey in prison. He further testified in his belief that Purkey was a Christian and he was remorseful for his criminal conduct. (Tr. 1564-69.)

Dr. Bruce Leeson, a clinical psychologist with the Missouri Department of Corrections, testified that he was retained as an expert witness for Purkey and had

administered neuropsychological tests to Purkey.  Dr. Leeson testified that in his opinion Purkey was depressed and anxious and had a significant amount of frontal and temporal lobe brain impairment which detrimentally affected his ability to plan ahead and focus.  He further testified that the brain damage could explain Purkey's impulsive behavior.  He also testified that Purkey's IQ was 90.  (Tr. 1577-1650.)

Purkey also called Mark Russell, a correctional counselor at the United States Penitentiary in Leavenworth, Kansas.  Mr. Russell testified that while Purkey was incarcerated in the special housing unit at Leavenworth he had no disciplinary violations.  He further testified that Purkey had submitted a request to have his tattoos removed.  (Tr. 1651-63.)

Purkey also called as an expert witness Dr. David Preston.  Dr. Preston is a radiologist from the Kansas University Medical Center specializing in nuclear medicine.  Dr. Preston testified that he had taken brain scans of Purkey's brain utilizing brain imaging technology.  He testified that the major deficit in Purkey's brain was in the temporal lobes, which affected Purkey's ability to control his emotions.  He further testified that Purkey had short-term memory loss and damage to the hippocampus portion of his brain.  Dr. Preston also testified that Purkey suffered from frontal lobe brain damage which affected his ability to plan ahead and control his emotions.  He testified that Purkey probably suffered the brain injuries as a result of car accidents and drug abuse.  (Tr. 1664-1734.)

Dr. Steve Peterson, a forensic psychiatrist, was also called as an expert witness on behalf of Purkey. Dr. Peterson testified that Purkey had a long standing chronic mental illness that had been untreated at the time of the murders of Jennifer Long and Mary Ruth Bales. Dr. Peterson testified that Purkey was severely sexually, physically, and emotionally abused during childhood. As a result, Purkey developed abnormal psychosexual ideas. Dr. Peterson testified that Purkey was extremely impulsive and anger ridden. He concluded that Purkey had substantial problems with substance abuse beginning in his teens. He also testified that Purkey was suffering from depression and was dysthymic. He further testified that Purkey was suffering from a severe personality disorder with anti-social features, as well as obsessive compulsive and dependency features. Dr. Peterson further described in detail three closed head injuries that Purkey had allegedly suffered in 1968, 1972, and 1974. He also testified in great detail about Purkey's abusive, chaotic, and neglectful home life as a child and into his teen years. He described Purkey's parents as alcoholics and further informed the jury that Purkey's father had committed suicide. In conclusion, Dr. Peterson testified that Purkey did not have the capacity to form the intent to kill Jennifer Long because of a severe psychiatric illness. (Tr. 1738-1832)

Finally, Purkey called Dr. Mark Cunningham, a clinical and forensic psychologist who testified as a mitigation specialist on behalf of Purkey. Dr. Cunningham performed a violence/risk assessment of Purkey. He testified that he had reviewed a total of ten binders of information about Purkey's background. These

-25-

reports consisted primarily of correctional records during Purkey's incarceration in both state and federal prisons. He testified that Purkey is a profoundly damaged person in both his neurological and neuro-developmental history.

Dr. Cunningham also described in great detail Purkey's abusive, neglectful, and alcoholic parents. He informed the jury of their poor parenting skills and how these had impacted Purkey's development. He also testified about Purkey's car accidents and head injuries and the probable brain damage that resulted. He testified that in his opinion these injuries were consistent with frontal and temporal lobe brain damage.

Dr. Cunningham added that Purkey's mother had been sexually promiscuous with several boyfriends in front of Purkey and his brother. He also testified that Purkey's mother sexually abused him as a child and as a teenager. Dr. Cunningham described for the jury Purkey's significant alcohol and drug addictions including an addiction to methamphetamine, cocaine, and his frequent needle injections of Ritalin.

Dr. Cunningham observed that there was an extremely high level of security at the Bureau of Prisons facility at ADX Florence in Colorado. Dr. Cunningham described it as a super max facility in which the likelihood of violence had been substantially reduced because of the high level of security. Dr. Cunningham also testified that because Purkey was taking appropriate medications to control his behavior, because of his age, and because of the high security precautions within the Bureau of Prisons he believed Purkey would not be a significant threat to others in the future within the confines of a prison. (Tr. 1840-1954.)

-26-

### E.    *Government's Rebuttal Evidence*

The Government called three witnesses to rebut the theory that Purkey suffered from diminished mental capacity as a result of frontal lobe damage to his brain. Dr. Dan Martell testified that he reviewed the tests administered to Purkey by Purkey's forensic psychologist, Dr. Leeson. The tests were given to measure possible frontal lobe malfunction or damage. Dr. Martell testified that Purkey scored within normal limits. Dr. Martell disagreed with the defense psychologist regarding whether Purkey's test results were indicative of an individual with frontal lobe brain damage. (Tr. 2120.) Dr. Martell testified Purkey's psychologist had blown minor things out of proportion when reviewing Purkey's test scores in order to suggest brain damage. Dr. Martell said this was unfair and incorrect. (Tr. 2121.)

Dr. Martell testified Purkey scored highest in the four following categories: (1) drug abusers; (2) anti-social personality disorder patients; (3) rapists; and (4) patients with assault histories. (Tr. 2127.)

Dr. Martell vigorously disagreed with Purkey's psychologist's opinion that the tests administered to Purkey supported the claim that Purkey suffered from frontal lobe damage. (Tr. 2127.)

To counter the testimony by defense psychiatrist Dr. Peterson that Purkey was suffering from a mental disease or defect and from frontal-lobe brain damage, the Government called Dr. Park Dietz. Dr. Dietz testified that he diagnosed Purkey with two problem areas. These findings were consistent with a multitude of previous

-27-

findings of psychiatrists and psychologists who had examined Purkey in the past. Dr. Dietz testified Purkey suffered from an anti-social personality disorder and polysubstance abuse. (Tr. 2156.) Dr. Dietz testified that he had not seen any evidence of schizophrenia or mania in Purkey. (Tr. 2162-63.) He further testified that Purkey displayed abundant evidence of all seven types of behavior that are features of anti-social personality disorder.

Dr. Dietz added that Purkey suffered from no mental disease or defect which could affect his capacity to appreciate the wrongfulness of his conduct. (Tr. 2170.) Dr. Dietz believed it was significant that Purkey had methodically taken elaborate steps to conceal his crime. (Tr. 2172.) Dr. Dietz concluded that he did not believe Purkey had any mental disease or defect which amounted to a severe mental or emotional disturbance and based on his observations did not believe Purkey's brain function interfered with his capacity to appreciate the wrongfulness of his actions. (Tr. 2175, 2177.)

Dr. Helen Mayberg, a neurologist, testified on behalf of the Government to rebut Purkey's claim that he was suffering from frontal lobe brain damage which caused an inability to conform his behavior to the requirements of society. Dr. Mayberg carefully reviewed Purkey's prior hospitalization records and testified she had not seen any evidence in any of the records of neurological damage to Purkey's brain. (Tr. 1992.) Dr. Mayberg reviewed hospital records from 1968 involving a traffic accident where Purkey was knocked unconscious. Dr. Mayberg testified the records revealed that

-28-

Purkey had a normal neurological exam and that no abnormalities were noted in the standard nurse charts. There was no call for additional doctors because of deterioration. There were no special tests or special monitoring conducted. Dr. Mayberg noted there were no invasive procedures conducted to look for bleeding in the brain. Dr. Mayberg testified Purkey's neurological findings were "absolutely stone cold normal." (Tr. 1994.)

Dr. Mayberg also reviewed the hospitalization records of Purkey following a 1972 incident in which Purkey was knocked out after being hit by a car. Again, the records reflected a normal neurological examination and that there were no indications Purkey had suffered any type of traumatic brain injury. (Tr. 1996.) Finally, Dr. Mayberg testified Purkey's actions following the murder of Jennifer Long, that is, the extensive cover-up and realization that he might be caught, were absolutely inconsistent with a dysfunctional frontal lobe. (Tr. 2003.)

By its verdict, the jury rejected the brain damage and diminished mental capacity defense of Purkey.

On November 18, 2003, the jury heard the court's instructions of law, closing arguments of counsel, and retired to deliberate at 11:30 a.m. (Tr. 2297.) The court excused the jury in the afternoon at 4:05 p.m. (Tr. 2308.) The jury returned the next day, November 19, at 8:30 a.m. and commenced deliberations. (Tr. 2309.) The jury was required to deliberate on six statutory and four non-statutory aggravating factors. The defense submitted and the court instructed on 27 mitigating factors. The jury

returned with a verdict at 2:45 p.m. the same day.  (Tr. 2310.)  By unanimous vote, the jury determined that a sentence of death should be imposed.  (Tr. 2311.)  In total, the jury deliberated for 11 hours and 10 minutes.

## *F.*     *Appeal*

Following the formal imposition of the death sentence Purkey filed a timely notice of appeal.  In his brief filed in the Eighth Circuit, Purkey raised a total of 19 issues.  On June 23, 2005, the Eighth Circuit heard oral arguments and the case was submitted for a decision.  On November 7, 2005, the Eighth Circuit affirmed the conviction and sentence in *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005).  Purkey's motion for rehearing and rehearing en banc was denied on January 13, 2006.  The United States Supreme Court denied Purkey's writ of certiorari on October 16, 2006.  *See Purkey v. United States*, 127 S.Ct. 433 (2006).

## II.  Standard of Review

In his § 2255 motion, Purkey has raised numerous claims of ineffectiveness directed against the attorneys who represented him at trial and on appeal, as well as several trial errors that were not litigated on direct appeal.

With respect to his ineffective-assistance-of-counsel issues, the Supreme Court set out a two-pronged test for constitutionally ineffective assistance of counsel in *Lockhart v. Fretwell*, 506 U.S. 364 (1993).  Counsel is constitutionally ineffective when: (1) counsel's representation falls below an objective standard of reasonableness; and (2) the efforts are so prejudicial that the adversarial balance between the defense

-30-

and prosecution is upset. *Id.* at 369. A court may exam the "prejudice" aspect of a claim without having to first determine whether the representation fell below the objective standard of reasonableness. *McCann v. Armontrout*, 973 F.2d 655, 660 (8th Cir. 1992) (citing *Strickland v. Washington*, 466 U.S. 668, 697 (1984)).

It is Purkey's burden to affirmatively prove the prejudice aspect of this claim. *Lawrence v. Armontrout*, 961 F.2d 113, 115 (8th Cir. 1992). The review of counsel's performance is deferential and the presumption is that counsel is competent and effective. *Smith v. Lockhart*, 921 F.2d 154, 156 (8th Cir. 1990). Finally, in order to demonstrate prejudice, Purkey "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Most of Purkey's claims of ineffectiveness are nothing more than an exercise in second-guessing the performance of trial counsel. In evaluating an attorney's performance, a court must begin with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" because individual criminal defense attorneys might employ different trial strategies. *Strickland*, *id.* at 689. Courts should avoid "the distorting effects of hindsight" and try to evaluate counsel's conduct by looking at the circumstances as they must have appeared to counsel at the time. *Id.* at 689. The burden is on the petitioner to show that counsel's representation was not within the range of sound defense strategy. *Id.* at 690. To establish prejudice, Purkey must demonstrate only that "there is a reasonable

-31-

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Here, Purkey has clearly failed to make the required showing and his motion should be denied.

Courts normally will not entertain a § 2255 motion if the movant did not raise the claim pretrial, at trial, or on direct appeal. *Hines v. United States*, 282 F.3d 1002, 1005 (8th Cir. 2002). In order to obtain § 2255 relief despite such procedural default, a movant must show both cause for his failure to assert the claim in earlier proceedings and actual prejudice from the alleged error. *Johnson v. United States*, 278 F.3d 839, 844 (8th Cir. 2002). The showing of cause and prejudice, however, is not required if: (1) the movant seeks § 2255 relief based on facts not developed at trial that should be considered to avoid a fundamental miscarriage of justice as the conviction of an innocent person;[6] (2) the Government fails to object to the consideration of newly raised issues[7]; or (3) the § 2255 motion raises certain constitutional claims that may be adequately addressed only on collateral review.[8]

### III. Argument

*A.*   *Introduction*

In this case, Purkey's trial counsel presented a total of 22 witnesses, including Purkey. Eighteen of the witnesses testified as mitigation witnesses designed to

---

[6]*McCleskey v. Zant*, 499 U.S. 467, 494 (1991).

[7]*West v. United States*, 994 F2d 510, 512 (8th Cir. 1993).

[8]*Massaro v. United States*, 538 U.S. 500, 509 (2003).

-32-

persuade the jury not to impose the death penalty. Many of the witnesses testified concerning Purkey's difficult circumstances during childhood and during his developmental teen years. Defense counsel did an excellent job of convincingly demonstrating to the jury the physical, emotional, and sexual abuse Purkey experienced as a child and a teenager. Any suggestion that the skilled and experienced representation of lead defense counsel Fred Duchardt, Jr., was constitutionally ineffective either at trial or on appeal is without any basis in fact, and quite frankly, is completely without merit.

Mr. Duchardt is one of the most skilled and experienced criminal defense attorneys in the Midwest. In addition, Mr. Duchardt's reputation as a capital litigator for the defense is virtually without peer in this area. Mr. Duchardt has represented many individuals in the Western District of Missouri and in the District of Kansas and in every case has performed at a superior level. He also has substantial experience of capital cases in the State Courts in Missouri.

The problem that Purkey and present counsel refuse to acknowledge is that the facts of this case were so shocking that they would virtually guaranteed that a death penalty would be returned by any reasonable jury. The Government's evidence involved the kidnapping, rape, and murder of an innocent 16-year-old high school sophomore, coupled with the facts that Purkey purchased a chainsaw and dismembered her body and burned her body parts, thereafter disposing of her remains as if she were an item of trash, not to mention Purkey's incredibly violent past and 15 prior felony

-33-

convictions. Any suggestion that Purkey received the death penalty because of an incomplete or inadequate representation by an attorney with the skill set of Mr. Duchardt defies logic and common sense.

Attached to this response is the 117-page affidavit of Fred Duchardt, Jr.[9] A review of Mr. Duchardt's affidavit reveals substantial insight into his strategical decisions during the course of his representation of Purkey at trial and on appeal. When reviewed in its entirety the affidavit of Mr. Duchardt clearly defeats any claim by Purkey that he received constitutionally ineffective representation. Purkey cannot meet his burden by demonstrating that Mr. Duchardt's representation fell below an objective standard of reasonableness and that the representation was so prejudicial that the adversarial balance between the defense and the prosecution was upset. *Lockhart v. Fretwell*, *id.* at 369. Purkey has also not shown "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, *id.* at 694.

In addition, Purkey makes unnecessary and inappropriate personal attacks upon government counsel, accusing the undersigned and formed United States Attorney Todd Graves of "deliberate misconduct" (Purkey Memo. 1),[10] "deceit" (Purkey Memo. 73), engaging in a "misleading tale of deceit" (Purkey Memo. 70), and of "misleading

---

[9]The Government has incorporated the affidavit of Mr. Duchardt by reference and has attached it as Exhibit A.

[10]"Purkey Memo." refers to the document styled "Purkey's Suggestions Memorandum of Law in Support of Motion Under 28 U.S.C. § 2255."

the jury" (Purkey Memo. 73) during the presentation of evidence and during argument.
These allegations are without merit and should be denied. Finally, many of Purkey's
new claims could have been raised on direct appeal but were not and therefore have
been waived by Purkey. *Hines v. United States*, 282 F.3d 1002, 1005 (8th Cir. 2002).

### B.     *"Club Fed" Evidence*

Purkey initially claims he was denied due process of law during the trial and at
sentencing because of government counsel's reference to evidence elicited during the
trial concerning Purkey's desire to serve a life sentence in the United States penitentiary
as a desire to go to "Club Fed." Purkey's assertion is completely without merit. The
prosecution has a right to introduce evidence concerning a defendant's post-defense
statements to members of law enforcement as admissions against interest. Fed. R.
Evid. 804(b)(3). During the testimony of Detective Howard of the Kansas City, Kansas
Police Department the following exchange occurred during the trial:

> Q. (Mr. Graves):     Did you talk about the difference between federal
> and state penitentiaries?
>
> A. (Det. Howard):   Yes, we did.
>
> Q:     And how did that go?
>
> A:     Well, when he was persistent about going to a federal agency with
> this information, I asked him, "So you really want to go to Club
> Fed?", and we talked about that for a minute, about how the
> federal penitentiary would be more comfortable surroundings for
> him, how he wouldn't have any enemies there, how the
> environment is a lot better to live out your life there.

(Tr. 423-24.)

-35-

Clearly, the above exchange reflects there was evidence that Purkey wanted to serve time in the federal prison system because he believed the conditions would be better than those in the Kansas prison system. There was no attempt to mislead the jury that Purkey had used the term "Club Fed." However, Purkey's desire to serve his time in the federal system was apparent. Consequently, it was entirely proper for the Government to make reference to these facts during its closing argument to the jury. In addition, any objection by Mr. Duchardt to the admission of this evidence and the use of it during argument by government counsel would have been properly denied by the court. Purkey's argument that government counsel engaged in "deliberate misconduct" is an overzealous and unnecessary accusation and is without merit in fact and law.

In addition, Mr. Duchardt's affidavit clearly sets forth the reasons he did not object to admission of the testimony. Mr. Duchardt's response reflects his substantial experience and understanding of the Federal Rules of Evidence concerning the admissibility of this evidence. Mr. Duchardt's affidavit also demonstrates his common sense approach and strategical reasons in addressing this damaging evidence against his client. (*See* Duchardt Aff. 14-19.)

Initially, the court should deny Purkey's new allegation that the "Club Fed" evidence and argument references were improper because Purkey did not raise the claim, at trial, or on direct appeal. *Hines* 282 F.3d at 1005. In order to obtain § 2255 relief despite such a procedural default, Purkey must demonstrate "actual prejudice"

from the alleged error. *Johnson v. United States*, 278 F.3d 839, 844 (8th Cir. 2002). Purkey has not made the required showing and has thus waived this claim.

Even assuming, *arguendo,* the above-described "Club Fed" references did constitute improper conduct, it cannot be seriously contended that they warrant a reversal in light of the overwhelming evidence of guilt. Purkey confessed to the crime on multiple occasions during interviews with investigators and in a hand written statement he prepared in December 1998. Further, while Purkey changed his testimony at trial and denied he kidnapped the victim, he still testified that he brutally raped, stabbed, dismembered, and burned the body parts of the victim. When considering Purkey's brutal claw-hammer beating death of 80-year-old grandmother Mary Ruth Bales, his senseless and brutal kidnapping and shooting of Gregg Carlberg in the head during a robbery in 1980, his Aryan Brotherhood membership in prison, his sexual assault of inmate Gary Hatfield in prison in 1987 in Oregon, and his overwhelming and substantial prior history of criminal felony convictions, the few references to the term "Club Fed" no doubt played little, if any, role in the trial jury's decision to impose the death penalty on Purkey. Purkey's contention is without merit and the Government respectfully requests that it be denied.

## C.   *Allegations of Ineffective Assistance of Counsel*

### 1.   *Failure to Object to "Club Fed" Testimony and Argument*

A review of Mr. Duchardt's affidavit reveals a well-reasoned and sound strategical decision in addressing the "Club Fed" testimony and argument. (*See*

-37-

Duchardt Aff. 14-19.) Mr. Duchardt's thorough understanding of the Federal Rules of Evidence reveals his correct belief that the Court would have overruled any objection to the testimony. Detective Howard used the "Club Fed" terminology when questioning Purkey during his initial interview. During the interview, Purkey clearly expressed his desire to serve a federal sentence in the custody of the Bureau of Prisons. As Mr. Duchardt writes:

> Purkey was strongly motivated by better conditions in federal prison to falsely accuse himself of kidnapping in order to obtain a federal, rather than a state, prosecution. In light of our defense, it was up to us to show the strength of Mr. Purkey's motivation in this regard. That was the defense edge of the federal sentence sword. Thus, even if the government had totally avoided mention of the matter, it would have been necessary for us to bring it up to support our defense. The evidence allowed me to argue the case for Mr. Purkey as I did.

(Duchardt Aff. 16-17.) In addition, during cross examination of Agent Tarpley, Mr. Duchardt made it very clear that Detective Howard had been the one to use the term "Club Fed," not Purkey. (Tr. 601-02.)

2. *Statements Made During Opening Statement by Mr. Duchardt That Jennifer Long's Friends and Family Would Testify That There Was No Kidnapping*

Again, Mr. Duchardt's explanation for his claims that Jennifer Long's family and friends would testify that there was no kidnapping during opening statement reflect a well-reasoned and logical explanation for his decision to make these statements to the jury during opening statement. (*See* Duchardt Aff. 19-29.) As Mr. Duchardt points out, "The critical flaw in this challenge is that it misrepresents what I said to the jury

-38-

in opening statement." (Duchardt Aff. 19.)  Purkey's primary defense during the trial was to try and convince the jury that he did not kidnap Jennifer Long and that she had accompanied him voluntarily to his home in Lansing, Kansas.  Although the jury ultimately rejected this defense, Mr. Duchardt's strategy was to portray Jennifer Long as a somewhat troubled teenager who regularly used illegal narcotics and alcohol.  The purpose behind Mr. Duchardt's remarks during opening statement was to inform the jury that during the course of the trial he would call witnesses such as Ms. Long's friends and family members, to support Purkey's contention that Ms. Long willingly entered his vehicle and began partying with him on the morning of January 22, 1998.

Finally, Mr. Duchardt explains in his affidavit that

> it was my clear understanding that Mr. Purkey very much wanted the argument, that there was no kidnapping, to be made, and that Mr. Purkey would never have countenanced an approach to the defense which left out such an argument.  Because of that, I developed the evidence and argument which I did, perceiving those to be the best way I could advance the argument.

(Duchardt Aff. 29.)

### 3. *Failure to Prepare and Present Evidence to Rebut the Testimony of Michael Speakman*

Mr. Duchardt's response to the allegations that he failed to prepare and present evidence to rebut the testimony of government witness Michael Speakman contains a very thorough explanation reflecting sound trial strategy.  (*See* Duchardt Aff. 29-43.)  Mr. Duchardt's affidavit reveals that he believed that use of the testimony of the

-39-

proposed rebuttal witnesses would have damaged Purkey even more than the testimony of Speakman alone.

Initially, Mr. Duchardt's affidavit demonstrates that a substantial amount of pretrial investigation was undertaken to try and develop effective witnesses to rebut the testimony of Speakman. The affidavit reflects that Laura O'Sullivan, Mic Armstrong, and Mr. Duchardt each participated in the pretrial investigation designed to discover witnesses who could rebut the testimony of Speakman. (Duchardt Aff. 30-31.)

It should also be noted that counsel for Purkey vigorously cross-examined Speakman in an effort to discredit his testimony. During cross-examination, counsel was able to establish for the jury that Speakman had eight prior felony convictions, was testifying pursuant to a cooperation agreement with the Government, and was hoping for a reduction in his 180-month prison sentence. (Tr. 668-71.) Purkey was also permitted to cross-examine Speakman concerning at least one of the fights he had while in custody at CCA because while he was in the segregation unit for fighting he had conversations with Purkey concerning his case. Counsel's vigorous cross-examination of Speakman most certainly protected Purkey's confrontation rights.

Purkey also exaggerates the damaging effect of Speakman's testimony. Post conviction counsel describes Speakman as the Government's "star witness." (Purkey Memo. 36.) While Speakman's testimony was helpful to the Government's case, in light of Purkey's multiple confessions to law enforcement authorities to the kidnapping, rape, and murder of 16-year-old Jennifer Long, and in light of the fact that Purkey

testified at trial and admitted he raped, murdered, and dismembered her body, it can hardly be seriously contended that Speakman's brief and limited testimony was devastating to Purkey.

Mr. Duchardt explains his decision not to call Cornelius Peoples, a convicted murderer. (Duchardt Aff. 31-34.) Mr. Duchardt explains that his reasoning was two-fold. First, Peoples was facing a retrial in his own capital murder case. Second, counsel for Peoples informed Mr. Duchardt that he had recommend to Peoples, and Peoples had agreed, that if he were called as a witness on behalf of Purkey in this case he would have invoked his Fifth Amendment privilege in order to protect himself from any cross-examination that could later be used against him during the prosecution of his case. In addition, Mr. Duchardt explains that counsel for Peoples was attempting to work out a plea agreement for Peoples in his own case. As a consequence, counsel for Peoples had strongly recommended to his client, and Peoples was agreeing with the advice, that he should not involve himself in the defense of others because it might jeopardize his ongoing negotiations with the prosecution.

Mr. Duchardt further explains:

Mr. Peoples would have brought substantial baggage as a witness, starting with his own capital case charge, for which he had already been once convicted. In addition, Peoples had a serious prior conviction, an aggravated battery from Wyandotte County in 1991 for which he had served eight years of a 10 to 30 year sentence. Besides all of this, I was also very familiar with other bad acts information pertaining to Peoples. In sum, Peoples had the reputation as a cold-blooded killer, willing to do or say anything. I was familiar with this information because I had represented one of Peoples' co-defendants, Carl Haskell, and had

-41-

received considerable information about Peoples in the discovery and in our investigation in that case. I was concerned that, under the right circumstances, some of that negative information might also come out on cross. Further damaging whatever credibility Peoples might be deemed to have.

(Duchardt Aff. 32-33.)

Finally, Mr. Duchardt provides a very logical explanation that Peoples had no way of knowing about conversations between Speakman and Purkey if he were not present. Mr. Duchardt's decision not to call Peoples as a witness is a sound strategical decision reflecting his substantial experience and common sense approach to capital defense.

Mr. Duchardt's decision not to call Xavier Lightfoot during trial also reflects sound strategy. Like Peoples, Lightfoot also was charged with capital murder and was awaiting trial. Lightfoot's counsel had advised him not to testify on behalf of Purkey because it could potentially be damaging to Lightfoot's defense at trial. Mr. Duchardt also explains that he did not believe that Lightfoot had any information that would be helpful to Purkey in attempting to damage the credibility of Speakman. Mr. Duchardt advises that he had been informed by counsel for Lightfoot that if Purkey attempted to call him at trial for testimony he would invoke his Fifth Amendment privilege. Consequently, like Peoples, Lightfoot was unavailable as a defense witness. Finally, because Mr. Duchardt was familiar with the horrific crime Lightfoot had committed, that is, arranging for the contract murder of a federal bank robbery witness, his testimony would likely have been more damaging to Purkey than helpful.

-42-

Mr. Duchardt also explains his decision not to call CCA employees to rebut the testimony of Speakman. Mr. Duchardt explains that because of Purkey's behavior while in pretrial custody at CCA in Leavenworth, his relations with CCA personnel "were abysmal." "Almost daily, Wes was at odds with one or another corrections officer. Wes filed several reams of paper worth of grievances over his conditions of confinement at CCA." (Duchardt Aff. 36.) Mr. Duchardt further explains that Purkey was removed from CCA prior to trial because of an incident in which Purkey was accused of an assault on a guard. Mr. Duchardt further writes that things got so bad between Purkey and CCA that he assisted Purkey in filing a lawsuit against CCA. Consequently, any attempt to call witnesses from CCA to try and damage the credibility of Speakman could easily have backfired at trial.

Mr. Duchardt explains that another concern he had in calling CCA employees on behalf of Purkey to rebut the testimony of Speakman related to his fear that if he called these employees it would open up an area of great concern for Mr. Duchardt. Mr. Duchardt did not want the jury to hear evidence concerning the substantial difficulty and problems Purkey had caused CCA during his pretrial incarceration. Purkey was clearly a very difficult inmate and Mr. Duchardt did not want the jury to hear this type of evidence because it would have ultimately reflected negatively on Purkey and would have assisted the Government in its contention that Purkey posed a future danger if given a life sentence without the possibility of release. Again, Mr. Duchardt's explanation reflects a sound trial strategy.

-43-

Finally, Mr. Duchardt explains his decision not to call witness Sam Hoffmeier on behalf of Purkey to rebut the testimony of Speakman. First, Mr. Duchardt explains he did not believe Hoffmeier's information was very helpful. Hoffmeier did not deal with Purkey in the segregation pod and could not have been privy to Purkey's interactions in the pod with staff and inmates. In addition, Mr. Duchardt strongly asserts that he believed that bringing up the testimony from Hoffmeier to counter Speakman would prompt the Government to call CCA corrections officers to lend credibility to the testimony of Speakman.

### 4. *Decision Not to Obtain the Services of a Mitigation Specialist*

(*See* Duchardt Aff. 43-79.) Mr. Duchardt explains in his affidavit in great detail the defense strategy during presentation of mitigation evidence at the trial. Purkey's present contention that the evidence presented in mitigation was deficient is completely without merit. Mr. Duchardt called a total of 18 witnesses on behalf of Purkey in mitigation during the penalty phase of the trial. The mitigation presentation was well-prepared and well reasoned, but because of the horrific nature of Purkey's crime and his past history of violence, the jury logically rejected the mitigation evidence and rendered a verdict of death. Mr. Duchardt's explanation is very thorough and no further argument is necessary.

It should be noted, however, that post-conviction counsel apparently did not thoroughly review the trial testimony of Dr. Cunningham and Dr. Peterson. Both witnesses testified extensively about Purkey's abusive childhood and teen years in

-44-

Wichita, Kansas. Both described in great detail the physical and sexual abuse against Purkey by his alcoholic parents. Consequently, the use of a mitigation specialist would have added nothing to the presentation in mitigation and would have merely been cumulative evidence.

5.     *Allegation of Failure to Prepare and Present the Testimony of Dr. Bruce Leeson*

(*See* Duchardt Aff. 79-82.) Mr. Duchardt provides a well-reasoned response to Purkey's allegations that he inadequately prepared defense expert Dr. Leeson to testify at trial. Purkey's contention that Dr. Leeson was inadequately prepared to testify because of the actions of Mr. Duchardt is without merit. A review of Dr. Leeson's testimony reveals that he was fully prepared and made an effective presentation on behalf of Purkey at trial. No further argument is necessary.

6.     *Allegation of Failure to Adaquetly Prepare and Present Testimony of Dr. Steven Peterson*

(*See* Duchardt Aff. 82-89.) As Mr. Duchardt appropriately points out in his responsive affidavit, "The trouble is that the conclusions which they [post-conviction counsel] urge can be drawn only through the faulty mechanism of drastic misrepresentation of the facts." (Duchardt Aff. 83.) Current counsel have asserted that Dr. Peterson did not testify about Purkey's previous reports to others about his sexual abuse, and that the Government as a consequence, argued that Purkey had fabricated the claim of sexual abuse to avoid the death penalty. However, Dr. Peterson did testify that Purkey had reported his sexual abuse to multiple persons on multiple previous

-45-

occasions.  In addition, Mr. Duchardt is correct that the Government essentially conceded by the end of the trial that Purkey had been abused both physically and sexually.

It is also significant that Mr. Duchardt has made contact with Dr. Peterson and has learned that post-conviction counsel obtained inaccurate admissions from Dr. Peterson by apparently misleading him, showing him only the limited parts of the record, and not providing him with the complete transcript of the case.  Mr. Duchardt further points out that Dr. Peterson was not provided portions of the trial transcripts where he referred to Purkey's other revelations of sexual abuse.  Consequently, the present allegation that Dr. Peterson was inadequately prepared for testimony at trial is highly suspect.  Mr. Duchardt describes in great detail the significant amount of testimony from Dr. Peterson at trial relating to Purkey's sexual and physical abuse in childhood and as a teenager.  (*See* Duchardt Aff. 83-88.)  Dr. Peterson prepared an extremely thorough report and made a thorough presentation on behalf of Purkey at trial.  Consequently, Purkey's present contention is without merit and should be denied.

### 7. *Allegation Regarding the Preparation and Presentation of the Testimony of Dr. Mark Cunningham*

(*See* Duchardt Aff. 89-92.)  As Mr. Duchardt correctly states in his affidavit, post-conviction counsel for Purkey have not fully and accurately described the trial testimony of Dr. Cunningham and have failed to note that Dr. Cunningham's testimony

-46-

actually contains many of the details that they incorrectly contend are missing. (Duchardt Aff. 89.)

Mr. Duchardt's decision not to utilize a PowerPoint presentation prepared by Dr. Cunningham at trial reflects the analysis and sound decision making of a skilled trial lawyer. Mr. Duchardt's strategy was to try and prevent the Government from utilizing a PowerPoint presentation by Dr. Deitz in his presentation. It would have been illogical for Mr. Duchardt to utilize a PowerPoint presentation by Dr. Peterson and then to try and exclude Dr. Deitz' PowerPoint presentation during the Government's presentation of rebuttal evidence. Again, this decision reflects sound trial strategy.

8. *Allegations Relating to Failure to Adaquetly Prepare and Present Testimony of Gary Hamilton, Dr. William Grant, M.D., and Mark Russell*

(*See* Duchardt Aff. 52-58, 93-98.) Mr. Duchardt provides a detailed explanation of his decision making regarding the preparation and presentation of Gary Hamilton, the defendant's brother, Dr. William Grant, M.D., and Mark Russell of the Federal Bureau of Prisons. Contrary to the assertions of post-conviction counsel, these witnesses were clearly helpful to Mr. Purkey's case in mitigation.

Gary Hamilton provided independent corroboration of Purkey's allegations that he was sexually abused by his mother and sexually and physically abused by his father. Dr. Grant's testimony was helpful in the sense that it lent support to the defense argument that with proper medication Purkey would not pose a future danger to other

-47-

inmates if given a sentence of life without possibility of release. Finally, Mark Russell testified concerning the very unpleasant circumstances of Purkey's confinement in administrative segregation, including being confined to his cell for 23½ hours per day. In addition, Russell testified that Purkey had exhibited no assaultive behavior while in custody at the United States Penitentiary at Leavenworth. He further testified that Purkey had requested to have his Aryan Brotherhood tattoos removed. Of course, the prosecution was able to make some points in its favor during cross-examination of each of the witnesses. However, a fair reading of the transcript of the testimony for the three witnesses will reveal that each witness contributed to the mitigation case in favor of Purkey in a substantial manner. Purkey's present claim that Mr. Duchardt did not adequately prepare and present testimony of these witnesses is without merit and should be denied.

9. *Purkey Urges this Court to Reject the Eighth Circuit's Holding in* Middleton v. Roper*, 455 F.3d 838, 850 (8th Cir. 2006)*

Purkey's argument contradicts long established Eighth Circuit precedent. The Eighth Circuit has repeatedly recognized "A habeas petitioner cannot build a showing of prejudice on a series of error, none of which would by itself meet the prejudice test." *Hall v. Luebbers*, 296 F.3d 685, 692 (8th Cir. 2002); *see, e.g., United States v. Robinson*, 301 F.3d 923, 925 n. 3 (8th Cir. 2002) (recognizing "the numerosity of the alleged deficiencies does not demonstrate by itself the necessity for habeas relief," and noting the Eighth Circuit's rejection of cumulative error doctrine); *Wainwright v.*

*Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Errors that are not unconstitutional individually cannot be added together to create a constitutional violation."). Here, Purkey has failed to demonstrate that any of the allegations of ineffective assistance described above were prejudicial. Assuming *arguendo,* that Purkey has established some minor deficiencies in the representation of Mr. Duchardt in his defense either at trial or on appeal, considered individually none of the alleged errors would by itself meet the prejudice test. In addition, Purkey's argument should be rejected because he advances an erroneous interpretation of Supreme Court precedent. Citing *Strickland* and its progeny, including *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Williams v. Taylor*, 529 U.S. 362 (2000), Purkey contends this Court should consider the cumulative effect of Mr. Duchardt's alleged errors in determining whether prejudice resulted in accordance with the standards set forth in *Strickland*.

Neither *Wiggins* nor *Williams* stands for the proposition that the court should accumulate the prejudice from separate ineffective assistance claims in determining whether to grant habeas relief. Rather, both decisions involve only a *single* claim of ineffective assistance of counsel-namely, trial counsel's failure to investigate and present mitigating evidence during the trial's penalty phase. *See Wiggins*, 539 U.S. at 514; *Williams*, 529 U.S. at 390.

In addition, as set forth above, Purkey's argument has been soundly rejected by the Eighth Circuit on multiple occasions. *Middleton*, 455 F.3d at 851; *Hall v. Lubers*,

296 F.3d at 692; *United States v. Robinson*, 301 F.3d at 925, n. 3; *Waynewright v. Lockhart*, 80 F.3d at 1233.

### 10.    *Purkey's Recantation of Kidnapping Claim*

(*See* Duchardt Aff. 100-115.) Purkey next accuses the Government of engaging in "deliberate misconduct" when government counsel elicited from Agent Tarpley that "right before this trial" was the first time he had ever heard that Purkey had claimed not to have kidnapped Jennifer Long. (Tr. 566.) Purkey further alleges that government counsel engaged in misconduct when during closing argument the undersigned informed the jury that Purkey had "changed his story" in order to avoid the death penalty--"he's trying to get out of it." (Tr. 1135.) The undersigned further argued, "All the way up, all the way through this case up until recently it's been I kidnapped her, I kidnapped her, I kidnapped her." (Tr. 1135.)

Purkey further alleges that he was denied effective assistance of counsel when trial counsel for Purkey failed to impeach Agent Tarpley's testimony that he had only heard of Purkey's recantation "right before this trial."

Finally, Purkey alleges he was denied effective assistance of counsel when on appeal appellate counsel failed to raise the issue concerning Agent Tarpley's and government counsel's contention that Purkey had recanted the kidnapping claim for the first time just a few months before trial. However, post-conviction counsel have accused government counsel of engaging in a "deceitful tactic," claiming that the

-50-

Government's assertion was "absolutely false," and accusing government counsel of "blatant misconduct." (*See* Purkey Memo. 51-52.)

Unfortunately, the problem with this entire argument is that it reflects a fundamental misunderstanding of the facts which gave rise to the Government's position that Purkey had withdrawn his kidnapping claims shortly before trial. In fact, government counsel learned for the first time that Purkey was recanting his kidnapping claims when it received Dr. Peterson's report dated August 13, 2003, shortly before trial. Dr. Peterson had been retained by Purkey to testify on his behalf at trial as an expert. Upon receipt of the report government counsel learned for the first time that Purkey was claiming that Jennifer Long had voluntarily accompanied him from Missouri to Kansas.

In his initial confessions to Detective Howard and Agent Tarpley in December 1998, Purkey told the investigators:

> After talking to her for a few minutes outside this grocery store, he asked her if she wanted to go party, if she liked to go get something to drink with him.
>
> Purkey said the female got into the pickup without any threats and then they proceeded to a liquor store a few miles away after the initial contact.
>
> After getting some of the gin and orange juice, he learned that she had been at school that morning and she was walking home from school as a result of having an argument with what he described as some black females at school.

(Tr. 485.)

Purkey further informed the investigators as follows:

Q (Mr. Whitworth): Go ahead. What else did he say?

A (Agent Tarpley): He said he needed to run home for a few minutes and she asked where home was and he said in Kansas. She didn't want -- she wanted to be dropped off. She didn't want to go. He said at that point he reached over in the glove box and pulled out what he described as a boning knife from the glove box and he placed it under his right thigh and he made the statement that from that point on he had no intention of letting her out of the truck.

Q: What else did he say?

A: He said that he drove I-70 west out of Missouri and Kansas, took K-7 north, and that he pulled off on some road and that's where he– off of K-7 somewhere he raped Jennifer in the truck.

Special Agent Tarpley further testified:

Q (Mr. Whitworth): When did he tell you that he pulled a knife out?

A: He told me that he pulled the knife out after she -- after he told her that he needed to go back home to get something, I believe, and she did not want -- when she learned where home was, she didn't want to go there with him and he said that's when I pulled the knife out and stuck it under my right thigh.

(Tr. 494.)

Purkey also wrote a written confession and provided it to investigators. In that confession, Purkey stated as follows:

Q (Mr. Whitworth): What did Mr. Purkey write in that statement?

A: "After filling out a job application at Roto-Rooter early in the morning I left and started driving down Truman

heading off of Troost. About a mile or a little more off the Paseo on the south side of the street, I pulled into a store parking lot. I seen a girl walking by the store and I stopped her and asked her what was happening. She said nothing really. Then I asked her if she knew which way Broadway was. She said it's west of here. I asked her if she wanted to go party, maybe get some, maybe sex, something to drink.

After she got in the truck, I [told] her my name and in turn she [told] me her name, Jennifer. Making small talk she said she was on her way home, that she had just had some kind of problems with a couple of black girls.

We drove to a liquor store on Troost south of Truman and bought some gin and orange juice. Then I said I need to run back to my place real quick and she asked me where that was at. I explained it's about a 20 minute drive to Lansing and wouldn't take over an hour up and back. She said I really don't want to go down there. How about take me back where you picked me up from by this time we were headed west on I-70 off the Paseo and I was telling her it won't take long, just up and back, and at the same time I was reaching in the glove box grabbing a knife that I stuck up my right thigh. We drove straight back to my house."

(Tr. 510.)

Neither Purkey nor the Government ever contended that 16-year-old Jennifer Long was grabbed off the street and kidnapped. It is clear from Purkey's accounting from the beginning that Jennifer Long apparently voluntarily entered his pickup truck on the morning of January 22, 1998. The kidnapping crime began when Purkey pulled out the knife in his pickup truck and decided he was not going to let Jennifer Long out of his truck. His intent at that time was to take her against her will

-53-

to his home in Lansing, Kansas and commit an act of rape.  Speakman's statements to FBI agents on November 2, 2001 were *not* inconsistent with what Purkey alleged from the very beginning in this case.  In Speakman's report of the interview set forth as Exhibit 3 in Purkey's addendum, it reads as follows:

> Purkey explained his case was different than the ongoing Keith Nelson and Pamela Butler incident, in that Purkey did not 'snatch' the girl from the street as Nelson did.  Purkey described the *initial contact* with the girl as more like they were 'partying,' and that it was not at all forcible.

It is apparent from a review of Speakman's report of interview that Purkey's accounting of his initial encounter with Jennifer Long was entirely consistent with the detailed confessions he provided to Agent Tarpley and Detective Howard nearly three years earlier at the Wyandotte County District Attorney's Office.  The kidnapping crime began once Purkey decided not to allow Jennifer Long out of his pickup truck and pulled out the boning knife from his glove box in order to frighten Ms. Long into not resisting.  There was never a contention that Purkey "snatched" Jennifer Long off the streets of Kansas City.

For the first time, when Purkey met with his psychiatrist, Dr. Peterson, and described the events of January 22, 1998, he changed his story and claimed that he never kidnapped Jennifer Long and that she had accompanied him voluntarily to his home in Kansas.  At page 46 of Dr. Peterson's report,[11] which was provided to

---

[11]A copy of Dr. Peterson's report can be found in Purkey's addendum as Exhibit 24.

government counsel on August 13, 2003, shortly before trial, Dr. Peterson wrote as follows:

> Jennifer wanted to go to Kansas City, Kansas with him. At that point, he had his work knife with him. This was a 3-inch blade pocket knife. He told the FBI that he held the knife to her to ensure that he got a 'federal crime of kidnapping'. His wife knows the truth that they drove around Leavenworth, Kansas and Jennifer didn't mind. They kept drinking and purchased more orange juice at the K-7 Town and Country. They went to the T&C lot together. They went in together and bought cigarettes. He smoked more of the crack. There was no sex between them and no 'partying' he was waiting for the alcohol to 'have its effects so they could go have a private party at his place.'

Purkey then describes in detail his recounting of a voluntary sexual encounter with Jennifer Long at his home. (Purkey Adden. Exh. 24 at 47.)

Dr. Peterson further wrote at page 47 as follows:

> "Ultimately, he killed her at home. He believes she came to his house willingly so it wasn't kidnapping. He told the kidnapping story 'for the FBI so he could get into the federal system.'"

It is apparent from a review of the above trial testimony, from Agent Tarpley recounting Purkey's detailed confessions in December 1998, a review of Speakman's reported interview, and a review of Dr. Peterson's report, that in fact Purkey did change his story when he recanted the kidnapping claim for the first time in his statements to Dr. Peterson. The Government did not come into possession of the Peterson report until shortly before trial, that is, on August 13, 2003. Clearly, the statements Purkey made to Speakman in his cell at CCA at Leavenworth did not differ from his initial accounts he made to investigators. A simple review of the report of the interview will

-55-

confirm that Purkey never told Speakman *he did not kidnap Jennifer Long*, as counsel incorrectly contend. Purkey merely claimed he did not "snatch" the girl from the street as Keith Nelson did. Purkey described the initial account with the girl as more like they were "partying" and that it was not at all forcible. The term "kidnapped" is never even discussed in his discussions with Speakman.

Consequently, when Purkey and post-conviction counsel claim that the Government "knew that in the month after it had obtained the indictment against Purkey, he recanted the kidnapping to its star witness – Michael Speakman," such an assertion is either a misrepresentation or most certainly an overzealous exaggeration of what Speakman told the FBI in November 2001. There was no discussion of the term kidnapping when Speakman spoke with Purkey. In addition, there apparently was no discussion about the knife that Purkey had used to frighten Jennifer Long when he decided to kidnap her and take her to his home in Lansing to rape and subsequently kill Ms. Long. This fundamental misunderstanding of the facts concerning the conversation between Speakman and Purkey and the subsequent statements by Speakman to the FBI clearly defeats any claim by Purkey that Agent Tarpley or government counsel acted inappropriately when they accurately and properly contended that Purkey changed his story about the kidnapping shortly before trial. Consequently, Purkey's motion should be denied on this basis.

Further, a review of Mr. Duchardt's affidavit reveals that he did not consider the statement by Agent Tarpley or the argument of government counsel to be particularly

significant.  A review of his affidavit reveals his strategy in addressing the testimony and argument.  While his explanation differs from that of government counsel, it does reflect a well-reasoned and common-sense approach to any possible concern.  Again, Purkey's position is not well taken.

Finally, Purkey's claim on this issue should be denied because he could have raised the issue on direct appeal but did not.  Thus, he has waived a claim on this issue. *See Hines*, 282 F.3d at 1005.

### 11.    *Allegation of Inadequate Preparation of Purkey's Trial Testimony*

(*See* Duchardt Aff. 110-114.)  It is clear from a review of Mr. Duchardt's affidavit that trial counsel spent a great deal of time preparing Purkey to testify at trial. Purkey's present contention that he was inadequately prepared is without merit and should be denied.

### 12.    *Allegation Regarding Failure to Raise Insufficiency of Evidence Claim*

(*See* Duchardt Aff. 115-16.)  Purkey argues that trial and appellate counsel were ineffective for failing to raise an insufficiency-of-evidence claim at trial and on appeal. Purkey contends, "The government, however, had absolutely no evidence of a kidnapping except Purkey's confessions.  It's entire case rested on that."  Purkey further contends, "A defendant may not be convicted based solely on his own admissions."  (Purkey Memo. 67.)

The problem with this argument is that the Government had a substantial amount of additional evidence in addition to Purkey's detailed confessions.  The charge in this

case was kidnapping resulting in death, in violation of 18 U.S.C. § 1201. In addition to Purkey's confessions, the Government introduced into evidence the chainsaw that Purkey used to dismember Ms. Long's body. The Government introduced a sales receipt from Sears dated January 22, 1998, the day of the crime. Purkey used a credit card to pay for the chainsaw at Sears in Lansing, Kansas. The Government also recovered the toolbox in which Purkey had dismembered the body of Jennifer Long. Inside the toolbox investigators found blood. In addition, there were cut marks in the toolbox consistent with the chainsaw that Purkey purchased at Sears.

The Government also introduced human bone fragments recovered from the fireplace ashes where Purkey said he burned the body parts of Ms. Long. The Government also recovered human bone fragments from a septic pond located near Wichita, Kansas where Purkey represented he had dumped some of the bone fragments of Ms. Long a few months after her murder. Purkey had drawn a map for investigators indicating exactly where he had dumped the bones. When the FBI excavated 50 tons of soil at the site of the septic pond several years later they found the human bone fragments in the same area where Purkey represented he had disposed of them.

Mr. Duchardt writes in his affidavit that he did not believe an appeal based on an insufficiency of the evidence claim would be well taken. He researched the issue and discussed it with Purkey prior to the submission of the appellate brief to the Eighth Circuit. Purkey apparently agreed with Mr. Duchardt that an insufficiency of evidence claim was not well founded and would fail. A simple review of the evidence developed

at trial by the Government will reveal that Purkey's present contention that a sufficiency of the evidence claim would have merit is, quite simply, not well taken. Finally, Purkey has waived an insufficiency of evidence claim because he could have raised it on direct appeal but failed to do so. *See Hines*, 282 F.3d at 1005.

## IV. <u>Conclusion</u>

The record fails to support Purkey's claims that his trial and appellate attorneys' performance was defective, or that their efforts were so prejudicial that the adversarial balance between the defense and prosecution was upset. Mr. Duchardt's affidavit clearly reveals that his representation was of the highest caliber and that his strategical decisions were sound and based upon his substantial experience as a capital litigator. Indeed, Mr. Duchardt's representation of Purkey in this horrific crime should be commended rather than criticized. Accordingly, Purkey's § 2255 motion should be denied without an evidentiary hearing.

Respectfully submitted,

JOHN F. WOOD
United States Attorney

By    */s/ Matt J. Whitworth*

MATT J. WHITWORTH
First Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East Ninth Street, Room 5510
Kansas City, Missouri 64106
Telephone: (816) 426-3122

*Attorneys for Respondent*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was delivered on May 19, 2008, to the CM-ECF system of the United States District Court for the Western District of Missouri and the undersigned hereby certifies that a copy of the foregoing was mailed to:

Gary E. Brotherton, Esquire
601 West Nifong Boulevard
Building 1, Suite C
Columbia, Missouri  65203

Teresa L. Norris, Esquire
P.O. Box 11744
Columbia, South Carolina  29211

*/s/ Matt J. Whitworth*
Matt J. Whitworth
First Assistant United States Attorney

-60-