IN THE UNITED STATES DISTRICT COURT,
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

WESLEY PURKEY )
          Movant )
           )
v. )      Case # 06-8001-CV-W-FJG
           )
           )
UNITED STATES OF AMERICA )
          Respondent )

## ***STATEMENT OF FREDERICK A. DUCHARDT, JR.***

Now on this 9th day of May, 2008 comes Frederick A. Duchardt, Jr., and in response to the Order of this Court (Doc. 62), and because no objections have been interposed by Mr. Purkey or his Counsel, does make the following, responses to those allegations of ineffective assistance of counsel made in the Petition, Suggestions and supporting documents filed by Counsel for Mr. Purkey before this Court pursuant to 28 U.S.C 2255 (Doc. 47, 52).

### ***General Information Pertaining to Appointment and Service of Defense Counsel and Defense Team of Experts***

#### 1. My Qualifications and Duties

I was appointed by the Court as lead counsel for Mr. Purkey at trial and upon appeal in the above captioned cause. I have been licensed to practice law in Missouri and in the United States District Court for the Western District of Missouri since

1

Exhibit A

1980. At the time that I tried Mr. Purkey's case, I had previously been a State Public Defender for 15 years, and had after that been in the private practice of criminal defense law for eight years, and had handled, as lead counsel at trial, and to completion, three other Federal capital cases and four other Missouri state capital cases.

As lead counsel in this case, I was ultimately responsible for all decisions and actions made with respect to the defense of Mr. Purkey. Included in my duties were the seeking and obtaining members of the defense team to work on the case with me.

## 2. Matters Pertaining to the Appointment and Service of Laura O'Sullivan, and Division of Duties between the Attorneys

I asked Laura O'Sullivan to join me as cocounsel for Mr. Purkey. I first became familiar with Ms. O'Sullivan in the early to mid 1990's when she was a Missouri State Assistant Public Defender and I was a supervising attorney for the Public Defender System. At that time, I was impressed by the quality of Ms. O'Sullivan's work and her rapport with her clients. When I began my search for cocounsel for the Purkey case, I inquired of various Missouri Capital Public Defenders for recommendations, and Ms. O'Sullivan's name was universally mentioned. She had recently left the employ of the State Public Defender System, and had entered private practice. Also, I learned that, in the years since my departure from the Public Defender System, Ms. O'Sullivan had further distinguished herself in her Public Defender service, and was

2

extremely well-thought-of in terms of her legal acumen in general, and her trial skills in particular. I interviewed Ms. O'Sullivan, and when she agreed to participate in this case, I sought and obtained her appointment as cocounsel.

Because of my extensive experience with capital and mental health case practice, and because of Ms. O'Sullivan's relative lack of experience with those specialties, I expected to, and actually did, take on the lion's share of the duties related to those matters. Even before Ms. O'Sullivan's appointment, I began work on the budget for the case, drawing upon my experience. While I explained the budgeting process to Ms. O'Sullivan as a means to teach her about the process for the future, she at that early stage in the case had little to offer for development of the budget, and thus was unable to provide, and in fact did not provide, much input. As a consequence, I prepared the budget myself. Also, I did the vast majority of the motion practice in the case, since that was an area of strength and experience for me. Other areas of strength and experience for me, for which I took charge, were the jury selection process (the development and analysis of the jury questionnaire, and the development and conduct of voir dire), expert testimony, and opening statements and closing arguments for both phases of trial.

It was my intention, at the outset, that Ms. O'Sullivan have full involvement with all aspects of the case. At that point, I was open to the possibility that Ms.

3

O'Sullivan might take on some of the tasks which I ultimately handled. To this end, I provided her with all of the discovery in the case, as well as copies of the pretrial motions which I was filing. I expected that she would immediately read and become fully familiar with all aspects of the case. I believed that, if things worked optimally, we could have two heads independently developing ideas, concepts and strategies about the case. I also expected that Ms. O'Sullivan, once she became familiar with case materials, would independently develop and implement lines of investigation in the case. Thus, in our case budget, I allotted ample resources for Ms. O'Sullivan to do this work, taking into account the voluminousness of the materials which had to be reviewed, and the octopus-like tentacles of the investigation work which would likely, and did in fact, develop.

Some difficulties emerged when Ms. O'Sullivan was slow to invest the necessary time to read and digest the voluminous case materials. During this early period, the fact that Ms. O'Sullivan was not up to speed on the case was obvious in many ways. In my discussions with her about the case, we would not be able to exchange ideas as equals. Instead, since she had not yet read the materials, I was having to spend our times together educating her about critical facts and issues of law concerning the case with which she was not yet familiar. This was about the same time that relations became strained between Ms. O'Sullivan and Mr. Purkey. Because he

4

was quite familiar with the law and with the facts pertinent to his case, Mr. Purkey, in his meetings with the attorneys, would regularly pose very complex questions and issues regarding his defense, and would expect intelligent answers to those questions. To be able to intelligently answer Mr. Purkey's questions, one had to be very conversant with the facts and the law pertaining to the case. At that time, Ms. O'Sullivan was not so conversant. Though I was not present during the one-on-one meetings between Ms. O'Sullivan and Mr. Purkey to know all that transpired, I did have feedback about those meetings from Ms. O'Sullivan and Mr. Purkey, and I knew what occurred in meetings in which all three of us would be present. From all of that, I intuited that Mr. Purkey was upset because, when Purkey would pose his questions about the case, Ms. O'Sullivan would sometimes give Mr. Purkey's inquiries short shrift, implying that the questions did not have merit, when the problem really was that Ms. O'Sullivan was not familiar enough with the case to fully and intelligently answer the questions.

Also, Ms. O'Sullivan would not independently identify and accomplish necessary case tasks. Rather, she would wait until I assigned her work to do on the case. Even when we would agree that Ms. O'Sullivan would take on certain case investigation tasks, which I expected would be addressed by her immediately, Ms. O'Sullivan would delay in getting to those tasks. This would result in my having to

5

take back and accomplish those tasks myself in order to keep the case preparation progressing. It seemed to me that, because we were still so far off from trial, Ms. O'Sullivan was lulled into a false sense of security, not realizing that hard work was necessary, even at the early stages, to make sure that everything would be accomplished in the time allotted. I became very frustrated with Ms. O'Sullivan over these failures, and I made that frustration known to her.

These problems came to a head when Mr. Purkey sought to have Ms. O'Sullivan removed from the case. Ms. O'Sullivan offered to withdraw from the case, and accused that I was not sufficiently supporting her with Mr. Purkey. I told Ms. O'Sullivan that she could certainly withdraw if she wished. I also directly and firmly told Ms. O'Sullivan that the problems were of her own making. I explained my belief that the problems could be solved by her immediately investing the time necessary to get herself ready on this case, and by her treating Mr. Purkey with more respect. I expressed to Ms. O'Sullivan and Mr. Purkey my confidence that Ms. O'Sullivan had all of the tools to be a valuable member of the defense team. After that, Mr. Purkey withdrew his motion to have Ms. O'Sullivan replaced. Ms. O'Sullivan, for her part, indicated that she did not wish to withdraw, and never again expressed any interest in withdrawing. Ms. O'Sullivan also proceeded to get the materials read and digested. However, Ms. O'Sullivan never did become a self-starter when it came to the

identification and discharge of case tasks. I was unsure whether this lack of initiative was part of Ms. O'Sullivan's makeup or owed to her deferring too much to my greater experience in cases of this sort. Whatever the reason, in order for Ms. O'Sullivan to be productive, it was necessary that I conceptualize, develop and assign specific tasks for Ms. O'Sullivan to complete. When she was given discreet tasks and explanations, Ms. O'Sullivan excelled in getting that work done. Thus, that is the way that I managed Ms. O'Sullivan's efforts thereafter.

Though Mr. Purkey did agree to Ms. O'Sullivan continuing as cocounsel, and though he did develop what I felt was a very good relationship with Ms. O'Sullivan, Mr. Purkey made clear to me that he expected that I would personally handle the more difficult duties of the case, i.e. complex motion practice, jury selection, opening statements, closing arguments, and examination of critical witnesses, including experts. I concurred with Mr. Purkey's assessment that it would be best for me to handle all of those matters myself, and thus I handled those matters as the case progressed.

As I prepared for my portions of the case, I would regularly include Ms. O'Sullivan in the work that was being done, and explain to her my reasoning in approaching the case as I was. During these discussions, Ms. O'Sullivan never

offered any other or different ideas. I did not think that unusual since she had never before tried a case involving the death penalty or a mental defense.

Though Ms. O'Sullivan's role in the case was somewhat limited, in the fashions I have described, I believed that the work she did was quite fine, and that her work assisted in preparation for and presentation of the defense.

3. The qualifications and use of Michael Armstrong as case/mitigation investigator

I asked Michael (Mic) Armstrong to act as an investigator related to both phases of the case, and to help with duties often assigned to a person commonly referred to as a "mitigation specialist". I chose Mr. Armstrong for this dual role because of his extensive experience and training. During the years I was employed as a supervising Missouri Public Defender, Mr. Armstrong was my lead investigator. In the four capital cases I tried during that time, Mr. Armstrong had performed very successfully for me in the dual role of fact and mitigation investigator. Mr. Armstrong had also, during this time, availed himself of training opportunities which subsequently served him well in discharging both of these dual roles. Mr. Armstrong left the Public Defender System some time after I did, and then entered private investigation practice. In 2000, I was asked to handle the Federal Capital case of *United States v. Carl Haskell*, 00-395. In that case, I rekindled my professional relationship with Mr. Armstrong, again enlisting his services, this time in his private

8

investigator capacity. In that case, as in the previous state cases, Mr. Armstrong distinguished himself in both aspects of his dual investigator role, developing significant evidence for both phases of trial. Because of Mr. Armstrong's success in these five previous cases in the dual investigator role, I believed that he could successfully handle this dual role in the *Purkey* case. Prior to my asking for Mr. Armstrong's appointment, I discussed this dual role with Mr. Armstrong, and he agreed to take on the duties.

In the *Purkey* case, Mr. Armstrong performed every investigative task assigned to him, and found and interviewed every witness, for both phases of trial, whom he was asked to find. I also assigned Mr. Armstrong the lead in handling Mr. Purkey's rather bizarre immediate family. In this capacity, Mr. Armstrong is the one to be credited for getting Jeanette Purkey, Mr. Purkey's wife, to finally admit, after years of denial, that she had been poisoning Purkey in 1998 (Tr. 2237-2243). Mr. Armstrong's ability to accomplish this rather amazing feat owed to the relationship which Mr. Armstrong developed with the family over the many months prior to trial. Noteworthy as well is Mr. Armstrong's willingness to discharge every task assigned to him, no matter how unusual or difficult. For instance, even before Jeanette's admissions, Mr. Purkey strongly believed that his wife had a role, not only in poisoning him, but also in poisoning his dog. Mr. Purkey fervently believed that, if

9

the body of the dog could be exhumed, it could be tested for the poison used to kill it, and thereby provide a lead regarding what poison might have been used on him. Mr. Armstrong fully investigated the matter to Mr. Purkey's satisfaction. For this and many other reasons, Mr. Armstrong earned Mr. Purkey's trust, and the two developed a strong relationship. Because Mr. Purkey is an intelligent man, but also suffers from mental illness, he can be a difficult person with whom to deal. The trusting relationship which Mr. Armstrong developed with Mr. Purkey, and the rapport that he had with Mr. Purkey as a result of that trust, well served our other defense efforts on Mr. Purkey's behalf.

### 4. The development and presentation of mental health evidence

Mr. Purkey had been prosecuted in Wyandotte County, Kansas State Court for the murder of Ruth Bales. That killing also occurred in 1998, a little more than a half a year after the killing which gave rise to the charges in this case. In the Bales case, the attorneys who had defended Mr. Purkey had employed Dr. Stephen Peterson, M.D., and Dr. Peterson had already conducted an extensive evaluation of Mr. Purkey even before Federal charges were brought. When I was appointed to this case, I obtained the Bales case file, and found Dr. Peterson's report. I was already well-familiar with Dr. Peterson's strong clinical and forensic credentials, and with the very good work he had done in other cases. I was also impressed with the thoroughness of

Case 4:06-cv-08001-FJG    Document 73-1    Filed 05/20/08    Page 10 of 117

Dr. Peterson's report for the Bales case. Thus, I consulted with Dr. Peterson, and when he agreed to act as forensic psychiatrist in this case, I sought and obtained an Order appointing him in that capacity.

Early on, I learned that, in conducting his evaluation of Mr. Purkey in the Bales case, Dr. Peterson had not had all that he needed to thoroughly assess Mr. Purkey's condition. First, Dr. Peterson had not received all of Mr. Purkey's voluminous medical and incarceration records, and had received virtually none of the records pertaining to Mr. Purkey's family. Second, Dr. Peterson had not taken into account the substantial likelihood that Mr. Purkey had been poisoned by his wife. That was because, though Mr. Purkey had repeatedly told Dr. Peterson and his State Court Counsel about his beliefs that he had been poisoned by his wife, Dr. Peterson could not and did not take those allegations into account in his Bales case report since there was no other information available at that time to confirm Mr. Purkey's accusations. Finally, though there was ample record evidence that Mr. Purkey had suffered severe head injuries in episodes which occurred prior to 1998, there had not been, to that point, any neuropsychological or brain imaging testing conducted, and thus that information had never been provided to Dr. Peterson.

Case 4:06-cv-08001-FJG    Document 73-1    Filed 05/20/08    Page 11 of 117

To address the records deficiencies, I took the steps to obtain and provide for Dr. Peterson all of the records. On the poisoning issue, I developed and presented to Dr. Peterson the confirmatory information about the matter.

I also enlisted the services of Dr. Bruce Leeson, Ph.D. to conduct neuropsych testing, and I had PET imaging done at KU Med Center by Dr. David Preston, M.D. Both Dr. Leeson and Dr. Preston opined that testing results demonstrated brain injuries suffered by Mr. Purkey. Neither Dr. Leeson nor Dr. Preston, from his results alone, could opine that Mr. Purkey suffered from a mental illness which constituted a first phase defense to the charge against Mr. Purkey. I provided the Preston and Leeson reports to Dr. Peterson for his consideration.

Dr. Peterson, for his part, ultimately concluded that, at the time of the offense charged in this case, Mr. Purkey suffered from mental diseases and defects. Dr. Peterson further concluded that, while Mr. Purkey's condition did not prevent him from appreciating the nature and quality or wrongfulness of his conduct, that condition did impact upon his ability to premeditate or deliberate.

Because of the limited findings of the experts, the government urged, and this Court ruled, that those findings were not relevant to the issues presented in the first

phase of trial, but could be presented in the penalty phase. Thus, all of this evidence was presented during the penalty phase.[1]

5. The use of Dr. Mark Cunningham to present a summary of all mitigation themes

Early on in the case, I determined that, though we would likely be presenting expert testimony about Mr. Purkey's mental condition, we also needed expert testimony for two additional purposes. We needed an expert to counter the government's aggravating factor claims of future dangerousness. We also needed an expert to effectively categorize and summarize all aspects of the negative milieu which was Mr. Purkey's life. I believed that the best choice for the doing of this work was Dr. Mark Cunningham, Ph.D., and I enlisted Dr. Cunningham's services. Dr. Cunningham is one the foremost experts in the field of assessment of future dangerousness in an incarceration setting, having published extensively on the subject. I myself had used Dr. Cunningham as a sentencing specialist in a previous capital case. I was also familiar with Dr. Cunningham's strong ability to identify and describe for a jury mitigating matters related to the psychology, character and upbringing of the

---

[1] Until the government filed its motion, I held open with Dr. Peterson the possibility that he might be called at the first phase of trial. After the Court's ruling, I notified Dr. Peterson that he would only be used at the penalty phase. We did still argue at time of trial and upon appeal that Dr. Preston's results could be used to support our defense theories regarding Mr. Purkey's problematic thinking patterns. However, both this Court and the Eighth Circuit found that Dr. Preston's general findings were insufficient to be put to this more specific purpose.

13

client. I believed that, in the Purkey case, Dr. Cunningham could well discharge those duties too.

From the early stages of the case, Dr. Cunningham helped develop mitigation themes. I assisted Dr. Cunningham by obtaining records and expert reports for him, and by securing sufficient resources for him to do his work. Dr. Cunningham then developed his presentation, which was made during penalty phase.

### *Issue regarding failure to object to "Club Fed" evidence and argument*

It is urged that I was ineffective for failing to object to "Club Fed" references at the times they were made by the government in opening statement, witness examination, and closing argument (Doc. 47, p. 6). It is further urged that, having failed to make these objections at time of trial, I was also ineffective for failing to raise the matters, as instances of plain error, on direct appeal (Doc. 47, p. 7). It is argued that these references to "Club Fed" prejudiced Mr. Purkey by leading the jury to choose the death penalty for Purkey, and reject the supposedly leisurely life sentence which "Club Fed" would imply (Doc. 47, p. 5). It is also argued that, in making these references, the government was implying, contrary to the facts, that Purkey himself used the term (Doc. 47, p. 5). Though not particularly stated in those terms, the question raised seems to be whether this Court would have been required, under F.R.E. 403, to sustain an objection that the

14

probative value of use of the "Club Fed" terminology was outweighed by its improper prejudice.

I did not raise the suggested objections, and I did not raise the matter on appeal, because I did not believe objections would have been well-taken. The seminal testimony about the matter came from Detective Howard, and was as follows:

Q   Did you talk about the difference between federal and state penitentiaries?

A   Yes, we did.

Q   And how did that go?

A   Well, when he was persistent about going to a federal agency with this information, I asked him, "So you really want to go to Club Fed," and we talked about that for a minute, about how the federal penitentiary would be more comfortable surroundings for him, how he wouldn't have any enemies there, how the environment is a lot better to live out your life there. (Tr. 423-424)

In light of this, there was no question but that the term "Club Fed" had been used by Detective Howard in his discussion with Purkey as shorthand to describe what Mr. Purkey was seeking through his offer of his statements, that is a Federal prosecution and Federal sentence. It is also clear from the Howard testimony that, while the term "Club Fed" was not used by Mr. Purkey, but by Howard, use of the shorthand term by Howard allowed him and Purkey to understand one another

regarding the nature of Purkey's request. It was my judgment that, in light of these facts, this Court would not have sustained an objection to the "Club Fed" term, and such a ruling would have been readily upheld on appeal as within the Court's discretion.

What is more, it seemed to me then, and still seems to me now, that use of the shorthand "Club Fed" was no better or worse than use of the concept that term was being used to describe, that a Federal prison sentence was considered by Purkey to be more desirable than a State institution sentence because it would be, in the words used by Detective Howard, "more comfortable surroundings for him" where "the environment is a lot better to live out your life". Thus, even if the buzz words "Club Fed" were removed, to the extent that Mr. Purkey's desires for a Federal sentence would have still become a part of the record, the jury would have still been potentially led to the very same sorts of dangerous misconceptions about the favorable conditions of confinement in a Federal penitentiary.

Our problem was that all of this was a double-edged sword. While there might have been a danger that the jury would improperly use all of this in deciding a sentence for Purkey, there was a better chance that the whole discussion would help the jury better understand the thrust of the first phase defense, that Purkey was strongly motivated by better conditions in Federal prison to falsely accuse himself

Case 4:06-cv-08001-FJG   Document 73-1   Filed 05/20/08   Page 16 of 117

of kidnapping in order to obtain a Federal, rather than a state, prosecution. In light of our defense, it was up to us to show the strength of Mr. Purkey's motivation in this regard. That was the defense edge of the federal sentence sword. Thus, even if the government had totally avoided mention of the matter, it would have been necessary for us to bring it up to support our defense. The evidence allowed me to argue the case for Mr. Purkey as I did (Tr. 1105).

The argument made about the term "Club Fed" also presupposes that use of the term would create juror misconceptions, which did not already exist, about conditions of life imprisonment confinement. From my prior experience in capital cases, and from my reading about studies of capital case juries, I was aware that jurors often have misconceptions regarding the supposedly soft conditions of life imprisonment confinement. Thus, even before mention of the term "Club Fed", it had been my intention that, should we reach a penalty phase, we would address any misconceptions by eliciting expert testimony about the actual conditions of Federal penitentiary confinement. This we actually did through the testimony of Dr. Cunningham and Mark Russell, Correctional Counselor at USP-Leavenworth (Tr. 1653-54, 1882-1904). I also addressed the "Club Fed" term directly in my argument (Tr. 1107).

As for the argument that the government attempted to ascribe the "Club Fed"

words to Purkey, the only time that I believed this occurred was during the testimony of Agent Tarpley. When that happened, I confronted Tarpley with the facts, that he had heard the testimony of Howard, and that Howard had testified that Howard had been the one to use the term (Tr. 601-602). Other than that one instance, I did not believe at the time, and still do not believe now, that the plain English sense of the references can be read to attribute the use of the "Club Fed" words to Purkey. Rather, the term was used by the government as shorthand for what Purkey was requesting, in the same way that it was used, in the first instance, by Howard.

There are two cases cited in supposed support for the arguments made. However, those cases are easily distinguishable upon their facts. In *Wynters v. Poole*, 464 F.Supp.2d 167, 180 (W.D.N.Y. 2006), counsel was found ineffective for failure to object to a "trifecta" of improper references by the prosecution to the defendant's invocation of his right to silence, invocation of his right to counsel and refusal to take a polygraph exam, along with the prosecutors claim that each of these facts could be used by the jury to infer the defendant's guilt. In *Girtz v. Yanal*, 501 F.3d 743, 757 (6th Cir. 2007) the failure of defense counsel to object involved three direct and certain argument references to the defendant's failure to testify. These cases are easily distinguishable from this case since the failure to

18

object here did not involve an obviously objectionable matter, such as a direct and certain reference to failure to testify.

### *Issue regarding opening statement references to testimony of Jennifer Long's family and friends*

It is alleged that, during my first phase opening statement, I made the claim "that [Jennifer] Long's family and friends would even testify that there was no kidnapping" (Doc. 47, p. 7, Doc. 52, p. 7). Citing to the affidavit of Laura O'Sullivan, it is further alleged that I had no good faith basis for making the opening statement representations which I made (Doc. 47, p. 7, doc. 52, p. 7). It is ultimately alleged that I was ineffective because the promises I made in opening statement supposedly went unfulfilled, and because Mr. Purkey was supposedly prejudiced thereby (Doc. 47, p. 8).

The critical flaw in this challenge is that it misrepresents what I said to the jury in opening statement. The portion of my opening statement to which reference is made is set forth in bold below, placed in context of the other, relevant portions of the opening:

> At that meeting in December, on December 16th of 1998, Wes explained what he wanted. He wanted a life imprisonment sentence without parole in a federal institution and he would tell them all they needed to know about what happened to a Missouri woman who he had killed, Jennifer Long. Wes expressed that idea of an agreement to the detective and to the agent. They then left him and went to a federal prosecutor and proposed that to the federal prosecutor. The federal prosecutor said go back and get more

information. They did. They told Wes we have to have more information. What Wes was led to believe at that point was that if he gave that more information, he would be put in prison for the rest of his life in a federal institution. Not let go. Put into a federal prison for the rest of his life.

With that understanding in his mind, over the next several days Wes gave the agents all the information that they needed to be able to put together the case that you will hear in this room. Every bit of it. He told them about all of the details of what happened to Jennifer Long. He told them about all of the things that happened and where they could find what evidence that they will come forward with to you here. Every bit of that information authorities found because of the information that Wes Purkey gave them.

But Wes Purkey also indicated to them something that was untrue. All of that was true. He said something that was untrue. The untruth was the part to make it a federal crime, that he kidnapped her. He had not.

***What you will hear in the evidence from witnesses who are friends of Jennifer Long, from family members, and from the information that Wes Purkey gave to the police, is that there was no kidnapping.***

What you will also hear in the evidence will show you about a man whose thinking is not tracking correctly in so, so many ways, Wes Purkey's. You will hear evidence about brain injuries that Wes Purkey has suffered....

After you hear all of the evidence about Wes Purkey, about what he told to the police, about what happened on that day, you will know that if it wasn't Wes Purkey, what happened to Jennifer Long would never have come out and would never have been discovered by anyone. Because of the information that he brought forward, we now know what happened to Jennifer. We now know that Jennifer Long is dead and we now know all of these details.

We also know exactly that Wes Purkey did not, and you will hear the evidence, did not kidnap Jennifer Long. And you will hear from the evidence that Wes Purkey gave the information that he did, and particularly gave the information claiming that there was a kidnapping only to be able to come to the federal court to be prosecuted here.

With all of that information, after you have heard it all, all of this information, I will come back to you and ask you to consider all of this and I'll ask you to find Wes Purkey not guilty of the charges that are brought against him here in federal court of kidnapping.

Thank you. (Tr. 412-413, 415-416)

20

As the plain wording above demonstrates, never in my opening did I say "that [Jennifer] Long's family and friends would even testify that there was no kidnapping". Rather, the themes of our opening were the important themes of the defense: that Wes Purkey had truthfully accounted what happened to Jennifer Long's remains, that but for Wes Purkey's truthful accounts in those regards, no one would have ever known what happened to Jennifer, that Wes Purkey had fabricated the story about kidnapping to make the case a Federal case and thereby attain his desired Federal sentence of life, and that the evidence in the case, taken as a whole, demonstrated that no kidnapping had occurred, Wes' false representation in that regard notwithstanding.

For the most part, the trial testimony of Jennifer Long's parents, friends, and school officials was consistent with what they told us during our interviews, and supported our opening statement theme that there was no kidnapping. Their testimony demonstrated that Jennifer was using drugs and alcohol, was skipping school regularly, and was unaccounted for, wandering the streets, for considerable times on numerous days during school hours (Tr. 715-16, 849, 853, 856, 869-71, 876, 889-891). There were also particular facts which provided significant support for our line of argument. For instance, Wes had accurate knowledge about the very kind of alcoholic drink that Jennifer preferred, gin and orange juice, which was confirmed by Jennifer's friend, Brooke Doolittle (Tr. 890, 928-929). Also, Brooke

21

confirmed that Jennifer not only was accustomed to using drugs, but also was accustomed to using drugs with people much older than her, particularly Jennifer's mother and father (Tr. 891). All of these facts painted the picture of Jennifer as a young woman who, as described in Wes Purkey's testimony, went willingly with Wes at the outset of their encounter in order to party by drinking and using drugs. Brooke did testify about one thing which she had not shared in pretrial interviews with Mr. Armstrong and Ms. O'Sullivan, an opinion that Jennifer would not get into a car with a stranger (Tr. 892). Even had we known, prior to trial, that Brooke would venture such untoward information, we would have likely still used her because of the critical other information which she provided. Also, such a self-serving observation seemed to go contrary to other evidence about Jennifer's activities. Moreover, this Court sustained objection to Brooke's opinion testimony, and instructed the jury to disregard it, and thus the impact of that was decreased (Tr. 892).

In its opening argument, the government made a point against me similar to the one now made in Mr. Purkey's petition (Tr. 1097). That argument by the government served as a springboard for the detailed closing argument explanation which I made regarding the evidentiary support for the notion that there was no kidnapping. That portion of my argument was as follows:

22

Wes Purkey came forward with the idea of the kidnapping and he persisted with the idea of the kidnapping even in Exhibit 8, his own handwritten confession. Why? Because he wanted to go to a federal institution. Club Fed, baloney. A penitentiary. There's no club there. Is it away from problems that he has in the Kansas institutions? You bet. Is he afraid concerning the Kansas institutions? Yes. Is he punished in a federal institution for life without parole, what he asked for? You bet. That's what he asked for. That's what he wanted. That's why he said it was a kidnapping. It's not true. And you know it. You know from the evidence it's not true.

Jennifer Long on January 22nd, 1998, was a young lady who was 16 and was out of school. She was out of school for one of many, many times while she was at East High School. The folks down at East High School who were in the office came in here and testified for you that she was not attending school regularly, and the records and her grades showed it. Her mother told you that she was not going home when she was skipping school. Mom was dropping her off. And we know what she was doing. She was going out the back door. She wouldn't have been walking home because it was too far to go. It was a lousy area to have to walk through, an industrial area, down 435 and up a hill to try to get into Independence, some three and a half miles away.

And mom would have known she was walking home when she was skipping school because the neighbors would have told her that, and the neighbors didn't tell her that. Jennifer Long is skipping school, and in the area. You know that. And that doesn't say that she was wrong for doing that. That doesn't say she's a bad person for doing it. It's a fact.

And what you know is that when she would go to lunch at school, that maybe she went to a convenience store that used to be here at the corner of Truman Road and Hardesty to pick up a Dr. Pepper. That's what her mom said. But there were other places along Truman Road and particularly there was the Robert's Market where Wes Purkey saw her.

Now, isn't it interesting that Wes Purkey knows critical facts about Jennifer Long that wouldn't have come when you're holding a knife on a person, but would have come up in casual conversations, like whether or not Jennifer Long likes to drink and what it is that she would drink if you got it for her. Gin and orange juice, that Wes Purkey told the officers from day one that she liked and that he bought for her and that she drank. Is that true? Yeah. How do you know? Brooke Doolittle, her friend, said she likes gin

23

and orange juice. No question but that Wes Purkey knows that.

He knows that Jennifer is having trouble at school and getting into fights with some of the girls there. Is that true? Yeah. How do you know that? Because mom indicated to you that that's true.

What you also know is that Wes Purkey did smoke crack cocaine with Jennifer Long. How do you know that? Well, you know that because Jennifer Long smoked drugs. She smoked dope at the time, smoked marijuana. She did. How do you know that? Again, Brooke Doolittle was honest enough to come in here and tell you that she did.

You also know that Jennifer Long's drug problem and drug use was going on a lot more than the casual stuff that was trying to be portrayed to you in some of the testimony. You know that she was using it frequently enough to use it not only with her friends but with her mom and her dad. Jennifer Long's world was that drug use was okay. Smoking dope was okay. And smoking dope with people who are in their 40s is okay, because she did it, and she it. And that is not trying to indict her. That's a fact.

And so when the government says she would never get into a truck with a pretty nice-looking man in his 40s and smoke drugs, that's just flat wrong. And you know why. She was used to smoking drugs with older people, older than her, and she was out with nothing to do for one of many days during her time at East High School.

You have every reason in the world to think that she got into that truck voluntarily, talked with Wes, and gave him all of that information that she gave him about herself, drank, smoked, and went over into Kansas to Wes's house because she frankly didn't have anything better to do at 10 o'clock in the morning than that. She did not have to be home until late in the afternoon. The bus that would take her home would not get her there until the afternoon. She had plenty of time to kill in what would have been a lot better way of doing it than on a January day walking the streets over around Truman Road. And so you know good and well that she got into that truck of her own volition.

And you know that she rode in that truck over to Wes's home of her own volition without any difficulties, without any problems whatsoever. You have additional information that tells you that had there been any problems between them, Jennifer could have gotten out at a number of different times. The two stopped at a convenience store on Highway 7. She goes to the rest room. Could she have left then? Of course. She didn't. There are seven stoplights along Highway 7. Could she have gotten out

24

anywhere along there? Absolutely. She didn't.

When Wes stopped the truck at 608 North Main, the gate doesn't work very well. Tarpley told you that. He couldn't get it open when he tried to get into there, when he went there. And the dog is in the back yard, has to be put up first. Wes has to get out, put the dog up, come back. Could Jennifer have just gotten out of the truck and walked away? She could. She didn't.

All of those things didn't happen because Jennifer was not kidnapped. Jennifer was not taken across state lines without her permission, and Wes did not have any intention to forcibly rape her at that time. Did it happen in the basement, in Kansas, later? Yes. And that's where this case should be if it's going to be anywhere. But he did not kidnap her. And you know it. By the facts that are all there, independent of anything that Wes has told you. You know those verifications. (Tr. 1108-1112)

Therefore, contrary to the misrepresentations advanced by the government in its argument, and by current Counsel for Mr. Purkey in the Petition filed on his behalf, we made good on all of the promises which we actually made to the jury in opening statement.

In their pleading on Mr. Purkey's behalf, current Counsel for Mr. Purkey cite a host of cases in purported supported for their proposition that the supposed unfulfilled promises made by me were so egregious and prejudicial as to constitute ineffective assistance of counsel (Doc. 52, p. 7-8). The problems with the line of argument are two-fold. First, as noted above, there were no unfulfilled promises to the jury in the Purkey case. Second, as will be detailed below, the cases cited are easily distinguishable on their facts, involving as they do disastrous situations which occurred in those cases, situations which did not occur in the Purkey case.

25

In ***United States ex rel Hampton v. Leibach***, 347 F.3d 219, 260 (7th Cir.

2003), ***People v. Briones***, 816 N.E.2d 1120, 1124-25 (Ill.App. 2004), and ***Ouber v.***

***Guarino***, 293 F.3d 19, 27-30 (1st Cir. 2002), prejudicial ineffective assistance was

found due to the defense making an opening statement promise that the defendant

would testify, and then failing to present that testimony. Of course, in Purkey's

case, on the other hand, all of our promises were fulfilled, including the one to

present Purkey's own testimony.

In ***People v. Lewis***, 609 N.E.2d 673, 677 (Ill.App. 1992), ineffective

assistance was found due to the defense attorney's unfulfilled promise to present an

out-of-court statement of defendant, evidence which the defense attorney should

have known would be refused as inadmissible, self-serving hearsay. In the Purkey

case, no similar situation occurred.

***Anderson v. Butler***, 858 F.2d 16, 17-18 (1st Cir. 1988), defense counsel was

found prejudicially ineffective for promising to present mental health experts in

opening, but then later determining to not call those experts in light of negative

information which the experts would reveal; the problem was that the negative

information should have been known by the defense lawyer prior to trial, and

should have caused the lawyer to not mention the evidence in opening. Even at

that, this case was determined by two Circuit Judges over a vigorous dissent by

26

then Circuit Judge Steven Breyer. *Anderson v. Butler*, 19-21. In any event, there was no such misrepresentation made in Purkey's case about mental health evidence to be presented.

*State v. Moorman*, 358 S.E.2d 502, 510-511 (N.C. 1987) involved an ineffective assistance finding as a consequence of a defense opening statement representation, in a rape case, that evidence would be presented that defendant was physically and psychologically incapable of rape; in fact there was nothing from defendant or investigation which would have led counsel to reasonably believe that there would be evidence available to support either point. In Purkey, we made no such problematic representation.

*State v. Zimmerman*, 823 S.W.2d 220, 225-226 (Tenn.App. 1991) presents an ineffective assistance of counsel result owing to a conflict between defense lawyers during trial which resulted in one defense counsel making representations in opening that evidence of battered spouse syndrome would be presented via the defendant's own testimony and the testimony of a psychiatrist, and then the other defense counsel deciding to not present that evidence, but still arguing by referring in closing to facts "obviously intended to be, but never presented to the jury", with the attorney who had given opening statement not giving closing because he "couldn't face the jury". Fortunately, there was no such dramatic turn of events in

the Purkey case.

In *Montez v. State*, 824 S.W.2d 308, (Tex App. 1992), counsel was found ineffective due to faulty jury selection efforts, inadequate preparation, failure to conduct discovery, eliciting inadmissible and incriminating hearsay statements, making an opening statement in which he placed the burden of proof on the defense, and in making unspecified "extravagant promises" about evidence which was never shown to jury. Apparently, the case is cited in support of only the latter issue. The case is inapposite here since none of the accounted errors occurred here.

Finally, in *People v. Morgan*, 719 N.E.2d 681, 703-707 (Ill. 1999), the death sentence imposed at trial was reversed because of ineffectiveness of counsel in failing to develop and present mental health mitigating factor evidence. Since they make no reference to page number in their citation of this case, it is unclear to me why current Counsel for Mr. Purkey cite this case here, particularly since this case case was clearly not decided on alleged unfulfilled promises point made by counsel. It may have been their intention to cite this case, instead, in support of another of their issues raised later. If that is the case, then I note now, as I shall detail later, I believe that we presented all of the best mental health mitigation evidence available on Mr. Purkey's behalf.

What Counsel for Purkey have done is tease certain language from these

cases, ignoring the extreme facts in those cases which justified the language in those cases, and ignoring that the very different circumstances in this case would not allow application of that language to this case. The upshot of all of this is, despite the invective tone of the arguments advanced by Counsel for Purkey, there is no factual or legal support for the arguments themselves.

The arguments advanced by current Counsel for Purkey could be interpreted as a very valid point that it might have been better for the defense to avoid completely any argument that Jennifer was not kidnapped, thereby obviating the need for the defense to explain why Mr. Purkey told that untruth. However, it was my clear understanding that Mr. Purkey very much wanted the argument, that there was no kidnapping, to be made, and that Mr. Purkey would never have countenanced an approach to the defense which left out such an argument. Because of that, I developed the evidence and argument which I did, perceiving those to be the best way I could advance the argument.

### Issue regarding avenues of impeachment against government witness Michael Speakman

#### 1. Summary of the allegations

In the Petition, it is generally alleged that the defense team was ineffective in its preparation to confront and cross-examine government witness Michael Speakman (Doc. 47, p. 7). However, the lone specific complaint made about the

29

cross-examination concerns what is described as a failure to present available evidence to rebut a single contention by Speakman, that Purkey had supposedly boasted to Speakman about being in jail for killing people (Doc. 47, p. 7-9). In the Petition, it is alleged that there were six witnesses who should have been called to rebut the Speakman claim: CCA inmates Cornelius Peoples and Xavier Lightfoot, CCA personnel Lister, Perdue (misspelled Purdue in the pleadings) and Williams, and lay person Sam Hoffmeier (Doc. 47, p. 8). Affidavits and arguments are provided regarding what Peoples, Lister and Hoffmeier would have said if called to witness (Doc. 47, Attachment 25; Doc. 52, p. Attachments 1 and 2). No explanation is provided as to what Lightfoot, Perdue or Williams would have said.

<u>2. Preparation for Speakman cross was a team effort</u>

Before addressing the individual points, it would be well to first note what seems to be an underlying, but incorrect, assumption. That assumption seems to be that, since Laura O'Sullivan was the attorney who handled the Speakman cross-examination, she was the only one who prepared for that cross-examination. Preparation for the Speakman cross-examination was actually a team effort, involving Laura, Mic Armstrong and me. Thus, while Laura, in her affidavit made in support of the Petition, has acknowledged that she personally did not do all of the preparation work for the Speakman cross, that simply means that certain of

those items of work were done, not by her, but by Mic or me.

## 3. Cornelius Peoples issues

Preparation for possible use of Cornelius Peoples was done by me.  In light of information provided to me by Mr. Purkey, and in light of the fact that Peoples had been housed with Wes at CCA, we had contemplated the possibility of using Peoples to testify regarding this and other issues about which he had knowledge. In his affidavit, Mr. Peoples correctly indicates that I did not speak with him directly about his possible testimony.  That was because, at the time, Mr. Peoples was represented by counsel on his own capital case, *United States v. Peoples*, WDMO Case Number 00-395-03-CR-W-FJG.  On May 22, 2003, I contacted Peoples' attorney, Bill Odle, to determine whether Peoples would be willing to talk to me and to testify for us.  Mr. Odle told me that Peoples was not going to talk to me, and was not going to testify.  The reasoning was two-fold.  First, Mr. Peoples was facing retrial in his own capital case, *United States v. Peoples*, Case Number 00-395.  According to what Mr. Odle told me, he recommended to Mr. Peoples, and Mr. Peoples agreed, that should Peoples be called to witness on behalf of the defense in any case, he would invoke his Fifth Amendment privilege in order to protect himself from any cross-examination which could arguably be used to assist in his own prosecution.  Second, Mr. Odle was attempting to work out a plea

agreement for Peoples in his own case. As a consequence, Odle was strongly recommending to Peoples, and Mr. Peoples was agreeing with the notion, that Peoples not involve himself in the defenses of others, lest such entanglements jeopardize his lawyer's ongoing negotiations with the prosecution. On the basis of these representations by Mr. Odle, I did not take steps to secure the presence of Peoples for trial. To the extent that Mr. Peoples' 2007 affidavit amounts to a claim that he would have assisted with the Purkey defense at the time of our trial, that representation is contrary to what Peoples was saying, as relayed by his attorney, at the time the Purkey case was pending.

Even if Peoples had been willing to cooperate, though I would have consulted with Mr. Purkey on the issue, I would have had substantial questions over whether to use Peoples at trial for any purpose about which I was aware, including those mentioned in People's 2007 affidavit. Mr. Peoples would have brought substantial baggage as a witness, starting with his own capital case charge, for which he had already been once convicted. In addition, Peoples had a serious prior conviction, an aggravated battery from Wyandotte County in 1991 for which he had served eight years of a 10-30 year sentence. Besides all of this, I was also very familiar with other bad acts information pertaining to Peoples. In sum, Peoples had the reputation as a cold-blooded killer, willing to do or say anything. I

32

was familiar with this information because I had represented one of Peoples' codefendants, Carl Haskell, and had received considerable information about Peoples in the discovery and in our investigation in that case. I was concerned that, under the right circumstances, some of that negative information might also come out on cross, further damaging whatever credibility Peoples might be deemed to have.

There were also practical problems with using Peoples to indict Speakman in the way suggested in the Petition. Peoples would have to admit that he was not present in the cell with Purkey and Speakman when the conversations between those two allegedly occurred. Thus, while Peoples might have been allowed to say what he personally heard and did not hear Purkey say, he was in no position to say, one way or the other, what was said between Speakman and Purkey. What is more, Peoples was himself in negotiations to become an informer. As it turned out, Peoples actually became an informer against his codefendant, Xavier Lightfoot, and received a substantial reduction in sentence as a result. See WDMO Case # 00-395, Doc. 658, 660, 800. Peoples then went on to inform in another case, *United States v. Hargrove*, District of Kansas case number 03-20192-CM, and received an additional reduction of sentence for that cooperation. See WDMO case number 00-395-03-CR-W-FJG, Doc. 812, 813, 814. It is worth noting that, in

33

the *Hargrove* case, Peoples played a role similar to that played by Speakman in the Purkey case. That is, Peoples claimed, over Hargrove's denials, that Hargrove had supposedly confessed his guilt during a private conversation in a CCA cell between Hargrove and Peoples. Peoples also informed on another coconspirator in his own case, one Anthony Hunter, concerning another double murder. That case never developed because Hunter, who also cooperated in the *Lightfoot* case, countered Peoples' accusation with the claim that Peoples was actually the murderer in that case. Ultimately, Peoples had to admit that he participated in the double murder at least to the point of helping to hide bodies.

I feared that, in light of Peoples' own efforts to become an informer, even genuine efforts by him to help in Purkey's case could have been turned around by any adroit prosecutor. At the very least, any testimony by Peoples critical of Speakman would likely have, at best, been cast by prosecutors as the pot calling the kettle black. I figured it likely that Peoples would also have to concede that, in light of his own experience as an informer, he knows there are instances in which defendants who persistently deny guilt sometimes slip and confess to cellmates.

Thus, to put things succinctly, Peoples was a marginal witness who refused to cooperate with us. Thus, I did not attempt to call him as a witness.

4. Xavier Lightfoot issues

As mentioned above, though Xavier Lightfoot's name is mentioned in the Petition, no explanation about Lightfoot's alleged knowledge is given, Lightfoot's name is not mentioned in the suggestions, and no affidavit from Lightfoot is provided.

Current counsel for Mr. Purkey may not be familiar enough with the record to know that, in late 2002, we actually did secure the testimony of Lightfoot on Purkey's behalf during pretrial proceedings. While I found that testimony very helpful in that context, the cross-examination of Lightfoot confirmed two things. First, it made clear to Lightfoot's counsel just how vulnerable he was when subjected to cross even on issues strictly related to Purkey's case, leading Lightfoot's counsel to strongly advise him not to repeat such efforts for Purkey. Second, it made clear for me just how strong were the avenues of impeachment against Lightfoot, and how bad all of that would sound in front of a jury. I do not recall ever hearing from Wes or Lightfoot about an ability on the part of Lightfoot to testify about Speakman. However, even if it could be said that Lightfoot would have had such information, my understanding from talking to Lightfoot's attorney after Lightfoot's pretrial hearing testimony for us was that Lightfoot would invoke his privilege if called again. And, even if Lightfoot would have been willing to testify, it was my opinion that, because Lightfoot's frailties for this purpose were

35

even more pronounced than those suffered by Peoples, it was an even worse idea to use Lightfoot for this purpose.

5. CCA witness issues

In order to explain why I did not use CCA witnesses for the purpose of rebutting the Speakman testimony, or for any other purpose for that matter, it is necessary for me to digress regarding the matter of Wes' various battles with CCA. Throughout the pendency of the case, Wes' relations with CCA were abysmal. Almost daily, Wes was at odds with one or another corrections officer. Wes filed several reams of paper worth of grievances over his conditions of confinement at CCA. I filed several motions with this Court on Wes' behalf complaining over conditions of confinement. CCA guards threw away Wes' case materials, and that formed the basis for one of our substantive motions in the case. Things got so bad between Wes and CCA that I assisted him with filing of a *Bivens* action. See District of Kansas Case Number 03-3157-CM. Ultimately, Wes was removed from CCA, prior to trial, after an incident in which Wes was accused of assault on a guard, though it was Wes who was seriously injured while cuffed, hands and feet.

In order to deal with this array of problems, as well as to prepare with respect to both phases of the case, I was regularly talking with all sorts of CCA corrections officers and supervisors. That included Melvin Lister, one of the

names mentioned in the Petition. I also had Mic locate and interview Sue Perdue, a nurse who left the employ of CCA just prior to time of trial. I do not specifically recall speaking with a Mary Williams. As noted already above, Ms. Williams' name is mentioned in the Petition, but no description is given therein regarding her base of knowledge, no mention of her is made in subsequent suggestions, and no affidavit from her is provided.

Because I had widely spoken with CCA supervisors and staff, I knew that Mr. Lister was one of less than a handful of CCA workers who were willing to speak positively about Mr. Purkey. There were many, many others, including Ms. Perdue, who would relate strongly negative information about Purkey with little or no prompting.

I took the position, throughout the trial, that I was not going to open up the pandora's box of the problems at CCA if the government did not. I avoided this because I believed that, in a pitched battle, though we could certainly score some points in light of the cavalier way in which Purkey was treated at CCA, we would undoubtedly, on balance, end up on the losing end, particularly in light of an array of negative behaviors attributed to Purkey and the highly negative opinions of Purkey held by the bulk of the CCA personnel. Before, during and after trial, Wes accused me of having made a formal agreement with the government to avoid CCA

Case 4:06-cv-08001-FJG    Document 73-1    Filed 05/20/08    Page 37 of 117

issues at trial. Actually, what developed was not an agreement, but rather a stalemate. Government counsel also avoided introducing CCA matters in the first instance, seeing downsides to their side of the case. However, government counsel also made clear to me that, should I choose to make any CCA points, they were ready to present their counterpoint witnesses. The result was that, by and large, the significant bulk of the problems at CCA were never mentioned at trial.

I have no doubt that, had he been given the opportunity, Mr. Lister would have testified in much the fashion which was set forth in his affidavit. However, I knew for certain that the government could easily find many other corrections officers who would have been more than willing to come forward to confirm at least the tone, if not the precise language, about alleged rantings by Purkey, as described by Speakman. Especially since Mr. Lister, even if believed, could only account for Mr. Purkey's behavior for the forty hours per week during which he worked, I did not think that impeaching Speakman's account for that limited time was worth the likely counterpoint from other CCA workers, confirming Speakman's account for the remaining time. Thus, I believed at the time, and still believe now, that the smart move was to avoid using CCA workers to confirm either side, and instead let Speakman's and Purkey's accounts stand on their own.

6. Sam Hoffmeier

38

I had several opportunities to interact with Sam Hoffmeier. Mr. Hoffmeier was a kind individual who had befriended and regularly visited Mr. Purkey. I knew that Mr. Hoffmeier's interactions with Mr. Purkey had all been positive, and I have no doubt that he would have testified as described in his affidavit had he been asked to do so. I did not call upon Mr. Hoffmeier for this purpose for two reasons. First, I did not believe that the information was very helpful, since it would be easy for the government to argue that none of Mr. Hoffmeier's dealings with Mr. Purkey were in the context as described by Speakman, that is Hoffmeier did not deal with Purkey in the segregation pod, and could not have been privy to Purkey's interactions in the pod with staff and inmates. Second, and more importantly, I believed that bringing up this testimony from Hoffmeier to counter Speakman would prompt the government to go to CCA corrections officers to find support for Speakman. Since I was loathe to create this result through resort to the relatively the more germane testimony of Mr. Lister, I most certainly did not want to create this result through the rather feeble testimony which could be offered by Mr. Hoffmeier.

### 7. The cited cases are readily distinguishable on their facts

On this issue, as they have on other issues, current Counsel for Mr. Purkey cite to a host of cases, urging that those cases, and certain salient language from

those cases, supposedly support their arguments about this Speakman impeachment issue. Unfortunately, when one troubles to look carefully at those cases, one instantly finds that all of the cases are readily distinguishable upon their very different, much more egregious, fact patterns.

In *Cargle v. Mullin*, 317 F.3d 1196, 1212-1213 (10th Cir. 2003), counsel was found ineffective for failure to locate, interview and present witnesses who would have testified that government informers, who testified at trial that the defendant had confessed to them, made contrary statements to others, that the defendant, instead, had made only exculpatory statements. There was no comparable failure to investigate here.

In *Roberts v. State*, 602 S.E.2d 768, 771 (S.C. 2004), counsel was found ineffective for failure to discover and present evidence regarding the impossibility of an informer's account of defendant's supposed admissions; while the witness claimed at trial that he was able to have a private, in-prison conversation with the defendant because of the proximity of their cells, the distance between the cells was actually closer to 100 feet, necessitating any such conversation to have been conducted with shouts, with other inmates and guards necessarily overhearing the conversation; other inmates and guards were willing to swear that they never overheard any such conversation. There was no comparable failure to investigate

40

here.

In *White v. Roper*, 416 F.3d 728, 731-732 (8th Cir. 2005), counsel was found ineffective for failure to interview, prepare and present readily available witnesses to support misidentification defense. There was no comparable failure here.

In *Marshall v. Cathel*, 428 F.3d 452, 471 (3rd Cir. 2005), counsel was found ineffective for failure to interview, prepare and present testimony of defendant's children during penalty phase of trial. There was no comparable failure here.

In *Soffar v. Dretke*, 368 F.3d 441, 474-475 (5th Cir. 2004), a case in which the defendant had confessed and then recanted the confession, counsel was found ineffective for failure to interview the victim and bring out through the victim's testimony factual inconsistencies between the retracted confession and the victim's account of the crime. There was no comparable failure here.

In *Anderson v. Johnson*, 338 F.3d 382, 393 (5th Cir. 2003), counsel was found ineffective for failing to conduct any independent investigation whatsoever. There was no comparable failure here.

In *Towns v. Smith*, 395 F.3d 251, 253-254 (6th Cir. 2005), wherein the prosecutor's case was based solely upon eyewitness identification, counsel was found ineffective for failure to interview and present as a witness the person from whom police had obtained murder weapon, who would have exonerated defendant,

41

and would have instead implicated defendant's brothers who physically resembled him (thereby accounting for the misidentification of defendant by the eyewitness). There was no comparable failure here.

In *Hamblin v. Mitchell*, 354 F.3d 482, 490-491 (6th Cir. 2003), counsel was found ineffective due to failure to conduct any mitigation investigation, failure to obtain background records pertaining to the defendant, and interview of only one of 22 available family members. There were no comparable failures in this case.

In *Holsomback v. White*, 133 F.3d 1382, 1387 (11th Cir. 1998), counsel was found ineffective for failure to interview and call a doctor who would testify, in a case in which repeated sodomy against the victim was alleged, that the victim showed no physical signs of having been sodomized. There was no comparable failure here.

In *Ross v. State*, 954 So.2d 968, 1006 (Miss. 2007), counsel was found ineffective due to failure to develop and present readily available evidence regarding the defendant's history of mental health problems, including visual and auditory hallucinations, the defendant's history of being a physical and sexual abuse victim, and the defendant's history of having suffered other catastrophic personal tragedies. There was no comparable failure here.

In *Johns v. State*, 926 So.2d 188, 196 (Miss 2006), counsel was found

42

ineffective for failure to interview, prepare and present alibi witnesses identified by defendant and his family. There was no comparable failure here.

### *Issue regarding failure to hire "mitigation specialist"*

<u>1. For a host of reasons, rather than hiring a forensic social worker, I used other members of the defense team to develop and present our mitigation case</u>

Mr. Purkey's current Counsel correctly note in their pleadings on his behalf that I did not enlist the services of a forensic social worker, often referred to as a "mitigation specialist", to assist in our presentation of the case even though I had originally budgeted for the hiring of such a person (Doc. 47, p. 10-16). I have already described, above, the defense team which I actually assembled, and how the members of that team acted, in their various capacities, as mitigation specialists. There were a host of case-related reasons why I believed that the hiring of a forensic social worker was needless under the circumstances.

In my experience, a forensic social worker, specially trained in capital case work, is oftentimes employed to assist with development of the case. The roles often played by such a forensic social worker are

- the development of rapport with the client, family members and other potential mitigation witnesses as an adjunct for consequent development of mitigation evidence for trial,
- the accumulation and summarization of medical, psychological/psychiatric,

43

Case 4:06-cv-08001-FJG    Document 73-1    Filed 05/20/08    Page 43 of 117

schooling, work, incarceration and other records pertaining to the client and his family,

- the conceptualizing and crystallization of themes of mitigation defense, including the summarization of those themes in report form,

- the identification, interview and preparation of mitigation witnesses,

- the presentation of testimony, in hearsay fashion, about the information gathered by him/her and others from other persons and sources (such a presentation is regularly allowed because of the relaxed rules of admissibility which attend in the penalty phase of a capital case trial).

A forensic social worker is a particularly important part of a capital defense team in a case in which the lawyers, while fine practitioners in the normal criminal case, have no previous capital case experience, and thus no experience in development of capital case mitigation themes. However, the experienced capital case litigator, by training and experience, can and should be expected to develop case themes himself/herself. In fact, the Court pays appointed counsel a higher rate in a Federal capital case in deference to his/her training and experience in dealing with capital cases. I felt my prior capital case experience prepared me for the development of mitigation themes, and I relied on that experience to develop the themes in this case.

44

Also, in a case in which there are potential mental health issues, and the defense attorneys have no training and experience in the field, a forensic social worker could provide important help with those issues. Because my undergraduate and graduate school backgrounds are in medical biology and psychology, and because I had previously handled mental illness defenses, I did not require that sort of assistance.

It is sometimes argued that forensic social workers can be utilized to save costs in a case. Current Counsel for Mr. Purkey make just such an argument (Doc. 52, p. 19, fn 6). However, in my experience, the opposite is the case. At the time that Mr. Purkey's case was pending, appointed Federal capital case defense attorneys were being compensated at the rate of $125.00 per hour for in court and out-of-court time. At the same time, the hourly rates being charged by most experienced forensic social workers were ranging in the same vicinity, between $85.00 and $150.00 per hour. Thus, at the time that Mr. Purkey's case was pending, the mere expedient of expending forensic social worker time instead of a like amount of attorney time would yield little or no cost savings.

Moreover, in my experience, utilization of a forensic social worker is in most cases a redundant cost.

For the reasons which I have already described above, I believed at the time,

45

and still believe now, that, because of my training and experience in capital cases in general, and in mental health cases in particular, enlisting the services of a forensic social worker for development of mitigation themes and avenues of documentary and witness investigation was unnecessary. I planned to, and actually did, shoulder those duties myself. As for development of reports about mitigation themes, I had two of the best at work on that, Dr. Stephen Peterson, M.D. and Dr. Mark Cunningham, Ph.D. I believe that the thorough reports prepared by those experts served us well as means of discovery for the government and as roadmaps for the bulk of our mitigation presentation.[2]

As to the role of locator of mitigation case witnesses, it has been my experience that social workers invariably lack the skill set to ferret out people who, in cases like these, are almost always difficult to locate, and who, when found, are often situated in areas where the social worker fears to tread alone. That necessitates the social worker enlisting the services of the case investigator, to find the witnesses in the first instances, and then to accompany the social worker during the interviews. As I have already detailed above, in Mr. Purkey's case, I employed

---

[2] Because I have provided my file to current Counsel for Mr. Purkey, I am unable to provide the Court with copies of those reports. However, I am sure that copies of those reports could be provided by either of the parties, should the Court wish to review those to judge the accuracy of my description regarding the thoroughness of those reports.

46

Mr. Armstrong, who has the skill set to, by himself, both locate and interview such witnesses.

As to the role of obtainer of records about the client, I have found that social workers simply cannot complete such work independently, and have to enlist the assistance of the attorneys to obtain subpoenas and other means to force production of such records. In Mr. Purkey's case, I personally handled the identifying and obtaining of all the thousands of pages of records about his and his family's background.

As to development of client, familial and witness rapport, it is my practice to develop that rapport myself. I believe that, since I shall be the one presenting such witnesses at trial, I am the one who needs to have that rapport from the outset. Thus, I anticipated that I would, and indeed did, play this role for Mr. Purkey, for his family and for other witnesses we presented.

It was my intention to have Mr. Purkey's background thoroughly explained by a forensic witness. However, I did not want a mere social worker to take on such a weighty role. Instead, I enlisted the services of Dr. Mark Cunningham, Ph.D. to do this work. Dr. Cunningham had played a similar role in another case for me, and in many other such cases across the country. At trial, Dr. Cunningham made a comprehensive presentation, acting as a summary witness to advance

47

mitigation themes and debunk certain aggravating factors.[3] This supplemented the presentation made by Dr. Peterson and our other mental health experts.

Thus, to sum up, since I had already covered, in what I deemed to be a better fashion, all of the duties which might have been assigned to a forensic social worker, I decided to not needlessly expend funds for such a person. Current Counsel for Mr. Purkey correctly note that, in my pleadings for additional funds for the experts we employed, I highlighted the savings we realized in not needlessly employing a forensic social worker; but they go on to criticize that critical work went undone because of that decision (Doc. 47, p. 19-20; Doc. 52, p. 18). To the extent that it is implied that I was somehow afraid to ask for the tens of thousands of dollars for a forensic social worker, such an implication seems rather silly in light of my having asked for and received the hundreds of thousands of dollars for our other experts. There is no question in my mind that, had I made application for funds for a forensic social worker, in addition to the funds for all of

---

[3] Relying upon my original funding request for Dr. Cunningham, Mr. Purkey's current Counsel allege that Dr. Cunningham was used by us only to counter the government's aggravating factor allegation of Mr. Purkey's future dangerousness (Doc. 52, p. 15). I can only assume that, in making this argument, Counsel have failed to read Dr. Cunningham's trial testimony. I believe that a fair reading of Dr. Cunningham's testimony demonstrates that, though he certainly brought forth the anti-future-dangerous themes (Tr. 1880-1908), he also spent a considerable amount of time on the wide range of our mitigation themes (Tr. 1855-1879).

our other experts, that request would have been granted. While I am aware that others have had difficulties related to budget requests, particularly in getting approval from the Chief Judge of the Eighth Circuit for such requests, I have never had such difficulty. I attribute my success to the fact that I copiously justify the requests which I make. In this instance, I simply could not justify spending money on a forensic social worker when I believed that all of the duties I would have given to such a person were being better handled by others. Because of that fact, I was able to cite to my decision to not employ a forensic social worker as a means to explain additional costs being expended for other experts.

I suppose the real question is whether I was correct that the duties which a forensic social worker could have performed in this case were all done, and in better fashion, by other members of the defense team. I believe that the facts demonstrate the correctness of my representation in that regard.

2. As indirectly acknowledged in the pleadings filed by Counsel for Mr. Purkey, our team assembled all available mitigation information, and three persons, Dr. Peterson, Dr. Cunningham and me, combed that information for the mitigation themes which we presented

As a result of our efforts on Mr. Purkey's behalf, scouring the country, we located and obtained thousands of pages of records pertaining to Mr. Purkey and his family. I thoroughly read all of the records, and I had two professionals, psychiatrist, Dr. Stephen Peterson, M.D. and psychologist, Dr. Mark Cunningham,

Case 4:06-cv-08001-FJG    Document 73-1    Filed 05/20/08    Page 49 of 117

Ph.D., do the same.  Dr. Peterson and Dr. Cunningham produced comprehensive reports about their review.  Out of this preparatory work sprung a mitigation case consisting of eighteen lay and expert witnesses whose combined presentations cover over 500 pages of transcript.  As noted by current Counsel for Mr. Purkey (Doc. 52, p. 24), we chased every lead provided by Mr. Purkey, even those which might at first blush be considered odd, to wit Mr. Purkey's claims about his wife poisoning him.  In hindsight, it could be argued that, even though our persistence in that regard eventually resulted in Jeanette Purkey admitting that she was poisoning Wes (Tr. 2237-2249), the efforts were ultimately fruitless since the evidence was ruled inadmissible, and that ruling was upheld on appeal.  *United States v. Purkey*, 428 U.S. 738, 757 (8th Cir. 2005).  However, it was our approach to follow any and all leads to develop any and all potentially mitigating evidence.  Our efforts on the poisoning front were consistent with the approach.

It is urged by current Counsel for Mr. Purkey that I should have, in addition, employed a forensic social worker to also pour through the records, and prepare yet another report (Doc. 47, p. 17, 19; Doc. 52, p. 16-19).  Current Counsel for Mr. Purkey have also provided opinions from Dr. Peterson and Dr. Cunningham that it might have been well to have had a forensic social worker do this work as well as them (Doc. 27, attachment 15, p. 2, attachment 11, p. 1).  Current Counsel for Mr.

50

Purkey correctly indicate that I shared with this Court at the time that the case was pending my reasoning for not asking to expend funds for a forensic social worker (Doc. 27, p. 15-16). To reiterate, I chose to not expend the funds for a forensic social worker in this case because of my belief that the necessary work was better being done by others, and therefore obtaining a social worker would have constituted a needless additional expense. I wanted our experts and me to be directly familiar with all of the raw data rather than some summary of that data prepared by a forensic social worker. Though current Counsel for Mr. Purkey have indicted my approach in this regard, they do not identify in their pleadings a single mitigation theme which was missed as a result of this approach.

It is also implied in the argument made by current Counsel for Mr. Purkey that our efforts to develop certain avenues of mitigation evidence, for instance the poisoning, came at the expense of work on other avenues of mitigation evidence (Doc. 52, p. 25). However, current Counsel for Mr. Purkey do not support that inference, since they fail to advance even one new mitigation theme which they found and we supposedly missed. Instead, current Counsel for Mr. Purkey, relying heavily on the materials which we developed, complain only that we should have done a better job handling the witnesses we did call, and should have called several of the witnesses who were identified in our investigation, but whom we chose not

51

to call (Doc. 52, p. 23-27). I shall explain below why we handled each of those situations as we did.

### 3. Gary Hamilton was developed as a powerful mitigation witness at trial despite his recalcitrance, even up to the eve of trial[4]

Current Counsel for Mr. Purkey urge that my handling of Wes' brother, Gary Hamilton, was substandard, complaining that I made too few contacts, that I was not "sensitive" in the contacts which I made, and that I did not develop all of the available information in the way in which a forensic social worker might have (Doc. 52, p. 23).

At the foundation of these complaints lies an assumption that Gary Hamilton, prior to trial, was the very cordial, compliant individual who readily met with current Counsel for Mr. Purkey, and cooperatively shared with them his information and insights. When I first encountered Gary, his attitude was, to say the least, different.

From the outset, I knew from government discovery about interviews which had been conducted with Gary. Those reports painted a picture of Gary as being so hostile and adverse to his brother Wes that it appeared likely that he was being groomed as a government witness against us. Those reports specifically indicated

---

[4] My answers here are also meant to respond to the accusations made at Doc. 47, p. 31-32 and Doc. 52, p. 33.

Case 4:06-cv-08001-FJG     Document 73-1     Filed 05/20/08     Page 52 of 117

that Gary described his brother Wes as self-centered, manipulative, aggressive and lacking conscience. Gary purportedly also told government interviewers that Wes had no excuse for ending up the way he did, since he and Wes were given everything they needed when growing up. It was also reported that Gary held ill-will against Wes because Gary believed that Wes had forced himself sexually on their mother.

During my initial phone conversations with Gary, he conveyed to me much the same hostility, repeating many of the same things he had told government agents. Gary also rebuffed my questions designed to try to begin identifying problems with their upbringing which could have led to Wes' problems. Despite the venom coming from Gary, I believed that I needed to try my best to win him over, despite the odds against us. Since I believed the information which Wes had given me about his wretched upbringing, I also believed that Gary, for one reason or another, was not being candid with me about what had happened during his and Wes' childhood. I was hopeful that, through some combination of approaches, we would break through Gary's apparent hatred of Wes so as to get at the truth. I believed that I had two strong reasons for hope in this regard. Those were Gary's wife Becky and his daughter Tonya Braymer. I had some conversations with Becky, and many more with Tonya. Both were extremely kind and supportive

53

Case 4:06-cv-08001-FJG    Document 73-1    Filed 05/20/08    Page 53 of 117

during our conversations about Wes. I asked that these two work on Gary, to help me get him to open up, and they indicated they would.

I also decided that, in order to possibly change the dynamic, I needed to broach Gary in his own surroundings. Therefore, I made a trip to Gary's home on March 21, 2003, more than seven months before trial started. Since Gary lived in far off Gibbon, Nebraska, I enlisted the help of my son to assist me with the long drive there. When I arrived, my son remained in the car. However, when I reached the door, Becky could see my son in the car, and wanted him to come in as well. This actually helped my process in a couple of ways. First, both Gary and Becky appeared to like my son very much, and talked freely and easily with him. My son's presence seemed in particular to put Gary at ease. My feeling was that this cast me in the role as the father of a young adult, like Gary, rather than in my role as his brother's lawyer who wanted something from him. Second, during the time that my son was in the apartment, he further assisted me in that he would interact with and occupy either Gary or Becky, allowing me to talk semi-privately with the other. My son also left for a time, leaving me alone with Gary and Becky for that stretch of time.

Throughout all of the meeting, Gary was more cordial than I had anticipated. However, Gary's developing good will toward me in no way changed his negative

54

attitude toward his brother. All of the same invective against Wes came out in this context as well. Thanks to my son's presence, occupying Becky, I had several opportunities to address to Gary, out of the hearing of Becky or my son, about the issue of intrafamilial sex in general, and about Wes' contentions about their mother seeking sex from Wes in particular. Gary was adamant in professing his belief that Wes had raped their mother, saying his mother told him so. Gary was just as adamant in his conviction that his mother would have never had consensual sex with Wes. My impression was that Gary was very protective of his mother, and would have none of any conversation which portrayed the mother in any sort of a bad light.

On the whole, this meeting, which lasted better than three hours, broke the ice between Gary and me, but did not really change anything in terms of the still-negative substance of what Gary had to offer. Thereafter, I stayed in regular contact with Gary, Becky and Tonya. I also passed along to Gary, when I received it, police reports concerning the rape accusations which their mother made against Wes. It seemed to me, and I argued to Gary, that the reports made it pretty plain that their mother had concocted the story of rape against Wes.

Despite my efforts over the months prior to trial, Gary did not relent in my pretrial conversations with him. Nevertheless, I decided to keep up subtle pressure

55

on him, through my contacts with him and through the influence of Gary's wife and daughter. I certainly held open the hope and possibility that Gary would become a witness for us.

Then, as trial was beginning, Gary expressed his desire to attend Wes' trial. In light of what I was told by Gary and Tonya, I believed that Tonya had much to do with her Father's new-found attitude. I made the arrangements to have Gary, Becky and Tonya appear for trial. When they arrived, Gary had a new revelation: he had been sexually abused by his mother. Gary's willingness to now admit this fact allowed him to understand and believe that the same had happened to Wes, and that their mother had lied about Wes raping her. This was precisely the breakthrough for which I had hoped. Before that, we had very little other than Wes' claims about his mother's abuse, countered by the mother's own accusation of rape against Wes. Gary's was a separate, independent verification of the mother's sexual deviancy, thus confirming the likelihood that Wes' own accusations against his mother were true.

Mr. Purkey's current Counsel argue that I should have learned from Gary prior to trial, and should have elicited from Gary at time of trial, the account which Gary has now given them containing more details about sexual deviancy within the family. Unfortunately, Gary did not share with me all of these details as we

Case 4:06-cv-08001-FJG    Document 73-1    Filed 05/20/08    Page 56 of 117

feverishly prepared him, at the last minute, for his testimony based upon his new revelations. Had Gary shared that information with me at that time, I would have presented much of that information at trial. I in no way fault Gary for not providing me that information at that time. Frankly, at that time, he may not have even remembered that detail.

Mr. Purkey's current Attorneys argue that Gary should have been worked with by a social worker in a different way so that this additional detail could have been identified and presented at time of trial (Doc. 52, p. 23). My belief at the time was that, had we been more aggressive with Gary, as suggested by Purkey's current Counsel, we would have driven Gary further into his negative shell. It is my belief that our approach allowed Gary to finally come to terms with his own sexual abuse in his own way and in his own time. Fortunately, Gary's own time left us just enough time to allow us to present very significant evidence at time of trial. Unfortunately, Gary's own time did not leave him enough time to reconstruct all of his own memories, and timely share them with us for trial.

If I correctly understand Mr. Purkey's current Counsel, they also argue, correctly, that I could have asked Gary to provide more intimate details about the sexual activities between him and his mother as a means to bolster Gary's and Wes' stories of sexual abuse. I chose at the time, and would choose again today, to

Case 4:06-cv-08001-FJG    Document 73-1    Filed 05/20/08    Page 57 of 117

not ask this grown man to describe the sexual positions into which his mother placed him.  I believed then, and I believe now, that providing the level of detail which we did struck a good balance between our need to give enough detail for the jury to clearly understand what happened to Gary while still holding back on the gory details, conveying thereby to the jury Gary's real sense of embarrassment and shame over the matter.  I leave it to the Court to decide whether my approach, or the approach suggested by Purkey's current Counsel, would be the more wise.

### 4. The testimony of Angie Genail, Wes' daughter, was presented after significant preparation[5]

Though current Counsel for Mr. Purkey acknowledge that Purkey's daughter, Angie Genail, was called to witness at the penalty phase, they seem to complain that this testimony was presented after only brief and inconvenient prior interviews with her (Doc. 47, p. 11, fn. 3; Doc. 52, p. 26).

Counsel for Mr. Purkey do not explain how the testimony by Ms. Genail was in any way deficient.  My recollection was that Ms. Genail's accounts about her and her children's relationships with Wes, and Ms. Genail's plea for her father's life, were all powerful.  My recent re-reading of the testimony confirms in my mind those notions (Tr. 1541-1547).

---

[5]  I mean for this to also be a response to the non-specific accusations made in Doc. 47 at page 32.

It should also be noted that I met with Angie in person on three different occasions to prepare her for her testimony, and presented all the good information which I believed was available from her.

### 5. After considerable effort, we were able to identify, develop and present significant family background evidence from Wes' paternal aunt, Marguerite Hotchkiss

As we developed our mitigation case for Mr. Purkey, we wanted to find persons who were present while Mr. Purkey was growing up, who could account, first hand, for the hard life he led. Unfortunately, most of those persons had died. The only two persons left were Wes' brother Gary and Wes' maternal aunt, Marguerite Hotchkiss. We developed Gary's testimony, as described above. Through a long and difficult process, we were finally able to locate and interview Ms. Hotchkiss, and ultimate present her testimony at trial.

The process of finding Ms. Hotchkiss began with her daughter, Wes' cousin, Debbie Prothero. From my first contact with Debbie, she made a few things abundantly clear: that she had little or no recollection of or prior relationship with Wes and that she was personally very much in favor of the death penalty.[6] Debbie

---

[6] In a footnote, Wes' current Counsel allege that Debbie and her husband would have willingly testified on Wes' behalf (Doc. 52, p. 27, fn 9). However, Counsel do not provide affidavits from Debbie or her husband, nor do they mention what Debbie or her husband could have or would have said had they been called to

59

was very helpful in assisting me in tracking down her mother. Ms. Hotchkiss was living variously in Hawaii and California, with occasional stops to visit Debbie in Springfield. When I finally tracked down Ms. Hotchkiss for the first time, she was in California. During that conversation, and the ones that followed, she provided me all of what she testified about at time of trial. She had no other knowledge about Wes, his dad, his mother, or that part of the family beyond the information which we presented at trial.

I then set about trying to persuade Ms. Hotchkiss to appear in person to testify at trial. Ms. Hotchkiss was adamant that she could not do so. The reasons were two-fold, related to her emotional problems over the case itself and her perceived difficulties related to travel. In light of her ability to travel from California to Hawaii and back again, it seemed to me that Ms. Hotchkiss' problems were likely related much more to the first reason rather than the second. Nevertheless, in light of her advanced age, I endeavored to arrange for a deposition

witness. In her conversations with me, Debbie made clear that neither she nor her husband knew much of anything about Wes or his side of the family. Moreover, in every conversation I had with Debbie, she made sure it was abundantly clear that she was very much in favor of the death penalty, and was in no way opposed to Wes receiving the death penalty in this case. It seemed to me an obvious choice to not have Debbie or her husband witness in this case, and so I did not. I see nothing in the information from Mr. Purkey's current Counsel to make me question that decision.

of Ms. Hotchkiss in order to secure in that way the important information about the case which she had to offer (Doc. 405). In the meantime, Ms. Hotchkiss traveled to Springfield. At that point, I hoped that, since she was now situated much closer, she would be willing to appear in person for trial. Unfortunately, she again balked for the same reasons as before. Fortunately, I was able to reach an agreement with prosecutors whereby we presented Ms. Hotchkiss' testimony via teleconference between the Courthouse in Springfield and the Courthouse in Kansas City (Tr. 1520).

In their pleadings on Mr. Purkey's behalf, his current Counsel complain that our preparation for and presentation of Ms. Hotchkiss' testimony were somehow inadequate (Doc. 52, p. 24). However, they provide no details regarding this perceived inadequacy. To the contrary, and as noted above, we went to great lengths to develop complete testimony from this witness who was difficult to locate and produce.

6. After weighing the alternatives, I decided not to secure the testimony of Oregon Department of Corrections Psychologist Dr. Rex Newton, Ph.D.

Vigorous complaint is made over our failure to secure the testimony of Dr. Rex Newton, Ph.D., one of Wes' treating psychologists during the time that Wes was incarcerated in the Oregon Department of Corrections (Doc 47, p. 22; Doc. 52, p. 25-26). It is correctly noted that, in our investigation, we secured Dr. Newton's

report, and we were therefore well-aware of his findings regarding Mr. Purkey; it was via resort to the records, which I and my team assembled prior to trial, that current Counsel for Mr. Purkey were able to locate and interview Dr. Newton (Doc. 47, p. 22; Doc. 52, p. 25-26). It is argued that Dr. Newton's findings and conclusions were so clearly positive and significant that my failure to develop and present Dr. Newton as a witness amounted to ineffectiveness of counsel (Doc. 47, p. 21-22; Doc. 52, p. 25-26).

Certainly, when taken out of context, Dr. Newton's findings and conclusions were very positive and very helpful. My fear was that, if we directly presented those findings and conclusions through Dr. Newton at time of trial, the government would have countered by providing surrounding context, which was very damaging. That context was also contained in others of the records which we obtained in our investigation, provided to the government in discovery, and ultimately provided to Purkey's current Counsel.

According to those records, during the late 1980's Mr. Purkey was being housed in the Oregon Department of Corrections, serving his Kansas State sentence. When he encountered Dr. Newton, Mr. Purkey was being housed in a lower security facility in Oregon, and was on good track for an earlier release. Mr. Purkey's work with Dr. Newton was part of his work on that good track.

Unfortunately, as often happened with Mr. Purkey, things got off track. All the while Mr. Purkey was working with Dr. Newton, he was also engaging in activities which were at best against the rules and at worst, arguably criminal. As a result of those activities, Mr. Purkey not only lost his bid for earlier release, he was transferred out of Oregon and back to Kansas to continue the service of his lengthy sentence for robbery and assault. Some, but certainly not all, of this information about Mr. Purkey's problematic behavior in Oregon was already before the jury through the testimony of witnesses like Gary Hatfield and William Porter. It was my belief that, by bringing in Dr. Newton, we would give the government a springboard, not only for presentation of a more complete litany of Mr. Purkey's untoward behavior in the Oregon Department of Corrections, but also to logical questioning of Mr. Purkey's sincerity with Dr. Newton in light of Purkey's concurrent, untoward behavior. To avoid this, I chose to not bring in Dr. Newton, but instead bring forth what I believed to be the functional equivalent of Dr. Newton, and in most cases a more updated version of that information, through various of our experts, particularly Dr. Peterson and Dr. Cunningham, and lay witnesses, particularly Dominic Geniuk (Tr. 1491-1500), Patrick Howe (Tr. 1485-1491), Michael Gibbons (Tr. 1502-1516), Robert Lopez (Tr. 1530-1540), and Mark Russell (Tr. 1651-1655).

Counsel for Mr. Purkey find greatest fault over my failure to produce Dr. Newton to specifically say that Wes had told him, in the late 80's, about his mother sexually abusing him (Doc. 47, p. 21). This evidence, it is argued, would have countered what Purkey's current Counsel claim were government accusations "...that Purkey had recently fabricated the allegation that he had been sexually abused by his mother in order to avoid the death penalty..." and "...that Purkey had never before reported being sexually abused..." (Doc. 47, p. 21). The fatal flaw in this logic is that the government never made such claims.

As current Counsel for Mr. Purkey note, there were two queries upon the matter put to defense psychiatrist, Dr. Stephen Peterson. The first of those, complete with the context prior to the citation by current Counsel for Purkey, was as follows:

> Q   Doctor, going back to the defendant's childhood and the sexual abuse that he claims he suffered, again we have to rely on his word essentially, because there's not any -- there is very little, if anything, in the record to support that, correct?
> A   Well, that's correct. There are some elements to support it, such as the reports of his brother and his aunt and the people who talked with Mr. Purkey long before he was involved in any of these cases, about his development. So certainly it would have been nice to have a video camera on Mr. Purkey's shoulder to see what he experienced, but we don't have that. At the same time you can't really discount not knowing, or not having a camera there recording every event, because, for example, most children don't remember how they learned to walk, but most kids do walk. And so the fact that they don't remember or there's not a source of information that proves when they took their first step doesn't mean they didn't learn how to

walk.

    Q     We're not talking about walking. We're talking about a man who claims his mother had sex with him when he's a kid, right?

    A     Yes.

    Q     You're aware from the reports that -- the only report that exists of sexual contact between the defendant and his mother is her claim that in 1972 when he was 19 years old he raped her. Have you seen that report?

    A     I have seen the report. I've also seen the medical report that the doctor gave the opinion than she had not been sexually assaulted, and that once she had sobered up she dropped the charges.

    Q     That wasn't in a medical report, was it, sir? It was in the detective's report. He wrote that down.

    A     By the doctor to the detective.

    Q     Did you also read, sir, that the mother was agonizing over the fact that her son would have to go back to prison if she pursued it; did you read that?

    A     I read that. And the police could certainly have pressed charges without her. (Tr. 1816-1817)

Certainly, by this inquiry, the government was attempting to question Purkey's claim of sexual abuse against his mother. However, Dr. Peterson knowledgably deflected the accusation of rape against Purkey. That is the portion of the exchange to which current Counsel for Purkey refers. Current Counsel for Purkey does not note that Dr. Peterson also more generally deflected the government advances by specifically referencing Mr. Purkey's multiple prior accounts of the sexual abuse. Thus, while not mentioning Dr. Newton by name, Dr. Peterson conveyed the gist of the information which Dr. Newton would have himself provided in this regard.

The other skirmish between government Counsel and Dr. Peterson over the

Case 4:06-cv-08001-FJG    Document 73-1    Filed 05/20/08    Page 65 of 117

matter was as follows:

> Q   (By Mr. Whitworth)  To your knowledge, based upon your review of the records, the only time the defendant ever told a doctor who has examined him about this sexual mistreatment or maltreatment that he's now claiming is to you, that was the first time?
> A       To my understanding, I'm the only one he has ever told in detail to because I'm the only one who ever really asked.
> Q       To your knowledge.
> A       Yes.  I know that Dr. Fernando out at Larned did not ask because I asked Mr. Purkey, and I know the process out at Larned, and Mr. Purkey said Dr. Fernando did not ask him anything about his sexual development before he gave the diagnosis, which is common practice out at Larned.
> Q       Yet Mr. Purkey told you that?
> A       Mr. Purkey told me that, plus there's no indication in any of the records especially done by the social worker of any detailed psychosexual history done by Dr. Fernando or even the social worker.
> Q       Thank you.  That's all I have. (Tr. 1824-1825)

It is certainly true that, here, Dr. Peterson did not again include his earlier reference

to Mr. Purkey's prior accounts of the sexual abuse to others, and particularly did

not refer to Dr. Newton's discussions with Purkey about the sexual abuse.

However, the thrust of the point being made by Dr. Peterson at this point, which

was correct, was that no one before Peterson, particularly those who evaluated Mr.

Purkey for his Kansas state charges, had conducted a thorough psychosexual

evaluation of Mr. Purkey so as to ferret out all of the details of the abuse.  That

same criticism would apply to all prior evaluations of Mr. Purkey, including the

work done by Dr. Newton.  I could have come back to Dr. Peterson to countersink

the point advanced by current Counsel for Mr. Purkey.  However, I did not believe

66

at the time that the government's questions gained any traction. I believe my notions in this regard were confirmed in light of the way the government ultimately argued its case.

In their arguments, government Counsel took their questioning of the sexual abuse no further, instead essentially conceding that Purkey had been abused. Current Counsel for Purkey cite to two arguments (Doc. 47, p. 21). I have re-read the entirety of the government's penalty phase argument, and have found one other reference.

The first of those, in context, was as follows:

> We brought in Dr. Park Dietz, we brought in Dr. Helen Mayberg, and Dr. Dan Martell, who are three of the finest forensic psychologists, psychiatrists in the United States, because we didn't want you to be misled by this defense. And I submit to you when they say no brain injury, they say no mental disease, that you can believe their testimony over the defense experts.
>
> Dr. Peterson, who Dr. Dietz so aptly stated, his findings were a fairy tale. He couldn't even show me in the DSM-IV manual where he had come up with this diagnosis. And that's the Bible of forensic psychiatry. He said that medication could control and has controlled this defendant's behavior. Ten minutes after he says that, the defendant interrupts the proceedings in an angry outburst. (Tr. 2267)

Contrary to the representations by current Counsel for Purkey (Doc. 47, p. 21), the government "fairy tale" argument was referring, not to Purkey's representations about his abuse, but rather to Dr. Peterson's overall diagnosis of Purkey. In fact, just a few lines later, as part of the "blame game" reference complained about by

current Counsel for Purkey (Doc. 47, p. 21), government Counsel actually

conceded the abuse took place. That entire line of argument was as follows:

> Now, the next group of mitigating factors have to do with the defendant's bad childhood. Now, that's the old abuse excuse. He had a bad childhood. No doubt he did not have a good childhood. I'm not disputing that. But many people in this country grow up with alcoholic parents or are abused and they turn out fine. His own brother corrected his behavior way back in 1977, decided he wasn't going to do any more crimes, and he changed. And this is about personal choices. He chose not to make any changes in his life. He just kept doing the same things, being violent, committing crimes. He made those choices. (Tr. 2268)

The closest the government got to the sexual abuse claims issue was later in their

argument, when government Counsel simply left to the jury determination about

the sexual abuse.

> They want you to believe him, a man that can take a tattoo off his arm because he wears shirts to here and his boss is Jewish, they want you to believe that man when he said his mother sexually molested him. You're going to have to make that decision, whether you believe that. He was 46 years old when he made these decisions. (Tr. 2291-2292)

Current Counsel for Purkey fault me that I "…should have easily anticipated

that the government would allege that Purkey had recently fabricated the allegation

that he had been sexually abused by his mother in order to avoid the death penalty"

(Doc. 52, p. 21). Fatal to their point is that their "easily anticipated" argument

never occurred. To the contrary of their point, the most logical interpretation of the

government arguments would lead one to the conclusion that the government had

given up challenging the abuse.

Even if the government's queries and arguments could have been seen to be asking the jury to doubt Purkey's account of sexual abuse, the government's attack would have to be seen as more global than that the fabrication was recent. If anything, the government would have to be seen as asking the jury to doubt Purkey's accounts of the abuse, whenever those accounts occurred. The trouble with our trying to support the fact of the sexual abuse by resorting to Dr. Newton, or to any of the others to whom Wes confided the abuse, is that, at bottom, the source of the information for all of these witnesses was Wes himself. That was why it was so important that Dr. Peterson referred in his testimony to the reports in the records from two persons directly familiar with the abuse, Wes' deceased Aunt and Wes' brother Gary (Tr. 1816). That was also why it was so great, even miraculous, that Gary experienced his change of heart when he did. That way, we had, from the only still-living relative, direct confirmation, independent from Wes, about the mother's sexual deviancy.

While we could not have anticipated arguments which the government never made, the government argument theme which we did anticipate, the theme which actually was resounded in the cited arguments and throughout the rest of government argument, was to the effect that Purkey refused to change despite

Case 4:06-cv-08001-FJG    Document 73-1    Filed 05/20/08    Page 69 of 117

being given multiple opportunities to change (Tr. 2259, 2267-68, 2291-92). As I noted above, in my opinion, bringing forth Dr. Newton would have strongly supported that argument as an instance in which Purkey was receiving the help which he wanted, in this case psychological help, and repaid that assistance by continuing his criminal ways despite the help. Anticipating the argument which the government actually made, I decided that, rather than providing this golden opportunity for the government to make its point, I would instead bring Dr. Newton's findings in through Dr. Peterson and others.

<u>7. After weighing the alternatives, I decided not to call Floyd Bose or Dion Leiker</u>

As Mr. Purkey's current Counsel correctly allege, well prior to trial, Wes alerted me about his relationships with Dion Leiker and her father, Floyd Bose (Doc. 47, p. 23-24).[7] I had various opportunities to talk to Dion, though I never contacted Floyd. Through Wes and Dion, I learned about Wes' assistance to Floyd and Dion in their attempt to sort out the death in prison of Floyd's son, Dion's brother. I also obtained what records I could about the matter.

To briefly summarize what was a very complex story, when Floyd and Dion

---

[7] Current Counsel for Mr. Purkey reference a letter to me from Wes in August of 2003 (Doc. 47, p. 23; Doc. 47, attachment 9). Actually, my recollection is that Wes and I had talked many times about these folks, and long before Wes wrote that letter.

were left with no real answers from authorities about the killing, Wes contacted them and detailed for them a conspiracy which involved inmates, prison officials and state officials. However, a formal investigation of the matter did not confirm Wes' account. Floyd and Dion strongly believe the information which Wes provided, and believe that a government cover-up accounts for the failure to confirm Wes' account.

I weighed whether to present this information, and I decided there were too many problems. I knew that the government would easily be able to counter Wes' account with the contrary results of the official investigation. But, I was much more concerned with the argument question which I feared the government would likely pose in light of Wes' knowledge base: if Wes' account was true, does not that knowledge base prove how intimately involved he was in prison crime and violence? We were battling already over the issue of Wes' future dangerousness. Had we presented this evidence, we could have argued that Wes, by bringing these facts to light, was disavowing violence, and trying to bring the truth to light. However, the government would have been free to argue that, even if Wes' account was true, all this proved was how closely connected to the violence Wes was. Moreover, the government could have also argued that, had Wes really not been part of this, he would have reported things earlier, in time to have saved the man's

life in the first place.

It was also my understanding that, in the years since Wes' revelations to Dion and Floyd, Wes had asked for and had received from them financial assistance. While I was not sure the government was aware of this, I knew that it would not be difficult for the government to obtain institutional financial records, or to simply ask the questions directly of Dion and Floyd. I was very concerned that the government would try to use this information in order to inaccurately portray Wes as giving the help he was to these people, including possibly false information, only as a means to get help from them.

On balance, I decided that the risks of the testimony outweighed the benefits of this and the other limited information which Dion and Floyd had, and thus I chose not to call these two witnesses.

## 8. My recollections regarding Peggy and Evette Noe

My recollections about Peggy and Evette Noe are not as clear as with other witnesses and instances. I shall do my best to account for my knowledge based upon the recollections which I have.

Current Counsel for Mr. Purkey allege that we did not have contact with Peggy and Evette, though we discovered their identities in our investigation (Doc. 47, p. 22-23). Actually, it is my recollection, not only that I was aware of the

Case 4:06-cv-08001-FJG    Document 73-1    Filed 05/20/08    Page 72 of 117

referenced reports, but also that I did speak, prior to trial, certainly with Peggy, and possibly with Evette, though I cannot locate any documentation to confirm that recollection. In fact, I believe that Peggy's recollections, as accounted in the Petition (Doc. 47, p. 22), formed part of the basis for Dr. Peterson's testimony regarding Mr. Purkey's account to others regarding his sexual abuse, as noted above.

My recollection is in keeping with the allegations of the Petition about Wes never asking that I contact these women (Doc. 47, p. 22). My recollections are also that, since Wes did not advance these witnesses, I decided, independently from him, not to pursue using Peggy and Evette as witnesses, and that my reasoning was based on things contained in the materials we obtained, either about problems in the relationship between Wes and Peggy, or problems in Peggy's and Evette's backgrounds, or both. Because I have given to current Counsel for Mr. Purkey all of the file materials which I had about these women, I am unable to resort to those materials now to refresh my recollections about these latter matters. If the Court would deem it appropriate, I would be happy to obtain and review those materials to assist me in answering this matter further.

Current Counsel for Mr. Purkey also advance here, as they did with their arguments regarding Dr. Newton, their notions that I was ineffective in not using

73

Peggy Noe's testimony to counter the argument that Purkey had recently made up the story about the sexual abuse in order to avoid the death penalty (Doc. 47, p. 24). As I already noted in above in my response regarding the Newton issues, the government never made the argument, as claimed by current Counsel for Purkey, and actually conceded Purkey's abuse in their argument. Moreover, as I also noted above, even if the government's questioning and argument could be read as an indictment of Purkey's credibility, that indictment was over the truth of the sexual abuse accusations by Purkey generally, whenever they were made. Thus, the Peggy Noe testimony, like the Dr. Newton testimony, was merely more of the same, more of Wes' accusations against his mother. The only real counterpoint to the government's point was Gary Hamilton's independent account of the mother's sexual deviancy, which of course we presented.

### 9. Cited cases are, once again, inapplicable

To sum up, though they have not found one new piece of evidence that we did not discover during our initial investigation, current Counsel for Mr. Purkey contend that our investigation and preparation were inadequate because we did not have a forensic social worker on our team. At various points in their suggestions, current Counsel for Mr. Purkey cited to cases urging that those cases support their arguments. In truth, if one looks at the cases, one notes the egregious omissions by

counsel in those cases, but can find no factual corollaries in this case.

Current Counsel for Purkey first attempt to liken the efforts made in this case to those made in three cases (Doc. 52, p. 12). However, none of those cases is even similar. In *Karis v. Calderon*, 283 F.3d 1117, 1134 (9th Cir. 2002), the defense made a 48 minute mitigation presentation, without touching on the defendant's substantial history of childhood and familial abuse. In *State v. Tokman*, 564 So.2d 1339, 1342-1343 (Miss. 1990), no evidence presentation was made in penalty phase after little or no investigation into the defendant's background. In *Wiggins v. Smith*, 539 U.S. 510, 515-517, 523-524 (2003), defense counsel presented no mitigation evidence after admittedly not conducting an investigation, and reviewing only limited records about the defendant's background. In *Hamblin v. Mitchell*, 354 F.3d 482, 490-491 (6th Cir. 2003), there was a failure by defense counsel to conduct any mitigation investigation, a failure to obtain background records, and interview of only one of 22 available family members. Obviously, our efforts on Wes' behalf were considerably different that those made in these cases.

Current Counsel for Purkey urge that our decision to dispense with the hiring of a forensic social worker in this case is like unto failures to seek professional help in other cases they cite (Doc. 52, p. 18) Those cases are also

easily distinguishable on their facts. In *Marquez-Burrola v. State*, 157 P.3d 749, 764 (Okla.Crim.App. 2007), no substantive mitigation work was done until a week before trial, and the little work that was done consisted of interview of only a few family members for about two hours, and presentation of only 3 lay witnesses in a mitigation case comprising less than 15 pages of transcript. In *Rios v. Rocha*, 299 F.3d 796, 807-808 (9th Cir. 2002), there was a complete failure to interview witnesses, and a failure to request funds to employ investigator, all of which resulted in failure to develop an available misidentification defense. In *Garcia v. Portuondo*, 459 F.Supp.2d 267, 288 (S.D.N.Y. 2006), a retained attorney failed to conduct any investigation to support an available alibi defense, in part because he did not want to foot the costs of travel related to certain aspects of that investigation. In *Ex Parte Briggs*, 187 S.W.3d 458, 467 (Tex.Crim.App. 2005), because the defendant failed to pay necessary costs in advance, counsel refused to make any investigation about medical issues related to victim's cause of death, and did not consult experts on the issue, despite the fact that this was the only viable avenue of defense. None of these cases even remotely relate to the fact pattern here.

Current counsel for Mr. Purkey liken our approach to Gary Hamilton to the inadequate approaches take in certain other cases (Doc. 52, p. 23). The analogies

Case 4:06-cv-08001-FJG    Document 73-1    Filed 05/20/08    Page 76 of 117

are inapt. In *Cargle v. Mullin*, 317 F.3d 1196, 1212-1213 (10th Cir. 2003), defense counsel failed to locate, interview and present witnesses who would have testified that government informers, who testified at trial that the defendant had confessed to them, made statements to others that the defendant, instead, had made exculpatory statements. In *Ex parte Gonzales*, 204 S.W.3d 391, 393-394 (Tex.Crim.App. 2006), defense counsel failed to inquire of the defendant and his family members about the defendant's substantial history of childhood abuse, from which he developed, and continued to suffer from, post-traumatic stress disorder. No errors in any way similar to those in these cited cases occurred here.

Current counsel for Purkey complained that our pursuit of the poisoning defense, and our investigation related to Mr. Purkey's family members, made our work comparable to several cited cases (Doc. 52, p. 24). Again, the facts here bear no relation whatsoever to the startling deficiencies which occurred in the cited cases. Counsel again refer to *Wiggins v. Smith*, supra, in which defense counsel presented no mitigation evidence after admittedly not conducting an investigation, and reviewing only limited records about the defendant's background. Also, they refer to *Harries v. Bell*, 417 F.3d 631, 638-639 (6th Cir. 2005), in which, due to client resistence, there was a failure to obtain records of mental health problems and a failure to obtain mental evaluations, despite counsel being alerted to those

issues during conversations with family members.

In discussing our efforts with respect to the Newton, Bose, Leiker and Noe information, current Counsel for Purkey attempt to liken our those efforts to those set forth in certain cases (Doc. 52, p. 24-27). They cite again to *Marquez-Burrola v. State*, supra, in which, as described above, no substantive mitigation work was done until a week before trial, consisting of interview of only a few family members for about two hours, and only 3 lay witnesses testified in a mitigation case comprising less than 15 pages of transcript. They also mention *Collier v. Turpin*, 177 F.3d 1184, 1200-1202 (11th Cir. 1999), in which the defense presented a mitigation case which lasted just a little more than one hour, and offered virtually nothing of the defendant's background except that he was a hard worker and had a good reputation in the community. There is also *State v. Williams*, 794 N.E.2d 27, 49-50 (Ohio 2003), wherein after the defendant assaulted his attorneys upon the jury's return of a guilty verdict, those attorneys conducted no preparation for penalty phase mitigation. Then there is *Powell v. Collins*, 332 F.3d 376, 398-399 (6th Cir. 2003), in which defense attorneys did not begin prep for penalty phase until after the guilty verdict, and presented only one witness, a psychologist who testified that the defendant had the capacity to commit aggravated murder and that, in his opinion, it was a good thing that the defendant was not bigger, stronger,

78

heavier and smarter, as that would make him that much more dangerous. Next, there is ***Williams v. Anderson***, 460 F.3d 789, 797 (6th Cir. 2006), wherein the defense attorney did not do mitigation investigation, and presented only the defendant's testimony during penalty phase. Finally, there is ***Hovey v. Ayers***, 458 F.3d 892, 926 (9th Cir. 2006), in which there was a failure to obtain readily available records of prior diagnosis of schizophrenia to support similar diagnosis made by a defense expert.

Put simply, none of these cases in any way resemble the facts in this case.

### ***Issue regarding the preparation for and presentation of the testimony of Dr. Bruce Leeson, Ph.D.***

Current counsel for Mr. Purkey argue, that the credibility of defense expert, Dr. Bruce Leeson, was "severely challenged" in light of answers which he made to a few cross-examination questions posed to him, and that I was ineffective in not better preparing Dr. Leeson to answer those questions (Doc. 47, p. 25; Doc. 52, p. 27-29). I do not believe that the record of Dr. Leeson's testimony, taken as a whole, supports these concerns.

The only facts about Mr. Purkey which Dr. Leeson admitted not knowing prior to trial concerned Mr. Purkey having taken some psychology college correspondence courses and Mr. Purkey working as a jailhouse lawyer (Tr. 1616). On redirect examination, Dr. Leeson fully explained why it was not important for

him to know those particular facts, since the capabilities which those accomplishments required were unrelated to the damaged areas of Mr. Purkey's brain, identified in Dr. Leeson's neuropsychological testing, which caused the problems for Mr. Purkey which Dr. Leeson was describing (Tr. 1646-1647). Dr. Leeson also addressed in redirect examination an issue raised in cross, explaining that what was learned in the sorts of psychology courses which Mr. Purkey took would in no way assist a person in faking neuropsychological testing results (Tr. 1647-1648).

Current Counsel for Mr. Purkey posit that Dr. Leeson's answers to questions regarding Mr. Purkey's prior treatment for head injuries somehow demonstrated his lack of mastery of the content of the reports concerning that treatment (Doc. 47, p. 25; Doc. 52, p. 28). Actually, if current Counsel for Mr. Purkey were themselves more familiar with those reports, they would realize that Dr. Leeson was fencing with opposing counsel, and answered as he did, not because he was unfamiliar with the reports, but because the queries made of him were, to some degree, misleading with regard to the operative facts in those records, and Dr. Leeson would not allow opposing counsel to misrepresent the presence of facts which were not present (Tr. 1626-1631). Opposing Counsel was certainly trying to posit that the results of testing conducted at the time of Mr. Purkey's injuries

countered the claim of neurological damage, but Dr. Leeson would have none of that (Tr. 1629, 1630, 1631). On redirect examination, I gave Dr. Leeson even greater opportunity to make it abundantly clear that the testing methods at the times of the injuries were not sophisticated enough to rule out the sorts of neurological injuries which he detected in his testing (Tr. 1639-1642).

Having now re-read Dr. Leeson's testimony as a whole, its seems to me that he was wonderfully well familiar with all of the facts and the psychological literature bearing on the opinions which he rendered, and he adroitly countered all of the argumentative questions posed against him by government counsel.

Current Counsel for Mr. Purkey wish to liken what happened with Dr. Leeson to what happened in ***Bean v. Calderon***, 163 F.3d 1073, 1079 (9th Cir. 1998). In that case, at the trial penalty phase, defense counsel enlisted experts at the last minute and provided only minimal records about the case; as a result, when called to witness at trial, the experts were not able to make definitive diagnoses, or opine about Bean's legal competency; on the other hand, at the habeas evidentiary hearing, after proper preparation, the doctors were able to testify that Bean was mentally retarded, suffered from brain damage and post-traumatic stress disorder, and could not have formed the requisite intent for the charged offenses; trial counsel were deemed ineffective for not properly preparing these experts for trial

81

in the fashion as ultimately presented at the habeas hearing. ***Bean v. Calderon***, supra. On the contrary, in this case, all of the experts, including Dr. Leeson, had all of the records they needed to make their diagnoses, were prepared far in advance of trial, and testified directly as to their diagnoses, and the impact of the diagnosed conditions on Mr. Purkey.

Current Counsel for Mr. Purkey also cite again to ***Hovey v. Ayers***, supra the case in which there was a failure to obtain readily available records of prior diagnosis of schizophrenia to support similar diagnosis made by a defense expert. Of course, the facts there are far different from the facts here. It should also be noted that, in citing to that case in their pleading, current Counsel for Mr. Purkey take odd literary license by quoting directly from the ***Hovey*** case, at page 929, but substituting the name "Dr. Leeson" for the name which actually appears in the text of that case, which is "Dr. Satten" (Doc. 52, p. 29). I am unsure why current Counsel for Mr. Purkey would have so confusingly misquoted the ***Hovey*** case. So the Court is not confused by this, I would clarify that Dr. Leeson had no connection with the ***Hovey*** case.

### ***Issue regarding the preparation for and presentation of the testimony of Dr. Stephen Peterson, M.D.***

Upon this issue, current Counsel for Mr. Purkey ask this Court to find lacking my preparation for and presentation of the testimony of defense

psychiatrist, Dr. Stephen Peterson, M.D. (Doc., 47, p. 27; Doc. 52, p. 30-31). The trouble is that the conclusions which they urge can be drawn only through the faulty mechanism of drastic misrepresentation of the facts.

Current Counsel for Mr. Purkey have reprised here their incorrect assertions, that Dr. Peterson supposedly did not testify about Mr. Purkey's previous reports to others about his sexual abuse, and that the government, as a supposed consequence, argued that Mr. Purkey had fabricated the claim of sexual abuse to avoid the death penalty (Doc. 47, p. 27-28; Doc. 52, p. 30-31). As I have already detailed above at pages 63-68, contrary to the claims of current Counsel for Purkey, not only did Dr. Peterson testify that Purkey had reported his sexual abuse to multiple persons on multiple previous occasions, but also the government never made the complained-of argument, but rather essentially conceded the abuse committed against Purkey.

It should be noted that, even though their claims are incorrect, current Counsel for Purkey persuaded Dr. Peterson to embrace and admit them as if they were true (Doc. 47, attachment 15, p. 3-4). I have spoken to Dr. Peterson, and have learned that current Counsel for Purkey were able to obtain these inaccurate admissions from him by misleading him, showing him only the limited parts of the record, as cited in their pleadings, and not providing Dr. Peterson with the whole

83

transcript of the case, and in particular not providing Dr. Peterson the portions of the transcript wherein he does refer to Mr. Purkey's other revelations about the sexual abuse and wherein the actual government arguments are revealed. I did not ask for Dr. Peterson to complete another affidavit in these regards, but I can if the Court wishes.

Citing only sparingly to the pertinent record, current Counsel for Mr. Purkey also complain that I did not have Dr. Peterson sufficiently detail the sexual abuse suffered by Mr. Purkey (Doc. 47, p. 27; Doc. 52, p. 30). Actually, we did bring out many details about the kinds of sexual abuse, more than noted by current Counsel for Mr. Purkey, as well as Dr. Peterson's explanation about the impact of the sexual abuse, and that can all be found at transcript pages 1750-1751. However, the thrust of the argument is that, if only I had elicited from Dr. Peterson even more salacious details which Purkey had accounted to Peterson about the abuse, that would have caused the jury to more readily believe the account.

In his providing of detail about the abuse at trial, I wanted Dr. Peterson to strike a balance so that enough was said about the varieties of sex used by the mother upon Wes and the young age at which she exposed Wes to those kinds of sex, in order to give Dr. Peterson the opportunity to convey the psychological and emotional damage wrought by overwhelming one too young with such sex games.

84

I felt that Dr. Peterson, without leading from me, found that proper balance. I felt that had I prompted him into the sorts of lurid details suggested, I would have tipped over the balance, and would have taken away the clear impression left by Dr. Peterson about the shame associated with Wes' memories, and would have instead falsely portrayed those memories as erotic, prurient and titillating. Moreover, as I have indicated earlier, my reasoning was also that the mere expedient of accounting more words from Wes' mouth would not make his story as a whole more believable for the jury. That is why I had Dr. Peterson emphasize the independent confirmation of the abuse which was provided by Mr. Purkey's aunt and brother (Tr. 1816).

Current Counsel for Purkey posit that the government's "fairy tale" and "abuse excuse" arguments (Tr. 2267-2268) were somehow a consequence of Dr. Peterson not doing enough to support Wes' accusation of sexual abuse against his mother (Doc. 47, p. 27; Doc. 52, p. 32). However, as already described in detail at pages 67-68 above, this contention by current Counsel for Purkey founders on the fact that neither of these terms were ever used to describe Wes' sexual abuse allegations against his mother. The term "fairy tale" was first used by government expert, Dr. Park Dietz, to describe my request that he assume as true our expert's conclusions that PET testing showed brain damage (Tr. 2210-2212). Government

Counsel then used the "fairy tale" term to more broadly describe Dr. Peterson's ultimate conclusions about Mr. Purkey's inability to conform his conduct to the requirements of the law at the time of the offense (Tr. 2267). The "abuse excuse" argument referred generally to Wes' "bad childhood" (Tr. 2268). The contention, as made by current Counsel for Purkey, that the mere palliative of different answers from Peterson on the sexual abuse issues would have somehow preempted the government's arguments, and would have thereby somehow dissuaded the government from making these arguments, seems doubtful if not laughable.

The real problem faced by Dr. Peterson in advancing the conclusions which he did was that he was swimming upstream against a torrent of evaluation results from numerous mental health professionals made over the preceding thirty-some-odd years. As Dr. Dietz himself noted, in pronouncing his own antisocial personality disorder findings about Wes, that his conclusion was in no way novel, and simply mirrored the like conclusions reached consistently and persistently by the various mental health professionals who had evaluated Wes over the years (Tr. 2156).

Current Counsel for Purkey fail to note that, in confronting this phalanx of contrary opinions, Dr. Peterson used the sexual abuse as an important component, but only one component, in the complete story about the pervasive abuse and

Case 4:06-cv-08001-FJG    Document 73-1    Filed 05/20/08    Page 86 of 117

trauma which Wes suffered during his early life. Dr. Peterson certainly described the sexual abuse, and the psychological impact wrought by that abuse (Tr. 1750-1752). Dr. Peterson even endeavored to explain how previous evaluators had done incomplete evaluations, and thus had missed this very significant piece to the puzzle (Tr. 1813-1815, 1824-1825). Dr. Peterson also described Wes' physical beatings at the hands of his parents, and the psychological impact of that (Tr. 1753-1755). As well, Dr. Peterson described the adverse impact wrought from Wes' parents and brother not only pervasively modeling drug and alcohol abuse behavior, but also introducing Wes to drugs and alcohol as an early teen, and encouraging Wes to abuse substances with them (Tr. 1756-1756). And, Dr. Peterson detailed the functional impacts of the significant accidental head injuries which Wes suffered (Tr. 1759-1760). Dr. Peterson's concluded that Wes, as a result of this wide-ranging set of problems, suffered from a complex set of mental illnesses, and that that complex set of mental illnesses, rather than antisocial personality disorder, explained Wes' problems in general, and his actions against Jennifer Long in particular (Tr. 1748-1749, 1766-1771, 1775-1776). However, Dr. Peterson had to admit that his diagnosis could not be nicely pigeon-holed into a distinct category found in the DSM-IV-TR (Diagnostic and Statistical Manual, Fourth Edition, Text Review) (Tr. 1793). That answer, and not his answers about

Case 4:06-cv-08001-FJG    Document 73-1    Filed 05/20/08    Page 87 of 117

sexual abuse, left Dr. Peterson open to precisely the argument against him made by the prosecution (Tr. 2267).

Current Counsel for Purkey refer to three cases, wishing to liken what happened here to what happened there (Doc. 52, p. 31). What happened in those cases was far different than what happened in this case.

Current Counsel for Purkey cite a third time to *Hovey v. Ayers*, supra the case in which there was a failure to obtain readily available records of prior diagnosis of schizophrenia to support similar diagnosis made by a defense expert. Also cited is *Lewis v. Dretke*,[8] 355 F.3d 364, 366-367 (5th Cir. 2003), wherein counsel failed to submit any evidence about an abusive childhood when such evidence was readily available, and the only reason for the failure to develop and present the evidence was the failure to interview available, family member witnesses. Next is cited *Turpin v. Lipham*, 510 S.E.2d 32, 41-42 (Ga. 1998), wherein counsel failed to read, and failed to hire a mental health expert to evaluate, thousands of pages of records about defendant's institutionalization in mental hospitals, childrens' homes and treatment centers from age 9 to 10, failed to interview any of the doctors mentioned in the reports, and presented only three

---

[8] In their pleading, current Counsel for Purkey mistakenly refer to the party's name as "Drake" (Doc. 52, p. 31), whereas the correct spelling is "Dretke".

witnesses in penalty phase, two records custodians, who merely identified the records, and the defendant's wife, who simply made a plea for mercy. Finally cited is *Commonwealth v. Alvarez*, 740 N.E.2d 610, 617-618 (Mass. 2000), wherein a failure to obtain records of serious auto accident not only resulted in defense expert not having necessary support for his diagnosis, but also permitted the prosecution to incorrectly argue that the defendant's accounts about the seriousness of the accident were self-serving fabrications. There is nothing remotely similar about these situations in these cases and what occurred in this case.

### *Issue regarding the preparation for and presentation of the testimony of Dr. Mark Cunningham, Ph.D.*

Current Counsel for Mr. Purkey also ask this Court to find in my presentation about the maternal sexual abuse of Purkey through Dr. Mark Cunningham Ph.D. faults similar to those urged by them concerning my presentation of the same information through the Dr. Peterson testimony (Doc. 47, p. 29-31; Doc. 52, p. 32). Their criticisms here suffer problems very similar to those suffered by the complaints related to the Peterson testimony.

Once again, current Counsel for Mr. Purkey have not found it necessary to fully and accurately describe the trial testimony (Doc. 47, p. 29-30), and therefore have failed to note that the Cunningham testimony actually contains many of the details which they incorrectly contend are missing (Tr. 1862, 1864-1865).

89

However, it is certainly true for Dr. Cunningham, as it was with Dr. Peterson, that even more detail of the sexual abuse was available had I decided to ask for it. My approach to the Cunningham testimony was the same as with the Peterson testimony. I wanted the jury to have enough detail to fully grasp the impact of the sexual abuse without overwhelming the point with prurient detail. To me, that notion of balance was even more important in the Cunningham presentation because of the point, made by Dr. Cunningham, about the shame-induced reluctance of victims to detail their abuse (Tr. 1866-1867). It seemed to me that the sort of detail which Dr. Cunningham brought forth on his own was in keeping with the point about shame, and that my coming back to solicit even more Purkey-provided detail would have, if anything, undercut the point about shame-induced reluctance to share details. Moreover, with Dr. Cunningham, as I had with Dr. Peterson, I sought to support the abuse allegations, not with more questions about more words from Purkey, but rather with questions about the confirmation of the abuse provided by independent sources (Tr. 1865-1866). And, with Dr. Cunningham, as with Dr. Peterson, sexual abuse was but one of many trauma factors used to explain, as Dr. Cunningham put it, Mr. Purkey's "pervasive developmental poisoning" (Tr. 1854, 1857-1878).

Dr. Cunningham himself questions, and current Counsel for Purkey indict,

Case 4:06-cv-08001-FJG    Document 73-1    Filed 05/20/08    Page 90 of 117

my decision to not have Cunningham use a powerpoint presentation which he had prepared (Doc. 47, p. 30; Doc. 47, attachment 11, p. 3-4; Doc. 52, p. 32-33). I had several reasons for making this decision.

First, I had it in mind to try to stop the use of a powerpoint presentation by government expert Dietz. I had educated myself on Dietz's presentation strategies, and I knew that Dietz depended greatly on his powerpoint presentations, and that those powerpoint presentations contributed mightily to the effectiveness of the Dietz presentations. I felt that, if I could strip Dietz of his powerpoint, I could reduce his effectiveness. I developed objections to the Dietz powerpoint, and I was ultimately successful in preventing his use of the powerpoint (Tr. 2137). I knew that my arguments against Dietz's powerpoint would have been undercut if I had, just days earlier, had Cunningham use a similar presentation. This strategy against Dietz was a part of my reasoning in not letting Cunningham use his powerpoint.

Second, I was concerned that Dr. Cunningham's powerpoint could be used as a tool for a potentially devastating cross-examination. By the time that Dr. Cunningham testified in the Purkey case, he had previously testified in more than 75 other capital cases throughout the country (Tr. 1911-1912). I was aware that prosecutors were collaborating on various ways to attack Dr. Cunningham, and were particularly focusing on trying to use Cunningham's presentations in previous

91

cases to show what they would argue were rote repetitions of those presentations from one case to another. I personally had seen Dr. Cunningham's powerpoint presentations for various cases, including Purkey's and one other case which I handled, and I noted redundancies in certain of the powerpoint slides in those various presentations. While I could have asked that Dr. Cunningham remove the repetitive slides about which I was aware, I was concerned that, even with such a removal, in light of the sheer volume of the cases which Dr. Cunningham had previously handled, he could not possibly be able to assure that, even after the reduction I would propose, that there were not slides which remained in his powerpoint presentation for Purkey which were very similar to, if not exactly the same as, slides used in other cases. I believed that, if a confrontation with similar slides occurred, that would be devastating to Dr. Cunningham's otherwise very strong, case oriented presentation on Mr. Purkey's behalf.

Finally, I had had the opportunity to see Dr. Cunningham in situations in which he used his powerpoint and in situations in which he testified without the powerpoint. It was my perception that Cunningham was more effective without his powerpoint.

In light of the combination of these factors, I decided to have Dr. Cunningham provide his testimony without the powerpoint.

## *Issues regarding presentation of defense witnesses Grant and Russell*

In their pleadings filed on Mr. Purkey's behalf, current Counsel for him seriously question my judgment in calling as defense witnesses two BOP employees, Dr. William Grant, M.D. and Mark Russell (Doc. 47, p. 32-33; Doc. 52, p. 33-34).

As to the calling of Dr. Grant, the criticism is somewhat understandable. Our purpose in calling Dr. Grant was to have him testify that he had prescribed the psychoactive medications which Mr. Purkey was then taking, and believed them to be medically appropriate. In my conversations with Dr. Grant prior to his testimony, it was my understanding that he would say those things simply and straightforwardly. Direct examination was fairly straightforward, with the exception that Dr. Grant minimized the psychoactive effect of one of the agents he had prescribed, and indicated that he prescribed that agent because it "was not medically inappropriate" and because Purkey asked for it and was going on trial for his life (Tr. 1409-1410). Then, on cross, Dr. Grant allowed that "(t)he justification for Klonopin…came from another psychiatrist who was in private practice and consulting with the defense", but added that he didn't think that psychiatrist "supported the diagnosis very well in his reports" and that "he invoked anxiety where many of the rest of us would have invoked an attitude, belligerent,

irritable attitude" (Tr. 1415-1416). I went back on redirect and clarified that Dr. Grant had not seen Dr. Peterson's 70 page report to know all of his reasons for his diagnosis, and that, regardless, he, Grant, was the one to prescribe the meds (Tr. 1417, 1420).

I did not anticipate, and it still amazes me, that a practicing physician would essential admit under oath, as did Dr. Grant, that he had abdicated his professional role in deciding the appropriateness of prescribing controlled substances, and thereby jeopardize his license to continue prescribing such medications.

While I would not agree that Dr. Grant's testimony was "more harmful than helpful", as argued by current Counsel for Mr. Purkey, if I had it to do over again, I would have brought out the point about Grant's prescription of the medications through Dr. Peterson, thereby avoiding the problematic testimony which Dr. Grant volunteered.

I find the criticisms about the Mark Russell testimony much less understandable. On behalf of Mr. Purkey, current Counsel for him have expressed serious concern over the possibility that use of the term "Club Fed" in the testimony would mislead a jury into believing that penitentiary conditions were somehow posh (Doc. 47, p. 5-7). But now, while acknowledging that Russell was obviously called in part to squelch the "Club Fed" notions, current Counsel for

Purkey criticize that Russell did more harm than good (Doc. 47, p. 33). I respectfully disagree.

Current Counsel for Mr. Purkey are certainly correct that I wanted to directly address, from whatever source, any juror false impressions about the conditions of Fedcral prison confinement. I believed that this could be done best through two witnesses: expert Dr. Mark Cunningham, Ph.D. and prison worker Mark Russell. During my dealings with Mr. Russell in the months leading up to trial, I was able to discuss with him all aspects of the testimony which he would give, and he said everything at time of trial which we anticipated. Not only did Mr. Russell directly debunk the whole "Club Fed" idea (Tr. 1654), he generally described the security conditions of the institution (Tr. 1659-1660), and specifically described Mr. Purkey's rather stark conditions of confinement, 23.5 hours a day in his cell, and in restraints whenever moved (Tr. 1653-1654). Mr. Russell also added, in support of other points we were making, that Purkey had exhibited no assaultive behavior while at Leavenworth, and had requested to have his Aryan tattoos removed (Tr. 1654-1655).

Current Counsel for Purkey complain that, though Mr. Russell certainly debunked the "Club Fed" idea about prison conditions of confinement, he also said on cross-examination that Purkey was currently being held in a unit for inmates

with problem behaviors (Doc. 47, p. 32). What current Counsel for Mr. Purkey fail to note was that Mr. Russell clarified that the unit was also for administrative cases, and that Mr. Purkey was being housed in that unit for the administrative reason that he was "pretrial" (Tr. 1655-1656). Current Counsel for Mr. Purkey further complain that, on cross, Mr. Russell acknowledged that Purkey had been "demanding" in that he wanted more access than the normal inmate to the law library and to a typewriter, and once asked for a hot lunch rather than a sack lunch (Tr. 1656-1657). What current Counsel for Mr. Purkey fail to note is that Mr. Russell clarified those matters favorably for Purkey, noting that Purkey's needs for library and typewriter time were greater since he was facing trial (Tr. 1657), and that Purkey's request regarding a hot lunch owed to the fact that, because he was in trial, he would normally miss the only hot meal which would be served to inmates on a given day (Tr. 1661). Current Counsel for Mr. Purkey also complain that Mr. Russell acknowledged on cross-examination that he had heard rumors that Purkey had a long history of assaultive behavior in custody (Tr. 1658). In a different case, under different circumstances, such a revelation would have been problematic. In this case, Mr. Russell's information was but a thimble of water from the ocean.

The government was claiming Mr. Purkey would be a future danger, in part because of his prior assaultive history in prison (Doc. 145, Doc. 484, p. 10). We

knew that the government was prepared to come forward with experts to detail Mr. Purkey's assaultive behavior history in prison to support the future dangerousness aggravating factor. When the government chose not to advance those witnesses in its penalty phase case-in-chief, we had a choice to make. Unfortunately for us, the government already had presented evidence, not only about the facts of this case, but also about Mr. Purkey's prior history of assaultive behavior outside of prison, and about the incident with Gary Hatfield at the prison camp in Oregon, to support its future dangerousness allegation (Tr. 1215-1338). Even without any evidence about institutional violence, the government was in a position to make a very creditable argument for future dangerousness. It is my experience that a capital case jury is much more inclined to give a death penalty to the extent that its members believe that the client will pose a danger to others in prison. Thus, I believed that, in order to have a chance to save Wes' life, we had to try to convince the jury that, within a secure Federal institution, and with his new medication regime, Wes could be managed in a way to not constitute a future danger. In order to do that, we had to take the lead on making that case, knowing that by doing so we were opening the door to Wes' institutional history, including his assaultive behavior within those institutions. Mr. Russell just happened to be the first witness in that regard, and what he provided on the topic was marginal compared with

97

what would come out through Dr. Cunningham (Tr. 1898) and then through the government expert in rebuttal (Tr. 2052). Through Dr. Cunningham, we tackled the previous assaultive behavior head on, and tried to convince the jury that, in light of statistics and security of confinement in general, and in light of Mr. Purkey's advancing age, medication regime and recent behavior in particular, they could trust that future dangerousness in prison would not be a significant issue (Tr. 1880-1904).

My strategy might well be debated. But in that case, the argument would not be the one made against bringing in Russell to make one comment about rumors of assaultive behavior. Rather, the argument which should be made, but which is not made, would be against bringing in Cunningham to provide copious details about that behavior, thereby opening the door to the government's expert testimony. Regardless of which argument would be made against our approach, I felt that it was our only chance to confront the future dangerousness claim, and that we had to take that chance.

### *Issue about our decision to not have Purkey testify at penalty phase*

Complaint is made about our not having Purkey testify at penalty phase to express his remorse (Doc. 47, p. 33). Our reasoning behind this decision was as follows.

98

It was my plan to address Wes' remorse from the very beginning of trial. I spent much of the first day of trial beating the drum of Wes' remorse, first in my opening statement (Tr. 408), then in the testimony of Detective Bill Howard (Tr. 468-469, 477), and finally through the testimony of Agent Dirk Tarpley (Tr. 510-511, 583, 596). Then, in his testimony, Wes took the next step, to say that, even knowing he was facing the death penalty, he would still admit what he had done, because the closure his confession gave was all he had to give back to the family (Tr. 951, 971). The point about Wes' expressions of remorse were made so well that prosecutors even conceded Wes repeatedly said he was sorry, though they argued that the expressions of remorse were not genuine (Tr. 1097-1102).

Wes, Laura and I seriously discussed whether Wes should testify at penalty phase, simply to reiterate his previous apologies. We ultimately decided to not have Wes testify. Laura had developed a rather strong argument that Wes should be able to deliver such an apology as an allocution statement, without having to, once again, be subjected to cross-examination (Doc. 475). We advanced this argument with the Court, but the request for allocution before the jury, without cross-examination, was denied (Tr. 1838-1839, 1905). After that ruling, we knew that, if Wes went forward and testified, and submitted to cross-examination, that would have rendered moot our allocution argument, since any prejudice from the Court's ruling would have been

obviated by Wes providing his statements of remorse in testimony. We also knew that Wes' previous apologies were all over the record of the case. Thus, the three of us together decided that Wes would not testify, and we would preserve the allocution issue for a possible appeal.

Wes worked in close conjunction with me in the choosing of the issues which we raised on appeal. We originally prepared and tendered a brief containing twenty-nine points, and requested leave of Court to file an overlength brief. One of the points in that original brief was the allocution issue. The Court of Appeals sustained our request for overlength brief, and increased the word count permitted. However, the new word count was far less than the number contained in the tendered brief, and so that brief was rejected. We had to go back to the drawing board, and we eventually prepared a brief, which Wes approved, which contain nineteen issues. That brief was accepted by the Court of Appeals. In the paring down process, we decided, with Wes' approval, that the allocution issue should be removed because, while it was a significant issue, it was not as strong as the nineteen issues ultimately chosen for inclusion in the final brief.

If the Court would like, I can provide a copy of the allocution point which was contained in the original brief tendered to the Court of Appeals.

### _Issues pertaining to the Tarpley claim that he had only learned about Purkey's retraction about kidnapping just before trial_

100

## 1. The events at trial

There are raised a bevy of issues which relate to one brief statement by Agent Dirk Tarpley. The incident involved a single question posed to Tarpley, near the end of his direct examination, about when he first learned that Purkey had changed his story about the kidnapping of Jennifer Long; Tarpley's answer was "right before this trial" (Tr. 566).

To me, then and now, the point was a non-starter. That Tarpley was unfamiliar with our defense positions was natural in that he was law enforcement. Once Wes was represented by counsel, Wes would not be communicating with Tarpley. Besides, Tarpley had already been duplicitous with Wes in their prior discussions, making it understandable that Wes would never again have civil contact with Tarpley. Moreover, there would be no reason for defense counsel to ever share matters about the defense with a law enforcement officer. If we were going to share with anyone, it would be counsel for the government. Plus, in the case of Purkey's own testimony, we had no duty to share any of that with the government until Purkey testified. We had actually shared things early by mentioning the matter in opening statements. Besides that, I knew that, if we needed to do so, we could pop this whole balloon by confronting Tarpley and government counsel with the words of their informer, Michael Speakman, who had

101

told them two years earlier that Purkey was denying that a kidnapping had occurred.

For these reasons, I saw no reason to dignify such a frivolous point with a response. I figured I would approach things in one of two ways. If the matter was never raised again by the government, I would probably ignore the matter since it was likely that it would fade from the jury's memory, coming as it did so briefly and so early in trial. On the other hand, if the government raised the matter again, I would deal with it with the approaches which I noted above. Having made those judgments, I then went on to vigorously cross-examine Tarpley on what I believed to be the key issues: Tarpley's duplicity with Wes, and eventually the jury, about the agreement to secure Wes' statements, Wes' remorse over the killing of Jennifer Long, and the fact that Wes' statements formed the sole basis for discovery of the facts and evidence about Jennifer Long's death (Tr. 566-597). In handling things in this way, the one thing for which I had not accounted was how this single question and answer would impact upon Wes' psyche.

Not long after my cross of Tarpley was over, Wes was animated, wanting to know why I had not confronted Tarpley about calling Wes a liar. I first sorted out that Wes was upset about the single question and answer, and his somewhat peculiar interpretation of that question and answer. It was readily apparent that

102

Case 4:06-cv-08001-FJG    Document 73-1    Filed 05/20/08    Page 102 of 117

Wes' mental illness was really having an impact here. I tried to explain to Wes my reasoning in handling the matter as I did. Wes would have none of it. To Wes, this was a matter of utmost concern and even honor, because Tarpley had disrespected him, had lied to do it, and had not immediately been held accountable.

My recollection is that, while my interchange with Wes occurred very soon after my cross of Tarpley, it was after Tarpley had left the witness stand. Thus, I could not just jump back in at that moment, and make the inquiries which Wes wanted made of Tarpley. I explained to Wes that, while my notion would be to let the matter die on the vine, because he was so concerned, I would make sure that Laura brought out through Michael Speakman that Speakman had told Tarpley, two years before the trial, that Purkey was denying the kidnapping. Laura elicited that very testimony from Speakman later that same day (Tr. 695-696). I believed that the Speakman testimony not only put the matter to rest, it also made Tarpley look very bad.

Nevertheless, Wes was not satisfied. He remained obsessed with the matter, and was willing to do anything to find other sources of evidence to confront Tarpley with his "lie". This included suggestions that Dr. Peterson, Laura and I witness about Wes denying the kidnapping to us. While I acknowledged to Wes

that the three of us could be called to witness, particularly after Wes himself had testified, I deflected these requests by Wes by explaining to Wes that the Speakman testimony directly addressed the matter in a way which testimony from the lawyers and the psychiatrist could not. Whereas Speakman had communicated his information directly to Tarpley, none of the three of Dr. Peterson, Laura or I had ever communicated to Tarpley about what Wes had told us. Besides, Wes' discussions with Dr. Peterson about his denial of the kidnapping did not occur until 2002 and 2003, long after Tarpley learned of the matter from Speakman. I also explained the legal problems inherent in trying to make lawyers be witnesses in a case, and that while there are certain situations in which that step must be taken, this was not one of those situations.

I particularly did not want Dr. Peterson to get embroiled in this particular controversy, since I believed that such a use of Dr. Peterson would color jurors' perceptions of what he would say later. I knew that Dr. Peterson's testimony would be crucial in the penalty phase. The conclusions which Dr. Peterson would offer at the penalty phase were in no way dependent upon the truth or falsity of Wes' denial that there had been kidnapping. In fact, Dr. Peterson would not even testify unless the jury disbelieved Wes, and determined that there was a kidnapping. Had we done what Wes was suggesting, we would have brought Dr.

Case 4:06-cv-08001-FJG    Document 73-1    Filed 05/20/08    Page 104 of 117

Peterson in the first phase for the sole purpose to relate Wes' denial of the kidnapping. I believed that would have caused jurors to indelibly link Dr. Peterson, and therefore what he would say later, with the truthfulness of Wes' denial of the kidnapping. Thus, I wanted to make certain that Wes' obsession over the Tarpley "lie" did not have us tearing down the structure of our mitigation case.

I deemed myself fortunate that I was able to get Wes to grudgingly go along with my approach. I promised Wes I would argue, and then did argue, that the Speakman's testimony trumped Tarpley's testimonial claim (Tr. 1106, 1107). Though the Government Counsel had not mentioned the Tarpley issue in its opening argument, in closing argument Government Counsel did mention the claim that Purkey had come forward with his retraction of the kidnapping admissions just before trial, but also somewhat conceded how the Speakman revelations undercut that argument (Tr. 1129-1131).

2. The issue about my not confronting Tarpley with the 2001 Speakman revelations about Purkey's retraction of his kidnapping admissions

Argument is made that I was ineffective in not confronting Tarpley on cross with the fact that Michael Speakman had told Tarpley in 2001 that Purkey was denying that a kidnapping of Jennifer Long had occurred (Doc. 47, p. 35-36; Doc. 52, p. 41-45). This argument fails to account that, though Tarpley was not asked the

questions, the impeachment actually occurred later that same day when Speakman testified about the matter (Tr. 695-696). I already explained above my reasoning in not questioning Tarpley at the time about what I considered to be a marginal matter. Nevertheless, once the decision was made to confront the matter head on, the approach which we took was actually far preferable, since it did not give Tarpley the opportunity to concoct an explanation for his misstatement. Instead, Laura, was able to milk the point with Speakman that, way back in 2001, Tarpley was told by Speakman that Purkey was denying the kidnapping (Tr. 695-696). It should also be remembered that, since Tarpley sat at government counsel table throughout the trial, this confrontation of him through Speakman actually included him, helplessly sitting there as the confrontation occurred.

In the argument upon this point, there are cited a couple of cases in which available impeachment was clearly never made (Doc. 52, p. 42-44). The distinction here, of course, is that the impeachment was made, albeit not in the suggested fashion, but in arguably a better manner.

### 3. The issue about my not objecting to the Tarpley answer and the government argument about the matter

It is next urged that I should have objected to Tarpley's answer and the government's argument about that answer (Doc. 47, p. 38-40; Doc. 52, p. 50-54).

Case 4:06-cv-08001-FJG     Document 73-1     Filed 05/20/08     Page 106 of 117

However, no suggestion is ever made about what proper legal objection would have been well-taken as against either the inquiry or the argument.

As to the inquiry, since Tarpley's answer was inaccurate, the proper course was to correct the inaccuracy. That we did through the testimony of Speakman.

As to the argument, it should be noted that the government never mentioned the matter in its opening argument. I still believe that, had we not taken the government's bait, this issue would have faded away. Because of Mr. Purkey's obsession with the matter, and because of the way we ultimately addressed the matter in the evidence at Mr. Purkey's instance, I believed it was appropriate for us to argue the matter (Tr. 1106, 1107). Since we opened the matter in our argument, the government was clearly permitted to respond, and did actually respond, though pretty much conceding our point about the Speakman matter (Tr. 1129-1131).

Without any case law to support the actual point being made, reference is made in the pleadings to other, very different sorts of prosecutorial misconduct, and a request is made that this Court analogize the situation here to those very different actions by government counsel in the cited cases (Doc. 52, p. 51-54). Since the situation here is in no way analogous, the cited cases are inapt.

4. The issue about not presenting attorney testimony about the matter

It is urged that I was ineffective in not offering testimony from me and Laura O'Sullivan about Purkey telling us, "from day-1", that there was no kidnapping (Doc. 47, p. 37-38; Doc. 52, p. 45-50). I have already explained above my reasoning for not wanting to use attorney testimony to address the matter. To reiterate, the point made in the testimony was that Tarpley was supposedly unaware of Purkey's retraction of his previous kidnapping admissions (Tr. 566). There was no purpose to be served by calling the lawyers as witnesses, other than feeding Mr. Purkey's obsession. Though the lawyers had talked with Purkey, and knew about Purkey's account of the crime, the lawyers had never discussed with Tarpley the substance of their discussions with Purkey, and thus could not address the issue raised by Tarpley in his testimony. On the other hand, the testimony from Speakman, which was presented, directly countered Tarpley's point.

Several instances are cited concerning lawyers becoming witnesses in cases to offer critical testimony (Doc. 52, p. 46-49). The distinction here is that the lawyers had no evidence of substance to offer so as to justify their taking on the roles as witnesses.

5. The issue about not raising the matter on appeal

It is also argued that we should have raised the matter on appeal (Doc. 47, p. 39-40; Doc. 52, p. 54-58). It is specifically argued that the situation here is analogous to

the failure to raise an appellate issue addressed in two Eighth Circuit cases, though the facts of those cases are not shared with the Court (Doc. 52, p. 58). The situations in those cases are not even arguably similar to what occurred in this case. In *United States v. Bigeleisen*, 625 F.2d 203, 208-210 (8th Cir. 1980), the Eighth Circuit found reversible the combination of errors of the government failing to correct a false statement made by its key witness about a crucial aspect of his plea agreement, and then making an argument, unsupported by the evidence, to support a weakness in that same witness' testimony. In *United States v. Foster*, 874 F.2d 491, 494-495(8th Cir. 1988), the Eighth Circuit reversed because of the government's failure to disclose that its informers, who each denied under oath having an agreement with the government, actually did in fact each have a promise from the government that he would not be prosecuted. There is nothing in the facts of the Purkey case remotely similar to the facts in these cited cases.

It should also be noted again that, on appeal, we originally prepared and tendered a brief containing twenty-nine points, and requested leave of Court to file an overlength brief. The Court of Appeals sustained our request for overlength brief, and increased the word count permitted. However, the new word count was far less than the number contained in the tendered brief, and so that brief was rejected. We had to go back to the drawing board, and we eventually prepared a brief, which Wes

Case 4:06-cv-08001-FJG    Document 73-1    Filed 05/20/08    Page 109 of 117

approved, which contain nineteen issues. That brief was accepted by the Court of Appeals. All of the nineteen point raised in that brief were far more meritorious that the frivolous issue urged here. Mr. Purkey never urged me to replace any of those nineteen issues with this issue. But, had Mr. Purkey so urged me, I would have strongly resisted such a mistaken course.

6. Matters related to Mr. Purkey's trial testimony

Laura O'Sullivan and I are also criticized for the way in which we prepared Mr. Purkey for his testimony at trial (Doc. 47, p. 40-42; Doc. 52, p. 58-63). It is alleged that Mr. Purkey was told for the first time on November 4, 2003 that he would need to testify because there was no other admissible fashion in which his recantation of the kidnapping could come before the jury (Doc. 42, p. 59). That statement is half true. It is certainly true that we knew, in light of F.R.E. 802, that it was only through Mr. Purkey's testimony that we could present, in admissible fashion, Mr. Purkey's recantation of his kidnapping admissions. It is certainly not true that we took the matter up for the first time during trial. We had initially broached that subject with Mr. Purkey months before trial. That is why, for the months immediately preceding Mr. Purkey's trial, Laura and I regularly met with Mr. Purkey, and worked with him, preparing him for his testimony. I personally spent many sessions with Wes preparing him for his testimony. As part of my preparation work with Wes, I went so far as to

110

prepare a videotape of the places where the various events of the crime occurred, so I could play those back for Wes to refresh his recollection about details for his testimony. I still have that videotape should the Court wish to review it. It is my recollection that I reviewed and approved the presentation scheme which Laura prepared. It is further my recollection that Laura spent several sessions with Wes, developing the presentation which they ultimately made before the jury. I believe the transcript of the questions and answers bears out the careful preparation which went into that presentation of Purkey's testimony.

For all the claims about lack of preparation, there are only two allegations of errors in the presentation of Purkey's testimony: the failure to sufficiently prepare Purkey to answer the question posed on cross about when he made his kidnapping admission retraction and the failure to ask Purkey about his prior denials of the kidnapping to the defense team.

The complained-about interchange between government Counsel and Purkey, in context, was as follows:

Q   Now, you testified in this courthouse on October 25th of 2002 at a hearing, correct?
A   Right.
Q   And do you remember that at that hearing -- the tabbed portion, sir. Do you remember being asked questions about your handwritten statement?
A   Correct.
Q   And on that day we were in front of Judge Hays, Sarah Hays down in the magistrate courtroom; do you remember that?

A  That's right.

Q  And that was after you had been charged in federal court with this crime, correct?

A  Right.

Q  And do you remember that I asked you some questions about this signed statement –

A  Yes.

Q  -- that you wrote out yourself.  Do you remember that?

A  Yes.

Q  And do you remember that you were under oath that day?

A  Yes.

Q  You swore to tell the truth, do you remember that?

A  Yes.

Q  Do you remember me asking you, "Is that the document or a copy of the document you wrote out" and you answered yes?

A  Yes.

Q  And then I asked you, "You signed that on the back page; is that right?" And you answered that's correct.  And then I asked you, "Dated it 12/17/98" and you replied that's correct.  And then I asked you, "And then it was witnessed by Agent Tarpley and Detective Howard," and you answered that's correct.  Right?

A  Right.

Q  And I asked you, "And did you write that in your own handwriting" and you said what, what was your response?

A  I don't know where you're --

Q  Look on line 17.

A  Is that on page 59?

Q  Yes, sir.

A  "And did you write that in your own handwriting?"  "Yes, I did," is the answer.

Q  And I asked you, "Did you tell the truth when you wrote this?"  And what was your answer?

A  "Yes, I did."

Q  And then I asked you, "And that is a confession to the kidnapping, rape and murder of this young lady, correct?" And you answered --

A  "hat's correct."

112

Q   Now, you said under oath before Judge Hays that you were verifying the statements in that document, that you had admitted and confessed to kidnapping, correct;  that right?
A   Correct.
Q   You didn't change it and say I didn't kidnap her at that time, did you?
A   No.
Q   And you could have, right?
A   Yes.
Q   But you didn't do it.  And now here recently you have come up with this new story that you didn't kidnap her, right?
A   That's true. (Tr. 1005-1008)

What is not explained in Mr. Purkey's Petition and Suggestions is that Mr. Purkey made his complained-about answer, not because of anything which Laura instructed him to do or not to do, but out of necessity.  Mr. Purkey had to make that answer, about the recency of his retraction about his admission of kidnapping, because he was confronted with statements made by him under oath, just a year before, confirming the truth of his original admissions about the kidnapping.  No amount of preparation could have or should have changed Mr. Purkey's answer to that final question in light of what went before.

After Mr. Purkey's testimony as a whole, and after the aforementioned testimony in particular, it is surely obvious to anyone, save maybe those responsible for drafting of Mr. Purkey's pleadings in this case, as to why we did not ask Mr. Purkey about statements made by him to members of the defense team.  In his testimony, Mr. Purkey had well described many things, including his retraction of his

admissions about the kidnapping. There was no purpose to be served by asking him about what statements he had made when, and to what members of the defense team.

Finally, Laura's and my preparation for Wes' testimony is likened to the 15 minutes of preparation for the defendant's testimony found wanting in *Commonwealth v. Wesley*, 2005 WL 3106479, \*27-\*29 (Pa.Com.Pl. 2005). The comparison is, to put it simply and civilly, inapt.

## 7. The issue about not using Dr. Peterson to witness about the matter

Complaint is also made that we did not call Dr. Peterson to witness in the first phase, after Mr. Purkey's testimony, in order for Peterson to say that Purkey had denied the kidnapping during Peterson's interviews with him, thereby supposedly countering the argument about recent fabrication of Purkey's denial of the kidnapping (Doc. 47, p. 42-43; Doc. 52, p. 63-66).

The trouble with the argument is that there was absolutely nothing which Dr. Peterson's testimony in this regard would have accomplished. Mr. Purkey's discussions with Dr. Peterson did not occur until late 2002. In the context of this case, that timeframe was recent, coming four years after Purkey's inculpatory statements, but just a year before trial.

Moreover, as I mentioned earlier, I would have moved heaven and earth to avoid embroiling Dr. Peterson in the controversy over the kidnapping admission

114

retraction, lest that involvement compromise his effectiveness during the penalty phase.

Rather than trying to make our point through such ineffectual and counterproductive means, I chose other avenues. As acknowledged ever so briefly in Mr. Purkey's pleading (Doc. 52, p. 64), rather than calling witnesses to merely say that Purkey had told them there was no kidnapping, I tried to bring forth evidence, independent of Purkey's statements, which would lead the jury to its own conclusion that there likely was no kidnapping (Tr. 715-16, 849, 853, 856, 869-71, 876, 889-904). And, I made sure that Dirk Tarpley's specific testimonial misrepresentation was confronted with the testimony of Michael Speakman (Tr. 695-696).

### ***Issue regarding supposed failure to raise insufficiency of the evidence***

It is alleged that I failed to raise the issue about evidence insufficiency. That is simply not true. I had done considerable pretrial research about sufficiency of evidence issues. As a result of that research, I believed, and shared with Wes my belief, that the government's evidence, consisting of Wes' 1998 admissions combined with a modicum of physical evidence, was more than sufficient to survive a motion for judgment of acquittal. Nevertheless, I raised the matter of evidence sufficiency in our motion for judgment of acquittal at the close of all of the evidence (Doc. 448) and again in our motion for new trial (Doc. 490, p. 29). On appeal, our defense team,

including Wes, used the motion for new trial as our rough outline for the potential issues to be raised on appeal. In our discussions about issues to raise on appeal, I shared with Wes again my research-based notions about the weakness of the evidence insufficiency claim. As a result, we decided to not include that issue among the twenty-nine points contained in the original brief tendered to the Court of Appeals. Putting it another way, we believed that all of the twenty-nine issues contained in that original brief were much stronger than the evidence sufficiency issue. As already mentioned above, the Court of Appeals rejected that original twenty-nine point brief, and we had to pare down even further, to nineteen issues in the brief which was ultimately accepted by the Court. Because we had to abandon ten issues which were even stronger than the evidence sufficiency issue, there is no way that we would have included the weaker evidence sufficiency issue in the brief upon which we ultimately relied for our appeal.

116

## *Conclusion*

I believe that the foregoing answers the ineffective assistance of counsel allegations made in the pleadings in this case (Doc. 47; Doc. 52). If the Court wishes any further information from me, I am, of course, available. I do hereby swear that the foregoing is true and correct to the best of my knowledge and belief.

/s/Frederick A. Duchardt, Jr.
FREDERICK A. DUCHARDT, JR.

Subscribed and sworn to before me this 9th day of May, 2008.

/s/Joanna M. Parrish
NOTARY PUBLIC

My commission expires   1/4/2011

Case 4:06-cv-08001-FJG     Document 73-1     Filed 05/20/08     Page 117 of 117