IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| WESLEY IRA PURKEY, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | Case No. 06-8001-CV-W-FJG |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**GOVERNMENT'S RESPONSE TO MOVANT'S APPLICATION FOR
CERTIFICATE OF APPEALABILITY**

On March 24, 2010, movant, Wesley Purkey, filed an application for a certificate of

appealability of this Court's denial of his § 2255 motion. The Government opposes this

issuance of a certificate of appealability on all four issues sought by Purkey, and offers the

following suggestions in support of its position.

## I. Background

### A. *Procedural Background*

A jury convicted Wesley Purkey of the kidnapping, rape, and murder of Jennifer

Long, in violation of 18 U.S.C. §§ 1201(a), 1201(g) and 3559(d), and sentenced him to death.

On January 23, 2004, following a denial of Purkey's motion for a new trial, this Court, the

Honorable Fernando J. Gaitan, Jr. Chief District Judge for the Western District of Missouri,

sentenced Purkey to death. Purkey appealed, but the Eighth Circuit affirmed Purkey's

convictions and sentence. *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005). Purkey's

motion for rehearing and rehearing en banc was denied on January 13, 2006. The United

States Supreme Court denied Purkey's writ of certiorari on October 16, 2006. *Purkey v.*

*United States*, 549 U.S. 975 (2006).

Purkey then moved for a writ of habeas corpus under 28 U.S.C. § 2255, arguing

primarily that he was denied his Sixth Amendment right to effective assistance of counsel

at trial and sentencing. This Court denied relief without a hearing. (D.E. 89.) Purkey now

seeks a certificate of appealability on four issues:

1)      whether Purkey's counsel, Frederick Duchardt, failed to adequately investigate

and present mitigation evidence, regarding six claims that Mr. Duchardt failed to (a)

to obtain the services of a mitigation specialist or otherwise adequately investigate,

prepare, and present mitigation evidence; (b) adequately prepare and present the

expert testimony of Dr. Bruce Leeson; (c) adequately prepare and present the expert

testimony of Dr. Stephen Peterson; (d) adequately prepare and present the expert

testimony of Dr. Mark Cunningham; (e) adequately prepare and present the testimony

of Purkey's brother and daughter; and (f) to adequately investigate and prepare

witnesses Dr. William Grant and Mark Russell, so they were prejudicial to Purkey;

2)      whether this Court should have conducted a hearing on Purkey's claims of

ineffective assistance of counsel;

3)      whether this Court should have stricken Mr. Duchardt's affidavit; and

4)      whether Purkey's counsel was ineffective in not calling Dr. Peterson in the guilt phase of the trial to rebut a claim of recent fabrication. (D.E. 107 at 4-17.)

## B.      *Factual Background*

Purkey was convicted of kidnapping, raping, and murdering 16-year-old Jennifer Long. The investigation revealed that on January 22, 1998, Purkey had applied for a position as a plumber with the Roto-Rooter plumbing company, located in Kansas City, Missouri.[1] Following the interview, Purkey stopped his truck in a parking lot and smoked a rock of crack cocaine and then proceeded east on Truman Road. (Tr. 925.) Purkey then stopped at a grocery store to buy some orange juice and gin to drink before heading back to his home in Lansing, Kansas. (Tr. 485.) At that point, Purkey observed a young white female whom he believed to be approximately 17 to 19 years of age. During a conversation with the girl he learned that her name was Jennifer. Purkey asked the girl if she wanted to get something to drink with him. Jennifer entered the pickup without any threats or force, according to Purkey. (Tr. 485.)

The two then drove to a liquor store a few miles away and purchased gin and orange juice. Purkey soon learned that Jennifer was in high school and that she had left school during the morning after arguing with some female classmates. (Tr. 485.)

---

[1]Purkey's employment application was later recovered by investigators confirming that he applied for a job at Roto-Rooter on January 22. (Tr. 518.)

-3-

Purkey then informed Jennifer that he wanted to go to his home for a few minutes, which was in Kansas. Jennifer told Purkey that she did not want to go to Kansas and that she wanted to be dropped off. At that point, Purkey reached over into the glove box, pulled out what he described as a boning knife and placed it under his right thigh in the presence of Jennifer. Purkey claimed that it was at that point that he decided not to let Jennifer out of his truck. (Tr. 487.)

Purkey then drove west on Interstate 70 from Missouri into Kansas, to his home in Lansing. (Tr. 487, 493-94.) Upon arrival, Purkey took Jennifer into his basement; she asked him to please take her back home. (Tr. 510.) Holding a knife in his hand, Purkey ordered Jennifer to take her clothes off and lie down on the floor, where he then raped her. (Tr. 997.)

Following the rape, Purkey told her that he had just finished a long sentence in the penitentiary and did not want to return. Jennifer told Purkey that she had been a virgin. This increased Purkey's fear. (Tr. 942.) Jennifer begged Purkey to let her leave. (Tr. 1017.) A brief struggle ensued and Purkey became enraged and began stabbing Jennifer in the chest, neck, and face, eventually breaking off the blade of the knife inside of her body. (Tr. 942-43, 1017-18, 1024.) Following the murder, Purkey put Jennifer into a large tool box designed to fit into the back of a pickup truck. (Tr. 1024-25.) Purkey changed his clothes and got rid of the victim's backpack. Purkey then drove to Snoopy's Bar in Lansing and had

-4-

several drinks. (Tr. 1025-26.) Purkey next drove to the Sears store in Lansing and purchased an electric chainsaw for $59.00.[2]

Over the next several days, while his wife was at work and his stepchildren were at school, Purkey dismembered Jennifer Long with the chainsaw while she was lying inside the tool box. (Tr. 1028-29.)[3] Purkey put her body parts in plastic bags and mixed in leaves and debris from his back yard. (Tr. 1029-30.) Purkey burned her body parts in his fireplace; he purchased two cords of wood and used diesel gasoline to accelerate the burning process. (Tr. 492, 646-47, 1030.)

Purkey next cleaned up the chainsaw using gasoline to remove the blood and human debris. (Tr. 1032.)[4] Purkey made his three stepsons help him wash down the basement although they had no idea that a murder had taken place there. (Tr. 648-49, 1030-31.) Purkey also swept the ashes out of the fireplace after burning the victim's body parts. The bones that did not burn up were crushed by Purkey with a hammer. (Tr. 1033.) The bags with the bones and ashes were taken by Purkey south to Clearwater, Kansas, after his family moved from Lansing in March 1998. (Tr. 517, 1034.)

---

[2]Investigators later recovered a copy of the receipt from Sears confirming Purkey purchased the electric chainsaw on January 22, 1998. (Tr. 501, 1022.)

[3]The tool box was later recovered by investigators at the home of Purkey's friend, Patrick Howe. Purkey gave the tool box to Mr. Howe following the murder. (Tr. 730-32.) The box has several chainsaw cut marks in the bottom and on the sides. (Tr. 730, 810-18, 1029.)

[4]The chainsaw was recovered by investigators from the home of Purkey's stepfather, Edward Wiley. (Tr. 639-40.)

Purkey threw the bags with the ashes and bones of the victim into a septic pond located on the property in Clearwater. Crushed human bones of an individual under the age of 25 were recovered from the pond in the area where Purkey indicated he had thrown the remains of the victim. (Tr. 789.) Human bones were also found in the sweepings from the ash pit of the fireplace at Purkey's former home. (Tr. 781-83.) All of the bones recovered by the FBI appeared to have been burned. (Tr. 781-94.) Purkey admitted the bones recovered from the septic pond were those of the victim. (Tr. 1034.)

On December 15, 1998, while in the Wyandotte County jail awaiting trial for the robbery and murder of 80-year-old Mary Ruth Bales, Purkey contacted law enforcement and offered to speak about a murder and kidnapping that had occurred earlier that year. Purkey said he wanted to spend his time in a federal prison, rather than a state prison. After giving an account of the kidnapping, rape and murder of the victim, later identified as Jennifer Long, Purkey refused to cooperate further unless he was assured he would be federally prosecuted.

Purkey's defense at trial was that he did not kidnap the 16-year-old victim and that she had gone with him to Kansas voluntarily. (Tr. 934, 1014.) Purkey's claim at trial was inconsistent with all of his previous statements to investigators in which he steadfastly insisted that he had kidnapped the victim. By its verdict, the jury rejected Purkey's defense during the guilt phase of the trial, returning verdicts of guilty on November 5, 2003.

### C. *Penalty Phase Evidence*

The Government called nine witnesses in its case-in-chief during the penalty phase in support of its submission of six statutory and four non-statutory aggravating factors. (Tr. 1210-1403.) Purkey called 18 witnesses, including four doctors to testify concerning his alleged mental disorders, in support of his submission of 27 mitigating factors. (Tr. 1406-1955.) In rebuttal, the Government called four expert witnesses, including three doctors, in response to Purkey's diminished mental capacity and brain damage claims. (Tr. 1962-2225.)

### 1. *Aggravation Evidence*

The Government submitted six statutory aggravating factors to the jury, and the jury found all six, that: (1) the death of Jennifer Long occurred during the commission and attempted commission of her kidnapping; (2) Purkey killed Jennifer Long in an especially heinous, cruel, and depraved manner in that the killing involved torture and serious physical abuse; (3) the victim was particularly vulnerable due to her youthful age of 16 years; (4) Purkey had previously been convicted of an offense punishable by a term of imprisonment of more than one year, involving the use, attempted use, and threatened use of a firearm against another person; (5) Purkey had previously been convicted of an offense resulting in the death of a person for which a sentence of life imprisonment was authorized by statute; and (6) Purkey had previously been convicted of two or more offenses punishable by a term of imprisonment of more than one year, committed on different occasions and involving the infliction and attempted infliction of serious bodily injury and death upon another person.

-7-

The Government submitted four non-statutory aggravating factors to the jury, of which the jury found three, that: (1) the Government established loss and harm because of the victim's personal characteristics as an individual human being and the impact of the death upon the victim's family; (2) Purkey had previously killed Mary Ruth Bales in a vicious manner in that he repeatedly struck her in the head with a hammer until she died; and (3) Purkey had a substantial criminal history. The Government also submitted a non-statutory aggravating factor which the jury did not find - the future dangerousness of Purkey.

Prior to Purkey's conviction for Jennifer's murder, he had spent most of his adult life incarcerated in various prisons in the states of Kansas, Arizona, and Oregon. Purkey had 13 prior felony convictions before receiving the sentence of death in this case, including a 1971 conviction for first-degree burglary; 1976 convictions for robbery and theft; a 1978 conviction for aggravated escape from custody; a series of convictions for robbery, kidnapping, assault, and firearms violations stemming from a 1981 crime spree; and the May 2000, convictions for the murder and robbery of Ms. Bales. (Tr. 975-86, 1211-14.) Purkey received a life sentence as part of his 1981 crime spree but was eventually paroled in March 1997 after serving approximately 16½ years on the life sentence. (Tr. 985.)

On October 27, 1998, approximately nine months after kidnapping, raping, and murdering Jennifer Long, Purkey went to the home of Mary Ruth Bales, an 80-year-old Kansas City, Kansas, widow, who had called Roto-Rooter about a leaking pipe. Purkey, by that time employed by Roto-Rooter, agreed to make the necessary repairs for Ms. Bales. The

-8-

next day, October 28, Purkey smoked crack cocaine with a prostitute and then drove to the home of Ms. Bales with the prostitute in his work van. While the prostitute waited outside, Purkey viciously bludgeoned the 80-year-old grandmother to death with a claw hammer. She had defensive wounds on both of her hands, apparently trying to ward off the hammer blows from Purkey. (Tr. 1236.) Purkey caved in her cranium and her face using the claw side of the hammer. While Ms. Bales lay dead in her bedroom, Purkey and the prostitute smoked some more crack cocaine and ate food from Ms. Bales' kitchen. Purkey was arrested for these crimes and confessed; he was charged with murder and aggravated robbery in Wyandotte County, Kansas, district court and pled guilty as charged on April 28, 2000. Purkey was sentenced to a term of life imprisonment with eligibility for parole after 15 years. (Tr. 1238, 1243.)

Gregg Carlberg testified that he was the victim of a kidnapping, aggravated battery, and aggravated assault by Purkey in 1980. Carlberg was kidnapped from a convenience store in the summer of 1980 in Wichita, Kansas. (Tr. 1245.) He then was driven to a wooded area by Purkey and an accomplice, robbed of $40, and subsequently shot in the head and shoulder while being forced to lie down in an abandoned bathtub in the woods. (Tr. 1250-54.) Purkey later admitted to shooting Carlberg in the back of the head. (Tr. 1256.) Carlberg suffered serious injuries including paralyzation for several months, a stroke, and permanent neurological damage. Part of the bullet Purkey fired into Carlberg's head remains lodged in the back of his skull. (Tr. 1253-54.)

Ken Lucas, a gang expert with the Arizona Department of Corrections, testified that Purkey was an active member of the Arizona Aryan Brotherhood, a violent white supremacist prison gang, while confined in a Florence, Arizona prison in the early 1980s. (Tr. 1340-48, 1352-54, 1360.) Mr. Lucas also testified concerning the meaning of many of the tattoos that appeared on Purkey's body and their association with the Aryan Brotherhood. (Tr. 1361-67.)

Gary Lee Hatfield, a former inmate of slight stature who briefly served time with Purkey in the Oregon Department of Corrections in 1987, testified Purkey forcibly sodomized him at knife-point and then beat him in the kitchen of the prison camp where they were serving prison sentences. (Tr. 1270, 1273-77.)

William Porter, District Attorney for Tillamook County, Oregon, was the prosecuting attorney assigned to prosecute the Hatfield sodomy allegation. (Tr. 1315-17.) He testified he eventually dismissed the forcible sodomy charge against Purkey because Purkey cooperated in an internal prison investigation that resulted in criminal charges against prison employees. Mr. Porter testified that Hatfield never recanted his allegations that Purkey had beaten and forcibly sodomized him in the kitchen of the prison camp. In addition, Porter described the incriminating evidence contained in his files, including photographs of injuries to Hatfield as a result of the assault. (Tr. 1318-29.)

The Government called the parents of Jennifer Long as well as one close personal friend to explain what her loss meant to their lives and how it affected their families. (Tr. 1396-1406.)

-10-

### 2. *Mitigation Evidence*

Purkey called 18 witnesses to support the 27 mitigating factors he submitted to the jury. No juror found a single mitigating factor. Purkey's witnesses included: a prison psychiatrist; a criminal defense attorney who had previously represented Purkey; several former inmates who had been incarcerated with Purkey; a friend and pastor; a friend who was a tattoo artist; an administrator from the Hutchinson Correctional Center who had supervised Purkey while he was a custodian; a former parole officer from the State of Kansas; Purkey's aunt; a friend who was incarcerated with Purkey at the Hutchinson Correctional Center; Purkey's daughter; Purkey's brother; a prison minister; a clinical psychologist with the Missouri Department of Corrections; a correctional counselor form the United States Penitentiary at Leavenworth; a radiologist from Kansas University Medical Center; a forensic psychiatrist; and a clinical and forensic psychologist who testified as a mitigation specialist.

Dr. Bruce Leeson, a clinical psychologist with the Missouri Department of Corrections, testified that he was retained as a expert witness for Purkey and had administered neuropsychological tests to Purkey. Dr. Leeson testified that in his opinion Purkey was depressed and anxious and had a significant amount of frontal and temporal lobe brain impairment which detrimentally affected his ability to plan ahead and focus. He further testified that the brain damage could explain Purkey's impulsive behavior. (Tr. 1577-1650.)

Dr. Stephen Peterson, a forensic psychiatrist, was another expert witness who testified on Purkey's behalf. Dr. Peterson testified that Purkey had a longstanding chronic mental

-11-

illness that had been untreated at the time of the murders of Jennifer Long and Mary Ruth Bales. He testified that Purkey suffered severe sexual, physical, and emotional abuse during childhood. He testified that Purkey was extremely impulsive and angry, and concluded that Purkey had substantial problems with substance abuse beginning in his teens. He testified that Purkey suffered from depression and was dysthymic, and had a severe personality disorder with anti-social features, obsessive-compulsive, and dependency features.

Dr. Peterson further described in detail three closed-head injuries that Purkey allegedly suffered in 1968, 1972, and 1974. He testified in great detail about Purkey's abusive, chaotic, and neglectful home life as a child and teenager. He described Purkey's parents as alcoholics and told the jury that Purkey's father had committed suicide. In conclusion, Dr. Peterson testified that Purkey did not have the capacity to form the intent to kill Jennifer Long because of severe psychiatric illness. (Tr. 1738-1832.)

Dr. Mark Cunningham, a clinical and forensic psychologist, testified as a mitigation specialist on behalf of Purkey. Dr. Cunningham testified that he had reviewed a total of ten binders of information about Purkey's background, primarily from correctional records during Purkey's incarceration in both state and federal prisons, and then performed a violence/risk assessment of Purkey. He testified that Purkey was a profoundly damaged person in both his neurological and neuro-developmental history. He described in great detail Purkey's abusive, neglectful, and alcoholic parents. He informed the jury of their poor parenting skills and how these had impacted Purkey's development. He also testified that

-12-

Purkey had been in car accidents resulting in probable brain damage, consistent with frontal and temporal lobe brain damage.

Dr. Cunningham testified that Purkey's mother had been sexually promiscuous with several boyfriends in front of Purkey and his brother. He also testified that Purkey's mother sexually abused him as a child and as a teenager. He described Purkey's significant alcohol and drug addictions, including addiction to methamphetamine, cocaine, and Ritalin.

Dr. Cunningham testified that there was an extremely high level of security at the Federal Bureau of Prisons facility at ADX Florence, Colorado. He described it as a super-max facility in which the likelihood of violence had been substantially reduced because of the high level of security. Dr. Cunningham also testified that because Purkey was taking appropriate medications to control his behavior, because of his age (51 years old), and because of the high security precautions within the Bureau of Prisons he believed Purkey would not be a significant threat to others in the future. (Tr. 1840-1954.)

Angie Genail, Purkey's daughter, testified about her relationship with her father. She displayed a large number of photographs of Purkey's family and described for the jury the individuals in each photo. She testified that Purkey's parents were alcoholics. She testified that Purkey had shared with her that his mother had thrown alcoholic drinks in his face when he was a child. She testified that she had a good and loving relationship with Purkey and he had always kept in contact with her even though most of his adult life was spent in prison. She testified that Purkey was a good grandfather to her son, was supportive to her, that she

-13-

loves him, and that she would maintain a relationship with Purkey if he was given a life sentence.  (Tr. 1541-48.)

Gary Hamilton, Purkey's brother, testified that Jack Purkey was his stepfather and Purkey's father.  Hamilton testified that Jack Purkey was an alcoholic who had lost his job at Boeing Aircraft, after which he lived on skid row in Wichita.  He testified that Jack Purkey beat Purkey, himself (Gary), and their mother frequently.  He testified that Purkey's mother, Velma Purkey, would bring men home to have sex in front of both he and Purkey when they were children and in their teen years.  He further testified their mother sexually abused them both.  He also testified that both he and Purkey had been diagnosed as bipolar.  He testified that he also had prior felony convictions for property theft crimes, but he had decided to change his life in the 1970s and had not been in trouble with the law since that time.  He further testified that Purkey had volunteered to donate part of his liver to help his sick wife who had liver disease.  (Tr. 1548-63.)

Dr. William Grant, a Bureau of Prisons psychiatrist, testified that he had prescribed three medications to Purkey, which were designed to address Purkey's depression, anxiety, and anger.  (Tr. 1406-16.)

Mark Russell, a correctional counselor at the United States Penitentiary in Leavenworth, Kansas, testified that while Purkey was incarcerated in the special housing unit at Leavenworth he had no disciplinary violations.  He further testified that Purkey had submitted a request to have his tattoos removed.  (Tr. 1651-63.)

-14-

Nealy Vinson, a former inmate who was incarcerated with Purkey and Hatfield in Oregon was called to discredit Hatfield's account of the sexual assault by Purkey. Vinson testified that Purkey got along well with other inmates and that he was not a racist. Vinson also testified that Purkey was not violent during his incarceration in Oregon. (Tr. 1449-60.)

Randy Masterson, another inmate who was incarcerated with Purkey in Oregon, testified that Purkey was not a racist, got along well with the other inmates, and was not involved with the Aryan Brotherhood prison gang in Oregon. Purkey also offered Masterson's testimony to discredit Hatfield. Masterson testified that he had sexual relations with Hatfield in a broom closet at the prison. Masterson also testified that he was the homosexual lover of Purkey for two and a half years. (Tr. 1468-76.)

Linda Skeen, a pastor at the Faith and Evangelistic Center in Leavenworth, Kansas, testified that she became a friend of Purkey's while he was on parole in 1997 and 1998. Skeen testified that Purkey was always nice when in her home and that she and her husband referred to Purkey as "Uncle Wes." (Tr. 1478-84.)

Patrick Howe, a friend of Purkey and a tattoo artist, testified that Purkey asked him to cover up his Nazi swastikas and Aryan Brotherhood tattoos. Howe testified that he tried to cover up the tattoos with skin toned ink, but the process was unsuccessful. (Tr. 1485-90.)

Dominic Genuik, a Public Service Administrator at the Hutchinson Correctional Facility in Kansas, testified that Purkey was an auditorium custodian while incarcerated at his institution. Genuik testified that Purkey participated in a program called JAIL (Juvenile

-15-

Assistance Information Liaison), a program similar to the Scared Straight program. The purpose of the program was to counsel juvenile offenders not to violate the law and to share prison experiences. Inmates participating in the program would share with the juveniles the consequences of negative behavior in an effort to discourage participation in criminal activity. Genuik testified that Purkey was not a racist, counseled both African-American and Hispanic juveniles, and he did not consider Purkey to be a security threat at the institution. (Tr. 1491-98.)

Michael Gibbons, a correctional counselor from the Lansing Correctional Facility, testified that he was Purkey's former parole officer in Kansas. Gibbons testified that Purkey participated in a drug and alcohol counseling program, a family counseling program, and that he was employed while on parole. Gibbons testified that Purkey had no employment problems while under his supervision. Gibbons further testified that while Purkey was on parole he admitted to Gibbons that he was having a drug problem and sought to gain admission into a drug counseling program at the Kansas University Medical Center. (Tr. 1502-15.)

Marguerite Hotchkiss, Purkey's 78-year-old aunt, testified she was the sister of Purkey's father. She testified in detail about Purkey's neglectful and disadvantaged childhood. She further testified that when Purkey was five years old he could not speak words and would only grunt. She said that Purkey was a stutterer as he got older and that stuttering was a common trait in Purkey's family. Hotchkiss testified that Purkey's father,

-16-

Jack, had suffered a head injury requiring a metal plate, had terrible headaches, and was an alcoholic who was always drunk. She also testified that Jack Purkey lost a good job at Boeing Aircraft in Wichita, Kansas, because of his alcohol problem. She further testified that Jack Purkey committed suicide in 1984. She testified that Purkey was involved in a terrible automobile accident and was hospitalized. Hotchkiss also testified about her love for Purkey and that she would continue her relationship with him if he was granted a sentence of life without parole. (Tr. 1520.)

Robert Lopez, a fellow inmate who was incarcerated with Purkey at the Hutchinson Correctional Facility in Kansas, also worked as a custodian with Purkey. Lopez testified that Purkey was not associated with the Aryan Brotherhood prison gang at the Hutchinson facility. He testified that Purkey read the Bible frequently and he considered Purkey to be a friend who had counseled him about staying out of gangs while in prison. Lopez also testified Purkey was not a racist and would help African-American inmates with legal work. He testified Purkey represented other inmates, never fought with other inmates, counseled juvenile offenders, and did not use drugs in prison. Finally, Lopez also testified that in his opinion, Purkey loved his daughter very much. (Tr. 1530-40.)

Reverend John Otto, a prison minister at the Hutchinson Correctional Facility, testified that he counseled Purkey in prison. He further testified in his belief that Purkey was a Christian and he was remorseful for his criminal conduct. (Tr. 1564-69.)

-17-

## II. Standard of Review

Purkey asserted 22 grounds for relief in his § 2255 motion. He seeks a certificate of appealability on four issues: (1) Mr. Duchardt's failure to investigate and prepare mitigation evidence, encompasses grounds V - X of his § 2255 motion (and are listed as 1 - 6 in this response, below); (2) the court's failure to order an evidentiary hearing on Purkey's claims; (3) the court's failure to strike Mr. Duchardt's affidavit; and (4) Mr. Duchardt's failure to call Dr. Peterson during the guilt phase of the trial to rebut the charge that Purkey had recently recanted the kidnapping of Jennifer Long.

To appeal the denial of any of his substantive claims of constitutional error, Purkey must first be issued a certificate of appealability by this Court or the Eighth Circuit. *See* 28 U.S.C. § 2253(c)(1)(B). A certificate of appealability should be issued only if the movant can make a substantial showing of the denial of a constitutional right, 28 U.S.C. § 2253(c)(2). A substantial showing includes an analysis of the district court's ultimate resolution of the underlying constitutional claim.

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (burden is met by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner. "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition

and a general assessment of their merits." *Miller-El*, 537 U.S. at 336 (internal quotations omitted). A petitioner need not show that the appeal would succeed, but also must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his or her part." *Miller-El*, 537 U.S. at 337-38 (internal quotations omitted).

Like a substantive claim, a certificate of appealability also may be issued regarding whether a district court erred in failing to hold an evidentiary hearing. *Anjulo-Lopez v. United States*, 541 F.3d 814, 817 (8th Cir. 2008).

### III. Argument and Authorities

Purkey asserted 22 grounds for relief in his § 2255 motion. He seeks a certificate of appealability on four issues: (1) Mr. Duchardt's failure to investigate and prepare mitigation evidence, encompasses grounds V - X of his § 2255 motion (and are listed as 1-6, below); (2) the court's failure to order an evidentiary hearing on Purkey's claims; (3) the court's failure to strike Mr. Duchardt's affidavit; and (4) Mr. Duchardt's failure to call Dr. Peterson during the guilt phase of the trial to rebut the charge that Purkey had recently recanted the kidnapping of Jennifer Long.

### A.    *Claim of Failure to Adequately Investigate and Present Mitigation Evidence*

Even with the benefit of hindsight, Purkey does not advance one new mitigation theme or area of mitigation evidence that Mr. Duchardt failed to investigate or present. Instead, Purkey makes amorphous claims that the investigation should have been more "sensitive," that because Mr. Duchardt failed to properly "prepare" the witnesses, they

-19-

provided "generic" testimony; he also claims Mr. Duchardt was ineffective for failing to call additional witnesses who would testify to the exact same matters that the 18 mitigation witnesses presented by Mr. Duchardt testified to. (D.E. 107 at 5-6.) Purkey's allegations of ineffective assistance of counsel fall far short of making a "substantial showing of the denial of a constitutional right" as is required by the Antiterrorism and Effective Death Penalty Act (AEDPA) to obtain a certificate of appealability. 28 U.S.C. § 2253 (c)(2).

Purkey seeks a certificate of appealability on his claim that Mr. Duchardt failed to adequately investigate and prepare mitigation evidence, which encompasses several sub-claims, however, Purkey does not allege even one mitigation category of evidence that Mr. Duchardt failed to investigate or present. Instead, Purkey complains about the manner of presentation, and says Mr. Duchardt should have called even more than 18 witnesses.

1.    *Failure to hire "Mitigation Specialist"*

Purkey's first claimed area of ineffective assistance provides an example of his elevation of form over substance - he claims Mr. Duchardt was ineffective for failing to hire a forensic social worker with the job title of "mitigation specialist." He acknowledges in his application for certificate of appealability that "trial counsel did present some mitigating evidence," (D.E. 107 at 4) (18 witnesses in support of 27 mitigating factors), but speculates that because he did not hire a "mitigation specialist," Mr. Duchardt failed to call as witnesses Peggy Noe (to testify about Purkey's abuse as a child), Dr. Newton (to testify that Purkey had

-20-

disclosed sexual abuse to him, and that Purkey was not racist or involved in prison gangs), and Mr. Bose/Ms. Leiker (to present favorable character evidence).

As Mr. Duchardt stated in his affidavit (Duchardt Aff. 43-79), the role of mitigation specialist was filled by himself as experienced capital counsel in developing mitigation themes, and by Dr. Mark Cunningham, in making a comprehensive trial presentation. As Mr. Duchardt said, Dr. Cunningham was a far more qualified and impressive witness than "a mere social worker" would have been. As also noted by Mr. Duchardt, Purkey cannot point to a single mitigation theme or area of evidence that Mr. Duchardt failed to investigate and present.

Purkey claims that Mr. Duchardt should have called Peggy Noe as a witness to testify that Purkey was abused as a child, that Dr. Newton should have been called to reinforce Purkey's claim of being sexually abused as a child and that Purkey was neither racist nor involved in prison gangs, and that friends should have been called to present favorable character evidence. However, no fewer than five mitigation witnesses testified that Purkey was abused as a child,[5] no fewer than six mitigation witnesses testified that Purkey was neither racist nor involved in prison gangs,[6] and no fewer than five mitigation witnesses

---

[5]Angie Genail, Gary Hamilton, Marguerite Hotchkiss, Dr. Stephen Peterson, and Dr. Mark Cunningham all testified to abuse Purkey suffered as a child.

[6]Mark Russell, Nealy Vinson, Randy Masterson, Patrick Howe, Dominic Genuik, and Robert Lopez all testified that Purkey was not racist or involved in prison gangs.

-21-

testified that Purkey had positive character traits.[7]  Purkey's proffered testimony would therefore have been redundant and largely cumulative of evidence already presented.  *United States v. Paul*, 534 F.3d 832, 838 (8th Cir. 2008).

   2.     *Failure to prepare Dr. Bruce Leeson's testimony*

Purkey alleges Mr. Duchardt was ineffective in failing to properly prepare several witnesses to testify.  The first of these is Dr. Bruce Leeson.  As Mr. Duchardt explains in his affidavit, Dr. Leeson had all the records needed to make his diagnoses, was prepared far in advance of trial, and testified as to his diagnoses and the impact of the diagnosed conditions on Purkey.  (Duchardt Aff. 79-82.)  A review of Dr. Leeson's testimony confirms this.  A case from the Eighth Circuit is more on point than those cited by Purkey:  *Nave v. Delo*, 62 F.3d 1024, 1037 (8th Cir. 1995), which held that trial counsel "cannot be held ineffective merely because different counsel, three years later, was able to formulate a question which elicited the desired response."

   3.     *Failure to prepare Dr. Stephen Peterson's testimony*

Purkey alleges Mr. Duchardt was ineffective in preparing Dr. Peterson to testify.  He claims that Dr. Peterson was not familiar with his own report, and that somehow, this was Mr. Duchardt's fault.  His other claim is that Dr. Peterson testified only "generally" about Purkey's abuse as a child.  Mr. Duchardt addresses both claims in his affidavit.  (Duchardt

---

[7]Angie Genail, Gary Hamilton, Marguerite Hotchkiss, Linda Skeen and the Reverend John Otto all testified that Purkey had good character traits.

-22-

Aff. 82-89.) Purkey has not correctly characterized Dr. Peterson's testimony. Dr. Peterson did testify that Purkey had reported his sexual abuse to multiple persons on multiple previous occasions. (Tr. 1752-53, 1816.) Further, contrary to Purkey's allegations, he testified in some detail about Purkey's sexual abuse. To the extent he did not provide even greater detail, Mr. Duchardt exercised reasonable trial strategy - as he noted in his affidavit, "I wanted Dr. Peterson to strike a balance so that enough was said about the varieties of sex used by the mother upon Wes and the young age at which she exposed Wes to those kinds of sex, in order to give Dr. Peterson the opportunity to convey the psychological and emotional damage wrought by overwhelming one too young with such sex games." (Duchardt Aff. 84.) Mr. Duchardt's strategy worked, as government counsel essentially conceded that Purkey had been abused as a child. (Tr. 2268.)

> ### 4. *Failure to prepare Dr. Mark Cunningham's testimony*

Purkey alleges Mr. Duchardt was ineffective in failing to prepare Dr. Cunningham to testify, claiming that Dr. Cunningham should have given more detail about Purkey's sexual abuse as a child. Again, Mr. Duchardt sets forth in his affidavit his trial strategy in having Dr. Cunningham describe some, but not all of the details concerning Purkey's abuse. (Duchardt Aff. 89-92.) Likewise, Mr. Duchardt describes his reasonable trial strategy for not having Dr. Cunningham use a PowerPoint demonstration during his testimony, since that would have opened the door for Dr. Park Dietz to use a PowerPoint presentation during his testimony, which Mr. Duchardt hoped to prevent. Once again, Purkey has offered complaints

about form, rather than substance, and his claims do not come close to establishing a "substantial showing of the denial of a constitutional right."

     5.       *Failure to prepare the testimony of Gary Hamilton*[8]

Mr. Duchardt explains the lengths to which he went to secure Gary Hamilton's testimony on behalf of Purkey. (Duchardt Aff. 52-58.) Purkey suggests that Gary Hamilton should have testified to more details of Purkey's physical abuse, as well as specific sexual abuse suffered by Purkey's *mother*. As noted above, trial counsel "cannot be held ineffective merely because different counsel, three years later, was able to formulate a question which elicited the desired response." *Nave v. Delo*, 62 F.3d 1024, 1037 (8th Cir. 1995). Further, the decision not to elicit more explicit details of sexual abuse from Mr. Hamilton was the result of well-reasoned trial strategy by Mr. Duchardt, and thus cannot form the basis for a finding of ineffective assistance of counsel. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Middleton v. Roper*, 455 F.3d 838, 848-49 (8th Cir. 2006) (quoting *Strickland v. Washington*, 466 U.S. 668, 690 (1984)).

---

[8]This section of Purkey's § 2255 motion claimed that Mr. Duchardt was ineffective in failing to prepare the testimony of Gary Hamilton *and* Angie Genail. In that motion, Purkey does not provide any allegations or argument as to Angie Genail, but says he will in his memorandum of law to be filed later. (D.E. 31 at 31-32.) His memorandum of law (D.E. 52) does not mention Angie Genail, so the Government does not respond to that claim.

6. *Failure to prepare the testimony of Dr. Grant and Mark Russell*

Purkey claims that presenting the testimony of Dr. Grant and Mark Russell was actually prejudicial to Purkey's mitigation case. However, both men testified in support of mitigation themes for which, earlier in Purkey's same motion, he claims that Mr. Duchardt did not present *enough* evidence. (D.E. 47 at 10-24.) Leaving aside the contradictory positions taken by Purkey in attempts to argue Mr. Duchardt was ineffective, he fails to show prejudice. He complains that Dr. Grant testified that Purkey had "real anger control problems" and that Mark Russell testified that Purkey had a history of assaultive behavior in prison. (D.E. 47 at 32-33.) However, had these witnesses failed to state what was already in evidence through several different witnesses, and indeed, through Purkey's own outbursts during the trial (Tr. 1798-1800), which was thus patently obvious to anyone in the courtroom (that Purkey was angry and assaultive), the witnesses would have had no credibility. As noted by Mr. Duchardt in his affidavit (Duchardt Aff. 93-98), both men were called in order to provide favorable testimony for Purkey as part of a reasonable trial strategy. And they did provide favorable testimony - the defense was able to convince the jury that Purkey did not warrant a finding of future dangerousness, the one aggravating factor *not* found by the jury, so the testimony of these two men describing Purkey's current and future prison conditions must have been persuasive.

-25-

*7.      Discussion*

A recent Eighth Circuit case provides guidance in assessing claims of ineffective assistance for failure to investigate and present evidence in a capital case. *United States v. Paul*, 534 F.3d 832, 838 (8th Cir. 2008). Like this Court, the district court in *Paul* denied the § 2255 motion without a hearing; however in *Paul*, the Eighth Circuit granted a certificate of appealability on two issues: (1) whether trial counsel were ineffective for failing to investigate and present evidence of Paul's mental, medical, and physical history; and (2) whether trial counsel were ineffective for failing to investigate and assert Paul's incompetence to stand trial. *Id.* at 834. Paul was convicted by a jury of murder, while aiding and abetting another, for the killing of 82-year-old Sherman Williams, and Paul was sentenced to death. *Id.* His trial counsel presented no witnesses during the guilt phase, and in the sentencing phase presented the testimony of Paul's mother and played a tape recording from a co-conspirator which tended to show that Paul had not fired the fatal shot. *Id.* at 836.

In his § 2255 motion, Paul made the same claim Purkey does here - that his trial counsel failed to investigate and present evidence in mitigation. *Id.* The record in *Paul* was not as extensive as the record in this case, because the attorney in *Paul* did not provide a rationale for his actions, thus there was no evidence that any particular decision was strategic. *Id.* at 837. Nevertheless, the Eighth Circuit found that the record conclusively showed Paul did not suffer prejudice, as the proffered evidence "would have been largely cumulative of evidence already presented, and likely less powerful than testimony already elicited." *Id.* at

-26-

838.  Further, the court found that the Government had presented a strong case on aggravating factors that supported a death sentence, as the jury found three statutory aggravators and six non-statutory aggravators.  *Id.* at 839-40.  The court found that Paul's proffered evidence would not undermine any of the evidence in aggravation.  *Id.* at 840.

The jury in *Paul* had unanimously agreed on four mitigating factors.  However, Paul contended that his attorney was ineffective in not investigating and presenting additional witnesses to testify that Paul was abused as a child and had a compassionate personality.  *Id.* at 841-42.  The court held that much of the new evidence cited was largely cumulative, as Paul's mother had testified about his childhood abuse and Paul's love for animals and his great-grandmother.  *Id.* at 842.  The court's discussion of the issue of prejudice in the sentencing phase of a capital case is instructive:

> [w]e recognize that the jury's findings do not preclude the possibility that more detail about Paul's difficult and abusive childhood or his compassionate character may have caused the jury to give more weight to mitigating factors that some or all of the jurors already found, but we must consider the incremental benefit of the proffered evidence in the context of the entire record.  Nothing that Paul offers detracts from the government's strong case in aggravation, and the weight of this evidence is a proper and significant factor in considering whether Paul has established prejudice.  The mitigation case at trial covered much of the same ground as the newly proffered evidence.  The record at trial gave the jury an opportunity to consider the same mitigating factors to which the new evidence pertains for similar or identical reasons.  We acknowledge that the evidence of physical abuse by Paul's father presented at trial was not as extensive as that proffered in this habeas proceeding, but the jury certainly was not given reason to develop a "benign conception" of Paul's childhood, as in *Rompilla v. Beard*, 545 U.S. 374, 391 (2005).  Unlike the record in *Williams v. Taylor*, 529 U.S. 362 and *Wiggins v. Smith*, 539 U.S. 510, 534-38 (2003), the mitigation case here did include a good deal of mitigating information about Paul's childhood, sufficient to convince all jurors that Paul's

experienced "parental neglect, abandonment, and corruptive influence," "parental abdication as to holding the defendant accountable for his behavior," and "chaotic family instability," and to persuade eight jurors that Paul experienced modeled parental irresponsibility.

*Id.* at 843. (Some internal citations omitted.)

The Eighth Circuit held, "[t]aking the record as a whole, therefore, we conclude that Paul's proffered evidence concerning his medical, mental, or physical history is insufficient to undermine confidence in the jury's verdict in the penalty phase. Accordingly, even assuming that Paul could show that the performance of trial counsel was constitutionally deficient, he has not established resulting prejudice." *Id.*

Purkey's claims of ineffective assistance are much weaker than Paul's were. Mr. Duchardt presented 18 witnesses in support of 27 mitigating factors, so that Purkey alleges, at best, cumulative benefit, which does not demonstrate that reasonable jurists would find the district court's assessment of his constitutional claims debatable or wrong. As this Court noted in its order denying Purkey's § 2255 motion, not a single juror found a single mitigating factor on the verdict forms. While it is possible the jury may have believed one or more of the mitigating factors and decided not to fill out the forms, it is just as likely that the jury found that childhood abuse and claimed mental conditions were irrelevant for a man who, when he was 46 years old, committed two vicious, senseless murders in less than a year, after spending most of his adult life in prison for many other serious and violent crimes. As jurors are presumed to follow the court's instructions, Purkey's complaints that they did not fill out the mitigation forms are without merit. *United States v. Griffith*, 301 F.3d 880, 884

-28-

n.3 (8th Cir. 2002).  In any case, the jury by their verdict gave more weight to the aggravating evidence than the mitigating evidence, as they were entitled to do.

**B.      *Claim That the Court Should Have Conducted an Evidentiary Hearing*

Purkey seeks a certificate of appealability on this Court's denial of his § 2255 motion without an evidentiary hearing.  "A district court does not err in dismissing a movant's § 2255 Motion without a hearing if (1) the movant's allegations, accepted as true, would not entitle the movant to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Buster v. United States*, 447 F.3d 1130, 1132 (8th Cir. 2006) (citing *Sanders v. United States*, 341 F.3d 720, 722 (8th Cir. 2003).  Purkey relies on the opinion in *Nelson v. United States*, 297 Fed.Appx. 563 (8th Cir. 2008), to support his claim that this Court should have held an evidentiary hearing.   However, *Nelson* is easily distinguished because the Government in *Nelson* actually *joined* in Nelson's request for an evidentiary hearing, since neither of Nelson's attorneys at trial had provided affidavits.  "[I]t will be necessary to obtain testimony or affidavits from Mr. Berrigan and Ms. Hunt in order to fully address all of the allegations raised.  The United States requests the Court to set this matter for an evidentiary hearing at its earliest convenience."[9]  In contrast, Mr. Duchardt has provided a thorough, 117-

---

[9]*Nelson v. United States,* Case No. 04-CV-08005-FJG.  (D.E. 39 at 5.)  The Government attached to its response as Exhibits A and B, letters from Mr. Berrigan and Ms. Hunt, confirming that they would not provide an affidavit or testify without court order.

-29-

page affidavit for this case, detailing his investigation and trial strategy, and conclusively showing that Purkey is entitled to no relief.

Likewise, all the cases cited by Purkey in support of his claim to an evidentiary hearing present much different factual situations. Purkey cites *Koskela v. United States*, 235 F.3d 1148, 1149 (8th Cir. 2001), but in *Koskela*, the record contained sharply conflicting evidence as to whether the attorney failed to investigate an entire *category* of evidence - alibi evidence. *Id.* The other cases cited by Purkey (D.E. 107 at 12) are also easily distinguishable. *See Latorre v. United States*, 193 F.3d 1035, 1041 (8th Cir. 1999) (prisoner claimed actual innocence and the original plea colloquy was inadequate); *Smith v. United States*, 182 F.3d 1023, 1026 (8th Cir. 1999) (remanded for hearing for court to decide whether attorney's failure to object to prisoner wearing jail clothes at jury trial was ineffective); *Shaw v. United States*, 24 F.3d 1040, 1042 (8th Cir. 1994) (remanded for hearing because the court did not permit prisoner to find and interview witnesses in support of his § 2255 motion, before denying motion); *Neary v. United States*, 998 F.2d 563, 566 (8th Cir. 1993) (remanded because prisoner was sentenced in excess of maximum sentence authorized by law); *United States v. Unger*, 665 F.2d 251, 256 (8th Cir. 1981) (remanded for hearing where prisoner claimed attorney materially misrepresented sentence she would receive after pleading guilty, and where prisoner had not waived attorney's actual conflict of interest on the record); *Rose v. United States*, 513 F.2d 1251, 1257 (8th Cir. 1975) (remanded for hearing on whether prisoner was incompetent at time of guilty plea, where

-30-

there was no record he was competent, and where he was found incompetent eight months after plea).

In an attempt to bolster his claim that this was a close case, Purkey cites the length of jury deliberations in the penalty phase. As Purkey correctly notes in his application for certificate of appealability, the jury deliberated approximately 10 hours and 53 minutes over two days, before returning a unanimous death verdict, having unanimously found nine aggravating factors. (D.E. 107 at 14.) This time period included two lunches, and almost surely other breaks as well. (Tr. 2297.) The jury was instructed to deliberate on 37 separate factors (ten aggravating factors and 27 mitigating factors), after listening to 31 witnesses testify over several days. They never sent a note or question to the judge indicating that they were having trouble reaching a verdict. (Tr. 2297, 2308-10.) The fact that the jury took their job seriously does not mean this was a close case. Purkey brutally kidnapped, raped, and killed a 16-year-old girl, after which he coldly and methodically dismembered her, burned her body, and disposed of her remains in a septic pond. A few months later, he brutally robbed and murdered an 80-year-old woman, using a claw-hammer, in her own home. Purkey committed these two murders after spending the majority of his adult life in prison for a series of violent crimes such as kidnapping, assault, robbery, and aggravated escape from custody. As the Eighth Circuit held in *Paul*, in affirming the denial of a § 2255 motion without a hearing,"[n]othing that Paul offers detracts from the government's strong case in aggravation, and the weight of this evidence is a proper and significant factor in considering

whether Paul has established prejudice." *Paul*, 534 F.3d at 843. This Court properly denied

Purkey's request for a hearing.

**C.      *Claim That the Court Should Have Stricken Mr. Duchardt's Affidavit***

Purkey cites no authority for this Court to strike Mr. Duchardt's affidavit. Although

Purkey criticizes the court for relying on black letter law allowing an affidavit (D.E. 107 at

15), he nowhere cites any case, statute, or rule that would authorize, much less compel, this

Court to strike a validly executed affidavit which it ordered Mr. Duchardt to produce. Purkey

cites the Missouri State Public Defender Guidelines, which are irrelevant, and offers an

opinion from a commercial litigator, which is likewise irrelevant. He complains that

Mr. Duchardt exceeded the scope of the attorney-client privilege waiver, but in each example

he cites, Mr. Duchardt directly responded to a claim by Purkey that he was ineffective. As

this Court properly noted in denying the motion to reconsider striking the affidavit, "simply

because they do not like what was said in the affidavit is no reason to strike the affidavit.

Purkey makes numerous and detailed claims of ineffectiveness against Mr. Duchardt. The

revelations in the affidavit were necessary in order to rebut those allegations." (D.E. 102 at

3.)

**D.      *Claim That Mr. Duchardt Was Ineffective for Not Calling Dr. Peterson in Guilt
Phase***

Purkey claims Mr. Duchardt was ineffective for failing to call Dr. Peterson in the guilt

phase of the trial to testify that Purkey had denied kidnapping Jennifer Long during

interviews with him in late 2002, thereby supposedly countering the argument that Purkey's

-32-

recantation was a recent fabrication. As Mr. Duchardt says in his affidavit (Duchardt Aff. 114-15), calling Dr. Peterson during the guilt phase of the trial, to testify that Purkey had actually recanted his kidnapping confession some months before the Government knew that he had done so, would have accomplished little if anything. In December 1998, Purkey repeatedly confessed to law enforcement that he had kidnapped Jennifer Long. (Tr. 495-510.) He recanted his confession to Dr. Peterson in late 2002, relatively recently in the context of the case; four years after his confessions and just a year before trial. Thus, Purkey cannot show any prejudice as there is little significance as to when he recanted his confessions - it was certainly after he found out he could face the death penalty if convicted. Further, Mr. Duchardt explains his very reasonable trial strategy of not jeopardizing Dr. Peterson's credibility during the guilt phase, as it was entirely sensible to foresee that the jury would not believe the self-serving recantation of a career criminal, no matter when the recantation occurred.

"We give great deference to counsel's informed strategic decisions, noting we "must resist the temptation to second-guess a lawyer's trial strategy."" *Middleton*, 455 F.3d at 848-49 (8th Cir. 2006) (quoting *Laws v. Armontrout*, 863 F.2d 1377, 1393 (8th Cir. 1988)). "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Middleton,* at 849 (quoting *Strickland*, 466 U.S. at 690). Mr. Duchardt made a thorough investigation of the law and facts, and decided not to call Dr. Peterson during the guilt phase of the trial, reasoning as follows: "I would have

-33-

moved heaven and earth to avoid embroiling Dr. Peterson in the controversy over the kidnapping admission retraction, lest that involvement compromise his effectiveness during the penalty phase." (Duchardt Aff. 114-15.) Mr. Duchardt decided to bring forth evidence, independent of Purkey's statements, to try to prove there was no kidnapping. Mr. Duchardt made reasoned choices and Purkey does nothing more than second-guess his strategy. This claim, like the others, is without merit and should be denied.

## IV. Conclusion

Purkey has failed to demonstrate that reasonable jurists would find this Court's assessment of the constitutional claims debatable or wrong. Purkey cannot overcome the Government's strong case in aggravation, nor the excellent investigation and representation provided by Mr. Duchardt, one of the most skilled and experienced capital defense attorneys in the Midwest, to make a substantial showing of the denial of a constitutional right, pursuant to 28 U.S.C. § 2253(c)(2). Accordingly, his certificate for appealability should be denied.

Respectfully submitted,

BETH PHILLIPS
United States Attorney

By   */s/ Kathleen D. Mahoney*

KATHLEEN D. MAHONEY
Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East Ninth Street, Fifth Floor
Kansas City, Missouri 64106
Telephone: (816) 426-3122

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on

May 11, 2010, to the CM-ECF system of the United States District Court for the Western

District of Missouri for electronic delivery to all counsel of record.


*/s/ Kathleen D. Mahoney*
Kathleen D. Mahoney
Assistant United States Attorney