# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

WESLEY IRA PURKEY,        )
                Movant,        )
                                )
     v.                     )          No. 06-8001-CV-W-FJG
                                )
UNITED STATES OF AMERICA,   )
                Respondent.   )

### REPLY TO GOVERNMENT'S RESPONSE TO MOVANT'S APPLICATION FOR CERTIFICATE OF APPEALABILITY

On March 24, 2010, Movant, Wesley Ira Purkey, filed an application for a certificate of appealability on four issues. (Doc. 107). The Government responded to the request on May 11, 2010. (Doc. 111). Purkey replies to this document and offers additional suggestions in support of the grant of the COA.

1.       <u>Failure to Adequately Investigate and Present Mitigation</u>

In its response, the Government asserts that Purkey is not entitled to a certificate of appealability (COA), in part, because he has not identified "one new mitigation theme or area of mitigation evidence" that trial counsel failed to investigate or present. Response at 19-20. Purkey is not required to make such a showing in order to obtain a COA or to obtain ultimate relief.

> [T]he prejudice inquiry is not a rote cataloging exercise where a court merely ensures that counsel presented some testimony on each potential area of mitigation. Rather, a court must examine the "entire evidentiary picture" presented to the jury, and ask whether that picture would have changed if counsel had conducted a proper mitigation investigation and presentation.

1

*Jackson v. Kelly*, ___ F. Supp. 2d ___, 2010 WL 1189796, *22 (E.D. Va. Mar. 29, 2010) (quoting *Strickland v. Washington,* 466 U.S. 668, 696 (1984)).

Here, the Government asserts that Purkey claims trial counsel, Fred Duchardt, was ineffective for "failing to call additional witnesses who would testify to the exact same matters" as the mitigation witnesses called in sentencing. Response at 20. As discussed below, this is, at best, a simplistic overstatement and, at worst, a deliberate attempt to distort the issues before this Court. For example, the Government claims that Purkey engages in "form over substance" in asserting that Duchardt was ineffective in failing to retain a "mitigation specialist." Purkey's actual claim as stated in the 2255 Motion (Doc. 47 at 10), the Memorandum in Support (Doc. 52 at 11), and all other relevant pleadings is that counsel was ineffective in failing "to obtain the services of a mitigation specialist *or* otherwise adequately investigate." While counsel's failure to retain a mitigation specialist to investigate may not alone require relief, this failure certainly contributed to the failure to adequately investigate as it did in *Wiggins v. Smith*, 539 U.S. 510, 524 (2003), where counsel failed to retain a "forensic social worker" to prepare a "social history report." *See also McNeill v. Branker*, 601 F. Supp. 2d 694, 717 (E.D.N.C. 2009) (counsel ineffective, in part, due to failure to retain a "mitigation expert"); *Sowell v. Collins*, 557 F. Supp. 2d 843, 869 (S.D. Ohio 2008) (counsel ineffective, in part, for failing to "request or obtain a mitigation specialist or investigator").

While the Government asserts that Duchardt "filled" the role of mitigation specialist by investigating himself, the bottom line, aside from counsel's lack of qualification to fill this roll, is that counsel performed inadequately in the investigation.

2

Counsel did gather Purkey's records, retained mental health experts, and interviewed family members and others who had known him in the several years prior to his arrest. The problem, however, as addressed in detail in the 2255 motion, the memorandum in support, and the numerous affidavits submitted is that counsel made little or no effort to interview persons with intimate knowledge of Purkey, except in the limited time frame surrounding the crimes.

Specifically, Purkey submits that counsel did not adequately interview Purkey's brother – meeting with him only in the presence of counsel's son – or Purkey's daughter, who counsel first attempted to interview at her wedding reception. He interviewed Purkey's aunt and cousin only by phone. In these instances, "[t]he problem with the investigation was not a lack of quantity of witnesses interviewed, but the quality of the interviews." *Turner v. Wong*, 641 F. Supp. 2d 1010, 1096 (E.D. Cal. 2009).

Leaving these family witnesses aside, the only information counsel obtained concerning Purkey's childhood and his entire history, outside that immediately surrounding the crimes, was from records. "[A]ssembling those records was not, in and of itself, an adequate mitigation investigation." *Jackson*, *supra*, \*5. Counsel's conduct was deficient in failing to interview witnesses who were obvious from those records or to seek out additional relevant and significant background witnesses. *See, e.g., Worthington v. Roper*, 619 F. Supp. 2d 661 (E.D. Mo. 2009).

Specifically, Duchardt completely failed to interview Peggy Noe, who was identified in prior records as Purkey's common law wife and who knew Purkey as a child and teenager. He did not interview her daughter, who views Purkey as a father-figure.

3

He did not interview two former law enforcement officers, identified by Purkey himself as mitigation witnesses, who would have given positive character mitigation evidence.[1] He did not interview Dr. Rex Newton, a prison psychologist – clearly identified in the records – who had treated Purkey for several years more than a decade prior to the capital crimes. Thus, any asserted "strategy" or "reason" for not presenting their testimony must be rejected as "the presumption of sound trial strategy founders . . . on the rocks of ignorance." *White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005).

Specifically with respect to Newton, while Duchardt concedes that he never interviewed Newton, Duchardt spends nine pages of his statement (pages 61-70) providing *after-the-fact rationalizations* for not calling him to testify. These rationalizations are not "strategy" because "[a]n uninformed decision cannot, by definition, be a strategic decision." *Jackson*, *supra,* *9. *See also Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005) ("counsel could not have evaluated or weighed the risks and benefits of calling [a witness] as a defense witness without so much as asking [him] what he would say if called"); *Holsomback v. White*, 133 F.3d 1382, 1388 (11th Cir. 1998) (Counsel "could not have made an informed tactical decision" concerning the benefits versus the risks of presenting the testimony of a witness that counsel had not interviewed); *Johns v. State*, 926 So. 2d 188, 196 (Miss. 2006) ("The decision not to

---

[1]Notably, while Duchardt claims to have interviewed some of these witnesses, there are no time records or notes in his file to support his claims and the witnesses themselves directly refute his statements. This dichotomy alone warrants an evidentiary hearing or, at minimum, warrants a COA on the issue.

interview witnesses, particularly your own, cannot be considered an effective strategic choice").

Moreover, whether Duchardt himself would have decided to present Dr. Newton's testimony if Duchardt had actually interviewed him is not the question and is not even relevant to the question. "The question is whether, objectively, 'a competent attorney,' aware of this evidence, would have introduced it.'" *Jackson, supra,* *21 (quoting *Wiggins*, 539 U.S. at 535).

Regardless, by his own description, Duchardt relied on, what he believes was "the functional equivalent of Dr. Newton, and in most cases a more updated version of that information, through various of our experts, particularly Dr. Peterson and Dr. Cunningham." Duchardt Affidavit at 63. The problem, however, came in the fact that counsel presented solely the "updated version," particularly concerning the sexual abuse of Purkey by his mother and the ramifications of that on him. What counsel presented, and the only evidence presented, was that Purkey had claimed – *only after he was charged with a capital crime and facing the death penalty* – that he had been sexually abused by his mother. As such, the evidence of sexual abuse was easily open to attack – and was attacked, despite the hollow protestations to the contrary of Duchardt and the Government now. As addressed in detail in prior pleadings, the record speaks for itself and speaks very loudly and very clearly in the testimony of Park Dietz, a psychiatrist retained by the Government, who testified in rebuttal in sentencing specifically in reference to whether Purkey "might have been sexually abused by his mother" that this "is

5

a matter in dispute" not supported by the records "until he's facing capital murder charges." Tr. 2191-94.

The Government attempts to blur this issue by asserting that "no fewer than five mitigation witnesses testified that Purkey was abused as a child." Response at 21 and n.5. Not one of the three lay witnesses identified (Angie Genail, Gary Hamilton, and Marguerite Hotchkiss), addressed the question of whether Purkey had been sexually abused by his mother.[2] The two mental health experts (Dr. Peterson and Dr. Cunningham) identified testified only that Purkey had told them after the capital charges were pending that he had been sexually abused.

If counsel had adequately investigated, Dr. Newton and Peggy Noe, could have and would have provided specific testimony that Purkey did not just assert *after the capital charges* that he had been sexually abused by his mother. He had informed Ms. Noe, his childhood friend, of the abuse contemporaneously and just in speaking to a friend with no obvious motive or reason to make it up. He had also informed Dr. Newton when he was in prison simply seeking mental health treatment and counseling when there were no pending charges, and contrary to Duchardt's claims in his affidavit, no parole dates or parole possibilities in sight for years. This is the type of evidence and information that withstands credibility challenges as opposed to "the updated version"

_____

[2]Genail, Purkey's daughter, provided only hearsay testimony that Purkey had told her his parents were alcoholics and his mother threw alcohol in his face for stuttering. Tr. 1544. Hamilton testified that he (Hamilton) had been sexually abused by their mother and often "wondered" if Purkey had. Tr. 1552-53. Hotchkiss, Purkey's paternal aunt, testified generically about her brother's problems with alcohol, but did not provide any testimony about abuse

through *paid* defense experts with information only that Purkey told them *after he was charged with capital murder* that he had been abused. This is strong corroborative evidence rather than simply "redundant and largely cumulative" evidence, as asserted by the Government. Response at 22. "Cumulative evidence" is "offered to prove something already established beyond reasonable dispute," *Washington v. Smith*, 48 F. Supp. 2d 1149, 1164 (E.D. Wis. 1999), *aff'd*, 219 F.3d 620 (7th Cir. 2000), rather than as the government's own expert put it: "a matter in dispute."

In short, a reasonable investigation for capital sentencing "should have included, at a minimum, interviewing other[s] . . . who could corroborate the evidence of abuse and speak to the resulting impact." *Williams v. Allen*, 542 F.3d 1326, 1340 (11th Cir. 2008). Aside from the fact that this should be obvious, as discussed in detail in the 2255 Motion (Doc. 47 at 14) and the supporting Memorandum (Doc. 52 at 22-23), Dr. Cunningham, who was a retained defense expert, specifically informed counsel of the need to corroborate the information that Purkey had been sexually abused by his mother *and* that he had made the allegations prior to being charged with capital murder.

Here, counsel could have done so through witnesses with knowledge of the abuse well prior to the capital charges, including a prison psychologist, who was more than willing to travel from Oregon to Missouri to testify on Purkey's behalf.

> This evidence coming as it did from [a] doctor[] who had no connection to the defense or incentive to invent a diagnosis and thus who [was] invulnerable to charges of fabrication, could very well have made the difference in a life as opposed to death verdict.

*Hovey v. Ayers*, 458 F.3d 892, 927 (9th Cir. 2006). Moreover, this evidence, while not changing the diagnoses of the defense experts would have "corroborated [their] testimony and bolstered the credibility of [their] response to the prosecution," *id.* at 926, whose primary strategy was to assert that Purkey's claims of sexual abuse were never made prior to his capital murder charges. Rather than agreeing with the prosecution that Purkey had never claimed sexual abuse until he was pending murder charges in Kansas and these capital charges, if Dr. Peterson (and the jury had been aware of the testimony of Ms. Noe and Dr. Newton), Dr. Peterson would have been able to "better weather the prosecution's attempts to discredit him," *id.* at 929, and the assertion that Purkey was sexually abused. In short, "[a] lawyer who should have known but does not inform his expert witnesses about essential information going to the heart of the defendant's case for mitigation does not function as 'counsel' under the Sixth Amendment. *Smith v. Stewart*, 189 F.3d 1004, 1012 (9th Cir. 1999).

Even with respect to the more general allegation that Purkey had experienced and witnessed physical abuse in the home, counsel missed significant, specific points. Specifically, Hamilton would have provided eyewitness testimony that both he and Purkey had observed Purkey's father break their mother's arm by slamming her arm in a door repeatedly. (Doc. 47 at 20). Likewise, Noe could have provided eyewitness testimony that she observed Purkey's step-grandfather threaten him with a shotgun when Purkey, as a teenager, confronted him about the inappropriateness of having sexual relations with his step-daughter (Purkey's mother). (Doc. 47 at 23).

Likewise, Dr. Newton's testimony of Purkey's disavowal of racial bias and racist prison gangs was not "redundant" or "cumulative" to the "no fewer than six mitigation witnesses" identified by the Government (Mark Russell, Dominic Genuik, Nealy Vinson, Randy Masterson, Patrick Howe, and Robert Lopez) as testifying that Purkey "was neither racist nor involved in prison gangs." Response at 21 and n.6. Mark Russell was a correctional officer who knew Purkey only after he had pending capital charges and testified only that Purkey had submitted a request to have a prison gang tattoo removed. Tr. 1654. Dominic Genuik was a correctional officer who knew Purkey only after he was charged with capital murder and testified only that Purkey interacted well with black and Hispanic juveniles in a prison mentoring program. Tr. 1494-97. Nealy Vinson, who has prior convictions for robbery and perjury to a judge, testified only that he previously shared a cell with Purkey and a black man. Tr. 1450-51. Randy Masterson, who admitted to being Purkey's lover in prison for several years and has prior convictions for forgery, burglary, and providing false information to police, did testify that Purkey did not associate with prison gangs and played on a "rainbow" softball team in prison. Tr. 1475-78. Patrick Howe, who had also been incarcerated with Purkey previously, provided similar testimony. Tr. 1491. Likewise, Robert Lopez, who had convictions for burglary, assault, and taking indecent liberties with a child and knew Purkey only after he had pending capital charges, provided similar testimony. Tr. 1533-34.

Dr. Newton, on the other hand, could have and would have testified that Purkey was "a throw away kid," who was abused and never got adequate parenting, but he very much wanted to face his demons with therapy and treatment. Dr. Newton also would

9

Case 4:06-cv-08001-FJG    Document 114    Filed 06/18/10    Page 9 of 19

have provided disinterested and credible testimony that, contrary to the government's arguments and evidence and the tattoos on his body, Purkey was not involved in racist prison gangs and, indeed, was ashamed of his tattoos.

Dr. Newton could have and would have provided testimony addressing these issues as an expert witness with personal knowledge gained in mental health counseling and treatment of Purkey for over a two-year period. Dr. Newton also had the enhanced credibility as an employee of the Oregon Department of Corrections, with absolutely no incentive or reason for personal bias. Scott E. Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 Va. L. Rev. 1109 (Sep. 1997) (discussing Capital Jury Project study findings that "lay experts"–such as former teachers, former employees or supervisors, and correctional staff with personal knowledge of the defendant–are viewed by jurors as far more credible and believable than both retained professional experts and family and friends).

In addition, notably absent from the Government's litany of the alleged "cumulative" nature of the significant evidence and witnesses counsel missed is specific mention of the significant good character evidence that would have been provided by Sheriff Floyd Bose and his daughter, Dion Leiker. While counsel did present some positive character evidence, most of the witnesses called were either family members or present or former inmates. As addressed in detail in the 2255 Motion, Bose and Leiker, who between them had approximately 36 years in service as law enforcement officers, would have provided very positive character evidence that did not in any way duplicate the character evidence provided by family members and inmates. (Doc. 47 at 24-24).

10

And, certainly, the credibility of this type of testimony coming from law enforcement as opposed to family members inmates is certainly unquestionable.

This evidence could have made the difference because there is a

> *qualitative* difference between having a family member generally ask the jury to spare the life of the defendant, and having third parties offer the jury *more objective and specific* examples of *why* the defendant's life should be spared. . . . Jurors may well understand that a defendant's mother will almost always extol the virtues of her son; but they may give different treatment, and perhaps greater weight, to the testimony of less biased witnesses which illuminates the man whose life is in their hands. . . .

*Marquez-Burrola v. State*, 157 P.3d 749, 766-67 (Okla. Crim. App. 2007) (emphasis in original).

At bottom, rather than being "cumulative" the information counsel missed and, therefore, failed to present went to the very "heart" of the mitigation case, but came exclusively through lay witnesses, whose bias or credibility could be questioned, or *retained* defense experts who had interviewed Purkey only after he was facing the death penalty. Counsel failed to prepare and present the corroborative evidence for the experts and the detailed specific lay witness information from unbiased witnesses with enhanced credibility. This evidence "rather than being cumulative, . . . provides a more nuanced understanding of [Purkey's] psychological background and presents a more sympathetic picture of [him]." *Jells v. Mitchell*, 538 F.3d 478, 501 (6th Cir. 2008). This more "vivid description" of Purkey's life, background, and specific instances of positive character evidence may well "have influenced the jury's assessment of his moral culpability." *Simmons v. Luebbers*, 299 F.3d 929, 938 (8th Cir. 2002). *See also Williams v. Taylor*,

529 U.S. 362, 397 (2000) (noting that graphic description of defendant's childhood, filled with abuse and privation, might influence jury's assessment of moral culpability).

In addressing whether Purkey is entitled to a certificate of appealability, however, this Court need only make a threshold inquiry rather than fully considering whether Purkey has established entitlement to relief. *Miller-El v. Cockrell*, 537 U.S. at 337. At minimum, Purkey has established that reasonable jurists could debate whether he is entitled to relief." *Id.* at 338. Thus, he is entitled to a certificate of appealability on this claim.

        2.      <u>Denial without an Evidentiary Hearing</u>

Notably absent from the Government's response is any mention of the Eighth Circuit's decision in *Sinisterra v. United States*, 600 F.3d 900 (8th Cir. 2010) – decided just one week after Purkey filed his application for a certificate of appealability. Instead, the Government pins all of its hopes on the asserted distinction between this case and *Nelson v. United States*, 297 Fed.Appx. 563, No. 07-3071 (8th Cir. Oct. 27, 2008) – i.e., contending, "*Nelson* is easily distinguished because the Government in *Nelson* actually *joined* in Nelson's request for an evidentiary hearing, since neither of Nelson's attorneys at trial had provided affidavits." (Doc. 111 at 29). This is a distinction without a difference. While the Eighth Circuit certainly "note[d]" the Government's position in this regard, *id.* at 565, it's decision to remand cannot be described as depending upon this. Indeed, before even mentioning the Government's position regarding a hearing, the Eighth Circuit held, "*Our examination of the claims asserted in this case* convinces us that a fair and just determination of some of them required an evidentiary hearing to be

held." *Id*. (emphasis added). Just as Nelson was entitled to an evidentiary hearing, so is Purkey.

The facts in *Sinisterra* are virtually identical to those presented here. There, Duchardt also prepared an affidavit, as did his co-counsel and investigator. *Id*. at 905. Duchardt's affidavit undertook to refute Sinisterra's 2255 claims and contradicted the statements of his co-counsel and investigator. *See, e.g., id*. at 907 ("[Co-counsel and the investigator] stated that they did not know this information about Sinisterra's upbringing, but Duchardt stated that he was 'aware of all of this information prior to the start of the trial'"). With these contradictions, the Eighth Circuit concluded the "record does not conclusively show" that counsel were effective, and an evidentiary hearing was required. *Id*.

Likewise, here, Duchardt's 117-page affidavit undertakes to refute Purkey's 2255 claims and to contradict co-counsel's – i.e., Laura O'Sullivan – affidavit as well as the volume of affidavits from other witnesses. This yields the same type of factual dispute as presented in *Sinisterra*.[3]

As was true in *Sinisterra*, nothing in the files and records of the underlying criminal case refutes Purkey's allegations. That entitles him to an evidentiary hearing to prove his allegations and to prove that prejudice resulted. Purkey has demonstrated that

---

[3] The Government's reluctance to refer this Court to Sinisterra is troubling since the same United States Attorney's Office is handling both cases. See Local Rule 83.5(c)(2) ("The Code of Professional Responsibility adopted by this Court is the Code of Professional Responsibility adopted by the highest court of the state in which this Court sits..."); Mo.S.Ct. Rule 4-3.3(a)(2) (a lawyer must disclose legal authority in the controlling jurisdiction that is known to the lawyer to be directly adverse).

reasonable jurists could find this Court's refusal to hold an evidentiary hearing to be debatable. Thus, a certificate of appealability is warranted.

### 3. Denial of Motion to Strike Duchardt's Affidavit

The Government devotes half a page to its bare assertion that a certificate of appealability should not be granted on the question of this Court decision that Duchardt's 117-page affidavit was reasonably necessary to answer the specific allegations of ineffectiveness in Purkey's 2255 motion. The Government complains, "Purkey cites no authority for this Court to strike Mr. Duchardt's affidavit." (Doc. 111 at 32). If, by this, the Government means that Purkey can cite no case addressing such a voluminous and over-reaching affidavit as the one Duchardt provided here, the Government is correct. One cannot extrapolate from this void that such adversarial briefing in the form of affidavits by former counsel are proper. Indeed, the void is simply a reflection of the fact that the litigation has typically addressed only whether any privilege had been waived, rather than addressing the scope of that waiver. Purkey did not object to the Government's motion to compel Duchardt to provide an affidavit as the Government's motion sought only a narrow waiver. (Doc 60 at 6) ("Implied waivers are consistently construed narrowly. *In re. Lott*, 424 F.3d 446 (6th Cir. 2005)."). Purkey did not object to a narrow waiver permitting Duchardt to respond by affidavit, but he has consistently objected to the affidavit actually prepared by Duchardt.

Rather than address Purkey's specific objections, to the scope of Ducharadt's disclosures and his conflicts in zealously *advocating against his* client (as opposed to simply providing evidence), the Government simply ignores the questions. Likewise, by

this Court's judgment, once a defendant claims his attorney was ineffective, there is not simply the limited waiver of privilege recognized by all courts, but there is a blanket waiver that gives counsel an unfettered license to disclose any and all privileged communications and to advocate against his client by drafting legal arguments that do not address the attorney's decision-making at trial.

Specifically, Duchardt wrote a 117-page brief against his former client. He did not merely state the facts as he recalled them, but he made legal arguments aimed at undermining Purkey's memorandum in support of his § 2255 motion (Doc. 73, Ex. A, pp. 18-19; 25-29; 39-43; 74-79; 81-82; 88-89; 106; 107; 108; 109; 114). All in all, approximately 25 pages of Duchardt's statement (roughly 21%) are devoted to legal argument about the applicability of the cases cited in Purkey's memorandum of law. In the same vein, Duchardt repeatedly opines as to the strength of Mr. Purkey's 2255 claims. In so doing, Duchardt employs the legal strategy of arguing that the claimed error is either harmless or that no prejudice can be proven. Unabated in his advocacy against Purkey's 2255 claims, Duchardt gratuitously disparaged several witnesses proffered in Purkey's 2255 motion: He falsely described Debbie Prothero as someone anxious to see Purkey executed (Doc. 73, Ex. A, pp. 59-60, including n. 6); he falsely described Marguerite Hotchkiss as someone aloof and uninterested in helping Purkey (Doc. 73, Ex. A, pp. 59-61); he falsely described Dion Leiker and Floyd Bose, both former law enforcement officers, as gullible and easily misled (Doc. 73, Ex. A, pp. 70-72); and he falsely described Peggy Noe and Evette Noe as having "problems" in their backgrounds (Doc. 73, Ex. A, pp. 72-74).

In opposing even a COA, the Government makes no effort to provide legal authority for such advocacy against one's former client. "[A] lawyer may reveal information relating to the representation of a client to the extent the lawyer *reasonably* believes *necessary*...to respond to allegations in any proceeding concerning the lawyer's representation of the client ..." ABA Model Rule 1.6(b)(5) (emphasis added); *accord* Missouri Rule 4-1.6(b)(3). The question, now, is simply whether "reasonable jurists" would find this Court's assessment of this issue to be "debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For all the reasons discussed in Purkey's objections to Duchardt's affidavit (Doc. 83) and in his application for a certificate of appealability (Doc. 107), Purkey has demonstrated that reasonable jurists could find this Court's ruling debatable. Thus, a certificate of appealability is warranted.

4. <u>Failure to Call Peterson in Rebuttal</u>

To avoid an appeal of this claim, the Government blurs the timing of events. The Government is right that

> "We give great deference to counsel's informed strategic decisions, noting we 'must resist the temptation to second-guess a lawyer's trial strategy.'" *Middleton* [*v. Roper*], 455 F.3d [838,] 848-49 (8th Cir. 2006) (quoting *Laws v. Armontrout*, 863 F.2d 1377, 1393 (8th Cir. 1988)).

(Doc 111 at 33). But it is not enough simply to label something as a strategic decision. To be fairly characterized as "strategic," a decision must be a conscious choice between two legitimate alternatives – coming from deliberation rather than happenstance, inattention, or neglect. *Wiggins* v. *Smith*, 539 U.S. 510, 526-527 (2003) (concluding that counsel's "failure to investigate thoroughly resulted from inattention, not reasoned

16

strategic judgment"); *Strickland* v. *Washington*, 466 U.S. 668, 690-691 (1984). *Wiggins* and *Strickland* emphasized that strategy is not borne of happenstance, but of deliberation, and this distinction illustrates the deficiency of Duchardt's performance and the debatability of this Court's judgment. Three critical facts demonstrate that Duchardt's failure to call Dr. Peterson to rehabilitate Purkey was nothing more than inattention:

- Duchardt initially had no means of calling Dr. Peterson in order to establish that Purkey denied kidnapping Long because the Government obtained an order *in limine* excluding such testimony (Underlying criminal file, Doc. #337, 440);

- Duchardt had no intention of calling Purkey to testify until right before court convened on November 4, 2003 (Doc 52 at 59), so, until that moment, Duchardt had no reason to consider the possibility of calling Peterson to rehabilitate Purkey;

- Immediately following Purkey's testimony, the court recessed for an offer of proof (TR 1044-1068), followed by a brief discussion regarding the schedule for the next day (TR 1068-1070), followed immediately by Duchardt announcing to the jury that the defense was resting its case in the guilt-or-innocence phase (TR 1071); and

- O'Sullivan would testify that she does not recall any discussion <u>after Purkey's testimony</u> about calling Dr. Peterson to testify about the kidnapping recantation (Doc. 47, Ex. 1 at 7).

Despite this sequence of events, the Government concludes that

> Mr. Duchardt made a *thorough investigation of the law and facts*, and decided not to call Dr. Peterson during the guilt phase of the trial, reasoning as follows: "I would have moved heaven and earth to avoid embroiling Dr. Peterson in the controversy over the kidnapping admission retraction, lest that involvement compromise his effectiveness during the penalty phase." (Duchardt Aff. 114-15.)

(Doc 111 at 33-34) (emphasis added). There was nothing thorough about Duchardt's consideration of this issue in 2003 – his thorough consideration did not come until 2008

while drafting his 117-page brief in opposition to Purkey's 2255 motion. Because reasonable jurists could find this Court's ruling debatable, a certificate of appealability is warranted.

CONCLUSION

For the reasons set forth above, as well as those in the initial Application for a Certificate of Appealability (Doc. 107), this Court should grant a certificate of appealability on each of the asserted claims and grant any additional relief the Court may deem just or proper.

Respectfully submitted,

Teresa L. Norris, Esq.
P.O. Box 11744
Columbia, SC 29211
(803) 765-1044 (Phone)
(803) 765-1143 (Fax)
teresa@blumelaw.com
Co-counsel to Movant

Gary E. Brotherton, Esq.
601 W. Nifong Blvd., Ste. 1C
Columbia, Missouri 65203
(573) 875-1571 Phone
(573) 875-1572 Fax
GEBrotherton@LegalWritesLLC.com
Co-counsel to Movant

By:    /s/  Teresa L. Norris
TERESA L. NORRIS
Co-counsel to Movant

<u>CERTIFICATE OF SERVICE</u>

This will certify that, on today's date, this reply was served upon the United States by filing same via CM/ECF.

<u>/s/ Teresa L. Norris</u>
Teresa L. Norris

<u>Dated:</u> Columbia, SC
June 18, 2010