# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| WESLEY IRA PURKEY, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No. 06-8001-CV-W-FJG |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |

## ORDER

Currently pending before the Court is petitioner's Motion for a Certificate of Appealability (Doc. # 107).

### I. BACKGROUND

On September 29, 2009, the Court entered an Order denying Purkey's Petition for Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2255. On October 13, 2009, Purkey filed a Motion to Alter the Judgment. On December 22, 2009, the Court denied the Motion to Alter the Judgment. Purkey filed the instant Motion for a Certificate of Appealability ("COA") on March 24, 2010. Purkey is seeking a Certificate of Appealability on four issues: 1) Whether he was denied effective assistance of counsel due to his counsel's failure to adequately investigate and present the available mitigation evidence; 2) Whether an evidentiary hearing should have been conducted regarding Purkey's claims of ineffective assistance of counsel and whether this Court's findings are sufficient to provide for meaningful appellate review; 3) Whether counsel's affidavit exceeded the scope of Purkey's waiver of his attorney-client privilege and 4) Whether counsel was ineffective in not calling Dr. Peterson to rebut the Government's unfounded charge that Purkey fabricated his recantation of the kidnaping right before

trial rather than having done so earlier.

## II. **STANDARD**

Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may issue only if a movant has made a substantial showing of the denial of a constitutional right. See Miller-El v. Cockrell, 537 U.S. 322, 335-36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); Garrett v. United States, 211 F.3d 1075, 1076-77 (8th Cir.2000); Carter v. Hopkins, 151 F.3d 872, 873-74 (8th Cir.1998); Cox v. Norris, 133 F.3d 565, 569 (8th Cir.1997); Tiedeman [v. Benson],122 F.3d 518, 523 [(8th Cir. 1997)]. To make such a showing, the issues must be debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings. Cox, 133 F.3d at 569 (citing Flieger v. Delo, 16 F.3d 878, 882-83 (8th Cir.1994)); see also Miller-El, 537 U.S. at 335-36 (reiterating standard). Courts reject constitutional claims either on the merits or on procedural grounds. "'[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy [28 U.S.C.] § 2253(c) is straightforward: the [movant] must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" Miller-El, 537 U.S. at 338 (quoting Slack v. McDaniel, 529 U.S. 473, 484,120 S.Ct.1595, 146 L.Ed.2d 542 (2000)).

Masse v. United States, Nos. C08-0092-LRR,CR04-0072-LRR, 2010 WL 3724536, *3 (N.D.Iowa Sept. 16, 2010).

## III. **DISCUSSION**

**A. Failing to Adequately Investigate & Develop the Mitigation Case**

Purkey claims that his former counsel, Mr. Fred Duchardt, was ineffective for failing to:

   1. Obtain corroboration and substantive information from Purkey's brother, Gary Hamilton and Purkey's friend, Peggy Martenay Noe, regarding Purkey's father's violence and his mother and grandmother's sexual abuse of Purkey and his brother.

   2. Obtain rebuttal evidence, countering the Government's argument of recent fabrication, establishing Purkey's prior report of sexual abuse to Dr. Newton in the Oregon Dept. Of Corrections.

   3. Obtain rebuttal evidence from Dr. Newton countering the government's arguments that Purkey was racist and active in prison gangs.

2

    4.  Obtain significant positive character evidence, including favorable testimony from two former law enforcement officers, Mr. Bose and Ms. Leiker.

  Purkey also argues that Mr. Duchardt failed to adequately prepare defense witnesses for their testimony and this resulted in the expert witnesses being unable to provide any meaning or details to describe the generic label of "sexual abuse" and losing credibility during cross-examination because they were unfamiliar with portions of Purkey's background records and history.  Purkey argues that in ruling on the § 2255 motion, the Court simply made conclusory findings that Purkey "failed to overcome the presumption that Mr. Duchardt's actions were not sound trial strategy."  Purkey also argues that the Court make conclusory findings that counsel's "actions did not fall below an objective standard of reasonableness."  Purkey argues that in deciding whether a Certificate of Appealability should issue, the Court needs to only make a "general assessment of [the] merits"  and he has established the debatability of the underlying constitutional claim.

  The Government argues that Mr. Duchardt presented eighteen witnesses in support of twenty-seven mitigating factors, and that the additional mitigating evidence which he argues Mr. Duchardt should have developed or introduced  would simply have been cumulative evidence.

  Purkey argues that while Mr. Duchardt did conduct some investigation - he gathered records, retained mental health experts and interviewed family members and others who had known Purkey for several years, these efforts were only directed at the limited time frame surrounding the crimes.  For example, Purkey argues that Mr. Duchardt did not adequately interview Purkey's brother and he only interviewed his aunt and cousin by phone.  The only information obtained about Purkey's childhood was

from records. Purkey argues that Mr. Duchardt failed to interview Peggy Noe, who was Purkey's common law wife and who knew Purkey when he was a young man. He also did not interview Ms. Noe's daughter, two former law enforcement officers or Dr. Rex Newton, a prison psychologist who had treated Purkey for years before he committed the crime at issue. If Mr. Duchardt had interviewed these witnesses, it would have confirmed that Purkey had complained to several people that he was sexually abused by his mother *before* he was facing capital murder charges. Purkey argues that Mr. Duchardt failed to present corroborative evidence for the experts and to call unbiased lay witnesses who possesses enhanced credibility. Purkey argues that he has made a threshold showing that reasonable jurists could debate whether he is entitled to relief and thus he should be granted a Certificate of Appealability on this issue.

Purkey notes that this Court need only make a threshold inquiry rather than fully considering whether he has established that he is entitled to relief. In the affidavit provided by Mr. Duchardt he recounts that he "located and obtained thousands of pages of records pertaining to Mr. Purkey and his family. I thoroughly read all of the records and I had two professionals, psychiatrist, Dr. Stephen Peterson, M.D. and psychologist, Dr. Mark Cunningham, Ph.D., do the same. Dr. Peterson and Dr. Cunningham produced comprehensive reports about their review. Out of this preparatory work sprung a mitigation case consisting of eighteen lay and expert witnesses whose combined presentations cover over 500 hundred pages of transcript." (Duchardt Affidavit, Doc. 73, Ex. A, pp. 49-50). Mr. Duchardt explains in his affidavit that before trial, Purkey's brother, Gary Hamilton did not share as many details about their mother's sexual deviancy as he has since shared with Purkey's current counsel. However, evidence of Purkey's sexual abuse by his mother was presented during the mitigation

case. Additionally, Mr. Duchardt states that it is his recollection that he did speak with Peggy Noe, but that there were some problems either in her relationship with Purkey or in her background which is why Mr. Duchardt did not call her to testify. In an affidavit attached to Purkey's Reply Suggestions in Support of his § 2255 motion, Peggy Noe states that Mr. Duchardt did not contact her before or after trial and she never spoke with him. (Margaret Noe Affidavit, Doc. # 82, Ex. 14). Evette Noe also states in an Affidavit that Mr. Duchardt did not speak with her either, although she had tried to contact him on numerous occasions. (Evette Noe Affidavit, Doc. # 82, Ex. 15). Mr. Duchardt notes that the Government was not disputing that Purkey had been sexually abused by his mother, so there was no real need to call Ms. Noe to counter this argument. Mr. Duchardt also notes in his Affidavit that his recollections with regard to Peggy and Evette Noe were not as clear as the other witnesses because he gave to Purkey's current counsel all the file materials he had regarding these witnesses.

With regard to Dr. Rex Newton, Mr. Duchardt explains that he considered calling Dr. Newton, but decided against it because it would have opened the door and allowed the Government to present unfavorable evidence. Mr. Duchardt notes that while Purkey was housed in the Oregon prison system, he was engaging in activities that were against the rules and were possibly criminal. Additionally, Mr. Duchardt states that he did not need to call Dr. Newton to testify that Purkey had told him in the late 80's that his mother had sexually abused him because the Government did not dispute the claim that Purkey was sexually abused.

Mr. Duchardt explains why he did not call Floyd Bose or his daughter Dion Leiker. (Duchardt Affidavit, Doc. 73, Ex. A, pp. 70-72). Mr. Duchardt states that while they could have possibly provided helpful information regarding Purkey's character,

5

there were significant problems with their testimony - such as the fact that Purkey provided them with details regarding the murder of one of their family members who Purkey had known while in prison. Mr. Duchardt worried that presenting their testimony might demonstrate that Purkey was closely connected to prison violence. Additionally, he was worried that since Mr. Bose and Ms. Leiker had given Purkey money while in prison, it might appear that Purkey had provided them with information about the murder only for financial gain. It should be noted that in an Affidavit attached to Purkey's Reply Suggestions, Dion Leiker disagrees with Mr. Duchardt's statement that he had spoken with her. Ms. Leiker states, "I did not talk to Mr. Duchardt before Wes' trial or even before his sentencing. I spoke with Mr. Duchardt twice after Wes was transferred to the prison in Terre Haute, but neither conversation had anything to do with Duane or my friendship with Wes." (Leiker Affidavit, Doc. 82, Ex. 12). Ms. Leiker also states that her brother was not killed while in prison and that Purkey had overheard the information about the murder from another inmate. (Leiker Affidavit, Doc. 47, Ex. 21). Mr. Bose states in his affidavit that he gave Purkey $10.00 or $20.00 dollars a few times, but that Purkey never asked him for the money and it had nothing to do with the information Purkey provided about his son. (Bose Affidavit, Doc. 82, Ex. 13).

In <u>Wong v. Belmontes</u>, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009), defendant alleged that his counsel was ineffective for failing to investigate and present sufficient mitigating evidence during the penalty phase of his trial. The Supreme Court stated:

> To prevail on this claim, Belmontes must meet both the deficient performance and prejudice prongs of <u>Strickland [v. Washington]</u>, 466 U.S., at 687, 104 S.Ct. 2052, [80 L.Ed.2d 674 (1984)]. To show deficient performance, Belmontes must establish that "counsel's representation fell below an objective standard of reasonableness." <u>Id</u>. at 688, 104 S.Ct. 2052. In light of "the variety of circumstances faced by defense counsel [and] the range of legitimate decisions regarding how best to represent a

6

> criminal defendant," the performance inquiry necessarily turns on "whether counsel's assistance was reasonable considering all the circumstances." Id., at 688-689, 104 S.Ct. 2052. At all points, "[j]udicial scrutiny of counsel's performance must be highly deferential." Id., at 689, 104 S.Ct. 2052.

Id. at 384-385. In reviewing the evidence which was presented and considering the evidence which was not presented, the Court does not find that reasonable jurists would disagree that Mr. Duchardt's performance was reasonable considering all of the circumstances. As he explains in his Affidavit, there were specific and strategic reasons as to why he did not call certain witnesses or inquire into matters with other witnesses. The Court finds that the decisions counsel made were based on a well reasoned trial strategy. Accordingly, the Court hereby **DENIES** a Certificate of Appealability on the claim that Mr. Duchardt failed to Adequately Investigate and Develop the Mitigation Case.

### B. Whether An Evidentiary Hearing Should Been Conducted and Whether This Court's Findings are Sufficient to Provide for Meaningful Review

Purkey argues that the Court relied on the 117-page Duchardt affidavit and ignored the 31 affidavits filed by Purkey. He argues that these competing affidavits alone establish questions of fact that cannot be resolved without taking testimony. Purkey argues that in a capital case, establishing a "reasonable probability that at least one juror would have struck a different balance," can only be determined by weighing the full body of mitigation evidence that was presented against that which could have been presented and which might have influenced the jury's decision. Purkey argues that without hearing the mitigation evidence that *could have been* presented, the Court has nothing against which to judge whether, when added to the mitigation evidence actually presented, the full body of mitigation evidence might produce a "reasonable

7

probability" that at least one juror would have voted to spare Purkey's life. Purkey argues that a "reasonable probability of a different result" is thus *less than a preponderance of the evidence.* It is present when an evaluation of all of the evidence that should have been before the jury is "sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 694 (1984). Purkey argues that the Court's analysis was flawed because by concluding that the jury was not swayed by the mitigation evidence that was presented it also would have rejected the full body of mitigation that *could have been* presented. Purkey argues that this reasoning would make it impossible for any capital defendant to prove prejudice. Purkey also argues that the Order is inconsistent because it states at one point that the jury "simply chose not to give any weight to that evidence [mitigating factors] which under the law they are entitled to do." Later in the Order it is stated that "no jurors voted for a single mitigating factor." Purkey argues that neither statement can be made with any certainty because the Verdict form is blank as to the mitigating factors. Purkey argues that this is the only case from the Western District of Missouri in which the jury simply left the form blank as to all the mitigating factors. He argues that this lack of voting on the mitigating factors made it impossible to ascertain what evidence the jury considered to be mitigating, how it may have weighed that evidence and how the full body of mitigating evidence that could have been presented would have been viewed by each individual juror. Purkey then argues that the jury must have had difficulty in returning its verdict because the jury deliberated for nearly eleven hours over the course of two days.

Purkey also argues that the Order denying his § 2255 claims was conclusory and did not discuss any of the specific claims or evidence that should have been offered at trial. He argues that this does not allow the Eighth Circuit a clear understanding of the

basis of this Court's decision.

The Government argues that in this case there is no need for an evidentiary hearing, because Mr. Duchardt provided a very extensive, detailed affidavit. The Government also notes that all of the other cases which Purkey cited are distinguishable. Finally, the Government notes that the length of time the jury deliberated does not necessarily mean this was a close case. The jury was required to deliberate on 37 separate factors (10 aggravating and 27 mitigating) after listening to 31 witnesses testify over the course of several days. The Government also notes that the jury is presumed to follow the court's instructions, so Purkey's complaints that they did not fill in the mitigation form is without merit.

Purkey argues that an evidentiary hearing is required in this case because Mr. Duchardt's affidavit contradicts the affidavit of his co-counsel, Laura O'Sullivan as well as the affidavits of other witnesses. Purkey argues that this was the same situation which occurred in <u>Sinisterra v. United States</u>, 600 F.3d 900 (8th Cir. 2010), and the Eighth Circuit recently remanded that case for an evidentiary hearing. Thus, he argues that because he has shown that reasonable jurists could find this Court's refusal to hold an evidentiary hearing debatable, he is entitled to a Certificate of Appealability on this issue.

The Court disagrees and finds that the issues are resolvable based solely on the record and the pleadings. Purkey argues that the affidavits which he submitted create questions of fact which must be resolved by hearing the testimony of these witnesses. The Court has reviewed the affidavits of these witnesses as well as the affidavit of Mr. Duchardt's co-counsel, Laura O'Sullivan, and find the majority of the affidavits do not create issues of fact. Although some of the affidavits dispute Mr. Duchardt's

9

recollection of events, the Court does not find that these differences are significant. Most of the affidavits are from individuals who state they would have testified in the mitigation phase had Mr. Duchardt called them. For example, Mr. Duchardt states in his Affidavit that Debbie Prothero, who was Purkey's cousin, indicated that she had little recollection of her relationship with Wes and she was in favor of the death penalty. Mr. Duchardt therefore decided not to call her in the mitigation phase. However, in her Affidavit, Ms. Prothero states:

> Being confronted with the prospect of my cousin being executed has really challenged my support of the death penalty. I have prayed about it often. Wes is family, and I have never wanted to see him executed. I spent hours on the phone with Mr. Duchardt, I helped my mother (Marguerite Hotchkiss) write out the details of the dysfunctional family Wes came from, and I maintained close communication with Wes while he was in pretrial confinement and since then. My actions demonstrate how wrong Mr. Duchardt got it. As I previously stated, I would have been more than willing to testify on Wes' behalf. Mr. Duchardt simply never suggested that to me.

(Prothero Affidavit, Doc. 82, Ex. 6). In their affidavits they offer details as to what information they would have provided. However, this additional information would only have added to the *quantity* of mitigation evidence and would not have changed the type or the nature of evidence which was offered. As previously discussed, in the penalty phase of the case Mr. Duchardt submitted 27 mitigating factors[1] and called 18

---

[1] The mitigating factors presented included: 1) Purkey's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired; 2) Purkey committed the offense under severe mental or emotional disturbance; 3) With proper medications, such as the medications which Purkey is currently taking, Purkey's mental illness and behaviors can be managed; 4) Purkey suffered brain injuries as a result of car accidents, drug abuse or both; 5) Purkey suffered significant psychological and emotional damage as a result of the serious physical and emotional abuse of him by his parents; 6) Purkey suffered significant psychological and emotional damage as a result of sexual abuse of him by his mother; 7) Purkey suffered significant psychological and emotional damage as a result of his growing up in a dysfunctional home environment in which alcohol abuse,

witnesses to testify. Purkey argues that the Court's analysis was flawed because by concluding that the jury was not swayed by the evidence that was presented, they would have also rejected the evidence which *could* have been presented. However,

---

sexual promiscuity and incestuous sex were modeled as proper behavior by his parents; 8) Purkey has never received treatment for the psychological and emotional damage which he suffered as a result of his parent's abuse of him; 9) Purkey's past criminal behavior is attributable, at least in part, to the brain injuries and psychological and emotional damage which he suffered earlier in his life; 10) Purkey became dependent upon alcohol and illegal drugs at an early age because of a genetic predisposition inherited from his parents and because such dependence was modeled for him by his parents and his older brother Gary; 11) Purkey's past criminal behavior is attributable, at least in part, to his alcohol and drug dependence; 12) As a child, Purkey suffered from slow speech development, and for his entire life, Wes Purkey has suffered from the disability of stuttering; 13) While incarcerated, Purkey was the victim of serious physical abuse, that is stabbings; 14) While incarcerated, when given the opportunity to do so, Purkey completed a significant number of hours of college coursework; 15) While incarcerated, when given the opportunity to do so, Purkey received training and became qualified as a plumber; 16) Purkey has offered to donate a portion of his liver to his sister-in-law who is dying of liver failure; 17) Purkey should be sentenced to life imprisonment without release because Purkey was led to believe that he would receive that sentence if he provided information regarding the killing of Jennifer Long, and Purkey provided all of the information which was required; 18) The disappearance of Jennifer Long was solved only because Purkey came forward and admitted that he had killed Jennifer Long, and directed authorities to evidence about the killing; 19) By coming forward and admitting that he had killed Jennifer Long, and directing authorities to evidence about the killing, Mr. Purkey has shown remorse for what he did; 20) Purkey has repeatedly expressed his remorse for what he has done; 21) Purkey is the father of Angie Purkey Genail, and the two have carried on a loving, father-daughter relationship, with Purkey providing Angie Purkey Genail advice, nuturance and emotional support, even while he has been incarcerated; 22) Angie Purkey Genail loves her father Mr. Purkey very much; 23) If Purkey is sentenced to life imprisonment without possibility of release, he and Angie Purkey Genail would continue to carry on a loving, nuturing father-daughter relationship; 24) Purkey is the grandfather of Angie Purkey Genails's children Mikey, age 4 and Haley, age 1, and has carried on a loving, grandfatherly relationship, particularly with Mikey, speaking with Mikey on the telephone on numerous occasions; 25) If Purkey is sentenced to life imprisonment without possibility of release, he and his grandchildren Mikey and Haley would continue to carry on a loving, nuturing grandfather/grandchild relationship; 26) Purkey has loving and caring relationships with friends and family, and those relationships would continue if he was sentenced to life imprisonment without possibility of release; 27) In the last three years, Mr. Purkey has volunteered to offer good advice to many young men in trouble about how to avoid a life of crime, and would continue to do so if sentenced to life imprisonment without possibility of release.

the Court finds that there is not a "reasonable probability" that this additional evidence would have swayed at least one juror, because despite carefully filling out all the other areas of the Special Verdict Form, and signing their names below the Certification, not one juror indicated that they found the existence of a single mitigating factor. Purkey argues that it is impossible to tell how the jury weighed the mitigation evidence. However, the Verdict Form clearly states in the instructions: "[f]or each of the following mitigating factors, indicate, in the space provided, the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence." Thus, by leaving all of the spaces blank, the logical conclusion is that none of the jurors found the existence of *any* of the mitigating factors. This conclusion is bolstered by the fact that the jury completely filled out the remainder of the nineteen page Special Verdict Form, finding the existence of six Statutory Aggravating Factors and three Non-Statutory Aggravating Factors. The jury did not find that the Government had established beyond a reasonable doubt the future dangerousness of the defendant.

In Paul v. U.S., 534 F.3d 832 (8th Cir. 2008), cert. denied, 130 S.Ct. 51 (2009), the Eighth Circuit considered a similar argument that an attorney should have presented additional mitigation evidence. The Court rejected that argument stating:

> Viewing Paul's proffer in the context of the trial record as a whole, we are not persuaded that there is a reasonable probability that if Paul's trial counsel had gathered and presented this additional evidence, then the jury would not have selected a sentence of death. Much of the new evidence cited by Paul is largely cumulative of evidence that was presented through his mother at the penalty phase of the trial. Paul's mother testified about Paul's difficult childhood, including the incident in which Paul's father struck Paul in the face with a knife and produced a wound that required extensive surgery. The jury clearly gave weight to her account, unanimously finding three mitigating factors relating to Paul's troubled upbringing. The additional evidence that Paul proffers concerning his compassionate nature is also largely duplicative. Paul's mother testified at trial that he cared for animals, shared a close relationship with

12

his great-grandmother, and supported his family financially.

Id. at 842.

The Eighth Circuit found that the additional witnesses might also have caused negative repercussions for Paul's case. The Court noted that "[n]othing that Paul offers detracts from the government's strong case in aggravation, and the weight of this evidence is a proper and significant factor in considering whether Paul has established prejudice." Id. at 843.

In Purkey's case, the Government also presented a very strong aggravation case. The jury heard testimony describing how Purkey first raped Jennifer Long, then stabbed her several times. Following the murder, he described how he put her body into a tool box and then used a chainsaw to dismember her body, put her body parts in plastic bags and then burned them in a fireplace. Purkey also described how he swept the ashes out of the fireplace and put any remaining bones into the bags and then threw the bags into a septic pond in Clearwater, Kansas. The jury also heard that Purkey confessed to murdering an eighty year old woman with a claw hammer. Additionally, the jury also heard that Purkey had kidnapped and robbed a man in 1980 and then shot him in the back of the head. The jury certainly weighed this strong aggravating evidence against all the mitigation evidence that Mr. Duchardt presented. The Court is capable without a hearing, of weighing the mitigation case which was presented against the mitigation case which could have been presented. The Court has determined that the additional evidence which Purkey argues should have been presented would have been as in the Paul case, largely cumulative to the evidence that was presented. The Court finds that it is not reasonably possible that the testimony of these additional witnesses would have swayed at least one juror to have voted for a life

sentence. Accordingly, the Court finds that reasonable jurists would not find this issue debatable, thus there is no need to issue a Certificate of Appealability on whether the Court Should Have Conducted An Evidentiary Hearing.

### C. <u>Whether Mr. Duchardt's Affidavit Exceeded the Scope of the Privilege</u>

Purkey argues that the District Court should have stricken Mr. Duchardt's affidavit because a) he included more attorney/client privileged communication that what was necessary; b) Purkey was not allowed an opportunity to see the affidavit before it was disclosed to the Government and c) Mr. Duchardt conducted independent legal research and analysis seeking to disprove his former client's legal arguments. Purkey argues that this Court in rejecting his claim that the Affidavit did not exceed the privilege transformed the limited waiver of privilege into a blanket waiver that gave Mr. Duchardt an unfettered license to disclose any and all privileged communications whether relevant to a claim of ineffectiveness or not.

The Government argues that Purkey cites no authority for this Court to strike an affidavit which this Court ordered Mr. Duchardt to prepare. The Government states that Purkey made numerous and detailed claims of ineffectiveness against Mr. Duchardt and the revelations were necessary in order to rebut those charges.

Purkey argues that Mr. Duchardt in his 117 page affidavit did not merely state the facts as he recalled them, but instead made legal arguments aimed at undermining Purkey's § 2255 motion. Purkey argues that 21% of the affidavit is devoted to legal argument about the applicability of the cases and the strength of the arguments cited in Purkey's memorandum. Purkey also argues that Mr. Duchardt disparaged several witnesses who Purkey argues should have been called in the mitigation case. Purkey argues that reasonable jurists could find this Court's ruling debatable and thus he is

14

entitled to a Certificate of Appealability on this issue.

Purkey argues that the Professional Rules and Tasby v. United States, 504 F.2d 332, 336 (8th Cir.1974), cert. denied, 419 U.S. 1125, 95 S.Ct. 811, 42 L.Ed.2d 826 (1975), require the Court to analyze each of Purkey's seventeen specific allegations of ineffectiveness and determine whether each response in Mr. Duchardt's 117 page affidavit was reasonably necessary to answer the allegations. The Court disagrees and does not find anything in the Rules or in Tasby which requires such an exercise. Tasby states, "[w]hen a client calls into public question the competence of his attorney, the privilege is waived." Id. at 336. See also Bittaker v. Woodford, 331 F.3d 715,716 (9th Cir.), cert. denied, 540 U.S. 1013, 124 S.Ct. 536, 157 L.Ed.2d 424 (2003)("It has long been the rule in the federal courts that, where a habeas petitioner raises a claim of ineffective assistance of counsel, he waives the attorney-client privilege as to all communications with his allegedly ineffective lawyer."). Purkey may not like the way that Mr. Duchardt drafted his affidavit or how he framed the issues, but the Court finds that the disclosures in Mr. Duchardt's affidavit were necessary in order to rebut the numerous charges of ineffectiveness raised by Mr. Purkey. Because the Court does not find that reasonable jurists could disagree regarding this issue, the Court will not issue a Certificate of Appealability on this issue.

**D. Failing to Call Dr. Peterson in Rebuttal**

Purkey states that during his interviews with Dr. Peterson in the fall of 2002, he denied kidnaping Ms. Long, telling Dr. Peterson that she had gone with him voluntarily. Before trial, the Court sustained the Government's motion in limine to preclude Dr. Peterson from testifying that Purkey had denied kidnaping Ms. Long. On Nov. 4, 2003, before the court reconvened to begin the defense's case-in-chief, Mr. Duchardt

15

informed Purkey that he had to testify because the defense had nothing else on which to base its argument that there had been no kidnaping. Laura O'Sullivan told Purkey that the Court would strike his entire testimony if he mentioned his statements to Dr. Peterson. On cross, the Government asked Purkey if he had recently come up with a story that he had not kidnaped Ms. Long. Purkey responded, "That's true." Purkey argues that Mr. Duchardt should have rebutted this admission by calling Dr. Peterson to testify in order to rehabilitate Purkey.

The Government argues that as Mr. Duchardt points out in his affidavit, calling Dr. Peterson would have accomplished nothing because there is little significance as to when he recanted his confession. The Government also notes that it was certainly reasonable for Mr. Duchardt to not call Dr. Peterson to refute this allegation, because he did not want to risk jeopardizing Dr. Peterson's credibility during the guilt phase. The Government argues that Purkey is simply trying to second guess Mr. Duchardt's trial strategy.

Purkey argues that Mr. Duchardt did not make a reasoned "strategic" decision whether to call Dr. Peterson in rebuttal because immediately following Purkey's testimony, the court recessed for an offer of proof, followed by a brief discussion regarding the schedule for the next day, followed immediately by Mr. Duchardt announcing that the defense was resting its case in the guilt phase of the trial. Purkey argues that Laura O'Sullivan will testify that she did not recall any discussion after Purkey's testimony about calling Dr. Peterson to testify about the kidnaping recantation. Purkey argues that Mr. Duchardt has come up with his rationalization as to why he did not call Dr. Peterson after the fact, and that he did not consider whether he should have called him during the trial. Because reasonable jurists could find this Court's ruling on

16

this issue debatable, Purkey argues that he is entitled to a Certificate of Appealability.

The Court disagrees. As Mr. Duchardt notes in his affidavit, Purkey had discussions with Dr. Peterson in 2002, which was four years *after* Purkey's statements that he had kidnaped Jennifer Long and only one year *before* the trial. Mr. Duchardt also states that he did not want Dr. Peterson to have to testify regarding this issue because he believed that it might color the juror's perceptions of Dr. Peterson's testimony in the penalty phase of the trial. Mr. Duchardt stated in his affidavit:

> I knew that Dr. Peterson's testimony would be crucial in the penalty phase. The conclusions which Dr. Peterson would offer at the penalty phase were in no way dependent upon the truth or falsity of Wes' denial that there had been kidnapping. In fact, Dr. Peterson would not even testify unless the jury disbelieved Wes, and determined that there was a kidnapping. Had we done what Wes was suggesting, we would have brought Dr. Peterson in the first phase for the sole purpose to relate Wes' denial of the kidnapping. I believed that would have caused jurors to indelibly link Dr. Peterson, and therefore what he would say later, with the truthfulness of Wes' denial of the kidndapping.

(Duchardt Affidavit, Doc. 73, Ex. A, pp. 104-105).

In United States v. Monnier, No. 8:02CR429, 2010 WL 2483885, (D.Neb. June 4, 2010), the Court stated:

> Under Strickland, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. Rodela-Aguilar v. United States, 596 F.3d 457, 464 (8th Cir.2010). The Eighth Circuit has "consistently held that a reasoned decision not to call a witness 'is a virtually unchallengeable decision of trial strategy,' in part because 'there is considerable risk inherent in calling any witness because if the witness does not hold up well on cross-examination, the jurors might draw unfavorable inferences.'" Id. (quoting United States v. Staples, 410 F.3d 484, 488-89 (8th Cir.2005)).

Id. at *8. The Court finds that the decision not to call Dr. Peterson was a strategic decision that Mr. Duchardt made after weighing all of the options. Accordingly, because the Court finds that reasonable jurists would not find this point debatable, the Court

17

hereby **DENIES** a certificate of appealability on this issue.

## IV.  CONCLUSION

Accordingly, for the reasons stated above, the Court hereby **DENIES** Purkey's Motion for a Certificate of Appealability (Doc. # 107).

| | |
|---|---|
| Date:   10/28/10<br>Kansas City, Missouri | **S/ FERNANDO J. GAITAN**, **JR.**<br>Fernando J. Gaitan, Jr.<br>Chief United States District Judge |