# United States Court of Appeals
## For the Eighth Circuit

_____

No. 10-3462

_____

Wesley Ira Purkey

*Movant - Appellant*

v.

United States of America

*Respondent - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: September 20, 2012
Filed: September 6, 2013

_____

Before BYE, GRUENDER, and SHEPHERD, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Wesley Ira Purkey appeals the denial of his motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. We granted a certificate of appealability to review whether Purkey received effective assistance of counsel during the penalty

phase of the trial and whether the district court[1] abused its discretion by denying relief without conducting an evidentiary hearing. We conclude that Purkey's proffered evidence, taken as true, fails to establish that his trial counsel's allegedly deficient performance was prejudicial to Purkey. Therefore, we affirm.

I.

In November 2003, a federal jury convicted Purkey of the interstate kidnap, rape, and murder of sixteen-year-old Jennifer Long. During the penalty phase of the trial, the jury heard evidence on six statutory aggravating factors, four non-statutory aggravating factors, and twenty-seven mitigating factors. The jury found the existence of all six statutory aggravating factors and three of the four non-statutory aggravating factors. The verdict form also contained spaces to record the number of jurors who found the existence of each mitigating factor presented by Purkey. The jury left each of those spaces blank. The jury determined that Purkey should be sentenced to death. We affirmed Purkey's conviction and sentence on direct appeal. *See United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005), *cert. denied*, 549 U.S. 975 (2006).

Purkey then filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 and sought an evidentiary hearing. As relevant to this appeal, Purkey argued that his death sentence should be set aside because he did not receive effective assistance of counsel during the penalty phase of his trial, as required by the Sixth Amendment. With his motion, Purkey submitted a proffer of "new" mitigating evidence including affidavits from several family members, friends, and expert witnesses who testified at trial. Purkey claims that his trial counsel, Frederick Duchardt, failed to perform consistent with objective standards of reasonableness

---

[1]The Honorable Fernando J. Gaitan, Jr., Chief Judge, United States District Court for the Western District of Missouri.

because he failed to adequately investigate and prepare these witnesses. Additionally, Purkey submitted affidavits from several potential witnesses whom Duchardt never contacted during his mitigation investigation or whom Duchardt decided not to call as witnesses. Purkey argues that Duchardt's performance also fell below an objective standard of reasonableness because he failed to call these witnesses during the penalty phase. Before replying to Purkey's motion, the Government requested an order from the district court compelling Duchardt to provide an affidavit responding to Purkey's claims of ineffective assistance. Duchardt prepared a 117-page affidavit, which the Government filed with its response to Purkey's § 2255 motion. Duchardt's affidavit contested many of the facts alleged in the affidavits attached to Purkey's § 2255 motion and provided strategic reasons for not presenting some of the proffered evidence—all challenging Purkey's claim that Duchardt's performance fell below an objective standard of reasonableness.

The district court denied Purkey's § 2255 motion, determining that Duchardt's performance did not fall below an objective standard of reasonableness. The district court alternatively concluded that, even assuming Duchardt's representation did fall below an objective standard of reasonableness, Purkey's proffered evidence did not support a finding of prejudice as required for relief under *Strickland v. Washington*, 466 U.S. 668 (1984). The district court also denied Purkey's request for an evidentiary hearing, concluding that the proffered new evidence, taken as true, provided no basis for finding prejudice. *See Machibroda v. United States*, 368 U.S. 487, 496 (1962) (remanding for an evidentiary hearing because the petitioner would have been entitled to relief if the allegations in his § 2255 motion were true, even if the allegations were improbable).

After the district court denied Purkey's motion for a certificate of appealability ("COA"), Purkey requested a COA from this court. *See* 28 U.S.C. § 2253(c)(1)(B). We granted a COA on the issue of whether Duchardt's performance during the penalty phase constituted ineffective assistance of counsel under the Sixth

Amendment. The COA allows Purkey to challenge three aspects of Duchardt's performance in this proceeding: (1) his alleged failure to adequately prepare and present the testimony of three expert witnesses, (2) his alleged failure to adequately investigate and prepare two mitigating witnesses, which resulted in their testimony being more prejudicial than beneficial, and (3) his alleged failure to adequately investigate and present other mitigating evidence. We also granted a COA to determine whether the district court abused its discretion in denying Purkey's request for an evidentiary hearing.

## II.

"To establish ineffective assistance of counsel, [Purkey] must show that his counsel's performance was deficient, and that he suffered prejudice as a result." *Paul v. United States*, 534 F.3d 832, 836 (8th Cir. 2008) (citing *Strickland*, 466 U.S. at 687). Purkey must establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Wong v. Belmontes*, 558 U.S. 15, 19 (2009) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Cullen v. Pinholster*, 563 U.S. ---, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland*, 466 U.S. at 694). "That showing requires [Purkey] to establish 'a reasonable probability that a competent attorney, aware of [the available mitigating evidence], would have introduced it at sentencing,' and 'that had the jury been confronted with this . . . mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Wong* 558 U.S. at 19-20 (second and third alterations in original) (quoting *Wiggins v. Smith*, 539 U.S. 510, 535, 536 (2003)). There must be a "'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen*, 131 S. Ct. at 1403 (quoting *Harrington v. Richter*, 562 U.S. ---, 131 S. Ct. 770, 792 (2011)).

-4-

During the penalty phase, Duchardt presented a lengthy and detailed mitigation case on behalf of Purkey, with testimony from eighteen witnesses spanning more than two days. The witnesses included Purkey's brother, daughter, and aunt, as well as inmates and religious counselors with whom Purkey had developed relationships while in prison. Each family member testified that, as a child, Purkey suffered significant physical and emotional abuse at the hands of his parents. The evidence established that Purkey's father was an alcoholic who repeatedly assaulted both Purkey and his brother and who eventually committed suicide. His mother, also an alcoholic, humiliated Purkey for stuttering, once throwing a drink in his face while he was having trouble speaking. Purkey's brother, Gary Hamilton, was sexually abused by their mother beginning at age eleven or twelve. Hamilton testified that she forced him to have sex with her in the bathroom on numerous occasions, though he did not know whether their mother also abused Purkey in this manner because the two never discussed it.

A religious counselor testified that Purkey was eager to leave his past behind, which Purkey had demonstrated by renewing his Christian commitments and expressing remorse for his crimes. Duchardt also elicited evidence that Purkey filed a request with the Bureau of Prisons to have his Aryan Brotherhood tattoos removed and attempted to cover up the tattoos on his own using flesh-toned ink. Family, friends, and fellow inmates alike testified that Purkey was a good friend, and that, if he were granted a life sentence rather than death, it would enrich their lives and the lives of his fellow prisoners.

Duchardt also presented testimony from various prison officials and mental health experts. Perhaps the most important evidence Duchardt presented came from two of Purkey's expert witnesses, Dr. Stephen Peterson and Dr. Mark Cunningham, who both testified in detail about the sexual abuse that Purkey suffered as a child. Dr. Peterson testified that Purkey's mother, Velma, sexually assaulted Purkey between ages six and fourteen, teaching him to "sexually stimulate her anally and orally and

Case 4:06-cv-08001-FJG   Document 120-1   Filed 09/06/13   Page 5 of 16
Appellate Case: 10-3462   Page: 5   Date Filed: 09/06/2013 Entry ID: 4072815

. . . washing him in way[s] that were sexualized." Purkey also witnessed his mother "being sexually involved with many of her paramours" after his father left the family household. When Purkey was about fourteen years old, his father began offering to pay for prostitutes for Purkey, "encourag[ing] him to be sexually active well beyond his years and emotional development." According to Dr. Peterson, these experiences rendered Purkey unable to engage normally with anyone in a sexual way and caused him to seek sexual gratification in a "scripted and controlled" manner.

In addition to interviewing Purkey, Dr. Peterson reviewed Purkey's medical and mental health records to corroborate Purkey's account of his past. He located a Kansas State Reception Diagnostic Center report from 1982 that described Purkey as "having a serious personality disorder centered on psychosexual problems of identification," a diagnosis consistent with reports of Purkey's childhood sexual abuse. Dr. Peterson also found within Purkey's records a statement from his aunt, which corroborated Purkey's claims of childhood abuse.

Dr. Cunningham gave similar testimony. He discussed in detail the sexual acts that Velma forced Purkey to perform on her. She had Purkey "rub[] lotion on her . . . stimulat[e] her with a hair brush, penetrat[e] her with a hair brush, [engage in] oral genital sexual exchanges, and ultimately hav[e] intercourse with her." Dr. Cunningham also confirmed that Purkey witnessed his mother having sex with other men in their home. He further testified that it was not unusual for a male to conceal childhood sexual abuse, noting that Purkey's records revealed symptoms of sexual abuse when he was as young as fifteen. Duchardt also called a third expert witness, clinical psychologist Dr. Bruce Leeson, who testified that Purkey had significant frontal lobe damage that affected his ability to control impulsive behavior. He also testified that Purkey had a below-average IQ of 90.

For more than two days, the jury listened to witnesses testify that Purkey is a positive influence in their lives and that society would be better off if he were to

Case 4:06-cv-08001-FJG   Document 120-1   Filed 09/06/13   Page 6 of 16
Appellate Case: 10-3462   Page: 6   Date Filed: 09/06/2013 Entry ID: 4072815

receive a life sentence rather than a death sentence. The jury also heard, in significant detail, that Purkey's parents abused him sexually throughout his childhood, causing him to develop abnormal sexual tendencies. Yet in his § 2255 motion to vacate, Purkey argues that Duchardt failed to present evidence of his childhood sexual abuse and his positive character traits. He also argues that Duchardt's performance fell short when preparing several mitigation witnesses for their testimony.

In Purkey's proffer of new evidence submitted with his § 2255 motion, several witnesses who testified during the penalty phase complain that, although Duchardt contacted them during his mitigation investigation, his investigative techniques were ineffective for various reasons. Hamilton, for example, claims that he withheld material evidence from Duchardt during the mitigation investigation because Duchardt's son was present during their interview. Purkey claims the evidence Hamilton withheld was pertinent to his defense. In his affidavit, Hamilton recalled an incident in which the boys' father slammed Velma's arm in a door repeatedly until it broke, indicating that he would have told the jury about the incident if Duchardt's investigation had been more thorough. Purkey's daughter, Angie Genail, criticizes Duchardt's investigation because he first visited her home for an interview on the day of her wedding and because he failed to follow up when she asked to reschedule. Duchardt only contacted her shortly before trial, never discussing his plan for her testimony, and Genail felt unprepared to testify as a result. If better prepared, Genail claims she would have testified about the many poems, stories, and songs that Purkey has written for her. Marguerite Hotchkiss, Purkey's aunt, felt similarly unprepared and further claims that the circumstances of her testimony, which Duchardt conducted via teleconference, hampered her testimony. Had Duchardt adequately prepared her, Hotchkiss now avers that she would have testified that Purkey's childhood home was unkempt and constantly reeked of liquor and cigarettes from his parents' drinking and smoking and that Velma was a "party girl" with poor parenting skills.

Case 4:06-cv-08001-FJG   Document 120-1   Filed 09/06/13   Page 7 of 16
Appellate Case: 10-3462   Page: 7   Date Filed: 09/06/2013 Entry ID: 4072815

The non-testifying individuals identified in Purkey's proffer of new evidence complain that Duchardt's investigation was defective because he either never contacted them or chose not to have them testify. Purkey's cousin and two of his childhood friends reiterate that Purkey grew up in an abusive home and claim that he is nevertheless a positive influence in their lives. A volunteer prison minister avers that Purkey never caused problems with other inmates and that his "family is still his number one concern." Two family friends, Floyd Bose and Floyd's daughter Dion Lieker, commended Purkey for his role in solving the murder of Floyd's son (Dion's brother) in prison. Bose and Lieker each went on to develop relationships with Purkey, both noting that Purkey was very sorry for his crimes. Lieker especially found Purkey to be compassionate but also unstable because his father "beat the daylights" out of him and because his mother forced him to have sex with her. Dr. Rex Newton, a prison psychologist who knew Purkey in 1987, believed, based on Purkey's behavior in prison, that he had been sexually abused as a child and noted that he would have testified and discussed corroborating evidence if Duchardt had asked him to testify.

Purkey also argues that Duchardt failed to adequately prepare and present the testimony of Dr. Peterson, Dr. Cunningham, and Dr. Leeson. He claims Duchardt should have allowed Dr. Peterson and Dr. Cunningham to testify about Purkey's sexual abuse in greater detail, that Dr. Peterson was not properly prepared to testify because he was aware of additional medical records that corroborated Purkey's claims of childhood abuse and failed to mention them during cross-examination, that Duchardt should have allowed Dr. Cunningham to use a PowerPoint presentation that he prepared to aid his testimony, and that Duchardt should have better prepared Dr. Leeson to withstand the Government's cross-examination.

Finally, Purkey argues that Duchardt failed to adequately prepare Mark Russell and Dr. William Grant, resulting in their testimony being more prejudicial than beneficial. Russell, a correctional counselor at the Bureau of Prisons, testified that

-8-

Purkey was housed in a special cell block while awaiting trial and spent at least twenty-three hours per day in his cell. Dr. Grant, a Bureau of Prisons psychiatrist, testified about the medications he prescribed to treat Purkey's anxiety while awaiting trial. Purkey claims Dr. Grant's testimony was ultimately prejudicial because he characterized Purkey's "anxiety" as "attitude, belligeren[ce], irritab[ility]" in response to a question on cross-examination. Purkey argues that Russell's testimony became prejudicial because he revealed on cross-examination that Purkey was housed in a special unit due to his history of behavioral problems.

All of Purkey's proffered evidence does nothing to establish prejudice as required by *Strickland* because it is entirely cumulative. *See Paul*, 534 F.3d at 843 (holding that the existence of additional but cumulative mitigating evidence "[was] insufficient to undermine confidence in the jury's verdict in the penalty phase"). During the penalty phase, Duchardt presented two days of testimony to support the argument that Purkey would provide a net benefit to society if he were to serve a life sentence. The new evidence about Purkey's positive influence on others adds nothing of substance. Duchardt also presented extensive, detailed evidence from multiple sources about the sexual abuse Purkey suffered as a child. Dr. Peterson testified that Purkey's behavior as early as 1982 suggested a history of childhood sexual abuse. Notably, the Kansas State Reception Diagnostic Center report that Dr. Peterson discussed is the same corroborating evidence that Purkey now argues Dr. Newton could have presented. Purkey's isolated examples of "prejudicial" testimony resulting from Duchardt's alleged failure to prepare mitigation witnesses comprised only a tiny portion of Purkey's case in mitigation. As the newly proffered evidence is entirely cumulative and the examples of "prejudicial" mitigation testimony are insignificant compared to the rest of the extensive case in mitigation, we conclude that Purkey suffered no prejudice, even assuming Duchardt's representation was

-9-

constitutionally defective.[2] *See Hanegan v. Miller*, 663 F.3d 349, 354-56 (8th Cir. 2011), *cert. denied*, 566 U.S. ---, 132 S. Ct. 2393 (2012) (assuming counsel's performance fell below an objective standard of reasonableness but denying habeas relief because petitioner failed to establish prejudice); *see also Cullen*, 131 S. Ct. at 1409 (finding no prejudice where "new" evidence largely duplicated the mitigation evidence presented at trial); *Wong*, 558 U.S. at 22-23 (concluding that additional evidence of the defendant's "humanizing" features would not have affected the sentencing jury's decision); *Bobby v. Van Hook*, 558 U.S. 4, 12 (2009) (finding no prejudice where "[n]either the Court of Appeals nor [the petitioner] has shown why the minor additional details the [fact finder] did not hear would have made any difference").

Even assuming for the purposes of argument that Purkey's filings did present new material evidence, we must assess prejudice by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence" to determine whether "the result of the proceeding would have been different." *Wiggins*, 539 U.S. at 534 (citation omitted). The underlying crime in this case is particularly gruesome, and the Government presented substantial incriminating evidence during the guilt phase, which created context for the aggravation case it later presented during the

---

[2]Purkey spends a considerable portion of his brief arguing that the district court improperly denied his motion to strike Duchardt's 117-page affidavit. Purkey also argues that the Duchardt affidavit made an evidentiary hearing necessary because the affidavit contradicts some aspects of his proffered new evidence and asserts strategic choices that are not credible. The Government moves to strike this portion of Purkey's brief, arguing that Purkey's request to strike the affidavit is outside the scope of the COA. Purkey counters that the question is intertwined with the issues identified in the COA. Because we conclude that Purkey fails to establish prejudice without reaching the only matter addressed in the affidavit—whether Duchardt's performance fell below an objective standard of reasonableness—we need not consider any of the contents of Duchardt's affidavit. As a result, we deny as moot the Government's motion to strike.

Case 4:06-cv-08001-FJG     Document 120-1     Filed 09/06/13     Page 10 of 16
Appellate Case: 10-3462     Page: 10     Date Filed: 09/06/2013 Entry ID: 4072815

penalty phase.  According to Purkey's confession to the FBI, which was largely confirmed by his own testimony during the guilt phase, Purkey drove to Kansas City, Missouri, from his home in Lansing, Kansas, on January 22, 1998, for a job interview with a plumbing company.  After the interview, Purkey smoked half a rock of crack cocaine and began driving down the street when he passed sixteen-year-old Jennifer Long, who was walking on the sidewalk.  He pulled over to ask Jennifer if she wanted to "party," then took her to a liquor store to buy her gin and orange juice.  After buying her the gin, Purkey told Jennifer he needed to go back to his home in Kansas.  She asked to be let out of his truck.  Instead, Purkey reached into the glove box, grabbed a boning knife, and placed it under his thigh, making it clear that he would not let her go.

When they arrived at his home, Purkey took Jennifer into a room in his basement.  Holding a knife, he ordered her to take her clothes off and lie down on the floor, where he raped her.  After Purkey finished raping her, Jennifer told him that she had been a virgin.  He then grew fearful, and as Jennifer tried to escape his house, he grabbed her leg and forced her to the ground.  The two briefly struggled before Purkey became enraged and repeatedly stabbed Jennifer in the chest, neck, and face with the boning knife, eventually breaking its blade inside her body.  When he confessed, he told FBI Agent Dirk Tarpley, "it's not like in the movies.  They don't die right away.  It took her a little time to die."  Purkey then stuffed Jennifer's body into a toolbox, cleaned up the surrounding area, and spent several hours drinking at a bar before driving to Sears to purchase an electric chainsaw.  Over the next few days, Purkey used the chainsaw to dismember Jennifer's body while it was lying inside the box.  Several times, Purkey had to stop and clean the chainsaw to continue cutting the body because it had become clogged with her remains.  At one point, he examined Jennifer's heart, observing two stab wounds.  Once he finished dismembering Jennifer's body, he divided her body parts among several plastic bags and added in leaves and debris from his back yard.  Purkey enlisted his stepchildren to help him clean the basement with bleach.  He then purchased several cords of

wood and began to burn the bags in his fireplace one by one while his wife and stepchildren were away at work and school. To keep the fire hot, he added diesel fuel. Despite these efforts, Jennifer's bones did not burn completely. He crushed the remaining bone fragments with his hands. When he finished burning Jennifer's body, Purkey collected her remains from the fireplace with a wet-dry vacuum and refilled the garbage bags. He then dumped the remains into a septic pond in Clearwater, Kansas.

No one knew about Jennifer's murder until Purkey himself contacted a Kansas City, Kansas police officer while incarcerated in a Kansas state prison for the unrelated murder of 80-year-old Mary Ruth Bales. The jury heard the details of Bales's murder during the penalty phase. Nine months after raping and murdering Jennifer Long, Purkey was employed by a plumbing company. He met Bales when he responded to a service call at her home during the evening of October 26, 1998. Purkey told Bales that his employer charged a great deal for the particular job she needed, and he offered to return later to do the work under the table if she would pay him $70 up front. She paid, and Purkey left, using Bales's money to hire a prostitute and buy several rocks of crack cocaine the next morning. Purkey and the prostitute proceeded to a motel room for several hours, where they had sex and smoked the crack cocaine before driving together to Bales's house. Telling the prostitute that someone who lived in the home owed him money, Purkey went inside with a toolbox from his truck and bludgeoned Bales to death in her bedroom with a claw hammer. Investigators determined that Bales, who had suffered from polio and walked with a cane, died from blunt force trauma resulting from repeated strikes to her skull with the claw side of the hammer. Bales also suffered from defensive wounds on both hands.

After murdering Bales, Purkey stayed at Bales's house for several hours with the prostitute, injecting drugs, smoking crack cocaine, and eating food from Bales's kitchen. The next day, Purkey returned to the house with two gallons of gasoline,

Case 4:06-cv-08001-FJG    Document 120-1    Filed 09/06/13    Page 12 of 16
Appellate Case: 10-3462    Page: 12    Date Filed: 09/06/2013 Entry ID: 4072815

intending to burn it down. He was arrested after a neighbor saw him in Bales's back yard and reported him to the police. Purkey pled guilty to murdering Bales and faced a life sentence in the Kansas penitentiary. In a misguided attempt to avoid serving a life sentence in state prison for murdering Bales, Purkey contacted authorities about the interstate abduction, rape, and murder of Jennifer Long, hoping to serve his life sentence in the relatively more comfortable surroundings of a federal penitentiary.

In addition to the details of Bales's murder and the other evidence related to the circumstances of Purkey's confession, the Government introduced evidence of Purkey's thirteen prior felony convictions, including: first-degree burglary in 1970; robbery and theft in 1976; aggravated escape from custody in 1978; and multiple counts of aggravated robbery, kidnaping, aggravated battery, and firearms violations in 1981. The jury also heard from several additional witnesses during the penalty phase. Gregg Carlberg testified that in 1980 Purkey and his friend kidnaped Carlberg, drove him into the woods, shot him in the head, and left him for dead. Gary Hatfield, a man who was incarcerated with Purkey in Oregon, testified that Purkey raped him at knife-point in a prison kitchen. A prison gang expert explained that Purkey's "Aryan Pride," swastika, and Ku Klux Klan tattoos indicated his involvement with the Aryan Brotherhood. And finally, Jennifer Long's family shared the impact of her death. Her father told the jury, "I can sit here for hours and tell you that he didn't murder her that day, he murdered me"; her mother lamented, "I lost my house. . . . I lost my job. I lost my car. I lost my husband. I lost my will. I lost a lot of great things, but most of all I lost her." After deliberating, the jury found nine aggravating factors beyond a reasonable doubt and determined that Purkey should be sentenced to death. *See Purkey*, 428 F.3d at 746.

In light of the heinous abduction, rape, and murder of sixteen-year-old Jennifer Long and the similarly heinous bludgeoning murder of eighty-year-old Mary Ruth Bales, both committed by someone who also had been convicted of first-degree burglary, aggravated robbery, theft, aggravated escape from custody, aggravated

-13-

battery, and who also kidnaped and tried to kill an innocent bystander and raped a man in prison, we conclude that it is not substantially likely that the jury would have returned a different sentence had Purkey's proffered evidence been presented to it. *See Cullen*, 131 S. Ct. at 1403 (requiring a habeas petitioner to show a "'substantial,' not just 'conceivable,' likelihood of a different result" to establish prejudice (quoting Harrington 131 S. Ct. at 792)). The aggravating evidence is too overwhelming and the "new" mitigating evidence too redundant for us to conclude that even "one juror would have struck a different balance." *See Wiggins*, 539 U.S. at 537; *see also Williams v. Roper*, 695 F.3d 825, 832-33 (8th Cir. 2012) (concluding that the state court reasonably determined that new evidence of the defendant's childhood sexual abuse did not establish prejudice where the state presented overwhelming aggravation evidence); *Paul*, 534 F.3d at 840-42 (affirming the denial of an inmate's § 2255 motion and holding that the inmate's newly proffered evidence was largely cumulative and thereby failed to establish the reasonable probability of a different sentence).[3]

Accordingly, we affirm the district court's denial of Purkey's motion to vacate, set aside, or correct his sentence.

---

[3]Purkey also asks us to reverse the district court because it relied on the arguably incomplete mitigating factors portion of the verdict form to conclude that Purkey failed to establish prejudice. *See Purkey v. United States*, 06-8001-CV-W-FJG, 2009 WL 3160774, at *5 (W.D. Mo. Sept. 29, 2009) ("[O]f the twenty-seven mitigating factors which were presented to the jury, no jurors voted for a single mitigating factor."). However, we review the issue of prejudice *de novo*, *Hamberg v. United States*, 675 F.3d 1170, 1172 (8th Cir. 2012), and we have not relied on the fact that the jury did not record any findings with respect to the mitigating factors in reaching our conclusion that Purkey fails to establish prejudice. On direct appeal, we held that the jury is not required to identify the mitigating factors it may find to exist and that the district court did not err when it accepted the arguably incomplete form. *See Purkey*, 428 F.3d at 763.

Case 4:06-cv-08001-FJG   Document 120-1   Filed 09/06/13   Page 14 of 16
Appellate Case: 10-3462   Page: 14   Date Filed: 09/06/2013 Entry ID: 4072815

III.

Purkey also argues that the district court abused its discretion by denying his request for an evidentiary hearing. No evidentiary hearing is required where "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ." 28 U.S.C. § 2255(b). We review the denial of a § 2255 evidentiary hearing for an abuse of discretion, but this standard is "somewhat misleading . . . because review of the determination that no hearing was required obligates us to look behind that discretionary decision to the court's rejection of the claim on its merits, which is a legal conclusion that we review de novo." *Noe v. United States*, 601 F.3d 784, 792 (8th Cir. 2010) (quoting *Saunders v. United States*, 236 F.3d 950, 952 (8th Cir. 2001)). Thus, when reviewing the denial of Purkey's motion for an evidentiary hearing, we must review the district court's conclusion that the evidence Purkey presented along with his § 2255 motion, taken as true, was insufficient to establish a violation of his Sixth Amendment right to effective assistance of counsel. As explained above, our *de novo* review of the record conclusively shows Purkey is unable to establish prejudice as required by *Strickland*. We therefore hold that the district court did not abuse its discretion by denying Purkey's request for an evidentiary hearing. *See Hill v. Lockhart*, 474 U.S. 52, 60 (1985) ("Because petitioner in this case failed to allege the kind of 'prejudice' necessary to satisfy the second half of the *Strickland v. Washington* test, the District Court did not err in declining to hold a hearing on petitioner's ineffective assistance of counsel claim.").

-15-

IV.

We affirm.[4]

_____

<hr>

[4]We also deny Purkey's belated motion to proceed *pro se*, filed after the case was fully briefed.

Case 4:06-cv-08001-FJG    Document 120-1    Filed 09/06/13    Page 16 of 16
Appellate Case: 10-3462    Page: 16    Date Filed: 09/06/2013 Entry ID: 4072815